UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | DOCKET NO. 5:15-cr-15-1 |
| | ) | |
| vs. | ) | VOLUME II of IV |
| | ) | |
| STEVEN W. CHASE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
SEPTEMBER 14, 2016

APPEARANCES:

On Behalf of the Government:

    REGINALD E. JONES, ESQ.,
    United States Department of Justice
    1400 New York Avenue, NW
    Washington, DC 20005

    CORTNEY S. RANDALL, ESQ.,
    Assistant United States Attorney
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    PETER ADOLF, ESQ.,
    Federal Defenders of Western North Carolina
    129 West Trade Street, Suite 300
    Charlotte, North Carolina 28202

LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

1                        I N D E X

2                SEPTEMBER 14, 2016; VOLUME II of IV
    GOVERNMENT WITNESSES:                              PAGE
3
    DANIEL O'DONNELL
4       Continued Direct Examination By Mr. Jones      117
        Cross-Examination By Mr. Adolf                 129
5       Redirect Examination By Mr. Jones              168

6   JAMES MEADE
        Direct Examination By Ms. Randall              169
7
    DANIEL ALFIN
8       Direct Examination By Mr. Jones                172
        Cross-Examination By Mr. Adolf                 226
9       Redirect Examination By Mr. Jones              259
        Recross-Examination By Mr. Adolf               261
10
    THOMAS BAUGHER
11      Direct Examination By Ms. Randall              264
        Cross-Examination By Mr. Adolf                 278
12
    DANIEL WARD
13      Direct Examination By Ms. Randall              283

14  KEVIN KELLEY
        Direct Examination By Ms. Randall              295
15
    RANDY WALKER
16      Direct Examination By Ms. Randall              299

17  DAVID LYNN BROWNING
        Direct Examination By Mr. Jones                301
18

19                      *  *  *  *  *  *

20

21

22

23

24

25

1                          E X H I B I T S

2       GOVERNMENT EXHIBITS:
        NUMBER                                        ADMITTED
3
        40a  ........................................225
4       40b  ........................................225
        40c  ........................................225
5       41   ........................................214
        47   ........................................197
6       48   ........................................199
        49   ........................................199
7       50   ........................................289
        51   ........................................294
8       52   ........................................293
        53   ........................................291
9       54   ........................................291
        57   ........................................292
10      59   ........................................275
        60   ........................................270
11      61   ........................................266
        64   ........................................296
12      65   ........................................298
        66   ........................................287
13      67   ........................................290
        68   ........................................288
14      70a-d ......................................171
        73   ........................................303
15      81   ........................................203
        94   ........................................209
16
                                  E X H I B I T S
17      DEFENDANT'S EXHIBITS:
        NUMBER                                        IDENTIFIED
18
        1  ..........................................155
19      2  ..........................................157
        3  ..........................................158
20      4  ..........................................238
        5  ..........................................241
21      6  ..........................................250
        7  ..........................................257
22      8  ..........................................258

23                         *  *  *  *  *  *

24

25

1                    P R O C E E D I N G S

2    WEDNESDAY, SEPTEMBER 14, 2016:

3              THE COURT:  Good morning, ladies and gentlemen.  I

4    take it you all have seen the memo I presented responding to

5    the motion in limine by the government and the discussion we

6    had about it yesterday evening.  So we'll move along unless

7    there is something else for the Court.

8              MS. RANDALL:  Your Honor, we just want to kind of

9    clarify the ruling to make sure we understand the parameters,

10   if that's okay.

11             THE COURT:  All right.

12             MS. RANDALL:  The way we read your ruling, Your

13   Honor, is that we understand, the defense or the government,

14   what evidence is admissible is basically that the government

15   did in fact monitor the website for a short time afterwards.

16   That's going to include talking about the log files,

17   monitoring activity.  But that neither side can get into

18   things such as the number of posts that were added, the number

19   of new users that were added.  Basically a lot of the

20   information that the defense put in their "Outrageous

21   Government Conduct Motion" where they allege that the

22   government improved the website or that, you know, some of the

23   other allegations that they made in there about posts and

24   images continuing to be added.

25             THE COURT:  That's correct.

1           MS. RANDALL:  If it's just about identification, it
2   should really just be limited to the IP logs and the servers.
3           THE COURT:  I think the memo is clear on that point.
4           MS. RANDALL:  I just wanted to make sure, I guess,
5   we understood your memo and that we don't get into something
6   inappropriate.
7           THE COURT:  Well, we're not going to try the
8   government should there be anything triable related to that
9   conduct.  We are allowing it in for what is relevant to the
10  case at hand, in particular the defense's posture relative to
11  the means and possible success of identifying users of the
12  website.
13          MS. RANDALL:  Okay.  I think that helps us, Your
14  Honor.  Thank you.
15          THE COURT:  All right.  Thank you.
16          May we have the jury, please.
17          MS. RANDALL:  My co-counsel is going to step out and
18  inform the witness of the rulings.
19          THE COURT:  All right.  Very well.
20          (The jury was returned to the courtroom.)
21          THE COURT:  Good morning, members of the jury.
22          THE JURY:  Good morning.
23          THE COURT:  All jurors appear to be settled,
24  bright-eyed and bushy-tailed, as my army commander used to
25  say.

 1      We'll continue with the Government's case.  You may

 2  call your witness.

 3           MR. JONES:  The Government calls Special Agent Dan

 4  O'Donnell, Your Honor.

 5           (Witness resumes the stand, previously sworn.)

 6      DANIEL O'DONNELL, GOVERNMENT WITNESS, PREVIOUSLY SWORN

 7                CONTINUED DIRECT EXAMINATION

 8  BY MR. JONES:

 9           THE COURT:  You're still under oath, sir.

10           THE WITNESS:  Yes, sir.

11           THE COURT:  Thank you.

12  Q.   Good morning, Agent O'Donnell.

13  A.   Good morning.

14  Q.   When we left off yesterday you were testifying in regards

15  to one of the administrators, alleged administrators of the

16  website, Isabella?

17  A.   Correct.

18  Q.   We were -- we just want to pick up where we left off.  We

19  left off at United States Exhibit 30.  I want to show you that

20  again and just have you, just for the jury's sake, just go

21  back through 30 and just kind of explain this posting.

22  A.   So this post was made in the "General" category, the

23  "Request" section.  It's entitled "Blonde BJ ID Request," that

24  was posted by the user Zovny on February 2, 2015.  It was read

25  703 times.  The text states:  "Hi.  Anyone knows the film name

1  or where I find."

2  Q.   If you could read the reply starting with "That would

3  be."

4  A.   Then there's a reply made on February 3, 2015, by the

5  administrator Isabella who states:  "That would be this one.

6  I'll work on posting part one and two."

7  Q.   Okay.  Could you read that second reply by, I think,

8  that's Zovny?

9  A.   Yes.  So this is the reply to the above post that states:

10 "Thank you very much Isabella.  The preview very useful for

11 me.  I found the film and I downloaded to it.  Do part two

12 only lesbian."

13 Q.   Okay.  Let's move now to U.S. Exhibit 31.  If you would

14 just walk the jury, like you did 30, through this thread.  One

15 second.  Okay.

16 A.   So this is a post to the "Preteen Photos" in the "Girls

17 Hard Core" section.  It's entitled "Puppy."  And it was posted

18 by the user Cecco, C-e-c-c-o, on December 31, 2014, with the

19 text:  "I only have these nine pics.  Hope some have more.

20 Puppy named as found."

21 Q.   How many times was this read?

22 A.   This was read 26,638 times.

23 Q.   Okay.  Let's just walk through.  Could you read from the

24 replies as we scroll through?

25 A.   So these initial replies, the first one's from a

1   different user the same date states:  "Thank you very much."

2   "Thanks pretty little pus."  The next one says:  "Thank you".

3   Great close-up of her.  Yummy pussy.  Thank you Cecco.

4   Karma."  "Nice girl.  I only miss her face.  BTW," which in

5   this context would stand for by the way, "her clothes

6   especially panties are in perfect color."  And the original

7   user replies stating:  "Those pics -- looks like she's newer."

8   Sorry, I think it's spelled wrong.  "Those pics looks like

9   she's newer been faced I don't know and yes her pants, face,

10  color and body makes me fucking hard."  Next one states:

11  "Thank you."

12  Q.   Okay.  And if you could just describe the posts under it.

13  A.   This post at the bottom, I believe, part of it is cut off

14  on the screen capture, but it contains certain images

15  depicting prepubescent female being vaginally penetrated by a

16  male's penis.  There's a preview link in the link to the full

17  files.

18  Q.   And who -- if you can look you see preview link and

19  password.

20  A.   Correct.

21  Q.   Who posted this thread?

22  A.   So this one appears to have been posted by the user

23  Isabella.  That's that particular user's password, both there

24  and in the right hand corner of the post.

25  Q.   Okay.  And that's fine.  I think you could see the

1    rest -- remainder are just replies.  What about that last one.

2    If you could look at last one we have now.

3    A.   So this last post, again, is by the administrator

4    Isabella on January 11, 2015, who states:  "My post has been

5    re-upped enjoy."

6    Q.   What does -- based on your training and experience, what

7    is re-upped?

8    A.   Typically, since most of these full files were hosted on

9    external websites the links would not stay active for all that

10   long, depending on the type of website.  So when other users

11   would try to download the files, if they weren't there or the

12   link was no longer working, then the other users would repost

13   it and it was just turned either -- sometimes they would call

14   it reposting but other times they would just say they re-upped

15   it and that just meant that there was a new link or the link

16   was refreshed.

17   Q.   Okay.  All right.  Now turning to Government

18   Exhibit 32 -- that's 31.  If you would just walk the jury

19   through this thread as well, starting with the title.

20   A.   So this was entitled, "9yo" -- again, nine years old.

21   "Australia UA Requested."  In the "Preteen Videos Girls Hard

22   Core" section.

23   Q.   Again, what does "Requested" mean?

24   A.   In this context typically it would mean that another user

25   had made a specific request and this user was responding to

1    that request.

2    Q.    Okay.

3    A.    So this particular post was made on December 21, 2014, by

4    the administrator Isabella.  And there's text that states:

5    "Here is the video as requested."

6    Q.    How many times was this thread read as well?

7    A.    This was read 25,602 times.

8    Q.    Would you briefly describe what is depicted for the jury?

9    A.    So this is a contact sheet or a preview image of what the

10   full files would contain.  This is approximately 16 images

11   depicting a prepubescent or early pubescent female, several of

12   which appear to contain child pornography depicting the

13   female's vagina.

14   Q.    If you would read some replies to the posting.

15   A.    First replies says:  "Thanks Isabella."

16         The next two says:  "Thanks.  Good vid.  Very hot.

17   Beautiful.  Thank you very much Isabella.  Great video Karma.

18   Yes.  Thank you.  Lovely."

19         The next is in a foreign language.  The next:  "Wow, nice

20   post Isabella.  Now that's a type of girl I wouldn't mind

21   running into in the outback.  Thanks Isabella.  But I would

22   guess this little honey is more likely to be 12 to 14 than 9.

23   Still quite fapable, though."

24         Then the administrator Isabella responds to the above

25   post stating:  "I didn't name it.  I'm just sharing what I

1  have."

2      The next reply:  "Is this not Liz Griffis?  I've seen at

3  least one more vid of the same girl.  And, yes, definitely not

4  9 years old.  Ain't no complaints here, just saying, thanks."

5  Q.   All right.  Moving now to Government Exhibit 33.  Walk

6  the jury through this post as well.

7  A.   This was a post to the "Preteen Videos Girls Hard Core"

8  section of the site entitled:  "Mask girl.  Dildo."  With some

9  letters and numbers in parenthesis.  The post was made on

10 November 19, 2014, by the administrator Isabella.

11 Q.   How many times was this post read?

12 A.   17,367.

13 Q.   If you could just walk the jury through that you just

14 described, briefly this photo.

15 A.   So this is another contact sheet with several images, 12

16 to 16 images that appear to depict a prepubescent or early

17 pubescent female including those images depicting her legs

18 spread with her vagina being penetrated by a foreign object.

19 Q.   Just read a few of the replies, starting with the first

20 one.

21 A.   The first reply:  "Dan, I wish that little sweetheart

22 would let me give her my real cock.  I would love to send some

23 of my cum gushing into that young snatch.

24     "Something about this girl brings out my primal urges to

25 fuck or fap.  T-Y.  Great post.  Karma.

1    "This video has most erotic audio in any CP or non CP

2    video I have seen."

3    Q.    Let's turn now to Government Exhibit 34.

4    A.    So this post was made in the "Preteen Photos Girls Hard

5    Core" section of the site entitled: "PlayPen Chat.  Pedo Chat

6    Girl."  That was made by the administrator Isabella on

7    September 19, 2014.

8    Q.    How many times was this posting read?

9    A.    19,202.

10   Q.    Briefly walk the jury through what is described in this

11   one.

12   A.    So the text states:  "I put out a request and someone

13   very generous provided a pic for PlayPen chat.  So here she is

14   along with the original pedo chat girl."

15   Q.    Just briefly read a few of these replies, as well.

16   A.    The first reply:  "Thanks friend but I must admit your

17   little girl is much more delicious looking.  I envy your

18   tongue."

19       The next:  "I have more they pics pedo chat and long

20   clip."

21   Q.    I think that's enough of that.

22       Agent O'Donnell, you also had the opportunity to document

23   undercover sessions for this -- one of the site's global

24   moderators "Stretch Armstrong."

25   A.    Correct.

1    Q.    I'm showing you what's been marked as Government

2    Exhibit 35.   If you could just walk the jury -- if you could

3    just walk the jury through as you did for the PlayPen user as

4    well as the PlayPen administrator and Isabella administrator,

5    walk them through the Stretch Armstrong global moderator

6    profile page.

7    A.    So this is another screen capture of that profile page

8    for this particular user.   In the left hand side his username

9    "Stretch Armstrong," his position on the site is global

10   moderator.   And then, again, options to either send him a

11   message or view his statistics and posts.

12        In the center of the page the total number of posts made

13   by this user, which was 809.   He was thanked 612 times.   No

14   age provided.   Registered to the site on November 13, 2014.

15   Local time as recorded by the site.   And then the last date

16   active, which at the time of this screen capture was that day.

17   And then below that is his file and downloading passwords.

18   Q.    All right.   Showing you now what has been marked as

19   Government Exhibit 36, Stretch Armstrong's stats page.   Just

20   walk the jury briefly through his stats page.

21   A.    So this is, again, the statistics page that you would go

22   to by clicking on the "Show Stats" from the previous page.

23   The first category with the general statistics.   The total

24   time spent on line, again, is the cumulative amount of time

25   this user had spent from the day he registered to the date of

1   the screen capture.  So that total time was over 22 days, 13

2   hours.  Then the total number of posts, 809 posts.  And 67

3   topics that were started by this user, who created no polls

4   and casted 12 votes.

5       The next section is the timeline for when his posts were

6   made throughout the day.  And then the bottom categories are

7   the specific sections of the board where he made his posts.

8   Q.  All right.  Showing you now what has been marked as

9   Government Exhibit 37.

10      And as you did with the PlayPen administrator, as well as

11  Isabella, walk the jury through this thread by Stretch

12  Armstrong.

13  A.  So this post was made in the "Web Cams Girls" section of

14  the site entitled:  "You now Brook.  Brand new clip.  File

15  links updated."

16  Q.  How many times had this thread been read?

17  A.  I believe 33,071 times.

18  Q.  Okay.

19  A.  So this post was made by the global moderator Stretch

20  Armstrong on January 20, 2015.  The text states:  "Found this

21  about a month ago and decided it was time to share with you

22  guys.  Takes them a few minutes to get going and while there

23  are more explicit cams out there.  I don't think you'll find

24  two hornier girls, especially the one on the left.  They want

25  it bad."

1   Q.    Okay.  Now, were you able to click on those links and

2   download this thread?  I mean, download this video?

3   A.    Yes.

4   Q.    I am going to show you, just for a few seconds, the

5   video.  If you could just briefly describe for the jury.

6   A.    So this video at this particular time depicts two

7   prepubescent or early pubescent females in front of a camera.

8   Q.    If you could just go down -- how many -- if you could see

9   that -- just briefly describe what that -- I know it's kind of

10  hard to see.  If you can see if you could just briefly

11  describe for the jury the following users.

12  A.    So this section of the post just contains the number

13  of -- the specific users who thanked Stretch Armstrong for

14  this particular post above.

15  Q.    Okay.  And does it show -- all right.  We'll read a few

16  of the replies if you can -- okay.

17       All right.  We're moving down now to Government

18  Exhibit 38 -- I'm sorry, 39.  As you did with 38, if you could

19  briefly describe the thread for the jury, please.

20  A.    So this post was made in the "General" category in the

21  "Request" section entitled:  "AMCRZ set-2 cool girls."  The

22  post was made on January 24, 2015, by the user "Project 777."

23  I believe it was read over 4,600 times.  The text on the

24  original post says:  "Please post.  AMCRZ set-2 cool girls."

25  Then there's a link below that.

1    Beneath that post is a reply by the global moderator

2    Stretch Armstrong on January 24, 2015, who states:  "Don't

3    know about the pics but here's an awesome video clip of the

4    young one getting a little vibrator play from her stepdad or

5    someone."  And then there's a link there to a particular page

6    within the PlayPen website.

7    Q.   Were you able to download this link within a particular

8    page of the PlayPen website?

9    A.   I went to that site -- or that section and then

10   downloaded the material, yes.

11   Q.   Just briefly showing you what's been marked as U.S. 39a.

12   A.   So this is a screen capture containing -- a screen

13   capture of a contact sheet containing numerous images of a

14   prepubescent or early pubescent female including those with

15   her legs spread exposing her vagina which appears to be

16   penetrated by a pink object.

17   Q.   Okay.  Agent O'Donnell just briefly for the jury explain

18   your -- why you documented sessions on -- specifically on the

19   PlayPen, Isabella, and Stretch Armstrong.

20   A.   So part of our standard procedures in these types of

21   investigations are to identify the facilitators, the

22   administrators, and the hierarchy of the particular websites.

23   So that includes conducting undercover sessions, as well as

24   other activity on these users.  So in this case it was my job

25   to identify the particular administrators and moderators on

1   the site, and then document the examples of their activity on

2   the site and to preserve that evidence.

3   Q.   And your activity in documenting the site, just briefly,

4   again, just walk the jury, you know, how you were able to do

5   this in creating a fake name so they understand.

6   A.   So I generally use a variety of ways to document.  With

7   these screen captures, it's a program called "Snag It," which

8   is just a software program that allows you to essentially take

9   a picture of what you're looking at on your screen.  I'll

10  also, in certain circumstances, use a video capture that's

11  actually recording step-by-step of what I do, as well as

12  downloading using a web browser so that I can preserve the

13  page in its entirety.

14  Q.   Was it possible -- is it possible for anyone to create a

15  fake user account and log in to PlayPen as you've done?

16  A.   Anyone who had access to the home page could register and

17  create an account with a username and password.

18  Q.   Okay.  Now -- and those exhibits that we just went

19  through, Exhibits 1 through 39, that's exactly what any other

20  user on the PlayPen website would go through upon accessing

21  the site.  There was nothing special what you did to those

22  exhibits?

23  A.   No, after registering to the site, a user would have

24  access to that home -- the index page, and then the individual

25  topics, and posts, and threads within the website.

1          MR. JONES:  Okay.  No further questions from the

2     Government, Your Honor.

3          THE COURT:  All right.  Cross-examination.

4          MR. ADOLF:  Yes, Your Honor.

5                    CROSS-EXAMINATION

6     BY MR. ADOLF:

7     Q.    Special Agent O'Donnell, good morning.

8     A.    Good morning.

9     Q.    I'm Peter Adolf.  I'm here representing Mr. Chase.  I

10    have questions for you.  If I ask anything that's unclear or

11    confusing, let me know.  I'll try to straighten that out.

12    A.    Yes, sir.

13    Q.    I may need to show you some of the government exhibits

14    you've already identified.  I'm just going to ask the

15    government.  If I do for some reason need to pull up an

16    exhibit of child pornography, I'll ask them not to show that

17    to anybody so we can zero in on the parts I'm talking about

18    and just deal with that.  So I may stop it sometimes and

19    consult with the government briefly out of your hearing.

20    A.    Yes.

21    Q.    Now, sir, you talked yesterday about the types of cases

22    that you have worked on during your career.  And you talked

23    about -- not just websites, not just child pornography posters

24    and users, but also people who traffic in children,

25    abductions, other kinds of crimes involving children as well;

1  is that right?

2  A.   Correct.

3  Q.   And your concern in any case when you are investigating,

4  trying to find somebody who is involved in looking at child

5  pornography, or uploading it or downloading it, is that that

6  person may be a pedophile.

7  A.   I mean, my role as a case agent is to investigate child

8  pornography networks.  So whether that's a possessor, a

9  distributor, advertiser, producer, it runs the entire

10 spectrum.

11 Q.   And -- but your concern when you are trying to find a

12 particular individual, so forth, is that you're not -- you may

13 not just be dealing with somebody who is just looking at child

14 pornography on the internet, you may be dealing with someone

15 who also has abused or is abusing children in real life.

16 A.   That's certainly a possibility, yes.

17 Q.   Now, in this case you were aware that Mr. Chase was

18 arrested.

19 A.   Yes.

20 Q.   And that was -- we saw a bunch of exhibits that you

21 created when you created a user account logged into PlayPen.

22 A.   Correct.

23 Q.   And those were all made actually before -- while the

24 website was still out there and running, before Mr. Chase or

25 anybody else had been arrested in this matter, correct?

1    A.    That's correct, yes.

2    Q.    And it's now been a period of time, about a year and a

3    half, I guess, since that arrest.

4    A.    Yes.

5    Q.    And you just told us your concern that folks who look at

6    child pornography on the internet may also be abusing actual

7    children.

8    A.    That's always a concern in these types of investigations.

9    Q.    Always a concern.  And so, of course you learned in the

10   course of both before and after the arrest of Mr. Chase that

11   his wife had just died a couple years ago, right?

12   A.    I didn't know much about Mr. Chase's personal family

13   issues.  That wasn't part of my role in this case.

14   Q.    Well, you've been working on this case now for what, two

15   years?

16   A.    Well, I transferred out of that unit in January.

17   Q.    Okay.  So you were working on the case at the time the

18   government was trying to find the website and then when the

19   people involved in this case right now were arrested, right?

20   A.    Yes.

21   Q.    And then onward for almost a year?

22   A.    Approximately, yes.

23   Q.    And you conferred with other members of the team that

24   were working on the PlayPen case?

25   A.    Yes.

1  Q.   Including Agent Alfin -- I'm sorry Special Agent Alfin

2  sitting at the table over there.

3  A.   Yes, sir.

4  Q.   And you learned that there's no accusations from

5  neighbors, family members, local schools or anything that he's

6  ever been accused of abusing an actual child, correct?

7  A.   I don't have any direct knowledge of that, no.

8  Q.   Well, you talked to other members of the team in the year

9  and a half or whatever it was you were working on the case,

10 right?

11 A.   Yes.

12 Q.   Including before and after Mr. Chase was arrested.

13 A.   Correct.

14 Q.   And you have no knowledge that anyone's ever made that

15 kind of accusation against him, right?

16 A.   Not that I know of, no.

17 Q.   Now you talked yesterday about the Tor network and the

18 way that it operates in certain ways.

19 A.   Yes.

20 Q.   Now, of course you're aware that the Tor network can used

21 for legitimate reasons.

22 A.   It can be, yes.

23 Q.   In fact, it was the government that built the Tor

24 network; isn't that right?

25 A.   I'm not familiar with the whole history of it.  But there

1    were parts of it that the government designed, the original

2    format.  But I'm not an expert in that area.

3    Q.   Well, you know that it was, for instance, it was the --

4    it was actually the Naval Criminal Investigation Service that

5    invented Tor so that law enforcement officers could

6    communicate with each other across distances without --

7    A.   No, I don't think that's correct.  I don't think the NCIS

8    had anything to do with Tor.

9    Q.   It was, in fact, Naval investigations, though, right?

10   A.   I believe DARPA, the research element of the military had

11   some role in it.  But I don't believe it had anything to do

12   with NCIS.

13   Q.   Well, you are aware that there are still several

14   government employees whose job it is to update Tor and keep

15   working on it even to this date.

16   A.   I'm not familiar with how, which parts or which sections

17   of the government have anything to do with Tor.  As far as I

18   know, Tor is a non-profit that is overseen by the Tor project.

19   Q.   Now, the Tor browser itself you said is something that

20   anybody can download.

21   A.   It's available for anybody to download, correct.

22   Q.   So putting it on one's own computer would be no different

23   than putting Internet Explorer on it or regular Firefox or

24   Safari or the other browsers that you talked about.

25   A.   The user would still have to download the program.  It

1    wouldn't come installed on a computer like, say, Explorer used

2    to be.  But certainly anybody with internet access could

3    download the browser bundle.

4    Q.    It looks pretty similar when you open it up.

5    A.    Roughly similar to other browsers, yes.

6    Q.    Now, you talked yesterday about some of the details of

7    what the website said on it as far as warnings to users, rules

8    and so forth.

9          Now, you're familiar with the fact that there are

10   websites, both legitimate and illegitimate on the internet

11   that advertise on other websites.

12   A.    Yes.

13   Q.    For instance, there are some websites where if you click

14   on links you will get pop up ads for websites that you didn't

15   know anything about that are trying to get you to go to their

16   website.

17   A.    It's certainly a possibility, yes.

18   Q.    What -- now once you -- you told us that you actually

19   created a -- an account on PlayPen so that you could be a user

20   and see what was going on on the website and create the

21   exhibits that we've seen since yesterday, right?

22   A.    Yes, sir.

23   Q.    And you recall that there was something saying that --

24   for when users first logged in saying that this website is

25   never going to send you email.

1   A.   Correct.

2   Q.   And that was for security reasons to maintain anonymity

3   at both ends.

4   A.   The primary purpose, yes.

5   Q.   Are you aware -- oh, and you're aware that after

6   Mr. Chase was arrested, the government actually ran that

7   website for a period of time?

8   A.   I'm aware of that, yes.

9   Q.   Either before or after Mr. Chase's arrest, while it was

10  just running, how ever it was running, and when the government

11  was running it, did this website ever send out pop-ups to

12  other websites?

13  A.   No, not that I'm aware of.

14  Q.   Did it ever -- were there ever any legitimate websites

15  where there were advertisements on the site to come use

16  PlayPen?

17  A.   That -- that the government created?

18  Q.   Or that were on there before the government took it over.

19  A.   I'm confused by the question.  If you could ask it again.

20          THE COURT:  Well, that's a compound question.  Go

21  with one element at a time.

22          MR. ADOLF:  I'm sorry.

23  Q.   Back when you were just acting as a user on the site

24  gathering information about it, were you aware of

25  advertisements on any other websites in the world, such as the

1  banners you see on the side of Google when you do a search, or

2  ESPN when you're looking at sports scores advertising for

3  PlayPen?

4  A.   There were other -- as I mentioned yesterday -- the

5  hidden wiki type sites for the Hard Candy sites that contained

6  indexes of hyperlinks to various hidden services for child

7  pornography and child erotica, certainly the PlayPen URL was

8  listed on that particular hidden wiki page.

9  Q.   So what you're saying is other people had found the

10  PlayPen website, obviously, because it had tens of thousands

11  of users as you testified to, right?

12  A.   Correct.

13  Q.   And some of those people would post somewhere else,

14  basically, "Look, I found this website, PlayPen.  You should

15  check it out."  And there would be a link to it.

16  A.   It's certainly possible that other users had posted a

17  link in other parts of either the Tor network or the internet

18  in general.

19  Q.   And the reason that people would want to see those is

20  because otherwise there's no way to find these websites,

21  right?

22  A.   You would have to know that specific URL to access the

23  site, yes.

24  Q.   Google search, Bing search, whatever, is not going to

25  come up with anything.

1    A.    If somebody had posted it on -- for lack of a better

2    term -- the regular internet, the website and you Googled it,

3    there's a possibility you could find the URL that way.

4    Q.    But from the rules you showed us on the website that you

5    would have to see as any user, whoever was running it was

6    trying to avoid that, trying to keep it secret.

7    A.    I wouldn't say that's correct.  The administrator running

8    the site, the purpose of running the site is to obtain

9    membership and allow users to register and sign in and access

10   and post material to the site.

11   Q.    It wasn't advertised anywhere outside the site, right?

12   A.    Well, it was certainly posted on the Hard Candy hidden

13   wikis.

14   Q.    By other users?

15   A.    I don't know who posted it on there.

16   Q.    Now, the main thing you told us about the Tor network

17   yesterday that makes it different from the ordinary internet

18   is that if you do things properly on it, if you are using the

19   correct browser, at the other end if you're running the site

20   correctly it maintains anonymity at both ends.

21   A.    That's the intent of it, yes.

22   Q.    And what that means is, if you are a user and you log

23   into that website going through Tor, the website doesn't know

24   where you are or who you are.

25   A.    Generally speaking that's correct.

1    Q.   Now, you told us about the server that -- I think you

2    told us about the server where this website actually sat.  The

3    computer that it actually sat -- where the data was stored

4    which is in Lenoir.

5    A.   I don't believe I testified as to the server location of

6    the website.

7    Q.   Well, you're aware of what the server location was,

8    right?

9    A.   I'm aware generally where it was, yes.

10   Q.   Well, you know that it was at a company called

11   CentriLogic.

12   A.   I'm aware of that, yes.

13   Q.   And CentriLogic is a legitimate data storage company.

14   A.   As far as I know, yes.

15   Q.   What they do is, they have stacks of servers that are air

16   conditioned cooled in a building somewhere and companies pay

17   them money to store their data on it.

18   A.   That's my assumption, yes.  I didn't have any direct

19   interaction with the company.

20   Q.   But you're aware from talking to other agents, from being

21   involved in this investigation for whatever it was, a year and

22   a half, that that is a business like any other business that

23   hosts websites from hundreds of thousands of legitimate

24   businesses.

25   A.   To my knowledge, yes.

1    Q.    And those kinds of servers -- CentriLogic, obviously a

2    commercial service that rents space to people, they don't

3    know, necessarily, what's on all the servers, right?

4    A.    Not necessarily, no.

5    Q.    They don't know that somebody might be storing child

6    pornography on it.

7    A.    Again, I'm not familiar with exactly how that company

8    operated but that's certainly a possibility.

9    Q.    Well, the way that these companies generally work, they

10   have ordinary servers, they just have more storage capacity

11   and better equipment than is available to say a small business

12   or an individual and so you host your website there instead

13   of --

14   A.    Generally speaking for ease of use, et cetera.

15   Q.    And those kind of servers like most normal servers keep

16   logs of the activity on the server, right?

17   A.    Again, it's depending on the company itself.  It's

18   certainly possible that companies keep logs.  There's no --

19   not necessarily a requirement that logs are kept, but -- so I

20   would say it's company specific.

21   Q.    Well, logs are kept in this case.

22   A.    I had -- my role in this case was not to review the

23   server logs.  So I don't have any direct knowledge of what was

24   on the server or what wasn't.

25   Q.    Well, when you say "direct knowledge," you're aware as

1   you sit here from working on the case and talking to the other

2   agents, and so forth, that when the government found the

3   server and seized it, there were logs on it showing whenever

4   somebody logged in, whenever did anything, there were logs

5   that in an ordinary server if it working on the ordinary

6   internet would show where they were.

7           MR. JONES:  Your Honor, I believe the witness

8   already answered this question.

9           THE COURT:  Overruled.

10          THE WITNESS:  I believe there were some sort of logs

11  on there.  But, again, I don't know what those were.  That

12  wasn't part of my role.

13          MR. ADOLF:  If I could pull up -- I'm going to ask

14  the Government to pull up Exhibit 2.  I don't believe there is

15  contraband on there, but --

16  Q.   If you could look on your screen at Exhibit 2.  That's

17  the agreement that you have to look at and click that you

18  agree on it before you set up an account on PlayPen; is that

19  right?

20  A.   That's correct.

21  Q.   And I guess there's one line in all caps, then there's

22  another line -- a single line, then there's a paragraph,

23  another line, in the middle there's some text that says, "Spam

24  flooding, advertisements, chain letters, pyramid schemes, and

25  solicitations are forbidden on this forum," correct?

1   A.   Right.

2   Q.   Advertisements are forbidden, right?

3   A.   I'm sorry.

4   Q.   Advertisements, what it says, advertisements --

5   A.   Yes, that's included on there.

6   Q.   You can take that down.  Thank you.

7        Now you identified a bunch of child pornography that

8   different users had posted on the website both this morning

9   and yesterday.  Do you recall doing that?

10  A.   Yes.

11  Q.   The exhibits I have -- exhibit numbers I have included

12  Exhibit 7, 8a -- I'm not asking the government to pull these

13  up right now, 7, 8a, 8, 13, 30, 31, 32, 33, 34, 37, 39a.  Do

14  you recall identifying those exhibits and displaying the

15  pornography on there to the jury yesterday and today?

16  A.   Yes.  I don't have the exhibits in front of me but that

17  sounds correct.

18  Q.   None of those were posted from the PlayPen account, were

19  they?

20  A.   I don't know which -- I believe there were child

21  pornography images that we displayed that I testified about

22  that were posted by the PlayPen user.  I don't know what

23  specific exhibit numbers those were.

24  Q.   We saw a lot this morning from Stretch Armstrong, I guess

25  it was.

1          MR. JONES:  Your Honor, if he would like to show the

2    witness the exhibit list and what he's referring to, we're

3    happy to oblige.

4          MR. ADOLF:  That's fine.  I'll just move along.

5    Q.   Now, you also showed us how you were able to capture how

6    the particular user who had posted a particular image and data

7    about that user.

8    A.   Correct.

9    Q.   And that included how many times that user had posted,

10   right?

11   A.   How many -- there were sections on the site that recorded

12   how many total posts a particular user had made.

13   Q.   Some of them were over 100 times.

14   A.   That's correct.

15   Q.   Now, you've worked on these cases for a number of years,

16   right?

17   A.   Yes, sir.

18   Q.   And you've seen the same images over and over again

19   through these investigations very often; is that right?

20   A.   I think some cases, yes.

21   Q.   When someone is posting 100 times, that doesn't mean they

22   have taken 100 pictures of a child somewhere, or necessarily

23   that they've taken 100 videos of a child somewhere, right?

24   A.   Not necessarily, no.

25   Q.   Very often it's -- these are images that had been out

1    there for years or even decades going back to the '80s, the

2    '90s, right?

3    A.    It's certainly a possibility.

4    Q.    For a lot of these images the government has already

5    identified who those children were.

6    A.    In some cases.

7    Q.    Some of them are grown -- plenty of them are grown adults

8    by now.

9    A.    In some cases.

10    Q.    If I can see Exhibit 13, please.

11          The post on top, do you see that's a user saying, "This

12    girl, she is one of the all time CP greats."

13    A.    Yes, sir.

14    Q.    And what that user is referring to is that this is an

15    image -- or these are pictures that had been widely circulated

16    on the internet in the past and expecting that most of the

17    users on this site are already familiar with it.  Is that a

18    fair statement?

19    A.    In general, in this context, that would be correct.

20    Q.    Scroll down.  Yeah, you can show the jury that one part,

21    yes.  All right.  And you can stop right there.

22          And you see the -- you can see the reply to that by

23    somebody who uses the name M-o-d-o-m.

24    A.    Yes, sir.

25    Q.    And that person is replying, "Most of the old timers here

1    have all these classics, if 2004 is old enough to be classic."

2        Then it talks about how users even complain about the

3    fact that these images are really old and everyone's seen them

4    before and the debate about putting them up -- why they should

5    be putting them up at all, and it's because there may be

6    people who haven't seen them before.

7    A.   That's correct, yes.

8    Q.   You can take it down.

9            MR. ADOLF:  Pull up Exhibit 3 for me.  Let me see it

10   first.  Scroll through it.  I can't see it.

11           MS. RANDALL:  I'm sorry.

12           MR. ADOLF:  Can you scroll down to the bottom?  A

13   little bit up.  Okay.  If you could stop right there.  And you

14   can show that to the jury.

15   Q.   At the bottom of this post or screen shot it lists the --

16   that there are actually forums in other languages on the

17   PlayPen website, right?

18   A.   Yes, sir.

19   Q.   A lot of them are in English, but there are specific

20   areas, specific forums where people who speak other languages,

21   are in other countries, can talk to each other in their own

22   languages, right?

23   A.   Correct.  Majority of the site was in English.  There was

24   a small section here that was divided into several different

25   foreign languages.

1    Q.    So there are, I guess, chat boards or whatever you want

2    to call them where people who are speaking Italian can go,

3    Portuguese, German, Spanish, one from the Netherlands, right?

4    A.    Correct.

5    Q.    Where they speak -- they're presumably speaking Dutch?

6    A.    Correct.

7    Q.    And then Russian.

8    A.    Yes, sir.

9    Q.    Now, all of these forums have their own moderators,

10   right?

11   A.    There were local moderators for each of these, yes.

12   Q.    What that means is, there are the regular users and then

13   there are some people who are sort of in charge of that small

14   section of the website.

15   A.    In general, yes.  Just overseeing the activity that's in

16   there.

17   Q.    Now you showed us yesterday and you've looked at the

18   profile for the PlayPen user account.  I'm not talking about

19   the whole website, but I'm talking about the account PlayPen.

20   A.    Yes, sir.

21   Q.    PlayPen was not any kind of moderator for the Netherlands

22   board, right?

23   A.    No.  The PlayPen account was the administrator.

24   Q.    But when you say the administrator, you mean for the

25   whole website?

1   A.    Correct.

2   Q.    But as far as just the Netherlands section, there are

3   people who specifically work on that section and that did not

4   include PlayPen; is that right?

5   A.    Well, that section was a part of the whole site.

6   Q.    Right.

7   A.    But there was a specific moderator assigned to that one

8   section.

9   Q.    Right.  And the moderator -- if you could just highlight

10  the word "Netherlands" and the moderator name under it.  Thank

11  you.

12        Moderator of the Netherlands section is somebody called

13  "Dark Mon."

14  A.    Yes, sir.

15  Q.    Are you aware of -- I'll put it a different way.

16        We talked earlier about the fact that the FBI was

17  investigating Mr. Chase, both before he was arrested and the

18  investigation into this case continued after that, right?

19  A.    Yes, sir.

20  Q.    And as a special agent with the FBI, you work for the FBI

21  which is in turn part of the Department of Justice, which is

22  in turn part of the Executive Branch of the United States

23  headed by the President, right?

24  A.    Yes, sir.

25  Q.    And you work with other agencies in the course of

1   investigations?

2   A.    Yes, sir.

3   Q.    You, for instance, the FBI works with the Department of

4   Homeland Security on a routine basis.

5   A.    In various cases, yes.

6   Q.    And the Department of Homeland Security and its branches

7   keeps track of anytime anyone enters or leaves the United

8   States, right?

9   A.    I believe that's part of their role.  I'm not -- I don't

10  work for HSI so I don't know exactly what they do but that

11  seems to be a reasonable part of their job responsibilities.

12  Q.    Well, you're familiar with the fact that the FBI

13  sometimes needs to check whether someone has left the country

14  or returned to the country at a certain time.

15  A.    Yes, sir.

16  Q.    And that's information you get from the Department of

17  Homeland Security.

18  A.    It's one of the ways, yes.

19  Q.    Because they keep entry and exit records through customs,

20  and so forth.

21  A.    Yes.

22  Q.    Any evidence that Mr. Chase has ever been to the

23  Netherlands?

24  A.    Not that I know of, no.

25           MR. ADOLF:  Let me pull up Exhibit 18, please.  Yes

1    the jury can see that.

2    Q.   Now you told us that, although because of Tor and the way

3    it works and the way the website was supposed to work, the

4    website can identify who the actual user really is, other than

5    just by a username and password that they make up.  The

6    website does store for a particular user, information about

7    what that account has been doing, right?

8    A.   Yes.  That was an option.  This type of software allows

9    the administrators to choose that.  In this case the site was

10   set up to keep track of certain statistics of users on the

11   site.

12   Q.   So even if you didn't know who a particular user was in

13   real life, you could at least look at the account and see how

14   many times they had posted, how many hours they spent on the

15   site, and even broken down to what smaller areas of the site

16   they were using or not using.

17   A.   Yes, sir.

18   Q.   What we're looking at here, Government's 18, is the

19   profile for the PlayPen account.

20   A.   That's correct.

21   Q.   That is the account that the government, your

22   investigation, is saying was Mr. Chase's account, right?

23   A.   I didn't testify to that but that's -- this is the

24   statistics page of the PlayPen account.

25   Q.   On the lower right you have the most popular boards that

1    that particular account has been on by how many posts has on a

2    particular board, right?

3    A.    In the general -- or the left-hand corner of the site

4    where it has different posts made by that user to those

5    specific sections of the board.

6    Q.    Right.  So, for instance, for the PlayPen account, most

7    of them were on the "General Discussion" board and then there

8    were others that had less activity, right?

9    A.    Yes, sir.

10   Q.    Now, over on the right we see a different statistic,

11   which is the most popular boards by activity.  You see what

12   I'm talking about, lower right there?

13   A.    Yes, sir.

14              MR. ADOLF:  Let me ask the Government to zoom in on

15   that corner of the board, basically.

16   Q.    And what you're seeing here is, whoever is controlling

17   the PlayPen account, how much time they're spending in each

18   particular area of the website, right?

19   A.    I believe that's what this is recording.  This is the one

20   part of the statistics page I wasn't as familiar with how

21   those stats were actually kept on the site.

22   Q.    Well, that's -- for instance, looking at that list,

23   that's not every group or area of the site that that account

24   has been on.  That's just the ones that it's been most active

25   on.

1  A.   It's just a section of the site, yes, or a section of the

2  post, yeah.

3  Q.   "PlayPen Information and Rules" is the time that that

4  account has spent the most time on, right?

5  A.   Yes, sir.

6  Q.   The fourth one down is the Russian language area that we

7  talked about, right?

8  A.   Correct.

9  Q.   So what this tells us that -- is that of all the areas of

10  the website, that somebody using the PlayPen account was

11  working on or doing stuff on, the one that they spent the

12  fourth most time on was the Russian language one.

13  A.   It appears to be from this, yes.

14  Q.   The posts there are in Russian.

15  A.   The intent -- there could be other languages in there

16  including English.  But the main point of those sites was that

17  the text, at least, of the sites was in a foreign language.

18  Q.   Now you just told us about the government's resources and

19  ability to track whether somebody has ever left the country or

20  returned to the country and the particular time and place they

21  did it, right?

22  A.   Yes, sir.

23  Q.   Has Mr. Chase ever been to Russia?

24  A.   Not to my knowledge, no.

25  Q.   Now, the government has, in the course of this

1   investigation, got access to Mr. Chase's Facebook page, right?

2   A.   Yes, sir.  We were able to view his Facebook page.

3   Q.   And get some location data from that page, posts that he

4   made and so forth, that the government is using to show, for

5   instance, that he was in Maine at a certain time or in Florida

6   at a certain time; you're aware of that, right?

7   A.   I'm aware of the Facebook account in general.  I didn't

8   personally review the logs or any of the results from any

9   legal process that was served.

10  Q.   But there's nothing on his Facebook page that indicates

11  that he's ever been to Russia, any Russian language posts,

12  Russian language groups.  No indication that he knows the

13  Russian language, right?

14  A.   Not to my knowledge, no.

15  Q.   You're aware that he was born and raised in Delaware.

16  A.   That's my understanding.

17  Q.   And was living in Florida at the time he was arrested,

18  right?

19  A.   Yes, sir.

20  Q.   Now, you are aware, of course, from -- both from your

21  work with the FBI and for more generally that there are plenty

22  of computer hackers that are based in Russia, right?

23  A.   I'm aware of hackers that could reside in Russia, yes.

24  Q.   We've all heard about that in connection with the

25  politics recently --

1    A.    Yes.

2    Q.    -- with that going on from Russia, right?

3          Now I'm showing you -- this is a profile of a different

4    user, right?

5    A.    Yes.  This is the statistics page for the -- another one

6    of the administrators, Isabella.

7    Q.    Isabella, is that one of the people actually charged in

8    the indictment along with Mr. Chase?

9    A.    I believe so, yes.

10   Q.    Mr. Fluckiger?

11   A.    Yes, sir.

12   Q.    And this shows similar data for the account associated

13   with him including, again, where most of the postings are and

14   where most of the activity is, right?

15   A.    Yes, sir.

16         MR. ADOLF:  If we could just zoom in on the bottom

17   right corner, "Most popular boards by activity."  Thank you.

18   Q.    So this shows what the account associated with

19   Mr. Fluckiger was spending most of its time doing, right?

20   A.    This, again, this was the one part that I'm not familiar

21   with because the top percentage is the exact same percentages

22   on the PlayPen account.  So I'm not entirely sure what it's

23   referencing.

24   Q.    Well, there's nothing about foreign languages or foreign

25   countries on there, right?

1   A.   Not in this case, no.

2   Q.   And Mr. Fluckiger is an American?

3   A.   Yes, sir.

4   Q.   He was also an administrator/moderator.

5   A.   He was another one of the administrators, yes.

6             MR. ADOLF:  You can take that down.

7             Your Honor, I'm putting up what I'm going to ask to

8   be marked as Defense 1.

9   Q.   Agent O'Donnell, I'm showing you a portion of a Cygnus

10  report.

11  A.   Yes, sir.

12  Q.   Are you familiar with what a Cygnus report is?

13  A.   Yes.

14  Q.   That's a tool that the FBI, including yourself, use to

15  arrange data that's been extracted from another computer; is

16  that right?

17  A.   It was a database that was created by our unit, yes.

18  Q.   And the purpose of that database was -- is to collect all

19  the information that was found on the PlayPen website server,

20  and put in a format where you could look through it and use

21  it; is that right?

22  A.   Generally speaking, yes.

23  Q.   Now, if you could just look at what you're seeing on your

24  screen, this appears to be -- well, first of all, using this

25  Cygnus report, the program that you just described that the

1   FBI uses, you can pull out the data from one account from the

2   entire website and look at it, right?

3   A.   Yes.  This organized the data associated with a

4   particular account on the site.

5   Q.   So, for instance, you could look for -- you could list

6   all the posts that came from a particular account and then

7   identify particular posts and look at them.

8   A.   Correct.

9   Q.   Now, in this case what this appears to be is a -- first

10  of all, this is information taken from the PlayPen account

11  itself, right?

12  A.   I believe so, yes.

13  Q.   And what it reflects is a post that PlayPen, his or

14  herself made on -- well, on the left hand side you can see

15  there's a list of dates, and account named "PlayPen" and a

16  subject line for each date.  Do you see what I'm looking at

17  over there?

18  A.   Yes, sir.

19  Q.   And those reflect particular posts that were made from

20  the PlayPen account and each one had a little title on it,

21  just like as if it was, say, an email.

22  A.   Yeah, I see the subject line below the PlayPen account.

23  Q.   Then there's a particular one highlighted from August 25,

24  2014.

25  A.   Yes, sir.

1   Q.    And what that highlight means is over on the right what

2   you're seeing is what that comment was that was posted on that

3   date that was posted in a longer discussion.

4   A.    Yes, sir.

5   Q.    Does that accurately reflect the data that was seized by

6   the FBI from the PlayPen server in Lenoir?

7   A.    Yes, sir.

8              MR. ADOLF:  Your Honor, I'm going to ask to admit

9   this as Defense 1.

10             THE COURT:  That will be for your case and received

11  for identification.

12             MR. ADOLF:  For identification then, Your Honor, for

13  Defense 1.  Judge, I guess, I will need to keep the witness

14  for recall when my case comes, just in case I haven't laid a

15  sufficient foundation.

16             THE COURT:  That will be fine.

17             MR. ADOLF:  Thank you.

18             All right.  So I guess at this point we don't

19  display to the jury.

20             THE COURT:  If there's no objection.

21             MR. JONES:  No objection, Your Honor.

22             MR. ADOLF:  Okay.  Your Honor, I would ask that

23  Defense 1 be displayed to the jury.

24             THE COURT:  So ordered.

25             (Defendant's Exhibit No. 1 was published.)

1   Q.   So this is a post that PlayPen made in August of 2014,

2   right?

3   A.   Yes, sir.

4   Q.   And that is in Russian, right?

5   A.   It appears to be, yes.

6   Q.   Or some other language that uses an alphabet that's not

7   ours.

8   A.   Correct.

9   Q.   I guess it could be Turkish or something of that nature?

10  A.   Yeah, it's not English.

11  Q.   Appears to be Russian.

12  A.   Yes.

13  Q.   Agent O'Donnell, you can see what we have up in front of

14  you on the screen as being similar to what we just saw, a post

15  from PlayPen, from the PlayPen account, that is --

16  A.   Yes, sir.

17  Q.   -- right?  That one is in October of 2014.

18  A.   Correct.

19  Q.   And that's from the same account that we just saw that

20  Russian post came from, right?

21  A.   Yes, sir.

22  Q.   And that one, in the context of some longer discussion,

23  whoever PlayPen is, is referring to some other post, right?

24  A.   It appears that way, yes.

25  Q.   And is saying, "I only speak English so these posts make

1  me nervous since I cannot read them."

2  A.   Yes, that's what it state.

3  Q.   Seems to indicate that this particular person, whoever

4  they are, is concerned that people are posting materials on

5  this website that he or she cannot understand because he or

6  she only speaks English, right?

7  A.   That appears to be the concern, yes.

8          MR. ADOLF:  Your Honor, I again offer this as

9  Defense 2, and ask if the Government has any objection to

10  showing this one to the jury as well?

11         MR. JONES:  No objection, Your Honor.

12         THE COURT:  All right.  They may be viewed for

13  identification purposes.

14         MR. ADOLF:  Thank you, Judge.

15         (Defendant's Exhibit No. 2 was published.)

16  Q.   Special Agent O'Donnell, I'm showing you some more data

17  from the government Cygnus report, another posting by PlayPen.

18  And this posting is from January 5 of 2015.  Do you see that?

19  A.   Yes, sir.

20  Q.   And there's a pink section where it says something about,

21  "There's one source we can trust, a freaking English grammar

22  book."  Right?  You see that pink section?

23  A.   Yes, sir.

24  Q.   The way the Cygnus report is set up, what that reflects

25  is, that's not what PlayPen posted.  That's what PlayPen is

1    replying to.

2    A.    Correct.

3    Q.    So it's like when you -- someone sends you an email and

4    you reply, their original email might be below or above what

5    you type, but it's all included, right?

6    A.    Similar, here, yes.  Everything in the pink box was

7    posted by a different user.

8    Q.    So somebody else, some other user posted something

9    criticizing PlayPen's bad grammar.

10   A.    Or somebody's grammar, yes.

11   Q.    So I guess even on child pornography websites people are

12   picky about grammar.

13   A.    Could be, yes.

14   Q.    And you see that PlayPen gave a response down there.

15   A.    Yes, sir.

16              MR. ADOLF:  Your Honor, I would ask to identify this

17   as Defendant's 3 -- as Defense 3 and ask if the Government has

18   an objection to showing it to the jury.

19              MR. JONES:  No objection, Your Honor.

20              THE COURT:  All right.  So allowed.

21              (Defendant's Exhibit No. 3 was published.)

22   Q.    Now, what we're looking at here is the original post by

23   somebody else that says, "Complaining that somebody doesn't

24   know the difference between your and you're with an apostrophe

25   and your y-o-u-r, right?

1    A.    Yes, sir.

2    Q.    And the difference between two, to and too?

3    A.    Yes, sir.

4    Q.    Again, that's something that there are plenty people

5    around the world that seem to get irritated about in English,

6    whether it's on websites or elsewhere, right?

7    A.    Yes, sir.

8    Q.    And PlayPen responded to that.

9    A.    Correct.

10   Q.    Saying, "I'm sorry, Miss Perfect, English is not my or

11   many of us first language.  More time loving and less time

12   pointing finger, please."

13   A.    Correct.

14   Q.    And that is PlayPen resenting the fact that somebody is

15   criticizing English, when English is pretty hard to learn if

16   you're not a native English speaker, right?

17   A.    That's what the text is attempting to portray, yes.

18   Q.    Exhibit 19, please.  I'm showing you what's already in

19   evidence as Government's Exhibit 19.

20         I'm showing you what's already in evidence as -- I guess

21   you already identified as Government's 19, another posting

22   from PlayPen.

23   A.    Yes, sir.

24   Q.    And this one -- this is somebody talking -- this is

25   PlayPen, whoever is on the PlayPen account or actually logged

1  in as PlayPen, just issuing a general thank you for all the

2  participation in it and the fact that it's been up for 16 days

3  at that point and already has 26,000 members.

4  A.   Yes, sir.

5  Q.   Now we discussed the fact that commercial servers, in

6  general, keep logs of when people log in and record the

7  information when a certain account logs in, where, when it

8  happened, and where it came from.

9  A.   They can keep logs, yes.

10  Q.   And in this case the server that was housing PlayPen did

11  keep those logs, right?

12  A.   Again, I'm not familiar with what those logs were.  That

13  was not part of my role in this case.

14           MR. ADOLF:  You can take that down.

15  Q.   Now you told us about your long experience investigating

16  cases and particularly focusing on internet-based cases --

17  A.   Yes, sir.

18  Q.   -- yesterday, right?

19       And you are aware that -- and we talked earlier also

20  about hackers.

21  A.   You mentioned it, yes.

22  Q.   And the fact that it's possible if you're just browsing

23  the regular internet or anywhere else and you click on a link

24  that you don't know it could actually be mal-ware.

25  A.   It's certainly a possibility.  You can click on a link

1    that contained mal-ware.

2    Q.    And what mal-ware does is, it -- mal-ware can be for all

3    kinds of purposes, but it's also something that people use

4    nefariously, the criminals use to get people's information,

5    for instance.

6    A.    It's possible, yes.

7    Q.    Well, you're familiar with that from your computer

8    expertise at the FBI, right?

9    A.    I'm familiar with the possibility, yes.

10   Q.    And, in fact, mal-ware can end up on someone's computer

11   because of something they clicked on, can extract information

12   from the computer, and then can send it to somebody anywhere

13   in the world and can be set up that way and yet leave no trace

14   on that person's computer.

15   A.    I mean, that's a very generalized hypothetical statement.

16   There is all kinds of different mal-ware so all kinds of

17   different functionality.  I'm certainly no expert in the

18   different types of mal-ware that exist.

19   Q.    Well, there are programs that if a person, for instance,

20   tries to download a picture or video, can, while that's

21   happening, also extract information from their computer and

22   send it somewhere else without them knowing it and leave no

23   trace on the computer; isn't that right?

24   A.    I'm not sure that I would say in all cases it would leave

25   no trace.  It's certainly a possibility that mal-ware can

 1   perform actions without a user's knowledge but just in a very

 2   general sense.

 3   Q.   Well, I guess what I'm specifically asking you is, isn't

 4   it true that there are programs out there that can, if set up

 5   a certain way, user downloads something or attempts to

 6   download something, and what they get along with it is a

 7   program that is sending their information to someone else that

 8   they don't know about and leaves -- and once that's done

 9   leaves no trace on their computer.  You are familiar with that

10   kind of software, are you not?

11   A.   There's a possibility that exists.  I'm not familiar with

12   specific mal-ware software.  I'm not a mal-ware expert.

13   Q.   Well that was used in this case, wasn't it?

14   A.   Not during this period of the investigation.  And as far

15   as anything -- any operation that the government conducted

16   after Mr. Chase's arrest, I had a supporting role but not a

17   direct role in the specifics of that part of the

18   investigation.

19   Q.   Well, maybe you weren't the one that did it, but you are

20   aware that the government used software just like that in this

21   case, right?

22   A.   There was software that was used.  I don't know that I

23   would generally describe it exactly like that.  But there was

24   software that was used in this case.

25   Q.   Well, what the software did, correct me if I'm wrong is,

1   because it's so difficult to figure out where somebody is who

2   is using this website on Tor, right?

3   A.    Correct.

4   Q.    Even -- okay.  Let me back up.

5        Mr. Chase was arrested.  The server was seized by the

6   FBI, right?

7   A.    Yes, sir.

8   Q.    And we talked about the fact that commercial servers keep

9   logs of where someone is logging in from, IP address that law

10  enforcement can then generally go to find them.

11  A.    Again, servers can keep logs and those logs can include

12  IP addresses.

13  Q.    But in this case the FBI knew going in that that

14  information was not going to be in those logs because the

15  whole thing is on Tor, right?

16  A.    Yes.  Legitimate IP addresses generally would not be

17  found in a case like this.

18  Q.    What you mean by legitimate is, you wouldn't be able to

19  see from the log where that log in came from?

20  A.    Not the originating computer, no.

21  Q.    Which is what you're looking for.  If you seize a child

22  pornography website, you want to find the people who have been

23  putting the porn on it and taking it down off it, people who

24  are using it, right?

25  A.    That's certainly one of the goals of child pornography

1   investigation.

2   Q.   And it was the goal of this investigation, wasn't it?

3   A.   Along with the attempting to find victims, determine the

4   administrators and other things, but certainly, yes.

5   Q.   And you couldn't do any of that until you could find

6   those users.

7   A.   Correct.

8   Q.   And the problem was, because people were accessing this

9   over Tor, there was no information in those logs about who

10  they were.

11  A.   Generally, no.

12  Q.   And even when the FBI took over the site and continued

13  running it, when people were logging in, you all couldn't even

14  see who they were or where they were even when you were

15  running the site yourself.

16  A.   I -- in general we weren't able to see the actual IP

17  addresses of users, without utilization of a different law

18  enforcement technique.

19  Q.   And by "different law enforcement technique" you mean the

20  kind of mal-ware that I was talking about.

21  A.   Well, I believe the technique that was used did not take

22  over anybody's account.  It did not hack anybody's account.

23  The technique merely provided us with the actual originating

24  IP address of the original computer.

25  Q.   All right.  Well, maybe the word "hack" is not precise.

1    Let me be a little more precise.

2        What the FBI did was, they continued to run this website

3    PlayPen, right?

4    A.   For a period of time, yes.

5    Q.   Right.  Leaving it as it was and allowing it to operate

6    in an effort to catch the users.

7    A.   Yes, sir.

8    Q.   There was no way to catch the users just by running the

9    website and looking at the trap?

10   A.   Generally, no.

11   Q.   Because the users were hidden because of Tor.

12   A.   Yes, sir.

13   Q.   So instead what the FBI did was, they put a program --

14   added a new program software, mal-ware, whatever you want to

15   call it -- you can use whatever term you like -- to that site

16   that wasn't on there before.

17   A.   To certain sections of the site, yes.

18   Q.   And what this meant was, now once the FBI was running the

19   site, anyone who logged on to it and tried -- they would have

20   to log in first and then go find some image or video they

21   wanted and download it.

22   A.   They could go to various parts of the site and attempt to

23   download, click on the external links that were posted by

24   other users and then attempt to download the contents from the

25   websites, videos, files.  But they certainly could view other

1    people's posts, posts themselves, all the things we discussed

2    this morning and yesterday.

3    Q.   Right.  But something new was going on also that wasn't

4    going on back before the FBI took over the site, right?

5    A.   If you're talking about the technique we're discussing

6    here, yes, that was new.

7    Q.   What this meant was, anytime somebody signed into the

8    site and downloaded an image or a video or what have you, the

9    kinds of images that you showed us earlier, they would get the

10   image but they would also get something else on their computer

11   they didn't know about.

12   A.   No, that's not correct.  They didn't need to download --

13   any actions that a user took to download images or videos was

14   separate and completely irrelevant to the technique.

15   Q.   Okay.  What would happen is, when someone signed into the

16   website and started or attempted or what have you to download

17   any picture or whatever, they would also be downloading a

18   program that the FBI had inserted on the website.  And that

19   program would, without their knowledge, gather information

20   from their computer, including about where they were, and send

21   that to an FBI server somewhere else, right?

22   A.   My understanding was on certain sections of the site this

23   technique was implemented.  That when users visited those

24   specific sections that this technique was able -- in some

25   cases certainly not all -- to potentially obtain the user's

1   true IP address.

2   Q.    Without them knowing.

3   A.    Correct.

4   Q.    And without leaving any trace on their computer.

5   A.    Again, that -- the specific technique that was used I

6   had -- I'm not a forensic examiner, I'm not a computer

7   programmer.  I don't know the specifics of the actual

8   technique.  All I know was that we were able in certain cases

9   to obtain the user's true IP address.

10            MR. ADOLF:  No further questions, Your Honor.  Thank

11  you.

12            THE COURT:  Redirect -- it's time for our morning

13  break, members of the jury.  We'll take a 15-minute break.

14  Please remember all the instructions I've given you.  Keep an

15  open mind about the case and don't discuss it.  Call for you

16  in 15 minutes.  Thank you.

17            (The jury was escorted from the courtroom.)

18            (Recess at 11:05 until 11:21.)

19            THE COURT:  Okay.  The parties ready to resume?

20            MR. ADOLF:  Yes, Your Honor.

21            MS. RANDALL:  Yes, Your Honor.

22            THE COURT:  May we have the jury, please.

23            (The jury was returned to the courtroom.)

24            THE COURT:  All right.  The jury is with us.

25  Redirect examination.

1    MR. JONES:  Just a few questions, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MR. JONES:

4    Q.    Agent O'Donnell, before we took a break Mr. Adolf was

5    asking you questions in regards to the FBI operation of the

6    site.  Now the technique that the FBI used to identify other

7    child pornography users on this website, did that have

8    anything to do with the identification of Mr. Chase?

9    A.    No, sir.

10   Q.    Okay.  Was he identified and arrested prior to any

11   technique by the FBI to identify other users?

12   A.    Yes.

13   Q.    Now in order for you to get on -- to get to the log-in

14   page of the PlayPen website was -- you mentioned before, was

15   there a specific address you had to enter?

16   A.    The user would have to know the URL of the specific site,

17   yes.

18   Q.    You couldn't just happen on the site?

19   A.    No.

20   Q.    And once you logged into the site -- we looked at, I

21   believe, Government Exhibit 2 was an index section consisting

22   of various sections of the site.  Let me show it to you very

23   quickly.  Government Exhibit 3, just briefly.

24        So these various sections starting with the "General"

25   category, "PlayPen Chant, Jailbait Videos," was that

1  accessible to any user who would access the site?  Anybody

2  that got on the site would see that?

3  A.   After either logging on or registering an account, yes.

4  Q.   Okay.  Were there any postings or images of adult

5  pornography on the site?

6  A.   No, not that I was aware of.

7  Q.   This entire site was a child pornography site.

8  A.   That was the reason for the site's existence, yes.

9  Q.   With children as young as --

10  A.   As infants.

11          MR. JONES:  No further questions.

12          THE COURT:  You may step down.

13          MS. RANDALL:  Your Honor, the Government's next

14  witness is James Meade.

15          JAMES MEADE, GOVERNMENT WITNESS, SWORN

16                  DIRECT EXAMINATION

17  BY MS. RANDALL:

18  Q.   Good morning, sir.  Can you please introduce yourself to

19  the jury.

20  A.   My name is Jim Meade and I'm a special agent with the

21  FBI.  I'm assigned to our Charlotte Division, but I work out

22  of our satellite office located in Hickory.

23  Q.   And how long have you worked at the FBI?

24  A.   For over 20 years now.

25  Q.   And what kind of responsibilities do you have working for

1   the FBI?

2   A.   I work a wide range of violations, primarily due to the

3   fact I cover a large geographic area, pretty much cover the

4   whole foothills area of North Carolina.

5   Q.   Are you sometimes asked to assist with investigations

6   that are being conducted by other FBI offices or squads?

7   A.   Yes, ma'am, I am.

8   Q.   Did you receive such a request for assistance back in

9   February of 2015 from Special Agent Alfin?

10  A.   Yes, I did.

11  Q.   What were you asked to do?

12  A.   I was asked to execute a search warrant at a business

13  located in Lenoir by the name of CentriLogic.

14  Q.   I'm sorry.  Go ahead.

15  A.   Ma'am?

16  Q.   Did you in fact execute that search warrant?

17  A.   I did.  It was on February 23, 2015.

18  Q.   And what were you there to seize that day?

19  A.   I seized the hard drives associated with a particular

20  CentriLogic customer.

21  Q.   I'm showing you what I marked as Government 70a, 70b, 70c

22  and 70d.  Do you recognize those items?

23  A.   Yes, ma'am.  Three hard drives, I'm sorry, four hard

24  drives.  Three of them are Hitachis and the fourth one is

25  Western Digital.

1  Q.   Where did they come from?

2  A.   They came from CentriLogic.

3  Q.   And are those the hard drives you received in response to

4  serving the search warrant on February 23, 2015?

5  A.   Yes, ma'am.

6        MS. RANDALL:  Your Honor, the Government would move

7  to introduce Exhibit 70a into evidence -- or 70a through d

8  into evidence.

9        THE COURT:  Let it be admitted.

10       (Government's Exhibits No. 70a-d were received into

11 evidence.)

12 Q.   What did you do with those hard drives after you seized

13 them?

14 A.   After I seized them I transported them back to my office

15 in Hickory where they were secured, and then the following day

16 I transported them down to our evidence room in Charlotte.

17 Q.   And at that point they're checked into evidence with the

18 FBI?

19 A.   Yes, ma'am.

20       MS. RANDALL:  No further questions, Your Honor.

21       MR. ADOLF:  No questions, Your Honor.

22       THE COURT:  You may step down.

23       MS. RANDALL:  Your Honor, I'm just going to get the

24 exhibits.

25       MR. JONES:  At this time, Your Honor, the Government

1    calls FBI Special Agent Dan Alfin.

2                DANIEL ALFIN, GOVERNMENT WITNESS, SWORN

3                        DIRECT EXAMINATION

4    BY MR. JONES:

5    Q.   Good morning, Agent Alfin.  Would you please state and

6    spell your name for the jury.

7    A.   My name is Daniel Alfin.  D-a-n-i-e-l.  A-l-f, as in

8    Frank, i-n.

9    Q.   Agent Alfin, just introduce yourself and let the jury

10   know where you are employed.

11   A.   I am a special agent with the FBI.  I am currently

12   assigned to FBI headquarters, Criminal Investigative Division,

13   Violent Crimes Against Children Section, Major Case

14   Coordination Unit or MCCU for short.  I've been assigned to

15   this unit since approximately July 2014.

16        My investigative duties at MCCU involve international and

17   wide ranging domestic investigations, individuals who use

18   various types of technology to facilitate the production,

19   distribution, advertisement and possession of child

20   pornography.

21        The majority of my case work focuses on what has been

22   referred to as the Tor network or also referred to as the Dark

23   Web.

24        Prior to being assigned to the MCCU, I was assigned to

25   the Albany, New York, division of the FBI from 2009 through

1  2014.  While I was assigned to the Albany, New York, division

2  I investigated a variety of both criminal and national

3  security matters, including crimes against children, criminal

4  computer intrusions or hacking, and national security computer

5  intrusions.

6  Q.   Prior to your assignment to MCCU, as well as in Albany,

7  have you had any other FBI assignments in regards to other

8  division, digital evidence, or any of that type of

9  responsibility with the FBI?

10 A.   Throughout my employment as an FBI agent I have picked up

11 various ancillary duties.  I am certified as a member of the

12 FBI adjunct faculty program.  I am certified to teach matters

13 involving investigations in the crimes against children arena.

14 I am also trained and certified to perform computer forensics.

15 Prior to my assignment at the major case coordination unit I

16 was a member of what is known as the FBI CAT or Cyber Action

17 Team, and that's the FBI FLY team for computer intrusions.  I

18 think that covers almost everything.

19 Q.   Okay.  Agent Alfin, where were you employed prior to

20 joining the FBI?

21 A.   Prior to being employed by the FBI I was employed by a

22 defense contractor, Raytheon Integrated Defense Systems, at

23 the Naval Undersea Warfare Center in Keyport, Washington.

24 While I was an employee of Raytheon I managed a number of

25 computer servers and computer networks that were utilized by

1  Navy and Marine Corps squadrons.

2  Q.   Just give the jury just a brief overview of your

3  educational background.

4  A.   I have a Bachelor's degree in information technology.   In

5  addition to that I have taken numerous courses in

6  investigations of online crimes, computer forensics, analysis

7  of network data and other -- other courses relating to my

8  investigative duties.

9  Q.   Have you also served as an instructor in any of those

10  courses?

11  A.   Yes.   I have provided both formal and informal

12  instruction to both domestic and international law

13  enforcement, and other agencies, on numerous occasions.   I

14  have presented at various security conferences over the past

15  several years.

16  Q.   Have you testified in any federal trials before?

17  A.   I have.   I have testified in two federal trials.   I

18  testified in a federal corruption trial in Albany, New York.

19  And I also testified in a child pornography trial in Vermont.

20  Q.   Switching gears, Agent Alfin, to the investigation of the

21  PlayPen child pornography website.   Did you participate in the

22  investigation of this website?

23  A.   I did.

24  Q.   When did you become involved in the investigation?

25  A.   I became aware of the PlayPen website shortly after it

1    came on line, approximately August 2014.  At that time, links

2    to the PlayPen website were advertised on other websites that

3    contained links to child pornography and child erotica

4    websites.  One of them was called "Hard Candy" which was a

5    section of the hidden wiki.  Another one was called "Topic

6    Links" which similarly contained links to child exploitation

7    material, sites advertising child exploitation material.

8        So in August of 2014 I became aware of the PlayPen

9    website.  I accessed it.  I observed that it was, in fact, a

10   website dedicated to the advertisement and distribution of

11   child pornography.  And given the fact that it existed on the

12   Tor network at that time, there was not much that the FBI

13   could do to find out where the site was or shut it down or

14   find any of its members.  So for the next several months we

15   monitored the website but there was not much we could do about

16   it, again, as I said.

17       In December of 2015 we received information that the

18   website had actually been misconfigured and that you could

19   access it over the normal internet.  I verified this myself,

20   and I confirmed that you could, in fact, access the PlayPen

21   website over the normal internet if you knew its exact IP

22   address.

23       And just to clarify, an IP address is what a computer

24   uses to communicate over the internet.  So any home computer

25   or any website that you access, which is actually just hosted

1    on a very powerful computer somewhere else, they communicate

2    through the use of IP addresses.  They can be thought of as

3    the phone number for your computer.

4        And so now that we knew the IP address or the phone

5    number for the website PlayPen, we opened up an investigation

6    in early January 2015.

7    Q.   You said you were able to access IP addresses as a phone

8    number.  This is based on you being able to access the website

9    over the regular internet or the normal internet?

10   A.   Yes, that's correct.  I was able to access the PlayPen

11   website directly over the regular internet not going through

12   the Tor network or through the Dark Web, as it's been referred

13   to.

14   Q.   Okay.  Upon obtaining the IP address for this child

15   pornography website, what were your next steps in this

16   investigation?

17   A.   At this point we took a number of steps.  First, now that

18   we knew the IP address of the server hosting PlayPen, we were

19   able to use that IP address and look it up in publicly

20   available databases.

21       Once you have an IP address there are a number of

22   websites on the internet where you can go to and figure out

23   who owns that IP address.  What company it is.  Is it Comcast?

24   Is it TimeWarner Cable?  All that information is publicly

25   available.  And so I looked up the IP address associated with

1   the PlayPen website.  And I determined that the PlayPen

2   website was being hosted at CentriLogic, a company in Lenoir,

3   North Carolina.

4   Q.   And just briefly, for the jury, explain when you say

5   "being hosted at a facility in Lenoir, North Carolina," what

6   does being hosted actually mean?

7   A.   So companies like CentriLogic house multiple dozens or

8   hundreds of powerful computer servers.  And so people will pay

9   money to lease space on those servers, or lease the entire

10  server for their own personal use.  Some people do this to

11  host personal websites, share personal pictures and other

12  things with people.  Some businesses do this because it's

13  cheaper and more cost effective than buying their own hardware

14  and setting up a server, a computer server in their own

15  office.  This was the typical business model for a company

16  like CentriLogic.

17       So someone was paying CentriLogic for space on one of

18  their computer servers to host the PlayPen website.

19  Q.   What did you do upon learning that CentriLogic was

20  hosting this PlayPen child pornography website?

21  A.   After we determined that CentriLogic was the company

22  where the PlayPen website was located, we issued a subpoena to

23  CentriLogic requesting information about the individual who

24  was paying for that server space.

25       We requested that individual's name, phone number, any

1   records of logging into the CentriLogic website, and other

2   customer data that was maintained by CentriLogic.

3   Q.   Okay.  All right.  I'm showing you what has already been

4   admitted as U.S. Exhibit 42.

5   A.   I see the exhibit on my screen.

6   Q.   Okay.  All right.  I am showing you -- all right.

7   Looking at U.S. Exhibit 42.  On the first of that page, if you

8   could just -- what is the information?  Just briefly describe

9   what the information is on this page.

10  A.   So this is one of the pages of information that

11  CentriLogic provided to us after being served with the

12  subpoena.  It contains information about the account that was

13  registered to host the PlayPen website.

14       As you can see here on the screen, it appears that the

15  individual who created the account at CentriLogic did so

16  under the name "Mike Taylor."  Other information that was

17  provided to CentriLogic was an email address which

18  is MikeT46589@Yahoo.com.  There's also an address provided in

19  Austin, Texas.  There is a phone number provided.

20       And at the very bottom of the screen there is an

21  indicator, that at the date that this information was provided

22  to the government, the individual paying for the PlayPen

23  server had paid approximately $839 in hosting fees.

24  Q.   Now, did you do any investigation on this Mike Taylor?

25  A.   Yes.  After receiving the information from CentriLogic,

1   using various law enforcement databases and open source

2   databases, I determined that Mike Taylor was a fictitious

3   individual, no such individual with the information provided

4   here to CentrilLogic existed.

5   Q.   And did this come as a surprise?

6   A.   No.  It is -- in my training and experience it is common

7   trade craft for criminals of any type, certainly someone

8   hosting the world's largest child pornography website, to

9   provide a fake name when doing so.  It would have come as a

10  shock to me if an individual had paid for this service in his

11  real name.

12  Q.   Okay.  On the invoices page -- and you mentioned an

13  invoices page.  Just scrolling down through the same exhibit,

14  you know, just what does that indicate?

15       You indicated $839 when it comes to payment method.

16  Briefly describe for the jury what that indicates.

17  A.   So this page of the exhibit shows payment history for the

18  account.  It shows that the invoices for the accounts were

19  paid through a service known as PayPal.  PayPal is a very

20  popular online payment service.  It is used for all types of

21  purposes to send money to friends, to pay for items on line.

22  It's popular with various auction websites like e-Bay.

23       And so in this case CentrilLogic allows their customers

24  to pay for services with the PayPal service.

25  Q.   Okay.  Going back now to that first page we just left

1    with the Mike Taylor information on there.  If you would walk

2    the jury through the set up date, the last log in.  What did

3    that indicate?

4    A.    So on this page you can see the sign-up date which is

5    listed as October 7, 2014.  That is when this account was

6    created with CentrilLogic.  On the next line you can see the

7    last log in.  This indicates the last time someone had logged

8    into the CentrilLogic customer account.  And so that last

9    log-in date is January 9, 2015.  And the time for that log-in

10   is also provided.

11        The third line shows an IP address.  This is the IP

12   address that was captured by CentrilLogic when an individual

13   logged into the customer portal for the account that was

14   hosting the PlayPen website.

15   Q.    Based on this information, the last log-in and IP

16   address, what was the next step in your investigation?

17   A.    As I mentioned earlier, once you have an IP address you

18   can use a number of different public databases to determine

19   who owns that IP address.

20        In this case this IP address which was 67.251.7.149 was

21   owned by TimeWarner Cable.  And so after obtaining that

22   information from CentrilLogic, a subpoena was issued to

23   TimeWarner Cable with a request that they identify the

24   individual who was using that IP address on that date and

25   time.

1   Q.   How did you know that TimeWarner Cable owned that IP

2   address?

3   A.   Again, information about what company owns an IP address

4   is publicly available. And so you can go to a number of

5   different websites to query that information.

6   Q.   I'm showing you what has already been admitted as

7   Government Exhibit 44.

8   A.   I have the exhibit in front of me.

9   Q.   Would you explain this page to the jury.

10   A.   This is the information that TimeWarner Cable provided to

11   the FBI in response to our subpoena requesting that they

12   identify the subscriber I had mentioned earlier. And so this

13   is the information that TimeWarner Cable provided.

14       The IP address that we requested information about is

15   listed in the top line next to target details. The subscriber

16   name is listed as Lois or Louise Chase. The subscriber

17   address is listed as 3119 Carrabassett Drive, Carrabassett

18   Valley, Maine, zip code 04947.

19       The next line indicates that the TimeWarner Cable service

20   at this residence was activated on November 22, 2014.

21       The return indicates that the -- as of the date that this

22   information was provided to the FBI, that the service at that

23   address was still active.

24       The username of the TimeWarner Cable account was

25   Mustang.SteveCOS@TWC.com.

1    There was a phone number provided for the account which

2   is 207-237-2733.  And the last line lists CM-MAC, which stands

3   for Cable Modem Mac address.

4    A Mac address is a hardware identifier, generally, a

5   unique identifier for any network device.  And this just

6   happens to be the identifier for the cable modem that was

7   associated with this TimeWarner Cable internet account.

8   Q.   Just information for the jury, what did this information

9   indicate?

10  A.   This indicates that on the date that the CentrilLogic

11  account had been accessed, which I believe in the last Exhibit

12  was January 9, 2015, that whoever accessed that account did so

13  from the residence of Louise Chase in Carrabassett Valley,

14  Maine.

15  Q.   Okay.  Going back to the CentriLogic return we just

16  looked at, was there also an email address listed on the

17  CentriLogic return?

18  A.   Yes.  The email address associated with the account was

19  MikeT46589@Yahoo.com.

20  Q.   Did you take investigative steps to investigate this

21  email account?

22  A.   Yes.  After receiving this information from CentrilLogic,

23  indicating that this was the email address associated with the

24  individual hosting the PlayPen website, I prepared an

25  affidavit that was submitted to a federal judge requesting

1   authorization for a search warrant to obtain a copy of that

2   email account from Yahoo.

3       I prepared this affidavit with a statement of facts of

4   the investigation.  The judge signed and authorized that

5   search warrant and I served it on Yahoo and they were

6   instructed to provide to me the content of that email account.

7   Q.   I'm showing you now what has been marked as Government's

8   Exhibit 45 returned from Yahoo.

9   A.   I have it in front of me.

10  Q.   What did you do upon receiving this return from Yahoo?

11  A.   After receiving the return from Yahoo, I analyzed the

12  data that it contained.  It contained numerous things,

13  including copies of emails.  It also included history logs of

14  when the email account had been accessed and the IP addresses

15  from where it had been accessed.

16  Q.   What -- go ahead.  I was going to say, if you would just

17  walk the jury through -- explaining the IP addresses listed

18  here.

19  A.   Certainly.  So the data that was provided by Yahoo is

20  listed here in four different columns.  The first column is

21  Yahoo ID, which, again, refers to the Yahoo accounts that is

22  the same throughout all of this data.

23      The second column of information is the IP address that

24  was recorded by Yahoo on the date and times that the account

25  was accessed.

1    The log-in time in the final column indicates when the
2    account had been accessed, and that is the date and time
3    associated with the IP address in the second column.
4    Q.   Now, do any of these IP addresses look familiar?
5    A.   Yes.  I testified earlier that I had served a -- or that
6    the FBI had served a subpoena to TimeWarner Cable for an IP
7    address that was associated with the individual who had logged
8    into the CentrilLogic account.  This first IP address listed
9    here is that same IP address associated with the Louise Chase
10   TimeWarner Cable account in Carrabassett Valley, Maine.
11   Q.   Did you do further investigatory steps in identifying any
12   of the other IP addresses listed here?
13   A.   Yes.  The second IP address listed here, which is
14   50.188.218.61, was owned by Comcast Cable.
15       During the investigation a subpoena was served to Comcast
16   Cable requesting that they identify that subscriber.  Subpoena
17   was served on Comcast.  Comcast responded to our request and
18   identified the subscriber of that information as the
19   defendant's wife in Naples, Florida, at the defendant's
20   address in Naples, Florida.
21   Q.   Now before we move on to the Comcast data, did you do any
22   investigatory steps to determine who the IP address -- the IP
23   addresses of these other accounts listed?
24   A.   The other IP addresses listed below, the four remaining
25   IP addresses, I did conduct similar lookups on those IP

1    addresses and determined that they either resolved to tor

2    notes, which as described earlier would make it very difficult

3    or impossible to identify the subscriber, or they resolved to

4    virtual private network servers.  A virtual private network

5    functions very similarly to how the Tor network functions, in

6    that, an individual who uses a virtual private network or a

7    VPN, when they do so they may be sitting here in this

8    courtroom, and when you turn on your VPN to access the

9    internet, it will appear as though you're coming from

10   somewhere else in the world.

11         So these last four IP addresses were IP addresses that we

12   were not able to connect back to a real individual.

13   Q.   Let's move forward to the Comcast return ending in .61

14   that came back to the defendant's wife, Barbara Chase.

15   A.   I have it in front of me.

16   Q.   Okay.  Can you walk the jury through this return for

17   Comcast?

18   A.   And so this is the information that was returned by

19   Comcast.  It identifies the subscriber name as Ms. Barbara

20   Chase.  The service address is 3570 15th Avenue SW, Naples,

21   Florida, 34117.  There is a phone number provided with the

22   account.  The type of service is listed as high speed internet

23   service.  The account number is listed.  There is an unknown

24   entry for start of service.  The account status was currently

25   active at the time Comcast provided this information to the

1  FBI.  There is an email user ID associated with the account

2  which is BChase_SWFLA and the number 1.

3  Q.   Okay.  Moving to the next page of this return, could you

4  walk the jury through this.  What this information provided

5  indicates.

6  A.   This is -- the information that Comcast provided to the

7  FBI included the history of IP addresses that had been

8  assigned to Ms. Chase's Comcast cable internet account.  And

9  so what this line indicates -- it is listed in reverse

10 chronological order so I'll read from the bottom up.

11      The IP address that I mentioned earlier, 50.188.218.61,

12 was initially signed to Ms. Chase's Comcast account on

13 September 8, 2014, and it was assigned to the account through

14 September 14, 2014.

15      Going up to the first line there is an indication that

16 the IP address was immediately reassigned to the account,

17 again on that same day September 14th, 2014, through

18 December 16th, 2014.

19      So combining the information in these two lines this --

20 the Comcast Cable internet account assigned to the defendant's

21 residence had this same IP address between September 8, 2014,

22 and December 16, 2014.

23 Q.   Going back to the Yahoo return, Government's Exhibit 45,

24 the Excel spreadsheet, what did that indicate?

25 A.   Given the timetable that Comcast Cable confirmed that

1  that IP address was assigned to the defendant's residence, as

2  you can see on the second line that IP address was captured by

3  Yahoo on November 25, 2014, during the timeframe which that IP

4  address was assigned to the defendant's residence, indicating

5  that an individual using the internet account at the

6  defendant's residence had accessed this Mike Taylor email

7  account, which was being used to pay for and host the PlayPen

8  website.

9  Q.    Okay.  Showing you, again, what has been marked as U.S.

10  Exhibit 42.  We talked briefly that payment was being made to

11  host the server on PayPal.  Did you also -- did you subpoena

12  any payment information from PayPal?

13  A.    Yes.  We issued a subpoena to PayPal requesting

14  information about the subscriber of the account, as well as

15  transaction histories of the account, where the money was

16  coming from, where the money was going.  We also requested

17  information about who was accessing the account over the

18  internet.

19  Q.    Showing you now what has been marked as United States

20  Exhibit 43.  Let's start with the registration page.

21        Please walk through that page with the jury.

22  A.    And so this is the first page of -- one of the pages of

23  the response from PayPal.  It indicates that the law

24  enforcement officer who served the subpoena was myself.  The

25  second line indicates that I had at some point been assigned

1    to the Albany, New York, field office, which is where I was

2    assigned the first time I ever issued a subpoena to PayPal.  I

3    was assigned to the Major Case Coordination Unit during the

4    course of this investigation.

5         The subpoena was served to PayPal on January 30, 2015,

6    and the evidence was gathered and provided to the FBI on or

7    about February 4, 2015.

8         The registration information included on file to PayPal

9    is included below.  Again, similar to the CentrilLogic

10   information, the registered user of this account provided a

11   name of Mike Taylor.  The same email address is listed.

12   MikeT46589@Yahoo.com.

13        The account was currently open at the time this

14   information was provided to the FBI.  The account number is

15   listed, and there is an indication that this PayPal account

16   was created on October 4, 2014.

17   Q.   Before moving on, what does the -- I see "personal

18   unverified."  What does that mean?

19   A.   PayPal has different account types.  There are verified

20   accounts and there are unverified accounts.  An individual who

21   has a verified account with PayPal has essentially confirmed

22   their identity to PayPal, generally, by connecting their

23   account to an actual bank account in their real name.

24        This account is listed as an unverified account,

25   indicating that PayPal has not verified the true identity of

1    this individual.

2    Q.    Okay.  Moving to -- can you just kind of walk the jury

3    through the activity logs that PayPal returned.

4    A.    So part of the information that was returned by PayPal

5    included the IP address that was captured, generally each time

6    someone logged into the PayPal account.

7          So we can see here the dates and times that the account

8    was accessed.  We can see the IP addresses that were

9    associated with the individual accessing the account.  The

10   activity that occurred is listed on the far right column,

11   someone logging into the account, someone logging out of the

12   account.

13         And then the Yahoo email address that was used to create

14   the account is listed in every row.

15   Q.    Okay.  Looking at November 10, 2014, the IP address

16   ending in .61, what did that indicate to you?  Did that look

17   familiar to you, that IP address?

18   A.    Yes.  That IP address is the IP address that I testified

19   about earlier that was assigned to the defendant's residence

20   in Naples, Florida.  So this line indicates that an individual

21   using the internet service at the defendant's residence logged

22   into this PayPal account.

23   Q.    What about the -- above it, the .149 -- IP address ending

24   in .149, does that IP address also look familiar?

25   A.    Yes.  There are several rows that contain the IP address

1   67.251.7.149.  As I testified to earlier, this is the IP

2   address that was owned by TimeWarner Cable that had been

3   assigned to the defendant's mother or stepmother's residence,

4   Louise Chase, in Maine.

5   Q.   Okay.  Once you -- after linking the CentriLogic account

6   hosting a server to the defendant's residence in Maine, his

7   mother's residence -- I'm sorry -- his mother's residence in

8   Maine, and his residence in Naples, Florida, did you do any

9   further investigation?

10  A.   Yes.  The first IP address that we obtained for the

11  subscriber was the one in Maine.  And so at that point in time

12  I contacted the Boston FBI field office, which has a satellite

13  office which covers area in Maine.  I gave them information

14  about my investigation and I requested that they initiate

15  surveillance on that residence and reach out to local law

16  enforcement to see if they could identify who was living at

17  that residence.

18  Q.   Did you also take measures to monitor any internet

19  activity at the Maine or Naples, Florida, residence?

20  A.   Yes.  During the course of the investigation we obtained

21  an order from a federal judge -- excuse me -- to monitor and

22  capture the internet activity that was going to and from that

23  residence in Maine.

24  Q.   Okay.  And just briefly describe for the jury just how

25  you were able to use this.

1   A.   So when we obtained what we refer to as a pen register

2   trap and trace order, we go to a judge and we inform the judge

3   that there is -- there appears to be evidence of a crime

4   originating from the internet connection at this residence.

5   And so we request authority to monitor the internet activity

6   going to and from that residence.  Such an order was prepared

7   and submitted to a judge, it was signed, and the order was

8   provided to TimeWarner Cable.

9        At that point in time, TimeWarner Cable began sending to

10  the FBI information about all of the internet activity going

11  to and from this residence in Carrabassett Valley, Maine.

12  Q.   What were the results of that request?

13  A.   The pen register data showed us several things.  The

14  first it showed that someone at the residence was accessing

15  the Tor network or the Dark Web on several days.

16       Additionally, there were connections directly to the

17  server in North Carolina, indicating that someone from that

18  residence was administering the server here in North Carolina,

19  from the residence in Maine.

20  Q.   And moving to the CentrilLogic server in North Carolina.

21  A.   Yes.  Direct connections to the CentrilLogic server in

22  North Carolina.

23  Q.   Moving to the defendant's Naples, Florida, residence,

24  what were the results of that trace?

25  A.   So at a certain point during the investigation we

1    refocused our efforts from the Carrabassett Valley, Maine,

2    residence to the defendant's residence in Naples, Florida.

3        A similar order was obtained to monitor and capture the

4    internet activity going to and from the defendant's residence.

5        The data that was captured from that pen register,

6    similarly showed that someone was using the internet account

7    from the defendant's residence to connect to the server in

8    North Carolina, in an administrative capacity.

9    Q.   And what's, I guess, just briefly, for the jury, just

10   around the time period that this was taking place in Maine and

11   Florida.

12   A.   So the investigation we sent a lead to the Boston field

13   office, which covered Maine, in January 2015.  During the

14   course of that investigation we determined that Mr. Chase was

15   in the area, in Maine, staying with his mother or stepmother

16   Louise Chase.

17       At a point in the investigation we determined that

18   Mr. Chase had departed from Maine and returned to his

19   residence in Naples, Florida.  I believe he departed from

20   Maine on or about February 3, 2015.  After determining that

21   Mr. Chase had returned to his residence in Naples, Florida,

22   that is when we obtained the order to monitor the internet

23   activity in Naples, Florida.

24   Q.   Around the same time, did you also have occasion to

25   review any of the log in files from the server hosting the

1  website?

2  A.   Yes.   In January 2015 a copy of the server hosting the

3  PlayPen website was seized from the facility at CentrilLogic

4  in North Carolina.   I did have the opportunity to review

5  information stored on that server.

6  Q.   Did any information stored on that server indicate any

7  activity incoming from Naples, Florida -- the defendant's home

8  in Naples, Florida?

9  A.   There was information on that server indicating that an

10  individual had logged into the PlayPen website, to the main

11  administrator account also named PlayPen from the defendant's

12  residence in Naples, Florida.

13  Q.   Based on this information, the pen trap information from

14  Maine and Florida, and as well as the log files from the

15  server hosting the PlayPen website, what were your next steps?

16  A.   After we had determined that Mr. Chase had returned to

17  his residence in Naples, Florida, I contacted the Tampa field

18  office which covers the Naples, Florida, area.   Again, similar

19  to my contact with the Boston field office, I informed them of

20  the background of the investigation, and I requested that they

21  prepare to execute a search warrant and an arrest warrant at

22  the residence of Mr. Chase.

23  Q.   And was that search warrant executed at the residence of

24  Mr. Chase?

25  A.   Yes.   In the evening hours of February 19, 2015, I

1  provided a briefing to the search team members who would be

2  participating in the search of Mr. Chase's residence.  And

3  then a search warrant was executed at his residence around

4  midnight of that same day.

5  Q.   Just briefly describe for the jury how the search

6  execution began.

7  A.   First I provided background of the investigation to all

8  of the individuals who would be participating, that included

9  law enforcement officers from the FBI who would be

10  responsible, initially, for approaching the residence,

11  securing it, apprehending anyone who was inside, doing so in a

12  safe manner.

13       Other individuals who were participating during the

14  briefing were other law enforcement personnel who would be

15  responsible for various activities such as taking pictures of

16  the residence, searching the residence for evidence, and

17  maintaining control of the scene while it was being searched

18  by the FBI.

19       And so the search warrant was executed at the residence.

20  One individual was found in the residence, the defendant,

21  Mr. Chase.  A number of items of evidence were observed and

22  seized from the residence.  Photos were taken of the exterior

23  and interior of the residence.

24  Q.   Did you observe Mr. Chase at any point during the search

25  warrant execution?

1    A.    I did.   I approached the residence after other FBI agents

2    had gone in and secured Mr. Chase.  I observed them transport

3    Mr. Chase out of the residence and place him into a law

4    enforcement vehicle.  I also had a brief conversation with

5    Mr. Chase during the execution of the search warrant.

6    Q.    Can you point Mr. Chase out for the jury?

7    A.    Yes.  He is the gentleman with the beard sitting at the

8    defendant's table.

9    Q.    And, again, at the time of the search warrant execution,

10   was there anyone else located inside the home?

11   A.    No.  Mr. Chase was in the residence alone.

12   Q.    Briefly describe for the jury what you observed upon

13   entering the home.

14            THE COURT:  I beg your pardon, before you answer

15   that.

16            The record will reflect that the witness identified

17   Mr. Chase sitting there at counsel table.

18            THE WITNESS:  Of note, I noticed several things

19   inside of the residence, but my primary focus was on a laptop

20   computer that was found inside of the residence.

21            I looked at the laptop computer and I observed that

22   it was currently logged into the PlayPen website as the

23   PlayPen user, the main administrator.

24            Additionally, the laptop was connected to the

25   administrative account of the server in North Carolina which

1    was hosting the PlayPen website.

2            In addition to that, a text file was opened on the

3    laptop computer containing various usernames and passwords

4    associated with the PlayPen administrator, including usernames

5    and passwords associated with the Mike Taylor persona that I

6    had described earlier.

7    Q.   Where did you observe this laptop, Agent Alfin?

8    A.   When you walked into the residence, directly to the left

9    was a couch and there was a portable TV dinner stand,

10   something of that nature, in front of the couch.  And so the

11   laptop computer was seated on that TV stand.  Right in front

12   of the couch.

13   Q.   I'm showing you what has been marked as U.S. Exhibit 47.

14   A.   I have it in front of me.

15   Q.   Just point out and identify to the jury the two

16   laptops -- first starting with the laptop sitting on the

17   coffee table.

18   A.   The laptop sitting on the coffee table --

19           MR. JONES:  Before I do that, Your Honor, if I

20   would.

21           First, do you recognize these photos?

22   A.   I do.

23   Q.   How do you recognize them?

24   A.   These are photos that were taken of Mr. Chase's residence

25   during the search warrant that was executed at this residence.

1  Q.   Were you there when the photos were taken?

2  A.   I was.

3  Q.   Are they a fair and accurate scene on the night of the

4  search warrant?

5          MR. ADOLF:  Your Honor, I'm sorry.  We have a juror

6  raising her hand.

7          THE COURT:  Yes, ma'am.

8          JUROR:  We don't see anything.

9          THE COURT:  The juror is not seeing what you

10  purported --

11          MR. JONES:  I'm getting ready to offer it into

12  evidence now, Your Honor.

13          MS. RANDALL:  It hasn't been admitted yet.

14          THE COURT:  Let it be admitted.

15  Q.   Is it a fair and accurate scene on the night of the

16  search warrant execution?

17  A.   Yes, it is.

18          MR. JONES:  We move to admit and publish to the

19  jury, Exhibit 47, to the jury.

20          THE COURT:  Let it be admitted.

21          (Government's Exhibit No. 47 was received into

22  evidence and published.)

23  Q.   Would you briefly describe the first photo.

24  A.   So as noted earlier, there are two laptop computers

25  visible in this image.  On the coffee table there is a silver

1    or white Mac Book Pro laptop.  That is my laptop computer that

2    I brought with me to the search.  It is not the defendant's

3    laptop computer.  I had to step away so that the search

4    warrant photos could be taken.

5         The computer that was found in the residence which was

6    actively logged on and connected to the PlayPen website and

7    the server in North Carolina, is the black laptop computer

8    which is located on the nightstand facing the couch.

9    Q.   I'm also showing you now just briefly -- not publishing

10   these yet -- look at U.S. Exhibits 48 and 49.

11   A.   I have 48 in front of me.

12   Q.   Do you recognize these two photos, 48 and 49?

13   A.   Yes, I do.  These are both pictures that were taken of

14   the -- of the screen of the laptop as it was when we entered

15   the residence.

16   Q.   Are they fair and accurate depictions of the scene of the

17   laptop -- the scene of the residence on the night of the

18   search warrant execution?

19   A.   They are.

20             MR. JONES:  The Government moves to admit U.S.

21   Exhibits 48 and 49 into evidence at this point in time, Your

22   Honor.

23             THE COURT:  Let them be admitted.

24             MR. JONES:  And published to the jury.  Starting

25   with U.S. Exhibit 48.

1      THE COURT:  Yes.  As I said before, unless I say

2  otherwise, you may publish them.

3      MR. JONES:  Okay.

4      (Government's Exhibits No. 48 & 49 were received

5  into evidence.)

6  Q.   Agent Alfin, would you briefly describe for the jury what

7  is in front of you, U.S. Exhibit 48.

8  A.   Again, this is a picture of the laptop that was found in

9  the defendant's residence as it was when law enforcement

10  agents entered the house.  As you can see from the photo, the

11  PlayPen website is displayed on the screen, and it is

12  currently logged into the PlayPen website.

13  Q.   All right.

14  A.   And so --

15  Q.   Go ahead.

16  A.   Exhibit 49 contains a close-up picture of the screen,

17  which is a little bit easier to read.  And so you can see in

18  the top right-hand corner it says, "Hello PlayPen."

19  Indicating that the individual account that has been logged

20  into when law enforcement agents entered the residence was the

21  PlayPen account, the main administrative account of the

22  PlayPen website.

23  Q.   Were there other files -- just looking at U.S. Exhibit 49

24  in front of us, going through the various sections, you can

25  see the administration and general category.  Briefly describe

1    that administration section for the jury.

2    A.    So when an administrator or a moderator, one of the staff

3    members of the PlayPen website logged in, they would have

4    access to a special forum of the website that regular users

5    could not see.

6         And so that is listed on this screen, conveniently right

7    next to the light flash it says "Administration."  And so that

8    is a forum where the administrators and moderators of the

9    PlayPen website could have private discussions out of the

10   purview of the regular users of the website.

11        And so, again, as this is the main PlayPen administrative

12   account logged in, you can see the link to the administrative

13   section here on the screen.

14   Q.    All right.  Turning back to U.S. Exhibit 48.  If you

15   would look at the laptop, is there another item mounted to the

16   laptop?

17   A.    Yes.  In the bottom left hand of the picture you can see

18   that there is a black and red flash drive that is connected to

19   the laptop.  This flash drive was connected to the laptop when

20   law enforcement agents entered the house.  This is how we

21   found the laptop.

22   Q.    Agent Alfin, were there other files opened -- found open

23   on the laptop besides being logged into the PlayPen website as

24   the username PlayPen?

25   A.    Yes.  Actually in Exhibit 49, which shows the close-up of

1    the laptop screen, you can see across the bottom of the screen

2    there are icons indicating the other applications that were

3    currently running on the laptop.

4        So the icon second from the right shows two computers

5    connected by a lightening bolt.  This is the icon for a

6    program known as "Puddy."  Puddy allows you to securely

7    connect to another computer or server over the internet.

8        And so I reviewed the information that was active in the

9    Puddy program and I determined that the laptop was currently

10   logged into the administrative account of the PlayPen

11   website -- excuse me -- of the server in North Carolina which

12   was hosting the PlayPen website.

13       In addition to that, there was an active connection

14   through that same program to a server in Canada which was

15   hosting a separate file hosting site, which contained numerous

16   images and videos of child pornography that were shared

17   through the PlayPen website.

18       In addition to the Puddy program, the fourth icon from

19   the right, which appears to show a text pad with the letter A

20   on it, that was also open when we encountered this laptop

21   computer.  There was a text file that was opened named

22   PP_2.RTF.  RTF stands for rich text file.  It's just a normal

23   text file format for a computer, similar to, you know, a .txt

24   file or Word document.

25       And so I reviewed this file which was opened when we

1   found the laptop and I determined that it contained what

2   appeared to be usernames and passwords associated with the

3   PlayPen website for the administrative account PlayPen.

4         It contained what appeared to be usernames and passwords

5   for the server in North Carolina which was hosting the PlayPen

6   website.

7         It also contained what appeared to be usernames and

8   passwords for the Mike Taylor email account, and the Mike

9   Taylor PayPal account.

10        Additionally, the text file contained a link to the Hard

11  Candy section of the hidden wiki, which is one of the places

12  where the link to PlayPen was advertised.

13  Q.   Agent Alfin, I'm showing you what's been marked as

14  Government's Exhibit 81.  Do you recognize this document?

15  A.   I do.  This is the text file that I described previously.

16  Q.   And how do you recognize it?

17  A.   I recognize it because I first encountered this file the

18  night of the -- or early morning on February 20th in the

19  defendant's residence.  This is the file that was opened on

20  the defendant's laptop computer.

21  Q.   And are the contents of this file accurate -- a fair and

22  accurate representation of what you encountered the night of

23  the search warrant execution?

24  A.   Yes.

25             MR. JONES:  Your Honor, the Government moves to

1   admit U.S. Exhibit 81.

2           THE COURT:  Let it be admitted.

3           (Government's Exhibit No. 81 was received into

4   evidence and published.)

5   Q.   Agent Alfin, would you just briefly walk through

6   Government's Exhibit 81 for the jury.

7   A.   So at the top of this file we have what appears to be the

8   username and password for the Mike Taylor Yahoo account.

9   Again, that email address was MikeT46589@yahoo.com.  This

10  email address was familiar to me at the time of the search.  I

11  recognized it as the email address that was used to create the

12  account at CentrilLogic in North Carolina.  It was also the

13  email address that was used to create the PayPal account which

14  was funding the account at CentrilLogic in North Carolina.

15      The password that appears to be listed for the account is

16  ##MINE, that's capital M-I-N-E 9999##.

17      There is also a phone number listed here.  And also below

18  that is the name and address for the Mike Taylor persona that

19  was provided to CentrilLogic when the CentrilLogic account was

20  registered.

21  Q.   Okay.  Moving down.

22  A.   I mentioned that the laptop computer was actively

23  connected to the administrative account of the server in North

24  Carolina.  It was similarly connected to a server in Canada

25  which hosted, again, a part of the PlayPen website where

1 individuals would upload larger images and videos.

2      And so this link here which goes to CA.OVH.com, that is a

3 link to a server hosting company in Canada named OVH.  That is

4 the company in Canada where that portion of the PlayPen

5 website was hosted.  And, again, we appear to have the

6 username and password for that account in Canada.

7      Below that is a link to the billing log-in portal for the

8 CentrilLogic company here in North Carolina.  You'll notice

9 that the actual link says "billing.dacentec,"

10 D-A-C-E-N-T-E-C.com.  CentrilLogic and Dacentec are the same

11 company, one of them bought the other.  I believe CentriLogic

12 purchased Dacentec, it may be the other way around.  But this

13 is the link to the billing portal for CentriLogic, the company

14 in North Carolina where the PlayPen website was being hosted.

15      Again, we have what appears to be the username and

16 password associated with that CentriLogic account.

17           THE COURT:  We'll take our lunch break at this time,

18 members of the jury, ask you to be back with us at 1:45.  That

19 gives you an hour and 15 minutes.  Thank you for your

20 attention to the case, please remember the usual instructions.

21 Thank you.

22           (Lunch recess from 12:30 until 1:46.)

23           THE COURT:  May we have the jury, please.

24           The witness may take the stand again.

25           (The jury was returned to the courtroom.)

1      THE COURT:  All right.  Members of the jury, you all

2  settled.  You may resume the examination.

3      MR. JONES:  Thank you, Your Honor.

4  BY MR. JONES:

5  Q.   Agent Alfin, before we took our lunch break you were

6  walking the jury through Government Exhibit 81.  Will you

7  briefly describe Government Exhibit 81 to the jury again?

8  Just kind of briefly pick up where you left off in your

9  explanation.

10 A.   As I testified to earlier, Exhibit 81 is a copy of a text

11 file that was already opened on the defendant's laptop when we

12 encountered it in his residence on February 20, 2015.  It

13 contains what appear to be a number of usernames and passwords

14 associated with the PlayPen website, and the identity Mike

15 Taylor, which was used to create various accounts associated

16 with the PlayPen website.

17 Q.   If you would walk the jury -- we'll blow it up again.

18 Start here.

19 A.   And so this part of the text file has various IP

20 addresses and passwords associated with the server in North

21 Carolina which was hosting the PlayPen website.

22      You can see it's labeled "PP1."  The next line is labeled

23 "server" and it has an IP address listed next to it.  That is

24 one of the IP addresses associated with the CentriLogic

25 account which was hosting the PlayPen website.

1    Below it starting with the line HTTP:// and then there is

2    what is seemingly a bunch of gibberish characters ending

3    in dot onion.  This was the link to the PlayPen website.

4    Below that are various passwords, again, associated with

5    the server that was hosting the PlayPen website.  The name

6    "PlayPen" is visibly seen in several lines of this text.

7    And so this is more of the same information, more IP

8    addresses associated with the various aspects of the PlayPen

9    website, including the image hosting section of the PlayPen

10   website, and the file hosting for larger videos and larger

11   collection of images section of the PlayPen website.

12   Similar to the previous zoomed in portion of the text

13   file, there are usernames and passwords associated with the

14   administrative accounts for the sections of the servers

15   hosting these parts of the website.

16   Down at the bottom there is a different URL for the

17   PlayPen website.  It begins with the line HTTP://M-U-F-F.  And

18   then again it follows with more seemingly gibberish letters

19   ending in dot onion.  This was an old link to the PlayPen

20   website.

21   Over time the link to the PlayPen website would change

22   every now and then.  According to postings made by the PlayPen

23   user, the administrator of the website, the username -- or

24   excuse me, the link to the website would change every now and

25   then to throw them off -- off the track; "them" in that

1  context referring to law enforcement.  And so I recognized

2  this as one of the older links to the PlayPen website.

3      Below that information you can see what appears to be the

4  username and password for the Mike Taylor PayPal account.

5  Again the Mike Taylor PayPal account was the source of funding

6  for the PlayPen website.

7  Q.   Agent Alfin, were you able to determine where the actual

8  text file was stored on the computer?

9  A.   Yes.  When I observed the text file was opened on the

10  computer, I also observed that it was actually located on the

11  flash drive that was connected to the computer when we

12  initiated the search.  That flash drive, at the time, was

13  available to the computer, and all the data on it could be

14  read.  It was actually an encrypted flash drive, indicating

15  that someone, prior to the execution of the search warrant,

16  had connected it to the laptop and made it available to be

17  accessed.

18      So if that flash drive had been pulled out of the laptop,

19  the data on it would have been encrypted.  Meaning, it would

20  have been unreadable without the proper username -- excuse

21  me -- without the proper password or key.

22      So it was important to us for our search that this flash

23  drive was found in a state where we could actually read the

24  data that was on it.

25  Q.   Were you able to read the data that was on it?

1   A.   Yes.

2            MR. JONES:  May I approach, Your Honor?

3            THE COURT:  Yes, sir.

4   Q.   Special Agent Alfin, I'm showing you what has been marked

5   as Government's Exhibit 66 and 68.

6   A.   I have it in front of me.

7   Q.   Do you recognize those exhibits?

8   A.   I do.

9   Q.   What are they?

10  A.   Government's Exhibit 66 is the defendant's laptop that I

11  encountered in the defendant's residence during the Naples,

12  Florida, search warrant.

13       It was the laptop which I described previously, which was

14  actively connected to the PlayPen website as the PlayPen

15  administrator, and further, to the server in North Carolina,

16  again, as the administrator.

17       Government Exhibit 68 is the flash drive that was visible

18  in the search warrant photo that was connected to the laptop

19  that contained the text file that I described, along with

20  various other files relating to the PlayPen website, including

21  multiple backup copies of the PlayPen website, backup copies

22  of the image up loader from the PlayPen website, backup copies

23  of the file hosting service for the PlayPen website, and

24  configuration information for the PlayPen website.

25  Q.   Agent Alfin, was the defendant subsequently arrested?

1   A.   He was.

2   Q.   Okay.  Showing you what has been marked as Government's

3   Exhibit 94.  Do you recognize this photo?

4   A.   I do.

5   Q.   How do you recognize it?

6   A.   When I had a -- I had a brief interview with the

7   defendant during the execution of the search warrant, that

8   interview was recorded, and this is a still shot from that

9   interview recording.

10          MR. JONES:  Your Honor, the Government moves to

11  admit Exhibit 94.

12          THE COURT:  Let it be admitted.

13          (Government's Exhibit No. 94 was received into

14  evidence and published.)

15  Q.   Agent Alfin, were any other devices seized from the

16  defendant's residence besides that laptop and another thumb

17  drive?

18  A.   Yes.  A number of devices were seized from the

19  defendant's residence.  Again, this laptop and the flash drive

20  connected to it were seized from the residence.  In addition

21  to those items, a cellular telephone was seized from the

22  defendant's residence, other computer and computer storage

23  devices were also seized from the residence.

24      In addition to those items, a hard drive was seized from

25  the residence, not one that belonged to the defendant, one

1    that we had brought to the search with us.  Because the flash

2    drive that we encountered was encrypted, we couldn't just

3    bring it back with us and analyze it back in our lab.  If we

4    had disconnected it from the computer, the data on it would

5    have been unreadable.  And so while we were on scene, myself

6    and another forensic experts made a copy of the data that was

7    on that flash drive.  That copy was placed on a hard drive

8    that, again, we brought with us, and that drive was also

9    seized from the defendant's residence.

10         Again, that hard drive did not belong to the defendant.

11   Q.   Now let's transition.  We previously looked at

12   Government's Exhibit -- all right.  We previously looked at

13   what's been admitted as Government Exhibit 70, the hard drive

14   seized from CentriLogic.  Did you have an opportunity to

15   review the evidence obtained from those hard drives?

16   A.   I did.

17   Q.   And were there IP addresses of other PlayPen users

18   located on those hard drives?

19   A.   So as described earlier, the Tor network prevents --

20   essentially prevents your IP address from being transmitted to

21   tor websites or hidden services.  And so in the normal course

22   of operation of a tor hidden service, Such as PlayPen, you

23   won't see a user's IP address in any log files.  You may see

24   an entry for an IP address, which is just useless information,

25   nothing to follow-up on.

1      In the case of the PlayPen website there were actually

2 some real IP addresses that were captured for certain users,

3 including the PlayPen administrative account.

4      The reason for this being, there was a misconfiguration

5 of the PlayPen website.  And so, if a user such as an

6 administrator or the person who was responsible for creating

7 the website knew the true IP address of the server as the

8 creator would, you could actually bypass the Tor network

9 entirely and just connect directly to the server over the

10 regular internet.

11     And so there were log files contained on that server

12 indicating that on several occasions an individual in control

13 of the PlayPen user account did just that.  They bypassed the

14 Tor network completely and they logged directly into the

15 website.  And so there were, in fact, some IP addresses that

16 were captured from that server, despite the fact that the

17 server was intended to be accessed over the Tor network.

18 Q.   Okay.  And were you able to, in reviewing the hard drive,

19 were you able to create any summary charts or exhibits based

20 on what was obtained on those hard drives?

21 A.   Yes.  The hard drives, again, were seized from

22 CentriLogic, the company here in North Carolina that had been

23 hosting the PlayPen website.  Those hard drives contained a

24 copy of the PlayPen website as it existed up until the

25 defendant's arrest.

1    A copy of the PlayPen website -- a backup copy of the
2    PlayPen website had been created on the server in CentriLogic
3    a few hours before the defendant's arrest.  The command
4    history on the defendant's laptop, as well as the text file
5    that I described earlier, contained those exact instructions
6    to create that backup copy.

7    So I did analyze that backup copy.  It is what contained
8    the IP addresses that I described earlier.  It also contained
9    all of the postings from the website.  I was able to prepare a
10   summary exhibit of the postings from the website.  I was also
11   able to analyze and follow-up on the IP addresses that were
12   contained within that copy of the website.

13   I noticed upon analyzing the IP addresses that a number
14   of log-ins to the PlayPen user account came directly from the
15   defendant's Naples, Florida residence.

16   A number of other IP addresses that were captured in the
17   website log files indicated that the account had been accessed
18   from IP addresses that appear to be in places like Texas or
19   Chicago.  This is not an actual indication that the individual
20   who was accessing the account was in Texas or Chicago.  Those
21   IP addresses, I researched them, and determined that they were
22   assigned to virtual private network companies.

23   As I testified to earlier, an individual utilizing a
24   virtual private network or a VPN, when you do that, your
25   internet connection to various websites or other places on the

1    internet, those websites will think that you are coming from

2    somewhere else.

3         So, for example, you could be in Florida, use your VPN

4    connection, and then a website may think that you're in

5    Chicago or in Texas.

6         So the IP addresses that were contained in those log

7    files did resolve to either VPN companies or other nodes on

8    the Tor network.

9         But, again, there were some that came directly back to

10   the defendant's residence.

11        Additionally, I testified to earlier, that for a period

12   of time we were monitoring the internet activity going to and

13   from the defendant's residence.  That internet activity

14   captured information showing that a user of the internet

15   account at the defendant's residence in Naples, Florida was,

16   in fact, using such VPN software.

17        And, additionally as I mentioned earlier, the backup copy

18   of the website also contained the postings of the website,

19   including all the postings that had been made by the

20   administrative account, by the PlayPen user accounts, and I

21   prepared a summary exhibit of those postings.

22   Q.   Agent Alfin, I'm showing you Government Exhibit 41.  Do

23   you recognize this document?

24   A.   I don't have anything on my screen.  Now I do.

25   Q.   Okay.

1    A.    Yes.   This is the summary exhibit that I described

2    earlier, containing a number of postings that the PlayPen user

3    account had made to the PlayPen website.   It does not contain

4    every single posting made by the PlayPen user account.

5    Q.    Did you create these charts yourself?

6    A.    Yes.

7            MR. JONES:   Okay.   Your Honor, at this time the

8    Government moves to admit Government's Exhibit 41 into

9    evidence.

10           THE COURT:   Let it be admitted.

11           (Government's Exhibit No. 41 was received into

12    evidence and published.)

13   Q.    Agent Alfin, I just want you to walk the jury through the

14   summary chart you made of the postings by the user "PlayPen"

15   on the site, starting with page 1.

16   A.    So these are postings in the administration section of

17   the PlayPen website.   As I testified to earlier, staff members

18   of the website, administrators and moderators, had access to a

19   special section of the website where they could discuss the

20   general business of the website, things of that nature.

21           And so this first post is in the administration section.

22   The post title is "100,000 posts."   It was made on or about

23   February 8, 2015.   And the PlayPen user account posted,

24   "closing in on that number.   Quite happy with what started out

25   as a toy has really grown."

1       The second posting is a reply to a topic titled
2   "Admission requirements."  And so it begins with a quote from
3   another individual of the website, a moderator who used the
4   username "Stretch Armstrong."  And it goes on to say, "You are
5   absolutely right.  I have been seeing the same posts.  Half of
6   the members do not care.  I started this board out of the need
7   for one and planned to always keep it open."
8       Plan pen -- "PlayPen is as much yours as it's mine.  So
9   maybe coming up with a working model is possible.  I can see
10  PlayPen doubling in size again in the next few months."
11      Important in this particular post is the statement posted
12  by the account stating that he "had always planned to keep it
13  open."
14      There were other child pornography websites that existed
15  on the Tor network which were not open websites like PlayPen.
16  Websites where you had to be invited by other individuals or
17  meet certain criteria.
18      And so this is a reference to the fact that anyone who
19  knew how to find the PlayPen website could register for an
20  account and join.
21  Q.   Okay.  Moving to the next page.
22  A.   Still in the administration section.  This is a reply to
23  a post titled "Another questionable video."  On or about
24  February 12, 2015.  It begins with a quote, again, from the
25  moderator Stretch Armstrong, referencing a video that some

 1   users on the website were complaining about.  The black text

 2   at the end is the text from the PlayPen user account stating,

 3   "I say just delete it.  And give him a reason why."

 4        Showing the administrator of PlayPen providing

 5   instruction to one of his, I guess, subordinates, one of the

 6   moderators.

 7   Q.   Agent Alfin, were you able to identify Stretch Armstrong?

 8   A.   Yes, I was able to identify Stretch Armstrong as David

 9   Lynn Browning from Kentucky.

10   Q.   Okay.

11   A.   The next post, still in the administration section, topic

12   title, "Authenticating mods admins," on or about December 13,

13   2014.  The post states.  "Hi Little Smiles, and welcome to

14   PlayPen.  I started PlayPen for fun and the need for such a

15   community.  I do understand what you are saying, but I will

16   not be giving out any personal contact information for myself.

17   Hope you understand."

18        Little Smiles was another moderator on the PlayPen

19   website.

20   Q.   Okay.

21   A.   This is a post titled "File Host" on or about

22   February 11, 2015.  The post states, "What you all think of

23   the files must be encrypted.  Does it matter?  Should I care?

24   Also not happy with the speed so I am setting up a bigger

25   server for this.  Spending most of my life as a webmaster, I

1   find Tor to be quite a challenge.  That's what makes this so

2   much fun for me."

3       A post titled "Global Moderators invites, nominations" --

4   or there's a typo "nomiations and welcomes."  November 7,

5   2014.  Reply to a quote by the user "Tactile," also one of the

6   moderators of the Playpen website.  The user Tactile states

7   that he would like to nominate another user on the website

8   "the Wizard" to become a moderator and vouches for him, says

9   that "He is a brilliant coder and good friend."  The

10  administrator of PlayPen responds, "sounds good.  Sign him up.

11  What I need is a good server guy."

12  Q.   Okay.

13  A.   This is a post titled "Logo" on or about November 7,

14  2014.  User PlayPen posts "Anybody here who can make a new

15  logo for PlayPen?  We are going on three months old now all

16  with the same logo.  Photo shop people, here is the link to

17  the current logo."  And then the links to the logo are posted

18  below.

19      The next post is titled "New Mod."  January 28, 2015.

20  The user Playpen posts, "What you all think of unleashed loser

21  as Mod?  Signed PP."

22      Unleashed user was a -- unleashed loser was another user

23  of the Playpen website who was eventually promoted to

24  moderator.

25      The post titled "PlayPen file host" on or about

1    January 31, 2015.  Post states.  "Just to let you know I am

2    going to do it.  Setting up a new server that will have six, 2

3    TB hard drives."

4         TB is an abbreviation for terabytes, which is 1,000

5    gigabytes.

6         "Will take me sometime to get it ready for testing.  But

7    12 terabytes of disk space, now that's going to be a lot

8    of CP.  Smiley face."

9         CP in this context is an abbreviation for child porn.

10   And this post was, again, signed "PP."

11        Post titled "Pleased to announce."  On or about

12   October 9, 2014.  Posts states, "Pleased to announce that

13   PlayPen has moved today to a new super-secure and very large

14   server, which means I'm in it for the long haul.  Smiley

15   face."

16        "Producers original content board."  Post on February 9,

17   2015, states:

18        "I think it's a great idea."

19        A producer's or original content board is a reference to

20   a section of a child pornography website where users are

21   encouraged to engage in new acts of child abuse, film it,

22   record it, and share it on the website.

23        A post titled "Rules."  On or about September 22, 2014.

24   Post states:

25        "Can one of you guys add to the rules an intelligent

1   response to this post?  Being an ass will get you banned."

2       And below that is a quote from another user.  "I love

3   Luda."  Stating, "New rules are needed.  It is against rude

4   and stupid comments.  I have reported comments like fuck you

5   but nothing has happened.  This kind of actions just destroy

6   the community.  And users that make this kind of --" I think

7   that's a typo for replies "should be banned.  We have enough

8   problem with LEA and the public."

9       Again, in this context, LEA is a reference to law

10  enforcement agencies.

11      "There's no need to fight with each other."

12      The last post on this page is a topic titled, "Thoughts

13  on this clip," on January 8, 2015.  Stating:

14      "I am still on my winter break home, which means no

15  secure set up to download and view videos to check for any

16  hurt core."

17      Hurt core is a reference to a genre of child pornography

18  featuring graphic abuse, hitting, whipping, any kind of

19  violent abuse involving sexual exploitation of children.

20      "So I have to rely on you guys to use your best judgment.

21  When in doubt, please delete it."

22      This is the final post from this exhibit, from the

23  Administration section.  Post title is "Two Things."

24  December 18, 2014, post states:

25      "Just want to reach out and thank you guys for all your

1    hard work.  PlayPen looks great, and without you this would

2    never have happened.  I have just pruned all members who have

3    not logged in for the last 40 days, which still leaves like

4    138,000.  I am still on my winter vacation so will only be

5    around to do backups and to check server logs for the next few

6    months, then I am thinking of going somewhere warm.  Signed

7    again PP."

8         The next post is in the "General Discussion" section of

9    PlayPen.

10        And, again, we're back to the sections of the website

11   that were probably available to all members of the website.

12        Post titled "I can find like minded here?"  September 2,

13   2014.  User PlayPen posts "Yes there is or should be a place

14   for everything.  This world needs a good hurt core board.

15   Please not here."

16        Next post in the General Discussion area title "PlayPen

17   New Board Visible."  November 9, 2014.  Post states "That

18   would be me.  It was time for a chance."

19        I believe typo for change.

20        "Smiley face."

21        This, based on my review of the board, was a reference to

22   a format update for the website.  The style, colors and

23   background had recently been updated.

24        Still in the General Discussion area.  Topic titled

25   "PlayPen, Thanks.  I just want to thank you guys for helping

1  make PlayPen a good board.  Today is the 16th day C and I

2  started PlayPen, and already have 26,358 members now.  I never

3  dream of this, way faster than expected.  I have worked my ass

4  off making this happen, and would like to ask you guys for

5  suggestions to make it the best within reason.  Smiley face."

6        Now I would like to thank Axiom for all of his help

7  sharing some of his hacks with me.  Class act guy.  PlayPen."

8        Also reply to the post titled "PlayPen thanks."  Same

9  day, September 6, 2014.  "Thanks, PandaKid.  With a Linux

10  learning you could start one of your own.  This world needs

11  hundreds of this kind of community.  Then let them try to shut

12  them all down."

13        In this context "them" is a reference to law

14  enforcement agencies.

15        General Discussion Board post title "Should this be

16  a closed application site?"  Post was on August 29, 2014.

17  PlayPen user posts "I have set this board up as safe as

18  possible, and if the users use safe Tor practices it will be

19  fine.  Please do not spread fear.  Nothing in this world is

20  without risk."

21        Final post on this page is in the General Discussion

22  area, again, titled "Thanks for the format update."  On

23  November 9, 2014, user PlayPen posts "Thanks.  It was time for

24  a change.  Smiley face."

25        General Discussion title "Who's the owner of this

1  site?"  September 6, 2014.  User PlayPen posts, "That would be

2  me.  Thank you for the appreciation."

3           General Discussion section title "Why does everyone

4  here hate anonymous?"  Post September 7, 2014, states:

5  "Members of anonymous who attack CP sites, there should be a

6  place in this case for CP.  Most pedos are very loving

7  people."

8           Again, in this context "CP" is an abbreviation for

9  child pornography.  "Pedos" is an abbreviation for pedophiles.

10          Moving on to the "How to" section of the PlayPen

11 website.  This is a post titled "How to extract RAR and 7Z

12 files."  On August 23, 2014 post starts with the text "First

13 download WIN RAR from here and follow the illustrations."

14          This is a how-to-guide for how to download the

15 images and videos that are posted on the website.  Per the

16 rules of the website, people are required to use RAR and 7Z

17 files to distribute archives of images and videos, and this is

18 the step-by-step instructions on how to actually download and

19 open up those files so that users can actually view the child

20 pornography contained within them.

21          "PlayPen Information and Rules Forum."  Title About

22 the New Internal Image Hosting."  February 12, 2015.  A reply

23 to a quote from username "Acorn."  The user "Acorn" posted

24 "This new file hoster is great news for us, and great news for

25 admin PlayPen.  You don't have to download CP any more,

1  because we're now going to be sending it all to you.  Winking

2  smiling face."

3         The user PlayPen posted in reply to that "Smiley

4  face.  That's why I asked that uploaded files must be

5  encrypted and password."

6         Moving on to the Preteen Video Girls Hard Core

7  section post titled "Three Young Lesbos."  August 22, 2014.

8  And the text of this post is a link to an image and video

9  pertaining to the title of the thread.

10        The password at the bottom is listed as "PlayPen

11  Open Me."  This will be the password that a user of the

12  PlayPen website would need to actually view the video after

13  downloading it.

14        Still in the Preteen Video Girls Hard Core section

15  another reply to the same post "Three Young Lesbos."

16  September 27, 2014.  User L-O-L-V-E posts, "Can't get to DL."

17  "DL" is an abbreviation for download.  "Please upload

18  somewhere else."

19        User PlayPen responds, "It's still there and has

20  been downloaded 13,084 times."

21        The next post is in the Preteen Videos Girls Hard

22  Core section.  The title is "Five YR Slut."  A reference to

23  five year old.  October 11, 2014.  And again this contains a

24  link to download video and image pertinent to the title of the

25  thread.

1    Next post still in Preteen Video Girls Hard Core

2    titled "Daddy's Little Girl Working It."  August 22, 2014.

3    Again, contains links to images and videos pertinent to the

4    title of the post.

5    Next post "Preteen Video Girls Hard Core."  Thread

6    titled "Young Finger Fuck."  September 25, 2014.  Again,

7    contains links to download images and videos pertinent to the

8    title of the post.

9    Q.   Agent Alfin, I asked you before you started reading the

10   posts you were able to identify who Stretch Armstrong is, you

11   said David Lynn Browning.  Were you also able to identify the

12   username "Isabella"?

13   A.   Yes.  Isabella, one of the other administrators of the

14   PlayPen website was identified as Michael Fluckiger from

15   Indiana.

16   Q.   Now, Agent Alfin, I'm showing you what's been marked as

17   Government Exhibit 40 -- 40a, starting with 40a, and just

18   going through 40a, 40b, and 40c.

19   A.   I testified earlier that I had analyzed a backup copy of

20   the PlayPen website that had been created shortly before the

21   defendant's arrest.

22   One of the things that the PlayPen website's database

23   tracked was the last post that each user had accessed.  That

24   information was recorded for the PlayPen user account.  And at

25   the time that the backup of the website had been created, the

1    last post accessed by the PlayPen user account was in the

2    peeing fetish section of the Playpen website.  It was a thread

3    titled "My Pee Collection."  It contained numerous images

4    depicting child pornography of prepubescent females exposing

5    their genitals.  It also depicted one or more pre-pubescent

6    females engaged in penetrating sexual activity with what

7    appears to be an adult male.

8    Q.   And are Exhibits 40a, 40b and 40c accurate depictions of

9    those activities?

10   A.   They are.

11          MR. JONES:  Permission to admit, Your Honor,

12   40a, 40b and 40c.

13          THE COURT:  Let them be admitted.

14          MR. JONES:  We will publish, briefly, for the jury,

15   Your Honor.

16          (Government's Exhibits No. 40a, 40b & 40c were

17   received into evidence and published.)

18   Q.   When were those posts accessed by the defendant?

19   A.   Based on the time the post was accessed and the time that

20   the PlayPen website backup had been created, the posts were

21   accessed from the defendant's residence while the laptop

22   computer in the defendant's residence was logged into the

23   PlayPen website.

24       In addition to those images being located on the PlayPen

25   website -- specifically on the Image Hosting section of the

1  PlayPen website, which was also located here in North

2  Carolina -- copies of all of those images were also located on

3  the encrypted flash drive that was connected to the

4  defendant's laptop at the time of the search.

5         MR. JONES:  Just briefly, Agent Alfin.

6         No further questions.

7         THE COURT:  Cross-examination.

8         MR. ADOLF:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10 BY MR. ADOLF:

11 Q.   Special Agent Alfin, good afternoon.

12 A.   Good afternoon.

13 Q.   I have some questions for you.  Let me get right to it.

14      What you are, in essence, telling this jury that every

15 single post, all the activity coming from the PlayPen account,

16 PlayPen user is all from Mr. Chase, right?

17 A.   Yes.

18 Q.   Now you told us a little earlier that the website was

19 misconfigured.

20 A.   Yes.

21 Q.   And what you mean by misconfigured is that it wasn't set

22 up right or maintained properly?

23 A.   I can clarify, if you would like.

24 Q.   That the settings were wrong.

25 A.   Yes.  I can go into detail about that if you would like.

1    But the answer to your question is, yes.

2    Q.   And that was a mistake?

3    A.   It appeared to be a mistake based on my review of the

4    configuration files.

5    Q.   And the reason that's a mistake is because this site was

6    supposed to run exclusively on Tor.

7    A.   That would be the general intent behind a Tor hidden

8    service, yes.

9    Q.   The reason it's configured only to run on Tor -- it's

10   supposed to run only on Tor -- is so that members of the

11   general public who don't know it's there can't find it.

12   A.   I would say more specifically it's so that law

13   enforcement agencies cannot find it.

14   Q.   But you would agree that the general public can't find

15   it.

16   A.   Sorry.  Can or cannot?

17   Q.   Cannot.

18   A.   Correct, if it's configured properly.

19   Q.   Now, if you have a regular commercial website, the

20   website has an IP address.

21   A.   The server hosting the website has an IP address, yes.

22   Q.   I'm sorry.  The server hosting the website has an IP

23   address, which is a string of numbers like we've been seeing?

24   A.   Yes.

25   Q.   And then there is a web address which begins with WWW.

1    A.    The URL uniform resource locator, which is so that you

2    don't have to remember IP addresses, you can just type

3    in CNN.com or Google.com.

4    Q.    And what somebody with an ordinary website, a website

5    that's normally searchable has, is, they have their website on

6    server that has the IP address.  They have that web address,

7    and the web address points the server to the IP address.

8    A.    Yes, that's correct.

9    Q.    And what Google or some other search engine does is, it

10   collects all of those web addresses.

11   A.    Search engines such as Google routinely index websites so

12   that you can find them using Google search engines or Yahoo

13   search engines, whatever you're using.

14   Q.    But what it's looking for -- what the website -- what

15   Google or Yahoo or whoever is indexing, is those web address

16   with a name that's usually a common word or a title that

17   identifies that an ordinary user would recognize.

18   A.    They're indexing content of the websites, not just those

19   titles, but those titles will -- the URLs you're referring to

20   will also appear in google search results, yes.

21   Q.    I guess what I'm getting at is:

22        If you don't have a URL, then Google is not going to find

23   you.

24   A.    That's not necessarily true.  You can still host a

25   regular website without a -- without using a URL.  So if you

1  wanted to you could actually host a website with just an IP

2  address and it is possible that Google could index such a

3  website.

4  Q.   But there are additional steps that you would have to

5  take to make that website searchable, to make it appear to an

6  aggregating site or a Google or a Yahoo?

7  A.   No, not necessarily.

8  Q.   Now you talked about how this particular website was

9  supposed to be set up so it was only visible through Tor.

10  A.   Yes.

11  Q.   And that would include the fact that there was no URL for

12  it that would be -- would have been searched for by Google,

13  Yahoo or some other search --

14  A.   Correct.  Search engines such as Google, Yahoo, Bing,

15  don't index Tor hidden services.

16  Q.   Now you told us that it was misconfigured, meaning

17  somebody had done the settings incorrectly so that it could

18  actually be viewed by somebody who knew that numerical code.

19  A.   Correct.

20  Q.   Now would you agree with me that something is more likely

21  to be misconfigured if you have a bunch of different people

22  working on it that aren't talking to each other, versus having

23  one person who is maintaining it?

24  A.   No.  One of the posts that I read from the summary

25  exhibit was a post created by the PlayPen user account that

1   stated -- I can't quote it verbatim, but it stated that the

2   user had personal life experience with hosting websites, I

3   think he said being a webmaster.  But that this was his first

4   run at doing so on the Tor network.

5       And so we're talking about a single typo in a very long

6   configuration file that someone who's creating their first Tor

7   hidden service I think could very easily make.

8   Q.   So what you're telling us is that whoever was

9   "PlayPen" -- whoever was logging in as "PlayPen" was trying to

10  keep the server set up so that you had to go through Tor, you

11  had to have that level of anonymity to get to the site.

12  A.   Based on my review of the configuration file it appears

13  that that was the creator's intent, yes.

14  Q.   And they just checked the wrong box, wrote something

15  wrong in the stream of code, made some mistake so that instead

16  you could type in the IP address and get right to the site.

17  A.   Yes, that's correct.

18  Q.   And they didn't know that.

19  A.   They were informed of it by other users of the website.

20  There had actually been a second mistake made by the

21  administrator and that was, as earlier exhibits have shown the

22  rules and agreements of the PlayPen website stated that you

23  had to enter an email address to register your account, but

24  that you would never actually receive any emails.

25      And so when the PlayPen website was created, the email

1   functionality of the message board was, in fact, disabled.

2       At some point in time, and I don't know exactly when,

3   that feature appears to have been re-enabled accidentally.

4   And so if you did actually enter a real email address, the

5   website would actually send you a confirmation email that

6   said, to the effect of, your user account on PlayPen had been

7   created.  And that email address would have the real IP

8   address of the PlayPen website in it.

9   Q.   We're talking about two totally different mistakes,

10  right?

11  A.   Those are two different mistakes, yes.

12  Q.   Let's stick with the first mistake.  I understand you

13  want to talk about this other one.

14  A.   I just want to answer your questions.

15  Q.   Okay.  Well, let's stick with the misconfiguration --

16  A.   Okay.

17  Q.   -- problem.

18  A.   Okay.

19  Q.   Just to keep it straight.

20      What you're telling us is that whoever was running

21  PlayPen through the PlayPen account was trying to keep it so

22  that you could only get to it through Tor, right?

23  A.   Yes, that is my testimony.

24  Q.   So that you could not get to it by just punching in the

25  numbers that we've seen, the IP address, right?

1    A.    Yes.   That is how, again, based on my review of that

2    configuration file, it appears that that was the intent of the

3    creator of the website.

4    Q.    And yet you've also told us that the -- whoever was using

5    PlayPen, at least at some point, was in fact accessing the

6    website using the direct IP address.

7    A.    Yes.

8    Q.    And also didn't know you could do that.

9    A.    I also testified that he had been notified by other

10   members of the website that such access was possible.

11   Q.    And you're saying that the user before that didn't know

12   that.

13   A.    I don't know exactly when it came to the attention of the

14   administrator.   The administrator could have known about the

15   misconfiguration.   I would expect that the administrator knew

16   about the misconfiguration prior to being informed by a

17   regular member of the website.

18   Q.    Well, you just told us that it was a mistake.

19   A.    Yes.   Based on my review of the configuration file it

20   appeared to be a mistake.

21   Q.    But you also say that the -- whoever was on PlayPen was

22   using that mistake -- using that flaw to get directly to the

23   website.

24   A.    Yes.   One of the benefits of that mistake is that if you

25   do access the website directly, since you're no longer going

1   through the Tor network, your connection to the website is

2   much faster.  Your connection is no longer being bounced all

3   over the world to five or so different servers in who knows

4   what country.

5        So it appears that the PlayPen administrator, after

6   acknowledging our finding out about this misconfiguration at

7   some point in time, did take advantage of that.

8   Q.   Can you show us that in the log when that changed?

9   A.   I don't have a specific exhibit prepared that shows that,

10  but all that information is contained on the hard drives that

11  have been submitted and were made available for review prior

12  to trial.

13  Q.   The fact is, that sometimes, apparently, PlayPen did not

14  know that there was this flaw in the website that allowed you

15  to get directly to it without using Tor, right?

16  A.   Sorry.  Could you repeat the question again?

17  Q.   There were times at which PlayPen, from your review of

18  the data, did not know that there was this flaw in the website

19  the way it had been set up that allowed someone to get

20  directly to it without going through Tor.

21  A.   Yes.  Based on the review, again, of the configuration

22  file, there was a typo on one line that made the website

23  available on the public internet.  That line of the

24  configuration was not standard, again, it had a typo in it.

25       And so it appears that the intent of that configuration

1  line was not to allow it to be available on the public

2  internet.

3  Q.   So just to dumb that down a little bit so we could get it

4  in a form we can understand.

5       There were times, at which it looks like whoever was

6  using PlayPen did not know about that flaw.  Yes or no?

7  A.   Again, I don't know when it came to that individual's

8  attention.

9  Q.   You've been calling it a misconfiguration.  You've been

10 saying that it was a flaw.  You've been telling us that it was

11 somebody who was new at this trying to configure it to hide it

12 and that they made a mistake, right?

13 A.   Yes.  Based on my review of the configuration file and,

14 again, based on a review of a posting made by the

15 administrator where he states as much.

16 Q.   Right.  So there were times at which the person who was

17 operating the PlayPen account didn't know that that flaw was

18 there?

19 A.   That is possible, yes.

20 Q.   And there were also times when the person who was logging

21 into PlayPen using the PlayPen account, that same account, was

22 exploiting -- to get a faster connection that was not over the

23 Tor network.

24 A.   It is my assumption that they used it for the benefit of

25 the faster connection.  But, yes, the PlayPen user account

1    did, on multiple occasions, connect directly to the website.

2    And, again, that was permissible because of the typo in the

3    configuration file.

4    Q.    So the same person both made a mistake and then exploited

5    it.  Is that what you're telling us?

6    A.    Yes, it appears that way.

7    Q.    Agent Alfin, you have gone through a number of the posts

8    from whoever was operating the PlayPen account.  And there was

9    one entry where the user, the administrator PlayPen, was

10   talking about how many times a particular image or video had

11   been downloaded.

12   A.    I believe it was a reference to how many times --

13   actually, I don't remember.  That could be accurate.  I would

14   have to look at the post again.  But I do recall that there

15   was an exhibit that made some mention of that.

16             MR. ADOLF:  Unfortunately, Judge, I don't believe

17   the Government's exhibit had page numbers.  So I have to ask

18   them to try to --

19             THE WITNESS:  My recollection is that it was a

20   reference to either how many times the video had been

21   downloaded or how many times that post had been accessed.

22             MR. ADOLF:  If I could just have a moment, Your

23   Honor.

24             THE COURT:  Yes, sir.

25             THE WITNESS:  There it is.

1  Q.   Agent Alfin, on your screen -- I guess we can show this

2  to the jury as well if it's not already up there -- this is

3  the summary chart you created.

4  A.   Yes.

5            MR. ADOLF:  I'm sorry.  The exhibit number is?

6            MR. JONES:  41.

7            MR. ADOLF:  41, page 9.

8  Q.   For the record, Government's 41, page 9.  I'm showing you

9  the last post on there, the one from September 27, 2014,

10 2:45 a.m.  Do you see that?

11 A.   Yes, I do.

12 Q.   And in that, whoever is using PlayPen at that point is

13 referring to something on the site, presumably some sort of

14 video or image, and saying, "It's still there and it has been

15 downloaded 13,084 times."

16 A.   Yes.

17 Q.   And you took that information from a post you had seen

18 that had been taken from the server logs.

19 A.   Correct.  This was one of the posts contained in the

20 server backup copy that I analyzed.

21           MR. ADOLF:  You can take it down.

22 Q.   I'm showing you what I'm going to ask to be designated as

23 Defense 4.

24      Agent Alfin, one of the ways you extract and analyze data

25 that was taken from the site is through a Cygnus report.

1   A.   We do have a tool called "Cygnus" which can analyze and

2   make it easier to read data from websites such as the PlayPen

3   website.  Our exhibits were not created using the Cygnus

4   report.  You were given copies of Cygnus reports, and that

5   appears to be where your exhibits came from.

6   Q.   And in particular, what you're looking at right now is an

7   entry from one of the government's Cygnus reports, right?

8   A.   Yes.  This is a part of that Cygnus report.

9   Q.   And this reflects the same kind of data -- and actually

10  the same data that you used to create your summary chart.

11  It's just in a different form.

12  A.   The Cygnus report was not sourced specifically from the

13  copy that I analyzed for trial.  But it does contain much of

14  the same information.

15  Q.   And, in particular, looking at what you have in front of

16  you marked as Defense 4, it -- that is, in fact, taken from

17  data that you got from the PlayPen server.

18  A.   This post would have been on the copy that I analyzed,

19  since it is prior to February 19.

20  Q.   And what you're looking at is in the left column, the way

21  this particular program is set up, it shows a list of

22  different posts, and one of them is highlighted.  And then on

23  the right you see that particular post, the content of that

24  post.

25  A.   Correct.  And as you clarified before, the pink

1   background text is not a post by the actual user.  It's quoted

2   text from another user.

3        MR. ADOLF:  Your Honor, I guess we don't admit at

4   this point, but I would ask if the Government has any

5   objection to displaying to the jury.

6        MR. JONES:  No objection, Your Honor.

7        THE COURT:  All right.

8        (Defendant's Exhibit No. 4 was published.)

9   Q.   So as we just said, Agent Alfin, this is a post that

10  whoever had the PlayPen account -- whoever logged in as

11  PlayPen -- made on February 8, 2015; is that right?

12  A.   Yes.

13  Q.   That would have been 11 days before Mr. Chase was

14  arrested, right?

15  A.   Approximately, yes.

16       MR. ADOLF:  Hold on just a minute.

17  Q.   Now I'm showing you a portion of the text.  And this is

18  PlayPen talking about how information is logged on the site,

19  right?

20  A.   It is referring to what information is and is not logged

21  in the PlayPen file hoster.

22  Q.   Whoever was using PlayPen at that point, did not believe

23  that it was set up to have the capability -- or at least to

24  record the information about how many times the file's been

25  downloaded.

1   A.    The PlayPen file hoster did not have that capability,

2   that is correct.

3   Q.    And if we can just go on to -- "No log kept of your

4   logging in," right?

5   A.    Yes, that's what it says.

6   Q.    Well, that's not true, is it?

7   A.    For the PlayPen file hoster, I do not believe user logs

8   were kept for log-ins.  The PlayPen file hoster was separate

9   from the PlayPen website.  So I believe that statement is

10  accurate.

11  Q.    But the PlayPen website was, in fact, keeping logs of

12  everybody who logged in.

13  A.    Yes.  It maintained records of when people logged into

14  the website.

15  Q.    Every time they logged in.

16  A.    I believe it was every time.

17  Q.    And if it was not coming --

18  A.    Excuse me.  I just want to clarify that answer.

19       It recorded it every time.  But the database, I believe,

20  would only maintain the last time that they had logged in.

21  And so it would update that entry anytime you logged in.  Now,

22  if you posted on the website, then it will also create logs

23  for that, as well.

24  Q.    And, of course, if you were logging in correctly over

25  Tor, it would record the log-in but it wouldn't say where you

1    were.

2    A.    That is correct.

3    Q.    Now, you told us a little bit about the different --

4    about the different places that appear on the log that appear

5    to be showing where somebody is logging into from their home

6    computer onto the PlayPen account.  Do you remember discussing

7    that?

8    A.    I testified that there were IP addresses recorded for

9    some users, including the PlayPen user account.

10   Q.    I'm showing you another part of the Cygnus report.

11   A.    I see it.

12   Q.    Now, what this chart reflects is -- this is part of the

13   user profile for PlayPen?

14   A.    Yes.  These are various IP addresses that had been

15   captured, associated with activity from the PlayPen user

16   account.

17   Q.    And what we have on, I guess, sort of in the middle -- I

18   guess it would be the fourth column is, you have the date,

19   time, hours, minutes, seconds of -- that the user using

20   PlayPen logged in.

21   A.    Well, not logged in.  You can see the recorded action in

22   the next column.  So that's the IP address that was captured

23   when that user made a post on the website.

24   Q.    And then farther over on the right you see a state

25   abbreviation, and then more specifically a city, name of the

1   city.

2   A.   Yes.   Now that is not information that was captured by

3   the PlayPen website.   As I testified to earlier, when you have

4   an IP address, you can use any number of publicly available

5   databases to see what company that IP address is owned by.

6   And you can also use databases to generally geo locate that IP

7   address.   So you can get a pretty good idea that whoever has

8   this IP address, is in this city and state.

9       And so that information, the last -- the last four

10  columns, this was information that was populated by the FBI.

11  It was not actually stored in the website.

12  Q.   But the FBI got that information from the website.

13  A.   We got the IP addresses from the website, and then we geo

14  located them and put those other columns in there.

15          MR. ADOLF:   Right.   Now -- and I'm sorry.   I guess,

16  again, I would ask to mark this as Defense 5.   Again, we're

17  not going to enter it into evidence formally, but ask the

18  Government if there is an objection to displaying to the jury.

19          MR. JONES:   No objection, Your Honor.

20          THE COURT:   All right.   It will be admitted for

21  purposes of viewing at this time.   It is identified as No. 5.

22          (Defendant's Exhibit No. 5 was published.)

23  Q.   Now you're telling us, again, this is a record of when

24  somebody using the PlayPen account logged on, did something on

25  the website.

1    A.    Yes.

2    Q.    And in the fourth column you can see year, month, day,

3    and then hour, minute, and second of the day.

4    A.    Yes.

5    Q.    Now you're talking just now about the IP addresses.  And

6    the IP address which is where the server is seeing that that

7    person is located who's logging in, that's in a column to the

8    left of the date at the top.  It says 207.207.7.135.

9    A.    Yes.  That is the IP address that is visible to the

10   website.

11   Q.    And if you look over more towards the right you see an FL

12   and a Miami which is indicating that that IP address is

13   located in the Miami, Florida area.

14   A.    Yes.  The geo location software is not perfect, but it is

15   generally accurate.  So that IP address was very likely

16   assigned to a company in Miami, Florida on that date in time.

17   Q.    Now, so what you're saying is, this is somebody -- well,

18   okay, let me back up.

19        The second item, the second row below that 207 number on

20   the left, if you look at that IP address it's 127.0.0.1.

21   A.    Yes, I see it.

22   Q.    That number appears several times down lower in the log.

23   A.    Yes, it does.

24   Q.    And looking across to the right, every time that number

25   appears.  There's no country listed where that's coming from.

1   There's no state listed where that's coming from, and there's

2   no city listed where that's coming from, right?

3   A.   Yes, that's correct.

4   Q.   And the reason for that is 127.0.0.1 is not an IP

5   address.

6   A.   That's not an accurate statement.  It is an IP address.

7   Q.   Okay.  I'm sorry.  It is the IP address of the server

8   itself, right?

9   A.   127.0.0.1 is generally present on every single computer

10  connected to a network.  It is not an IP address that can be

11  used to communicate across the internet.  It is not one that

12  you would be assigned by, say Comcast or TimeWarner Cable.  It

13  is on your network, on your computer.  It represents your own

14  machine.

15  Q.   So that is the server just putting down that it got the

16  signal from itself, basically.

17  A.   Yes and no.  A Tor hidden service, when it's accessed as

18  intended, connections come into the Tor hidden service and

19  then it appears to the website that the connections are

20  originating from within the computer, even though they're

21  coming across the Tor network.  And so when you see entries on

22  this column that say, 127.0.0.1, that is an indication that

23  someone has connected to and logged into the website through

24  the Tor network.

25  Q.   And that, of course, is what the Tor network is all

1    about, right?

2         It's to make sure that the website you're going to

3    doesn't know where you are.

4    A.    Yes, that is one of the intended uses of the Tor network.

5    Q.    So 127.0.0.1 is basically just a placeholder.  It's A

6    blank, essentially.

7    A.    I think I was clear in my explanation of what it is.

8    Q.    Fair enough.

9         If we're looking at that second row, we're talking about

10   August 23rd of 2014, that is somebody logging in over Tor.

11   A.    Yes.

12   Q.    And as you said -- just said, one of the primary purposes

13   why somebody would log into this website -- or why this

14   website would be set up only to allow access to Tor, is so

15   that neither side would know who the other side was or where

16   the other side was.

17   A.    Yes.  That is the intended functionality of a Tor hidden

18   service.

19   Q.    And yet the very next time somebody logs in from PlayPen,

20   or using the PlayPen account, now all of a sudden we have a

21   real IP address somewhere in the outside world that can be

22   traced to an outside computer that that communication came

23   from, right?

24   A.    Yes.  There is a normal internet routable IP address in

25   the next row?

1    Q.    In Ashburn, Virginia.

2    A.    That is where the company that owns that IP address was

3    located.

4    Q.    And what company is that?

5    A.    Appears to be Insync Internet Services.

6    Q.    Did you investigate Insync Internet Services to figure

7    out who -- where that connection was coming from through them?

8    A.    No.  The IP addresses in here, for the most part, other

9    than ones that -- just give me one second.

10        The IP addresses that are listed in here, for the most

11   part, belong to either VPN companies or Tor node companies.

12   And I described earlier that they generally cannot be followed

13   up on.

14   Q.    By --

15   A.    I don't recall specifically what Insync Internet

16   Services, what that company is.

17   Q.    When you say they can't be followed up on, that means

18   that you can't go look up Insync Internet Services and go talk

19   to them?

20   A.    You certainly can.  But generally with VPN providers,

21   most of the ones used by individuals, certainly ones who are

22   accessing child pornography websites, choose VPN providers

23   that don't keep log files.

24        And so we could contact them and we could serve them with

25   a subpoena, but it would be wasted effort.

1   Q.   So you have logs coming in from a company in Ashburn,

2   Virginia, right?

3   A.   Yes.

4   Q.   How far is that from your office?  Your office is in

5   Maryland?

6   A.   It is.

7   Q.   But it wasn't worth it to talk to Insync Internet

8   Services and see if they have a record of who was logging in

9   and from where?

10  A.   No, it was not.

11  Q.   Because you decided in advance that they probably don't

12  keep any records, and it's probably a waste of time.

13  A.   At that point in the investigation we had confirmed the

14  identity of our subject, Steven Chase.  And so, again, there

15  was no -- nothing to be gained by following up on that -- I

16  guess -- that IP address, that VPN IP address.

17  Q.   So at that point in the investigation you had already

18  seen Mr. Chase logged into the computer.

19  A.   I, of course, had not seen Mr. Chase -- or rather I

20  should clarify.  What timeframe are you referring to?

21  Q.   At the time the police broke into his house.

22  A.   That never happened.

23  Q.   Okay.  At the time the police knocked on his door and

24  then walked in and found the laptop opened, logged into the

25  site, that was in his home on his laptop?

1    A.    He -- I'm not sure what you're referring to with that,

2    but when we executed the search warrant at his residence, we

3    did find his laptop, and his laptop was connected to the

4    PlayPen website.

5    Q.    And so as far as you were concerned you had already found

6    who was the person who had the PlayPen log-in and password,

7    and you had determined his identity as you just said, right?

8    A.    Well, we had determined Mr. Chase's identity prior to the

9    night of the search warrant.  But, yes, during the

10   investigation we did confirm Mr. Chase's identity as the

11   PlayPen administrator.

12   Q.    And there would be no point looking to see if, for

13   instance, it turns out that that same account was logged into

14   from some other computer.  That didn't matter any more, right?

15   A.    I'm sorry.  The suggestion that the -- any of these

16   companies could tell us that the website was accessed from a

17   different computer is inaccurate.  So I'm not exactly sure

18   what you're asking.

19   Q.    Well, VPN companies are actual businesses that keep

20   actual records, have business accounts, have people that work

21   there in the building, right?

22   A.    Yes.  Some of them have, you know, one employee.  Some,

23   I'm sure, have several.  And I'm sure they keep varying levels

24   of records and log files.

25   Q.    Varying levels of records and log files.

1    A.    Yes.

2    Q.    You believe.

3    A.    Well, I know that from my experience.

4    Q.    Some of them keep them, some of them don't.

5    A.    Yes.

6    Q.    There are plenty of legitimate businesses that are VPN

7    services, right?

8    A.    Yes.  I've never testified that VPN services are only

9    used for criminal activity.  There are plenty of legitimate

10   reasons to use both VPNs and the Tor network.  It's common

11   within the government to use VPNs.

12   Q.    And it's common for private companies, whose employees

13   are working at home or off site, to use VPN to use -- to use

14   their working log in information, right?

15   A.    Yes, that is common.

16   Q.    And those private companies that people are working for,

17   typically pay money to a VPN company to supply that service.

18   A.    Some VPN companies do require payments, some do not.

19   Q.    How --

20   A.    There are free VPN providers that you can utilize.

21   Q.    So in Ashburn, Virginia, Insync Internet Services, is

22   that a free VPN or do you have to pay for it?

23   A.    I don't recall.

24   Q.    If it's a service you would have to pay for, there would

25   be a method of payment and somebody would have had to pay for

1    it, right?

2    A.   Generally for a paid service you need to pay, yes.

3    Q.   And it needs to be a person with some sort of account,

4    PayPal or otherwise, that has to make that payment.

5    A.   That is generally accurate, yes.

6    Q.   And that's apparently, at least sometimes, how you find

7    people that you're looking for by tracing their PayPal

8    payments, right?

9    A.   Well, if you're referring to the matter at hand, yes, we

10   did trace the PayPal payments for PayPal -- excuse me, for

11   PlayPen back to Mr. Chase.

12             MR. ADOLF:  If I could just have a moment, Your

13   Honor.

14             THE COURT:  Yes, sir.

15   Q.   Agent Alfin, I'm showing you what I'm going to ask to be

16   designated as Defense 6.  This is more data from the Cygnus

17   report, right?

18   A.   Yes, that's what it appears to be.

19   Q.   And this is showing other activity by somebody using the

20   PlayPen account, right?

21   A.   This shows more IP addresses.  I think this might be --

22   this looks very similar to the exhibit that you had on

23   previously.

24        Sorry.  It's not the same exhibit, but it contains the

25   same data.

1   Q.   And this is data that obviously came from your analysis

2   of the PlayPen website after it was seized and accurately

3   reflects that data; is that right?

4   A.   Yes, that's correct.

5        MR. ADOLF:  Your Honor, again, not formally

6   admitting, but seeing if the Government has an objection to

7   displaying to the jury.

8        MR. JONES:  No objection, Your Honor.

9        THE COURT:  All right.  It may be viewed by the

10  jury.

11       (Defendant's Exhibit No. 6 was published.)

12  Q.   And we already talked a little bit about Insync Internet

13  Services in Ashburn, Virginia.  Looking down the log you can

14  see a little over halfway down there's one highlighted in

15  blue.  Do you see that?

16  A.   Yes, I see that.

17  Q.   That would be some activity of someone using the PlayPen

18  account August 25, 2014, around 5:30 in the morning, right?

19  A.   Yes.  That's the timestamp.  Yes, that all sounds

20  accurate.

21  Q.   And in that case, what the server -- what the PlayPen

22  server recorded or the server that PlayPen was hosted on

23  recorded, was information coming from a computer in Chicago,

24  Illinois.

25  A.   Again, the server recorded the IP address, and then we,

1    on our own geo, located it to the Chicago, Illinois area.

2    Q.    That's as far as it went.

3    A.    I'm sorry.  I'm not sure what you're asking.

4    Q.    Well, that IP address is a computer that's owned by

5    someone.

6    A.    That IP address is owned by a company, yes.

7    Q.    A company apparently called Unus.

8    A.    Yes.

9    Q.    In Chicago.

10   A.    Yes.

11   Q.    And you're telling us you believe that might be a VPN

12   company?

13   A.    Yes.  Based on the research that I conducted.  The IP

14   addresses that we were not able to follow-up on, either

15   resolved to VPN companies or Tor nodes.

16   Q.    When you say you weren't able to follow-up on it, you

17   mean you didn't go to Chicago or send anyone from the FBI

18   Chicago office to go visit Unus and see if they had any logs?

19   A.    We did not contact Unus.

20   Q.    So you have no idea even if somebody had to pay for that

21   service, that VPN service, or whether that was a free VPN

22   service that's paid for by advertising or something else.

23   A.    I don't recall off the top of my head, but I'm fairly

24   certain that's something that could be answered by a quick

25   Google search.

1   Q.    I guess it could have, couldn't it.  As for a question,

2   that date, again, that's August 25th, 2014, at 5:34 in the

3   morning that that activity was made, right?

4   A.    Now that is the date stamp that is recorded there, yes.

5   And that is the time as recorded by the website.  It does not

6   necessarily mean that it was 5:30 in the morning eastern time.

7   It's configured to the time zone of the website.  But that is

8   the data that was collected by the website.

9   Q.    Agent Alfin, I'm showing you what has already been shown

10  to the jury and designated as Defense Exhibit 1.  Do you

11  recognize this as being also data that was taken from the

12  PlayPen server and was laid out this way using Cygnus?

13  A.    Yes.  This is one of the posts that was made by the

14  PlayPen user account.

15  Q.    And this accurately reflects the data as you recovered it

16  from the server?

17  A.    Yes.

18  Q.    You can see the postdate on that is August 25, 2014,

19  5:34 a.m., by whatever time zone the server's configured on,

20  right?

21  A.    Yes.

22  Q.    So this is the post that went through -- or that came

23  from the Unus Company in Chicago, right?

24  A.    I would have to correlate that posting activity back with

25  the other page, but I'm sure that's accurate if you've done

1    that already.

2    Q.    You need to see it again?

3    A.    I'm not concerned that you're misleading me on that

4    aspect.

5    Q.    I appreciate it.

6    A.    Absolutely.

7    Q.    That post is in Russian, isn't it?

8    A.    It is.

9    Q.    And it's responding -- because at the top of the blowup

10   there you can see that that is in fact a response to another

11   post that's in Russian.

12   A.    Yes, that's correct.

13   Q.    So somebody is making a Russian post from -- that's going

14   through a company in Chicago.

15   A.    Yes.   That appears to be what happened here.

16   Q.    You told us that another item that was found in

17   Mr. Chase's house was a cell phone.

18   A.    Yes, that's correct.

19   Q.    You are aware that cell phones -- obviously in a very

20   different way from the way websites track activity -- but also

21   contain plenty of historical data about the user.

22   A.    They can.

23   Q.    For instance, if they are actually assigned to a network

24   like Verizon or AT&T or something, that company keeps data

25   about actually where the cell phone was at given times.

1   A.    The -- I don't know that the cell phone generally keeps a

2   record of where it was.  But cell phone companies do sometimes

3   have records of where cell phones were at various dates and

4   times.  I think that's accurate.

5   Q.    And if you have the number of the phone, you as a federal

6   agent can obtain records from Verizon or AT&T or whatever cell

7   provider, to see if not the exact location, at least at any

8   given day or time where the nearest cellular tower was that

9   that phone was closest to at the time, right?

10  A.    You can obtain cell site information through various

11  forms of legal process from those companies.

12  Q.    Agent Alfin, I'm showing you another entry from a Cygnus

13  report.  Does this accurately reflect the data that you

14  retrieved from the PlayPen server?

15  A.    Yes.  This accurately reflects another post that was made

16  by the PlayPen user.

17  Q.    Now, in this post, whoever is logged on to PlayPen and is

18  posting, is saying that they only speak English, and that

19  whatever foreign language post they're referring to makes them

20  nervous because they can't read them.

21  A.    Yes, that's what the post says.

22  Q.    Now you were present in court -- you were present in

23  court when Special Agent -- or I'm sorry -- Supervisory

24  Special Agent O'Donnell was on the stand; is that right?

25  A.    Yes, that's correct.

1    Q.   And you recall us talking about what mal-ware is and how

2    it works.

3    A.   Yes, there were questions regarding mal-ware.

4    Q.   And you're aware that -- I guess one of the dangers of

5    going to websites that you're not familiar with, or dangers of

6    opening emails that -- or attachments to emails, in general,

7    that you don't know the source of, is that you can end up with

8    mal-ware on your computer.

9    A.   Mal-ware can be -- you can get mal-ware on your computer

10   through various different ways, including opening malicious

11   email attachments, as you've said.

12   Q.   Or going on websites where there's criminal intent behind

13   the person who's running the website and they're trying to

14   gather information from the people who click on whatever links

15   are on the website.

16   A.   That's possible as well.

17   Q.   And it is possible, in fact, to write mal-ware, to set it

18   up so that somebody who is trying to download an image from a

19   website that's set up to do it, who's trying to open a video

20   or download some other file, can end up with a program on

21   their computer that takes information from their computer and

22   sends it to someone else without them knowing it?

23   A.   Yes, that's accurate.  Mal-ware is generally designed --

24   if you're going to steal someone's information -- you don't

25   want them to know that it's happening.

1   Q.   And more than them not knowing that it's happening when

2   it happens, programs like that can also be written so that

3   there is no code left behind on the computer, once that

4   information has been sent somewhere else.

5   A.   Yes, that's correct.

6              THE COURT:  Members of the jury, we'll take our

7   afternoon break at this time.  I would ask you to keep in mind

8   the usual instructions.  Call for you in 15 minutes.

9              (The jury was escorted from the courtroom at 3:12.)

10             THE COURT:  As always, I urge the parties to take

11  the time they need, but move along as best we can.

12             MR. ADOLF:  Yes, Your Honor.

13             THE COURT:  Thank you.

14             May we have the jury.

15             (The jury was returned to the courtroom at 3:32.)

16             THE COURT:  All right.  The jury is with us.

17             MR. ADOLF:  Thank you, Your Honor.

18  Q.   Agent Alfin, I'm showing you more data that was produced

19  on Cygnus -- using Cygnus.  And I'd like you to take a look

20  through it and see if this reflects all of the log-in data

21  that was done from the PlayPen account, all the data that was

22  stored on the server, and let me know if you need me to slow

23  it down.

24  A.   It appears to be everything.

25             MR. ADOLF:  Your Honor, again, I would offer that as

1    Defendant's 7, which is the log of all the PlayPen IP data.

2              And if the Government has no objection, I would ask

3    to show that to the jury.

4              THE COURT:  All right.  It may be viewed by the jury

5    at this time.

6              (Defendant's Exhibit 7 was published.)

7    Q.   Now, Agent Alfin, I'm showing you another log.  This is

8    all the log-in data for the administrator or moderator named

9    Stretch Armstrong.  Do you recognize the name Stretch

10   Armstrong?

11   A.   I do recognize Stretch Armstrong, but to clarify, I don't

12   believe this is all of the data.

13   Q.   Hang on.

14   A.   My mistake.  It's rolling.

15   Q.   My mistake.  I'm sorry.  We'll scroll through that

16   quickly and I'll ask you if you recognize that being the same

17   data that you recovered from the server and is now expressed

18   as a Cygnus report for users, administrator/moderator Stretch

19   Armstrong.

20        Are you able to review it at that speed?

21   A.   It appears to be accurate.

22   Q.   Now, you're aware of who Stretch Armstrong -- who is the

23   person who actually used that account?

24   A.   Yes.  As I testified earlier, I identified an individual

25   named David Lynn Browning as Stretch Armstrong, the moderator

1    from PlayPen.

2    Q.   And you confirmed with him that he's the only person

3    that's used that account, right?

4    A.   Yes.  He told me that to his knowledge he was the only

5    person who used the Stretch Armstrong account.

6              MR. ADOLF:  Your Honor, again, I would ask to mark

7    that as Defense 8.  And if the Government has no objection, to

8    show that to the jury.

9              THE COURT:  All right.  You may do so.

10             (Defendant's Exhibit 8 was published.)

11   Q.   These are the logs showing every time that Stretch

12   Armstrong logged into the PlayPen website, right?

13   A.   Well, no.  These are logs associated with when he made

14   actual postings on the website.

15   Q.   And every one of those postings were made in such a way,

16   using Tor, that there was no IP address outside the server

17   recorded on the service.

18   A.   Yes.  It appears it was connecting through the Tor hidden

19   service to the Tor network as intended.

20   Q.   This log is 28 pages long, right?  Twenty-eight pages

21   long.  Which is actually longer than the PlayPen log; is that

22   right?

23   A.   Yes.

24   Q.   And you heard earlier, you were in court when the

25   government announced that Mr. Browning, who is the person who

1   operated this account, is actually going to testify for the

2   government; is that right?

3   A.    Yes.  He is on the Government's Witness List.

4           MR. ADOLF:  I have nothing further, Your Honor.

5           THE COURT:  Any redirect?

6           MR. JONES:  Just a couple of questions, Your Honor.

7                    REDIRECT EXAMINATION

8   BY MR. JONES:

9   Q.    Agent Alfin, was there any indication that the

10  defendant's computer was remotely hacked or controlled?

11  A.    No.  As I testified earlier, we were monitoring internet

12  activity from a residence in Maine, when we were able to

13  confirm that Mr. Chase was staying at that residence in Maine.

14        Additionally, we were monitoring internet activity at the

15  defendant's residence after we were able to determine that he

16  had returned to his Naples, Florida residence.

17        And so when we were monitoring that internet activity, we

18  were capturing all internet activity going to and from the

19  residence, not just activity to the PlayPen website or to the

20  servers here in North Carolina.

21        And so had Mr. Chase's computer been being remotely

22  controlled during that timeframe, such data would have

23  appeared in the data that we collected.  No such data did

24  appear.

25        Importantly, on the night of the search warrant when we

1  found Mr. Chase's laptop connected to the PlayPen website and

2  to the servers in North Carolina, that pen register, that

3  internet data collection was still active.

4      And so there was no indication -- there was no data

5  showing that those connections to the PlayPen website were

6  caused by any outside entity indicating that those connections

7  were caused by an individual using the laptop inside of

8  Mr. Chase's residence.

9  Q.    Exhibit 2, the Russian post.  Could you put that up.  Was

10 it 2, I believe, or -- the Russian post -- 1?  Okay.

11 A.    I have the exhibit in front of me.

12          (Defendant Exhibit 1.)

13 Q.    Agent Alfin, do you know what this post says?

14 A.    Yes.  It says, "Looking good, Alleynea.  I love little

15 girls."

16      Alleynea was the name of the user who created this

17 posting on the PlayPen website.

18 Q.    Agent Alfin, do you speak Russian?

19 A.    No, I don't speak Russian.  The original post was created

20 in Russian.  Someone posted images of links to one or more

21 girls.  And so there was a reply from the PlayPen user

22 account, also in Russian, going through this process takes a

23 matter of seconds.

24      I know what that says, because I went to a free online

25 service called Google Translate.  I typed in, "Looking good,

1    Alleynea.  I love little girls."  And the output that I got

2    was exactly the same as the output of this text.

3        This posting is not an indication, in my mind, that the

4    individual who created it actually speaks Russian.  Merely

5    that they had access to the internet, which is why I know what

6    that says.

7        Again, I don't speak Russian, but it's very easy to get

8    access to all types of tools and technology on the internet.

9    Translation is just one of them.

10   Q.   In reviewing Chase's private messages and posts, was any

11   other post or message written in Russian?

12   A.   No.

13   Q.   Are you able to speak Russian to review the Russian

14   section of the website?

15   A.   No.  Anyone can access any of the foreign language

16   sections of the website, and they can still easily download

17   and view any of the child pornography that was advertised on

18   those sections of the website.

19   Q.   Okay.

20            MR. JONES:  No further questions, Your Honor.

21            MR. ADOLF:  Just briefly, Your Honor.  Regarding

22   what the Government just asked.

23            THE COURT:  All right.

24                       RECROSS-EXAMINATION

25   BY MR. ADOLF:

1   Q.   You've seen the profile of the PlayPen account.  Let me

2   phrase it a different way.  You were here in court when

3   Supervisory Special Agent O'Donnell testified earlier, right?

4   A.   Yes, I was.

5   Q.   You were here when he identified the government's exhibit

6   showing the profile for the PlayPen account.

7   A.   Yes, I recall that exhibit.

8   Q.   And it included the number of total posts by PlayPen.

9   A.   Yes, it did.

10  Q.   And it included the total time that a user or users of

11  the PlayPen account spent in different forums.

12  A.   It included a section that indicated -- I believe it was

13  titled "Activity by Forum."  That was a feature of the message

14  board software that the PlayPen website operated on.

15  Q.   Person or persons using the PlayPen account had spent a

16  total, to that point, of something like 12 hours -- 12 days on

17  the site, I guess, total time?

18  A.   That sounds accurate.

19  Q.   And the Russian language area was the area where the

20  PlayPen user spent the fourth most time of any area of the

21  site; isn't that right?

22  A.   According to that page of the report, that appears what

23  it was stating.  However, I'm not confident that the website

24  recorded that type of information accurately.  If you'll

25  notice the percentages down, that added up to something like

1    15 percent total.

2    Q.   Well, it was showing just the most used, by the user, not

3    all of the groups, right.

4    A.   Correct.  However, if you extrapolate from there and

5    added in every single other forum of the website, there's

6    still no mathematical way it could add up to 100 percent.  So,

7    again, I'm not confident that those statics were tracked

8    accurately by the website software.

9    Q.   So you think the software made up this person was a

10   frequent user of the Russian area of the site?

11   A.   I'm not suggesting that the software has the capability

12   to consciously make things up.  I'm just stating that those

13   numbers don't add up to 100 percent.  So the numbers don't

14   appear to be accurate.

15   Q.   Computers don't lie.

16   A.   Computers do not lie.

17   Q.   People do.

18   A.   They do.

19   Q.   Now, you told us a moment ago that there was a pen trace

20   and trap -- I think you called it -- on.  That was actually on

21   the -- Mr. Chase's home line that was monitoring traffic at

22   the time he was arrested.

23   A.   Yes, that's correct.

24   Q.   And that had been on there for -- this was about a week

25   or so, at that point.

1    A.    Seven to ten days, something like that.  That sounds

2    accurate.

3    Q.    And what you told us is during that period of time there

4    was no evidence that somebody was remotely hacking into his

5    computer, controlling his computer from somewhere else?

6    A.    Yes, that's correct.

7    Q.    However, if somebody hacked into his computer months

8    earlier than that, and had gotten log-in information and had

9    logged in later on as PlayPen or had gotten any other

10   information from his computer, there need not be any trace of

11   that hacking on his computer at the time he seized it; isn't

12   that right?

13   A.    If his computer had been hacked or remotely controlled

14   prior to the time that we were monitoring his internet

15   connection, we would have no record of that.

16              MR. ADOLF:  Nothing further, Your Honor.

17              THE COURT:  Step down.

18              THE WITNESS:  Thank you, Your Honor.

19              MS. RANDALL:  Your Honor, the Government calls Agent

20   Thomas Baugher.

21              THOMAS BAUGHER, GOVERNMENT WITNESS, SWORN

22                       DIRECT EXAMINATION

23   BY MS. RANDALL:

24   Q.    Good afternoon, sir.  Can you please tell us your name

25   and spell your name for the record, please.

1    A.   Good afternoon.  My name is Thomas R. Baugher.  Last name

2    is spelled B, as in bravo, a-u-g-h-e-r.

3    Q.   And how are you currently employed?

4    A.   I'm currently employed as a supervisory special agent for

5    the FBI in Sarasota, Florida.

6    Q.   How long have you worked for the FBI?

7    A.   Approximately 19 years and three months.

8    Q.   And what is your current assignment?

9    A.   Currently I'm supervisory special agent for the Sarasota

10   office.

11   Q.   What were your responsibilities back in February of 2015?

12   A.   In February of 2015 I was a senior team leader for the

13   FBI SWAT team out of the Tampa Division.

14   Q.   And what exactly is a SWAT team?

15   A.   Well, SWAT stands for Special Weapons and Tactics.  It's

16   a team of tactically trained agents who perform high risk,

17   armed and dangerous type arrests.  We train approximately one

18   day a week.

19   Q.   And as a senior team leader of the SWAT team, were you

20   asked to assist in the execution of a search warrant at a

21   residence located at 3570 15th Ave. Southwest in Naples,

22   Florida?

23   A.   Yes, I was.

24   Q.   Do you remember when that was?

25   A.   February 19, 2015, is when we executed the search

1    warrant.  And I think I might have been asked about four or

2    five days before that.

3    Q.   I'm going to show you what's been previously admitted as

4    Government's Exhibit 61.  Do you recognize the house depicted

5    in Government's Exhibit 61?

6    A.   Yes, I do.

7    Q.   Actually, I apologize.  That was not previously admitted.

8         Special Agent Baugher, can you identify what is in

9    Exhibit 61?

10   A.   That is a photograph taken at night of the defendant's

11   house.  It bears the numbers 3570 above the garage door on the

12   left hand side.

13   Q.   Is this the house you executed the search warrant on in

14   the late night hours of February 19th into February 20th?

15   A.   Yes, it is.

16   Q.   Does it accurately depict how the house appeared that

17   evening?

18   A.   Yes, it does.

19        MS. RANDALL:  Your Honor, the Government would move

20   to introduce Exhibit 61 into evidence.

21        THE COURT:  Let it be admitted.

22        (Government's Exhibit No. 61 was received into

23   evidence.)

24   Q.   Can you explain to the jury how the execution of a search

25   warrant is done when SWAT is involved?

1   A.   When SWAT's involved, it's similar to when regular agents

2   execute a search warrant.  Our prime directive is safety.

3   Safety of third parties who may be in the house and

4   surrounding areas, safety of my team, and the safety of the

5   subjects we're going to arrest or search a search warrant on

6   the premises.

7        So once we get notified by an agent that he has an arrest

8   or she has an arrest that might call for the SWAT team based

9   on different factors.  We evaluate it.  If I agree that it is

10  in fact a SWAT arrest, we go into what's called like a

11  mission-planning phase where we research the structure, the

12  occupants, known occupants, probable occupants.

13       And then myself and some of the team leaders that work

14  for me, we devise the safest possible way to accomplish the

15  mission, which is either to arrest the individual or determine

16  that the residence is safe and clear for agents to come in

17  with the search warrant, the duly signed search warrant by a

18  federal magistrate and perform the search of that structure.

19  Q.   Was there anything unusual about the timing or method of

20  executing this particular search warrant?

21  A.   Yes, it was.

22  Q.   What was unusual about it?

23  A.   It was unusual that it was late at night.  It was unusual

24  that we were asked to gain access to the interior of the house

25  as quickly as possible.

1  Q.   And in order to execute a house [sic] at night and to do

2  it in the method you did it, did you have to get special

3  permission from a judge to do so.

4  A.   Yes.  When the judge reviews the affidavit and he

5  determines that there is in fact probable cause, that fruits

6  or instrumentalities of a crime are present in that specific

7  location, there's a cover sheet that he signs off.

8       Usually you can't execute a search warrant before 6:00 in

9  the morning, and you can't execute it later than 10:00 at

10 night.

11      Then there's another box that you check off which

12 authorizes law enforcement to execute the search warrant

13 basically 24 hours and that's the box that was checked off.

14 Q.   And normally do you make an announcement when you

15 enter -- when you try to execute a search warrant?

16 A.   Yes.  Pursuant to the Fourth Amendment we're required to

17 knock and announce our presence before entering an

18 individual's house.  We do that to provide them with notice

19 and also it makes it safer for us.  Because if somebody came

20 in my house at 5:00 in the morning, first thing I'm thinking

21 is my children, my wife, and then grabbing my weapon, that

22 sort of thing.  So it's much easier when you knock and

23 announce why you're there.

24 Q.   In this case, though, did the judge give your team

25 permission to enter the house without announcing?

1    A.   Yes, he did.

2    Q.   Can you please explain to the jury how you approach the

3    house to execute the search warrant?

4    A.   Well, given that our mission was to gain access to the

5    house and secure the computer before it could be locked up, it

6    was very important for us to be as quiet and surreptitious as

7    possible until we got to the house.  So we stopped about

8    500 yards from the residence.  We walked up.  We left the two

9    marked units back where we stopped and an ambulance.  We

10   always have marked units and ambulances with us.  We left

11   them.  We walked up with our night vision googles.  Along the

12   side of road there was like a ravine area that was a little

13   overgrown on the street in front of the defendant's house.  We

14   walked up and we took our positions around the house.

15       Previous to that I had dispatched a scout team at the

16   defendant's house in his yard to try and tell us which light

17   in the house was on that would indicate to us where the

18   computer was being used.

19       So if they said the bedroom light on the right rear is

20   on, then obviously we know that's probably where we want to go

21   to make entry through that window.  We didn't have any

22   information about that at all.  They didn't observe any signs

23   of activity inside the residence.  So we walked up on foot.

24   We took our positions and that's where we waited for a very

25   short amount of time.

1    Q.    So what part of the house did you actually approach to

2    make entry?

3    A.    So we had three window teams.  There were three primary

4    windows.  We had two people on each window.  Their mission

5    was, upon the command "execute," they were going to stand up,

6    look inside and see if they saw the defendant or anyone else.

7    And then I went to the front door with approximately eight

8    other SWAT operators.  So we had the house essentially

9    surrounded.

10   Q.    I am going to show you what I marked as Government's

11   Exhibit 60.  Do you recognize Government's Exhibit 60?

12   A.    I do.

13   Q.    What is it?

14   A.    That's the front of the defendant's house.

15   Q.    And does this picture accurately depict how the front of

16   the defendant's house appeared on the day you executed the

17   search warrant?

18   A.    Yes, it does.

19          MS. RANDALL:  Your Honor, we move to introduce

20   Government's Exhibit 60 into evidence.

21          THE COURT:  Yes.

22          MS. RANDALL:  Thank you.

23          (Government's Exhibit No. 60 was received into

24   evidence and published.)

25   Q.    Is this the front door depicted in Government's

1    Exhibit 60 that you in fact approached?

2    A.    Yes.  This is where I was with approximately eight other

3    SWAT operators.

4    Q.    So when you approached it was the door open or shut?

5    A.    The door was shut, both doors were shut.

6    Q.    And as you approached the front door, did you make any

7    observations that caused concern to you?

8    A.    Yes.  So my plan was, we're all going to get into

9    position and I'm going to wait to hear from the sub-units that

10   they're in position.  So they would say something to the

11   effect of "Window Team One in place.  Window Team Two in

12   place."  So we all sort of are taking their lead that way and

13   everybody gets in place.  I looked in the window that is just

14   behind the palm tree and that was one of his windows.  I could

15   see a glow suggestive of someone watching TV or a light on.  I

16   could also see a fan going around.  It seemed to be going

17   around very slowly.

18        As we were sitting there and I was waiting for the

19   command to tell people to initiate, I saw a male come to the

20   front door and there's -- you might be able to see it if you

21   blow it up.  But on the top of the door there's like a window,

22   I'm not sure of the technical name for it but like a half

23   window.  And I saw a man I later came to realize was the

24   defendant looking out the window.

25   Q.    And I'm going to show you what's previously been

1    introduced as Government's Exhibit 94.  Do you recognize that

2    individual?

3    A.    Yes.

4    Q.    Who is that?

5    A.    That's the defendant.

6    Q.    And did you see the defendant that night?

7    A.    I did.

8    Q.    At what point did you first see the defendant?

9    A.    Well, I saw the top of his head through the window at the

10   top of the door, and then I saw him once we executed the

11   search warrant on the floor of his living room.

12   Q.    So once you saw the defendant -- when you first saw him

13   what did you do?

14   A.    So normally when we do an operation that requires

15   simultaneous action by different elements, I give a count

16   down.  So I say, "Team leader has control five, four, three,

17   two, one.  Execute.  Execute.  Execute."  And you say

18   "execute" three times so everyone can hear it.  We have the

19   radios with the little, you know, the ear deals.

20        But if you're discovered before you get through the

21   countdown, you say, "Compromise.  Compromise."  And so when I

22   saw the defendant's head, I said, "Compromise.  Compromise.

23   Execute.  Execute."  So then we initiated entry.

24   Q.    When you say you saw the defendant's head, how close was

25   he to the front door at that point?

1    A.   Well, he was against the front door and he was looking

2    out.

3    Q.   Of that little window?

4    A.   Of that little window.

5    Q.   And what were you guys wearing that night?

6    A.   We were wearing -- I think we were wearing our green

7    tactical suits.  We had our Kevlar helmets.  Some guys had

8    night vision goggles that they flipped up because they didn't

9    need them anymore.  We would our bulletproof vests with the

10   ceramic plate to stop rifle rounds.

11   Q.   And so then after you yell "Compromise," what happened

12   next?

13   A.   So I'm not sure exactly what caused the defendant to come

14   to the door.  I think it might be -- when I started the count

15   down one individual was designated to open the screen door.

16   And he opened the screen door as quietly as he possibly could.

17   But as a screen door will do, it made a little creak, a

18   little -- almost imperceptible.  That might have got the

19   defendant to the door, or just maybe his Spidey senses were

20   tingling.

21        But for whatever reason the door was opened.  And then we

22   had, our breacher has a ram to knock the door down.  Before we

23   knock the door down it's always smarter to test the handle to

24   make sure it's open.  So he was doing that and once I saw the

25   defendant I started yelling, "Police.  Search warrant.

1  Police.  Search warrant."

2      And the door wasn't being opened.  I don't know if it was

3  still locked or the defendant was holding it.  And then so the

4  breacher rammed the door.  The door went in.  Hit the

5  defendant and it came back, and then there was a pushing match

6  that went on between the defendant and two of the guys at the

7  door.  And that took maybe five seconds; 1,001, 1,002, 1,003,

8  1,004, 1,005.  A significant time under those circumstances.

9  Finally we won the pushing contest.

10     The door pushed in, hit the defendant.  The defendant

11 fell back.  Two of my guys fell on top of him.  They landed on

12 his lower part of his body.  He got up and started to go over

13 to where the computer was.  But only sort of lurched towards

14 it, maybe got on a knee, and then somebody else dove on top of

15 him.

16     I was the next through the door.  I said, "Computer.

17 Computer."  Because that was what we were concerned about.

18 Our concern was, we had to get to the computer before he shut

19 it or before he control/alt/delete locked it up.  Because we

20 were told that the encryption was so good that it would be

21 nearly impossible to get in to see the child pornography on

22 his computer if we didn't get it in an active state.

23     So when I saw the computer that was -- that was a good

24 sign.  We had -- I had designated someone else to be the

25 "mouse jigglier," for lack of a better term, to make sure that

1  the computer didn't lock up on itself.  You know, in a period

2  of inactivity on your computer it will lock, the screen will

3  lock.  So he went over there.  I don't remember if he

4  manipulated the mouse or an internal mouse pad on the laptop.

5  But he's actually a cyber agent so he's very well trained in

6  computers.  So that night his job was just to make sure he

7  kept the computer curser moving.  He did a good job.

8  Q.   I'm going to show you what I marked as Government's

9  Exhibit 59.  Do you recognize that picture?

10 A.   Yes, I do.

11 Q.   What does it depict?

12 A.   This is the front of the defendant's house as you look

13 in.

14 Q.   And does it fairly and accurately depict his house as it

15 appeared the night you executed the search warrant?

16 A.   Yes.  There's more lights on now but it does.

17      MS. RANDALL:  Your Honor, the Government would move

18 to introduce Exhibit 59 into evidence.

19      THE COURT:  Let it be admitted.

20      (Government's Exhibit No. 59 was received into

21 evidence and published.)

22 Q.   So the struggle that you described happening between the

23 defendant and your two agents where they fell on the ground,

24 where did that happen in relation to this picture?

25 A.   Well, just inside the door.  I would say the defendant

1   initially had been standing on the doormat inside the house

2   that's depicted in the photograph.  And then they fell.  I

3   think the defendant is 6'1" on his driver's license.  So they,

4   you know, fell straight from there.  So maybe about 7 feet

5   from where the threshold of the door is.

6   Q.   And then you -- excuse me.  You described the defendant

7   as making a lurching motion.

8   A.   Yes.

9   Q.   Which direction, using this picture, did he lurch?

10  A.   Okay.  Well, viewing the picture from outside the house

11  he would have gone to the left, which is where the computer

12  was.  If he was inside the house and fell down it would have

13  been to his right.

14  Q.   Showing you what's been marked previously as Government's

15  Exhibit 47, do you recognize what's depicted in that picture?

16  A.   Yes, I do.

17  Q.   What is that?

18  A.   That is the defendant's living room where he was seated,

19  probably a few minutes before we executed the search warrant.

20  Q.   And so from looking at the previous picture, is this the

21  room that would be to the left if you went in the front door?

22  A.   Correct.

23  Q.   And is that the computer you saw him lurching towards on

24  the little table there?

25  A.   Yes, in that direction.

1   Q.   So at that point was the defendant taken into custody?

2   A.   He was.

3   Q.   And for the record, do you see the person that you

4   arrested that evening here in the courtroom today?

5   A.   Yes, I do.

6   Q.   Can you give us a brief description to identify him?

7   A.   The defendant is wearing a yellow shirt with a long beard

8   and long hair.

9            MS. RANDALL:  Your Honor, if the record could

10  reflect he's identified the defendant.

11           THE COURT:  It will so reflect.

12           MS. RANDALL:  Thank you.

13  Q.   After Mr. Chase was taken into custody, what was the rest

14  of your role in executing the search warrant?

15  A.   Well, as we were getting him under control on the floor

16  and I say, "Computer" and the computer mouse jigglier went to

17  the laptop, we had ballistic shields to protect us against

18  things in the house, and they pushed forward to what would be

19  the kitchen area to make sure there was no one else inside the

20  house that would be coming around the corner, you know.

21           In SWAT everyone has their specific assignment.  You have

22  to take care of your assignment and not get tunnel vision on

23  one specific thing.

24  Q.   And so did you discover anybody else inside the home that

25  evening?

1    A.    No.

2    Q.    And at that point was the home considered secured?

3    A.    Yes.  We searched it and we did a secondary search.  And

4    then I deemed it secure and I called for the case agents to

5    come up and initiate the search.

6              MS. RANDALL:  No further questions, Your Honor.

7                        CROSS-EXAMINATION

8    BY MR. ADOLF:

9    Q.    SSA Baugher, I guess, it is?

10   A.    Yes, sir.

11   Q.    Would that be your title?

12   A.    Yes, sir.

13   Q.    Thanks.  Good afternoon.  I'm Peter Adolf.  I'm here

14   representing Mr. Chase.  I just got a couple questions for

15   you.  You talked about the fact that what you got was a

16   no-knock warrant.

17   A.    Yes.

18   Q.    And what that means is that's giving you special

19   permission to enter the house without knocking to surprise the

20   occupants, right?

21   A.    Yes.

22   Q.    And you do that in some cases because you're dealing with

23   particularly dangerous individuals who might be armed, and the

24   element of surprise is going to help keep you safe.

25   A.    Correct.

1    Q.    As part of getting ready for an operation like that, one

2    of the things you want to do is assess the threat of the

3    person or persons inside.

4    A.    Correct.

5    Q.    So to the extent you have any information about that

6    person, you're going to review it with your team to let them

7    know, basically, who you're dealing with and what you should

8    be worried about.

9    A.    Absolutely.

10   Q.    One of the things you do is review their criminal record.

11   A.    Yes.

12   Q.    And you learned that Mr. Chase had been arrested once

13   before, I believe it was in 1979, for disorderly conduct and

14   paid a small fine, right?

15   A.    I additionally know that he was arrested for two felonies

16   and four misdemeanors.

17   Q.    That's what you were told at the time?

18   A.    That's what I saw on his criminal history report, yes.

19   Additionally, I know that on two occasions individuals went to

20   his door and he threatened them with a handgun which he

21   admitted to the police when they responded.

22   Q.    That was information you were given before that?

23   A.    Yes, it was.  It's part of our thorough research of the

24   occupants of the structure.

25   Q.    Who was it that gave you that information?

1   A.    The local police department.   And then his criminal

2   history is available through NCIC through a database search.

3   Q.    Now, you said that there were -- as far as where the team

4   was deployed, there were eight armed officers at the front

5   door.

6   A.    Correct.

7   Q.    And you said you initiated entry with him looking through

8   the door.

9   A.    Yes.

10  Q.    And by that you mean you broke down the door with a

11  battering ram.

12  A.    We tried the door first.   I don't know if it was open.

13  He was pushing on it.   But we actually -- the need for the

14  no-knock warrant was obviated somewhat by the fact that he

15  discovered our presence.   So we didn't in fact have to rely

16  upon that.

17  Q.    And you said that was a pushing match between Mr. Chase

18  and two officers?

19  A.    Yes.

20  Q.    Those two officers were wearing full body armor.

21  A.    Correct.

22  Q.    Helmets, visors.

23  A.    No visors, but helmets.

24  Q.    And armed?

25  A.    Yes.   Well, usually people who are going through the door

1  do not have their long guns on them.  They just have their

2  handguns in their holster.  There's a concept called "cover

3  officer" and "contact officer."  You never want to put hands

4  on a subject when you have a weapon in your hands because of

5  sympathetic finger movement and stuff like that.  So you

6  always holster up or sling your weapon safe before you have to

7  put hands on someone.  So in that case I don't know if they

8  had their M-4 long guns on them or not.

9  Q.   You said that once he was in the ground and the officers

10 were trying to restrain him, he lurched towards the computer,

11 I think, is what you said?

12 A.   Yes, in that general direction.

13 Q.   As far as looking at the front door you're saying he went

14 to the left?

15 A.   Yes.  If you're looking at the front door he went to the

16 left where the computer would have been -- where the computer

17 was.

18 Q.   Of course if he had gone to the right, he would have been

19 lurching into that door that had just hit him in the face,

20 right?

21 A.   He was -- if you're looking at the door, the door opens

22 and the door goes against the wall and then he's directly in

23 front of the opening of the door.  So when he's laying on the

24 ground, if he's laying on his back the computer was to his

25 right and the couch where he was on the couch as the

1  administrator.

2  Q.   Right.   In other words, he was going to the left, right,

3  correct?

4  A.   He was going to our left, his right.

5  Q.   Towards another room.

6  A.   Towards the living room where his computer was.

7  Q.   And away from the door that had just hit him in the face.

8  That was on --

9  A.   I don't know if the door hit him face but...

10 Q.   He was behind it when it got battered in.

11 A.   No.  No, he wasn't.  The door pushed in and at a certain

12 point he stepped back.  He wasn't, like, pushed with the door

13 in one, like, pendulum-like swing against the wall.  At some

14 point we won the battle and he either stepped back and fell

15 directly back or we pushed him back.  But he didn't -- he was

16 not behind the door.

17      While the struggle was going on, I'm the number 5 person

18 in the lineup and I was looking in directly.  And my concern

19 was he didn't have a handgun in his hands.  So I kept saying,

20 "Police.  Search warrant.  Police.  Search warrant."  And I

21 could see the door was probably 6 inches open at one point and

22 he was struggling and they were struggling to get it open.

23 Q.   And you won the battle.

24 A.   We won, yeah.

25 Q.   The eight of you at the front door?

1   A.    Well, there was two of us and one of him.

2   Q.    And six behind you?

3   A.    Correct.

4              MR. ADOLF:  Nothing further, Your Honor.

5              MS. RANDALL:  No further questions, Your Honor.

6              THE COURT:  You may step down.

7              THE WITNESS:  Thank you.

8              MS. RANDALL:  Your Honor, the Government calls

9   Daniel Ward.

10               DANIEL WARD, GOVERNMENT WITNESS, SWORN

11                         DIRECT EXAMINATION

12  BY MS. RANDALL:

13  Q.    Good afternoon, sir.  Can you please state your name for

14  the record?

15  A.    My name is Daniel Ward.

16  Q.    And, Mr. Ward -- or Special Agent Ward, how are you

17  employed?

18  A.    I'm a special agent with the FBI.

19  Q.    And how long have you worked with the FBI?

20  A.    About four and a half years.

21  Q.    And what type of responsibilities do you have with the

22  FBI?

23  A.    I'm the Fort Myers Child Exploitation Task Force

24  Coordinator.

25  Q.    How long have you worked child exploitation cases?

1   A.   About three and a half years.

2   Q.   Did you receive a request for assistance to execute --

3   from another agent in another division -- to execute a search

4   warrant at 3550 -- excuse me -- 3570 15th Avenue Southwest

5   Naples, Florida?

6   A.   Yes.

7   Q.   Can you kind of describe, generally, the nature of that

8   request?

9   A.   It was a lead from another agent to assist in the

10  execution of a federal search warrant in my area of

11  responsibility.

12  Q.   And is that area of responsibility child exploitation?

13  A.   Yes.

14  Q.   Was there anything unusual about how the search warrant

15  was to be executed?

16  A.   This one was to be executed any time.  A lot of the

17  search warrants we do is 6:00 a.m. and 10:00 p.m.  However,

18  this one we had a special authority from the judge to allow us

19  to execute it anytime we saw fit.

20  Q.   Did you have concerns about preserving evidence in this

21  case?

22  A.   Yes, we did.

23  Q.   What kind of concerns did you have?

24  A.   The subject in this case was known to be more

25  technologically advanced than the average user of the

1   computer.  So in order to prevent that person from engaging in

2   some form of encryption on the computer we had to modify the

3   search warrant.

4   Q.   And did you get that permission from the judge to do so?

5   A.   Yes.

6   Q.   When did you execute the search warrant?

7   A.   It was February 20, 2015, a little after midnight.

8   Q.   And who made entry into the house first?

9   A.   Our SWAT team made entry first.

10  Q.   And after the SWAT team secured the residence and placed

11  the defendant in custody, what happened next?

12  A.   Once they let us know he was in custody and the house was

13  cleared, there were no occupants, my task force moved in and

14  we began processing the house for evidence.

15       THE COURT:  If you would speak a little closer to

16  the mic, please.

17       THE WITNESS:  Yes, sir.

18  Q.   Can you describe generally how the FBI processes a house

19  for evidence?

20  A.   Sure.  The team will go in and we will take overall

21  photographs of the entire house and then we will label each

22  room, A, through whatever the room would be.  And then the

23  search personnel begin searching the house room by room for

24  specific items of evidence.

25       Once the items of evidence are found, whoever finds it

1   comes and lets me know and let's the photographer know.   At

2   that point we both go in there, the item is actually

3   photographed as it is, and then I collect the item and take it

4   to the area where we're processing the evidence, collecting

5   it.

6   Q.   I'm showing you previously what's been admitted as

7   Government's Exhibit 61.  Do you recognize what's depicted in

8   61?

9   A.   Yes.

10  Q.   What do you recognize it to be?

11  A.   That's the front of the residence that we did a search

12  warrant on.

13  Q.   And did you follow the procedure you just described in

14  executing the search warrant at this house?

15  A.   Yes.

16  Q.   What did the search warrant allow you to seize, if

17  anything?

18  A.   Digital media, thumb drives, laptops, optical disks, some

19  paperwork, anything kind of related to a digital item.

20  Q.   And did you find items that evening that matched digital

21  media?

22  A.   Yes, we did.

23  Q.   Showing you what's previously been admitted as

24  Government's Exhibit 40a, do you recognize that item?

25  A.   Yes.

1   Q.   What is it?

2   A.   That was the laptop computer that was directly in front

3   of the couch that was in that position when we entered the

4   house.

5   Q.   Does Government's Exhibit 47 also depict that same

6   computer?

7   A.   Yes.

8   Q.   I'm going to show you what's been marked as Government's

9   Exhibit 66.  Do you recognize that item?

10  A.   Yes, that's the laptop computer.

11  Q.   This was the laptop that was depicted in the picture we

12  just saw?

13  A.   Correct.

14  Q.   Are you the agent who seized it that evenings?

15  A.   Yes.

16       MS. RANDALL:  Your Honor, the Government would move

17  to introduce Exhibit 66 into evidence.

18       THE COURT:  Let it be admitted.

19       (Government's Exhibit No. 66 was received into

20  evidence and published.)

21  Q.   Prior to actually seizing the laptop, were other agents

22  present who first do some on scene forensics with that laptop?

23  A.   Yes, there were.

24  Q.   Going back to Government's Exhibit 48 where you identity

25  the laptop.  Was there any other kind of digital media

1   attached to the laptop?

2   A.    Yes, the thumb drive that is depicted in the picture was

3   connected to it when we entered the house.

4   Q.    And is that the type of device you were also allowed to

5   seize under the search warrant?

6   A.    Yes.

7   Q.    Let me show you what I've marked as Government's

8   Exhibit 68.  Do you recognize that item?

9   A.    Yes.

10  Q.    What is it?

11  A.    That's the same disk -- thumb drive that was inside the

12  computer.

13  Q.    And are you the agent who seized it that evening after it

14  was taken out of the computer?

15  A.    Yes, ma'am.

16            MS. RANDALL:  Your Honor, the Government move to

17  introduce Government's Exhibit 68 into evidence.

18            THE COURT:  Let it be admitted.

19            (Government's Exhibit No. 68 was received into

20  evidence and published.)

21  Q.    I'm going to show you what has been marked as

22  Government's Exhibit 50.  Do you recognize Government's

23  Exhibit 50?

24  A.    Yes, I do.

25  Q.    And what does it depict?

1    A.    The cellular phone that was on the couch.

2    Q.    What couch?

3    A.    The couch that we just saw in the prior picture in front

4    of the -- behind the laptop.

5    Q.    And does it accurately depict how the phone was laying

6    when you guys executed the search warrant that evening?

7    A.    Yes.

8              MS. RANDALL:  Your Honor, the Government would move

9    to introduce Exhibit 50 into evidence.

10             THE COURT:  Let it be admitted.

11             (Government's Exhibit No. 50 was received into

12   evidence and published.)

13   Q.    So under the procedure you described previously, you

14   would have taken this photo and then taken it into evidence at

15   that point?

16   A.    Correct.

17   Q.    I'm going to show you what I marked as Government's

18   Exhibit 67.  Do you recognize that item?

19   A.    Yes, that's it.

20   Q.    "That's it," being the cell phone depicted in

21   Government's Exhibit 50?

22   A.    Yes, ma'am.

23   Q.    Are you the agent who seized it that evenings?

24   A.    Yes, I am.

25             MS. RANDALL:  Your Honor, the Government would move

1    to introduce Exhibit 50 [sic] into evidence.

2              THE COURT:  Let it be admitted.

3              MS. RANDALL:  Thank you.

4              (Government's Exhibit No. 67 was received into

5    evidence.)

6    Q.   You said you also looked for some documentation that was

7    relevant to the case.  Did you find some paperwork around the

8    house that looked relevant to the case?

9    A.   We did.  We found a piece of mail that had a Maine

10   address on it.  We also found some receipts.

11   Q.   I'm going to show you Government's Exhibit 54.  Do you

12   recognize Government's Exhibit 54?

13   A.   Yes.

14   Q.   What does it depict?

15   A.   A piece of mail.

16   Q.   And where was this mail found?

17   A.   I don't recall where the mail was actually found.

18   Q.   Was that found in the defendant's home, though?

19   A.   Yes.

20   Q.   And does this photo depict how the piece of mail appeared

21   when you executed the search warrant that evening?

22   A.   It does.

23             MS. RANDALL:  Your Honor, the Government would move

24   to introduce Exhibit 54 into evidence.

25             THE COURT:  Let it be admitted.

1     (Government's Exhibit No. 54 was received into
2  evidence and published.)
3  Q.   What about this piece of mail made you guys stop and take
4  a picture of it?
5  A.   The fact that it had an address in Maine.
6  Q.   And can you, just for the record, state who the letter is
7  addressed to and the address that made you guys --
8  A.   It's the addressed to Ms. Louise Chase 3119 Carrabassett
9  Drive in Carrabassett Valley, Maine, 04547.
10  Q.   Let me show you what I marked as Government's Exhibit 53.
11  Do you recognize that item?
12  A.   I do.
13  Q.   What is that?
14  A.   That's a piece of paper that was pinned to the cork board
15  that was also in his residence.
16  Q.   And does this accurately depict how you found that piece
17  of paper that evening while executing the search warrant?
18  A.   Yes.
19     MS. RANDALL:  Your Honor, the Government moves to
20  introduce Exhibit 53 into evidence.
21     THE COURT:  Let it be admitted.
22     (Government's Exhibit No. 53 was received into
23  evidence and published.)
24  Q.   You said this was pinned to a -- like a bulletin board
25  inside the defendant's house.

1    A.   Yes, ma'am.

2    Q.   Did you also search the garage of the house?

3    A.   Yes, we did.

4    Q.   Did you find anything of evidentiary value inside the

5    garage?

6    A.   His car was located in the garage.

7    Q.   Show you what has been identified as Government's

8    Exhibit 57.  Do you recognize that picture?

9    A.   Yes.  That's the Dodge Charger in the garage.

10   Q.   And do you -- does this picture fairly depict how the car

11   was in the garage that evening?

12   A.   Yes.

13        MS. RANDALL:  Your Honor, the Government would move

14   to introduce Exhibit into 57 evidence.

15        THE COURT:  Let it be admitted.

16        (Government's Exhibit No. 57 was received into

17   evidence and published.)

18   Q.   I'm sorry, I skipped over -- you said you also found some

19   receipts in the residence; is that correct?

20   A.   Yes.

21   Q.   And were those receipts also photographed?

22   A.   They were.

23   Q.   I'm going to first show you what has been marked as

24   Government's Exhibit 52.  Do you recognize Government's

25   Exhibit 52?

1  A.    Yes.

2  Q.    And what does it depict?

3  A.    The receipts from -- I think it was a Sugarloaf Ski

4  Resort in Maine.

5  Q.    Does this picture accurately depict the receipts that you

6  located inside the defendant's residence that evening?

7  A.    Yes, ma'am.

8         MS. RANDALL:  Your Honor, the Government would move

9  to introduce Exhibit 52 into evidence.

10        THE COURT:  Let it be admitted.

11        (Government's Exhibit No. 52 was received into

12  evidence and published.)

13  Q.    You said these receipts were for a place called Sugarloaf

14  in Carrabassett Valley, Maine; is that correct?

15  A.    Yes.

16  Q.    Do these receipts have any dates stamped on them?

17  A.    December 29, 2014, and December 8, 2014, and December 30,

18  2014.

19  Q.    And that's the receipts on the right?

20  A.    From left to right it starts off at December 8th then

21  December 29th and December 30t.

22        MS. RANDALL:  Move to introduce Government's

23  Exhibit 51.

24  Q.    Are those the other receipts that you were just talking

25  about?

1    A.    Yes.

2    Q.    Were these also seized from the defendant's residence

3    when you executed the search warrant?

4    A.    Yes, they were.

5    Q.    And does this photo accurately depict how they appeared

6    that evening?

7    A.    It does.

8              MS. RANDALL:  Your Honor, the Government would move

9    to introduce Exhibit 51 into evidence.

10             THE COURT:  Let it be admitted.

11             (Government's Exhibit No. 51 was received into

12   evidence and published.)

13   Q.    And what are the dates reflected on these particular

14   receipts?

15   A.    December 30, 2014.

16   Q.    And is there an address listed on these receipts?

17   A.    197 Main Street, Farmington, Maine.

18             MS. RANDALL:  No further questions, Your Honor.

19             MR. ADOLF:  Nothing, Your Honor.

20             THE COURT:  You may step down.

21             (Witness excused.)

22             MS. RANDALL:  Your Honor, the Government next would

23   call Kevin Kelley to the stand.

24              KEVIN KELLEY, GOVERNMENT WITNESS, SWORN

25                       DIRECT EXAMINATION

1    BY MS. RANDALL:

2    Q.   Good afternoon, sir.  Can you please tell us your name.

3    A.   My name is Kevin Kelley, K-e-l-l-e-y.

4    Q.   How are you employed?

5    A.   I am a special agent with the FBI assigned to the Boston

6    Division, Augusta, Maine, resident agency.

7    Q.   How long have you been with the FBI?

8    A.   Since 2005.

9    Q.   Did you receive a request to assist in the investigation

10   of Steven Chase?

11   A.   I did.

12   Q.   What were you asked to do?

13   A.   I was asked essentially to go up to Carrabassett Valley

14   Maine, 3119 Carrabassett Valley Drive to essentially conduct a

15   surveillance site survey to see if it appeared anyone was at

16   that address other than the known owner of the home Louise

17   Chase.

18   Q.   And what were you able to determine based on your

19   investigation?

20   A.   When I went by the address, I observed a white -- late

21   model white Dodge Charger backed into the driveway with its

22   front end facing the street.  And I noticed that the front of

23   the car did not have a license plate or license plate bracket.

24   Which in Maine all registered cars have to have a front and

25   back license plate.  So I assumed that the car maybe from out

1    of state.

2    Q.   I'm going to show you what I've marked as Government's

3    Exhibit 64.  Do you recognize that exhibit?

4    A.   I do.

5    Q.   Can you describe what it is for the record?

6    A.   That is a late model white Dodge Charge with the missing

7    front license plate as I described.

8    Q.   Does this photo accurately depict how the home and the

9    car appeared on the day you drove by that you just described?

10   A.   Yes, it does.

11              MS. RANDALL:  Your Honor, the Government would move

12   to introduce Exhibit 64 into evidence.

13              THE COURT:  Let it be admitted.

14              (Government's Exhibit No. 64 was received into

15   evidence and published.)

16   Q.   And is this residence the one that you were asked to

17   check out on the 3119 Carrabassett residence?

18   A.   It is, that's correct.

19   Q.   Do you remember what day you conducted the surveillance?

20   A.   That was on January 30, 2015.

21   Q.   At some point later were you also asked to assist in the

22   execution of a search warrant at the same residence?

23   A.   Yes, I was.

24   Q.   Do you remember when you executed that search warrant?

25   A.   The warrant was on February 20, 2015.

1  Q.   And were you present -- and was that search warrant

2  executed at that same residence we just saw the photo of?

3  A.   Yes, it was.

4  Q.   When you executed the search warrant, who was present in

5  that home?

6  A.   Louise Chase.  She was by herself.

7  Q.   What particularly were you looking for that day?

8  A.   We were looking for any devices, computer devices, that

9  may have been in the home or left behind, essentially, any

10 evidence of child pornography, production or distribution.

11 Q.   Did you find anything particularly relevant in this case?

12 A.   We found two items of note.  We found a ASUS router and

13 we found a Google Chrome Cast USB thumb drive plugged into the

14 back of Louise Chase's TV which she was not aware of.

15 Q.   And did you seize those items that day?

16 A.   We did.

17 Q.   Did you also find anything relevant to the defendant

18 Steven Chase in the home that you took photos of?

19 A.   I'm sorry.  Can you say that one more time.

20 Q.   Sorry, I phrased that terribly.  I will show you what's

21 been marked as Government's Exhibit 65.  Was this a photo that

22 was taken that day?

23 A.   Yes, that's right.

24 Q.   What does this photo depict?

25 A.   These are two pieces of mail that Louise Chase was

1  holding for Steven Chase that she was planning to forward back

2  down to him in Florida after three weeks.

3  Q.   And does this exhibit fairly depict how the mail appeared

4  the day you executed the search warrant?

5  A.   Yes, it does.

6          MS. RANDALL:  Your Honor, the Government would move

7  to introduce Exhibit 65 into evidence.

8          THE COURT:  Let it be admitted.

9          (Government's Exhibit No. 65 was received into

10  evidence and published.)

11  Q.   Looking for a piece of mail that's on the bottom, who was

12  this piece of mail originally addressed to?

13  A.   That is to Steven W. Chase of Naples, Florida.

14  Q.   And would the first piece, the top piece of mail, where

15  was that addressed to as well?

16  A.   Steven Chase, again, of Naples, Florida.

17  Q.   Are you familiar with these little yellow labels that

18  appear on the bottom of each piece of mail?

19  A.   Yes.

20  Q.   What does that signify?

21  A.   I believe those are U.S.P.S -- U.S. Postal Service

22  forwarding labels.

23  Q.   So in this case the mail was supposed to go to his

24  residence in Naples, Florida, instead it was forward to this

25  Carrabassett Drive residence?

1  A.   That would be correct.

2  Q.   And just to make it clear, this 3119 Carrabassett Drive

3  is the house you were executing the search warrant in.

4  A.   That is the warrant -- that is the address we did the

5  warrant at, correct.

6        MS. RANDALL:  No further questions, Your Honor.

7        MR. ADOLF:  Nothing, Your Honor.  Thank you.

8        THE COURT:  You may step down.

9        MS. RANDALL:  Your Honor, the Government would call

10 Randy Walker.

11        RANDY WALKER, GOVERNMENT WITNESS, SWORN

12             DIRECT EXAMINATION

13 BY MS. RANDALL:

14 Q.   Good afternoon, sir.  Can you please tell us your name.

15 A.   Randy Walker.

16 Q.   And how are you employed?

17 A.   I am the Deputy Chief of Carrabassett Valley Police

18 Department in the State of Maine.

19 Q.   And how long have you worked at the Carrabassett Valley

20 Police Department?

21 A.   Seventeen years.

22 Q.   Can you describe for the jury a little bit about what

23 Carrabassett Valley is like.

24 A.   Is like?  It's a ski resort town.  We have a -- the

25 second largest mountain in Maine in our town.  It goes from

1    about 600 residences in summertime to 10,000 in the

2    wintertime.  And it's a lot of outdoor activities.

3    Q.   How long have you lived in Carrabassett Valley?

4    A.   I don't live in Carrabassett.

5    Q.   How long have you worked in Carrabassett Valley?

6    A.   Seventeen years.

7    Q.   To your knowledge, was the defendant -- was the defendant

8    Steven Chase in Carrabassett Valley in the winter of 2014 to

9    2015?

10   A.   Yes.

11   Q.   How do you know that?

12   A.   I first met him in the base lodge at Sugarloaf.  He was

13   over by the guest services office.  He came up to me and

14   introduced himself and said he was up here -- up at

15   Carrabassett to take care of his stepmother and ski and relax

16   for the winter.  He also was involved in two car accidents,

17   minor car accidents on December 24th and December 26th in

18   town.

19   Q.   Do you happen to remember what kind of vehicle he was

20   operating at the time he was involved in this car accident?

21   A.   A white Dodge Charger with Florida tags on it.

22   Q.   During your first conversation with Mr. Chase regarding

23   the ski resort, do you remember approximately when that

24   conversation happened?

25   A.   It was the end -- I think it was the end of November,

1    beginning of December.  It was before the car accidents.  I

2    don't remember the specific date.

3    Q.   And he told you he was visiting his stepmother.  Did he

4    tell you who his stepmother was?

5    A.   Louise Chase.

6    Q.   Did you know who Louise Chase was?

7    A.   I do.

8    Q.   Show you what's been marked as Government's Exhibit 64.

9    Do you recognize that residence?

10   A.   I do.

11   Q.   And do you know who lives in that residence?

12   A.   Who lives --

13   Q.   Who lives there?

14   A.   Yes, Louise Chase does.

15              MS. RANDALL:  No further questions, Your Honor.

16              MR. ADOLF:  Nothing, Your Honor.  Thank you.

17              THE COURT:  You may step down.

18              MR. JONES:  Your Honor, at this time the United

19   States calls David Lynn Browning.

20         DAVID LYNN  BROWNING, GOVERNMENT WITNESS, SWORN

21                     DIRECT EXAMINATION

22   BY MR. JONES:

23   Q.   Good afternoon, Mr. Browning.  Please introduce yourself

24   to the jury.

25   A.   My name is David Browning.  What specific information do

1   you want?  I'm sorry.

2   Q.   Just a brief description -- just state and spell your

3   name for record as well.

4   A.    David Lynn Browning, D-a-v-i-d.  L-y-n-n.

5   B-r-o-w-n-i-n-g.

6   Q.   How old are you, Mr. Browning?

7   A.    Forty-seven.

8   Q.   Just briefly, what schooling did you receive?

9   A.    I had two years of college.

10  Q.   Mr. Browning, have you been represented by an attorney

11  throughout the course of this criminal process?

12  A.    Yes, sir, I have.

13  Q.   Mr. Browning, did you recently plead guilty to engaging

14  in a child exploitation enterprise?

15  A.    Yes, I did.

16  Q.   Did you enter into a plea agreement to cooperate here

17  today?

18  A.    I did.

19  Q.   I'm showing you what's been marked as Government

20  Exhibit 73.  I just want to go through the -- walk through the

21  pages of this plea agreement with you.  Starting in -- just

22  walking through page 1, 2, 3, 4, 5, 6, 7, 8.  Do you recognize

23  this document, Mr. Browning?

24  A.    I do, sir.

25  Q.    Is it a true and accurate copy of the plea agreement you

1   entered into with the United States?

2   A.   It is, yes, sir.

3            MR. JONES:  Your Honor, the Government moves to

4   admit U.S. Exhibit 73.

5            THE COURT:  Let it be admitted.

6            (Government's Exhibit No. 73 was received into

7   evidence and published.)

8   Q.   Mr. Browning -- Mr. Browning, looking at the last page of

9   this plea agreement, will you verify for us that you signed

10  this plea agreement?

11  A.   I did, yes.

12  Q.   And your signature is where?

13  A.   At the very bottom.

14  Q.   Are there any other signatures on this page?

15  A.   There are four total.

16  Q.   Turn to page -- show you page 6 in this plea agreement,

17  turn to paragraph 23.

18       Would you read this paragraph for us, Mr. Browning.

19  A.   "If requested by the United States but only if so

20  requested, the defendant agrees to cooperate with the United

21  States, including but not limited to the following:

22       "The defendant will provide truthful information about

23  the subject, charges, and any other criminal activity within

24  the defendant's knowledge to any United States agent or agency

25  that the United States designates.

1    "The defendant will testify truthfully in any trial,

2  hearing, or Grand Jury proceeding, including, but not limited

3  to, testimony against any co-defendants, as the United States

4  designates.  Should the defendant testify at the request of

5  the United States, the defendant hereby waives payment of any

6  witness fees or expenses."

7  Q.   Just in your own words, what does that mean -- that

8  paragraph mean?

9  A.   Just that I agree to testify on -- basically on behalf of

10  the government in and about this case in a truthful manner.

11  Q.   Okay.  Showing you now page 7 of this plea agreement,

12  next page.  If you could look at paragraph 25 at the bottom of

13  page 7.  You also read this paragraph.

14  A.   "Nothing in this agreement places any obligation on the

15  United States to seek the defendant's cooperation or

16  assistance.  If the defendant so assists the United States,

17  the United States in its sole discretion will determine

18  whether said assistance has been substantial and upon

19  determination that the defendant has rendered substantial

20  assistance the United States may make a motion pursuant to

21  U.S.S.G. 5K1.1 for the imposition of a sentence below the

22  applicable sentencing guidelines or pursuant to Rule 35(b) for

23  a reduction in the defendant's term of imprisonment."

24  Q.   Let me show you page 8, paragraph c.

25  A.   Paragraph c?

1  Q.   Yeah, well, you can finish reading those last two

2  sentences there.

3  A.   Okay.  I think it said "The United States may also,

4  within its sole discretion, move the Court pursuant to 18

5  U.S.C. 3553(e) and/or Rule 35(b) to impose a sentence below

6  any applicable statutory mandatory minimum.  Any determination

7  that the defendant has failed to provide substantial

8  assistance or is knowingly provided false information is

9  within the sole discretion of the United States and the

10  defendant waives all objections and rights of appeal or

11  collateral attacks such as determination.  The defendant

12  understands that if the United States makes a motion for

13  reduction of the sentence, the motion is not binding on the

14  District Court."

15  Q.   Can you just in your own words explain that last

16  paragraph, paragraph c?

17  A.   That if I -- I have not provided substantial assistance

18  that the United States does not have an obligation to request

19  a sentence under those guidelines.

20  Q.   Okay.  And what about that last sentence?

21  A.   "The defendant understands that the United States makes a

22  motion for a reduction of sentence, the motion is not binding

23  on the District Court."  I guess that -- I assume that means

24  the judge has discretion of what he wants to do.

25  Q.   Does that mean the judge determines sentencing?

1    A.    Right, correct.   That's what I understand that to mean.

2    Q.    Okay.   Mr. Browning, has anyone made any threats or

3    promises to you outside this agreement we just reviewed?

4    A.    No, sir.

5    Q.    Have you meet with the prosecution team at any time

6    before today?

7    A.    Yes, sir, I did.

8    Q.    Just briefly, what did you cover during those meetings?

9    A.    You know, we went over this information just, you know,

10   line of questioning, possible line of questioning.   How things

11   were going to go, the proceedings, that sort of thing.

12   Q.    Okay.   Has anyone told you what to say in your testimony

13   other than to tell the truth?

14   A.    No, sir.

15   Q.    Mr. Browning, just briefly let's talk about your

16   knowledge of the Tor network or the Dark Web.   Just in your

17   own words, what's the purpose of the Tor network?

18   A.    To my understanding the primary purpose of that network

19   is to mask your -- maybe there's more -- maybe there's more to

20   it, but the two prominent reasons for Tor is to mask your IP

21   address, your internet protocol address.   Basically every

22   computer or mobile device, from my understanding, has its own

23   separate IP number.   If you went and posted something say at a

24   sports forum, say NFL.com, a forum, just through regular

25   internet, your IP address could be located pretty easily

1    through that.  The purpose of Tor is that it masks that IP

2    address.  So it -- Tor actually stands for the onion -- the

3    Onion Network and it hides your address under many different

4    layers.

5        How they do that?  The technical aspect of that, I'm not

6    really certain.  I just know that's what it does.

7        So if your IP address is identified through Tor it may

8    show that you -- maybe today you're in Zimbabwe, tomorrow it

9    could show that you're in Brussels, you know, it's always --

10   it always varies.  And then it is hidden under several

11   different layers.  So there's essentially no way to gain your

12   true IP address.

13       The second purpose is to host websites that are known

14   commonly as deep web sites.  These are not sites that are

15   available through normal browsers.  In other words, you

16   couldn't open up Internet Explorer or Google Chrome or

17   something like that and find these websites.

18       You can access normal sites through Tor.  It uses the

19   Firefox browser.  So you could put in Yahoo.com and access

20   that site.  But there are -- the specific sites that are known

21   as deep websites are dot Onion sites and those are not

22   available through standard browsers.  It's just -- if you put

23   in the address it's just going to pop up an error message

24   saying they can't be access.

25   Q.    Mr. Browning, what do you primary use the Tor network or

1  the Dark Web for?

2  A.    Specifically, for me, it was for child pornography.

3  Q.    Now, Mr. Browning, are you familiar with the child

4  pornography website PlayPen?

5  A.    I am, yes.

6  Q.    What is it?

7  A.    It's just a forum that hosted child pornography.  People

8  could post videos or photographs in regards to that kind of

9  material.

10  Q.    Mr. Browning, how did you find -- were you able to -- you

11  gave us a description of the Tor network, the Dark Web.  How

12  were you able to find the PlayPen website operating on the

13  Dark Web?

14  A.    It's not really easy.  I had initially -- initially, I

15  was searching for some kind of support site for pedophiles,

16  just a place where you could go and discuss those issues.

17  Through just a Google search, you know, and doing a lot of

18  digging, I found reference to the site called the "Pedo

19  Support Community," and it was located on the Tor network.  Up

20  until that point I never heard of Tor.

21       But with Tor you have to download a program, a specific

22  program.  You have to install it.  You have to configure it

23  and so forth.  And then once you get that installed, even then

24  it's hard to -- you can't just go into Google and, you know,

25  type in "Pedo Support Community" and it had that specific

1    address come up.  You still have to do quite a bit of digging

2    in order to find it.

3        So I was able to locate that website.  I was active at

4    that site, which it's just a discussion site, there's no

5    material.  It's actually banned, videos, any kind of material

6    is not allowed at that site.  Links to other websites are not

7    allowed at that site.  But it's not difficult to find people

8    who are involved in other sites.  So, you know, it's just

9    through discussions with undoubtedly folks at that site that I

10   learned about PlayPen.

11   Q.   Just briefly describe for the jury what you mean when you

12   say "pedo community."  Just kind of describe what that

13   entailed.

14   A.   Well, it's a little -- it's pretty broad, actually.  Now

15   that website in particular was called "Pedo Support

16   Community."  But there's really a, you know, pedo community in

17   general.  And that, you know, that community -- I think a lot

18   of people, the general public sees pedophiles and child

19   molesters as one in the same.  You know, we're all just --

20   just the most evil and vial of humanity.  And a lot of us just

21   simply, you know, we're -- I mean, we're just attracted to

22   children.  It's -- it's just, you know, the way we're wired;

23   can't turn it off, can't change it.

24       So there's a lot of different -- when we speak about

25   sites such as PlayPen hosting child pornography, I think the

1    common idea is that this is a no-holds-barred, you know,

2    anything-goes-type forum and community.  And that's -- that's

3    really not the case.  There's a lot of people -- it's no

4    different from just an ordinary person's attraction to another

5    adult.  You know, I would say that -- I mean, I'm also

6    attracted to women.  So, you know, maybe, you know, I have

7    that attraction, it doesn't necessarily mean that I enjoy

8    watching pornography.  Maybe I like pornography, you know, but

9    passively.  You know, I could like, say, just standard guy on

10   girl porn.  Maybe I like interracial porn but I'm not

11   necessarily into, you know, sadomasochism and bondage.  You

12   know, I'm not into, you know, bestiality.  I'm not into midget

13   porn, you know, there's -- I mean, any other kind of fetish,

14   you know, that you could put under there.

15        So -- and in that respect the pedophile community is the

16   exact same way.  There's a lot of different mindsets.  A lot

17   of different, you know, just because we're attracted to

18   children doesn't mean that it's -- it's anything goes.  So

19   it's pretty detailed.

20   Q.   Now, Mr. Browning, just moving along to your involvement

21   in the PlayPen website.  Just generally speaking, were you a

22   member of the PlayPen website?

23   A.   Initially I was a member.  When I first joined the site I

24   was a member.  That was probably somewhere in the neighborhood

25   of October of 2014, I think.  I was approached, maybe

 1   November, by a couple of the moderators -- actually one

 2   administrator and one moderator and they had asked me if I

 3   would be interested in the moderator position.  And at the

 4   time I wasn't.  I, you know, I told them a couple times that I

 5   wasn't interested in it.  Then they came to me several weeks

 6   later and asked again.  And those particular individuals I had

 7   a pretty good relationship with so I agreed to take on the

 8   moderator role on the site.

 9   Q.   Now going back we talked about -- you said that you

10   became a member, first.  And we'll get to your duties as a

11   moderator in a second.  But just, generally, as a member,

12   general member of the PlayPen website, what did membership

13   entail?

14   A.   Just access to the different levels of the forum.  It was

15   setup so that I think that, you know, the primary section was

16   just a discussion section, just a discussion forum.  There was

17   a request section.  There was, I think, a section for, like,

18   tech support and kind of -- kind of a how-to-type section.

19        Passed that it got into the material which would be

20   broken down, for instance, I think this one in particular it

21   probably had a "Preteen" section and then it would have --

22   that would be divided between "Boys" and "Girls."  Maybe that

23   would be divided then between "Videos" and "Photographs."

24   There was a, like a, what was known as a "Jailbait" section

25   which was like early to mid teens, that also broken up in

1  sections -- excuse me, sexes.  I think there was also a "Web

2  Cam" section.  And it just -- so regular membership just gave

3  you access to those levels of material and aspects of the

4  porn.

5  Q.   Mr. Browning, I'm going to show you an exhibit that's

6  already been admitted into evidence, been marked as United

7  States Exhibit 35.  Do you recognize this exhibit?

8  A.   Yes, I do.

9  Q.   Just scrolling in on the bottom left "Summary," just

10 briefly describe for the jury this section.

11 A.   That was just my, kind of, my profile.  "Stretch

12 Armstrong" was the nickname that I used -- the moderator

13 nickname that I used.  Obviously told that I was a global

14 moderator and they had options of sending a private message,

15 showing posts I made, and the stats that went on with that.

16 Q.   What's this picture here?

17 A.   It's a girl who -- she was a -- she was part of a -- if

18 you want to call it a modeling agency that was located in

19 Europe that -- there was many different -- they had many

20 different girls who -- ranging from late preteens into the

21 teens who posed for -- all of the material was non-nude but it

22 was in this -- kind of in this form, a lot of lingerie and

23 things like that.

24 Q.   Did you create this picture?  Did you create that

25 picture?

1    A.    I did.

2    Q.    Just going to the middle of the page where it has "Posts"

3    and "Thanks" and "Age."  Just briefly explain for the jury

4    under your profile, kind of, what this information us in your

5    own words.

6    A.    The posts 809 -- I had a total of 809 posts, averaging,

7    looks like, 9.6 per day.  Thanked 612 times.  That was kind of

8    a Karma system that was set up in the forum where you could

9    thank people for their posts.  Basically, a like or dislike

10   option.  Age, that was, you know, we didn't put that

11   information.  Date registered looks like was November 13th,

12   that's when I registered for the forum.  Local time, I

13   guess -- I guess that was when this particular information was

14   accessed.  And last active was that day at 3:34 a.m. so...

15   Q.    Okay.

16   A.    The signature was -- was -- if I had posted any files or

17   material the -- the file password was "Stretch," the download

18   password was "SA."

19   Q.    Okay.  And just under "Stretch Armstrong," say "Global

20   Moderator," could you just explain briefly what "Global

21   Moderator" meant?

22   A.    It was -- there were, I guess, essentially three levels

23   of administration.  You had the person that set up the forum.

24   You had -- there was a couple of administrators and then there

25   were moderators.  So maybe a good example was that the person

1  that set the -- you know, that set up the forum would have

2  been the manager.  If you want to compare to say like a

3  restaurant or something.  The person set up the forum was a

4  manager.  There were two -- two other administrators that you

5  could call assistant managers.  There were -- I think there

6  were eight or ten moderators that you could refer to as maybe

7  a shift leader.

8  Q.   I'm showing you what's now been marked as U.S.

9  Exhibit 10.  It's already been admitted.

10     Now, does this page of -- page of the "Staff List," just

11  briefly describe as you were doing for the jury what this page

12  entailed.

13  A.   Let's see, yeah, looks like the global moderators are at

14  the top and there were one, two, three, four, five, six --

15  looks like seven of those.  The administrators, three of

16  those.  And the local moderators, I think the local moderators

17  were -- the global moderators had access to all of the

18  forums -- or each -- excuse me, each section of the forum.

19  They could perform moderator duties in each of those sections.

20     The local moderators I think were specific to --

21  actually, no.  Looks like these are -- these were different

22  languages.  I know that there were some -- some moderators who

23  only had moderator duties over certain sections of the forum.

24  So maybe they were only -- they could only moderate the

25  discussion forum or maybe a boys forum or section.

1    This one, maybe they were different languages.  I'm not

2    real certain to be honest.

3    Q.   And just briefly for the jury explain -- you were a

4    global moderator, just explain the different duties that a

5    global moderator would have versus administrator PlayPen,

6    Isabella, and Vitellius.

7    A.   We basically just followed out what the administrator

8    said.  You know, we didn't have any say over how the forum was

9    set up, the way it was, you know, designed.  The way it was --

10   the content that was hosted.  You know, that stuff -- that

11   stuff was left up to the administrators.  Our job was just to

12   enforce whatever rules and so forth that they had set for the

13   forum.

14   Q.   Can we go to showing you now what's been marked as U.S.

15   Exhibit -- U.S. Exhibit 3, I believe.  I just want to walk

16   through some of the sections of the board, just have you

17   describe for the jury what some of the sections entail.  Let's

18   start with the "General" category section.

19   A.   Yeah, again, just the "General" category, as I said

20   earlier, "Information and Rules."  The first section "How To,"

21   that was kind of a fact section.  "Security and Technology

22   Discussion" -- I mean, they're -- they're pretty

23   self-explanatory.  "Request" section if there was something

24   specific you were looking for.

25   Q.   Just to show -- on the "Security and Technology" section,

1    why was there a security and technology section on this

2    website?

3    A.    You simply wanted your identity masked.  You know, you

4    didn't want anyone knowing who and where you were.

5    Q.    Okay.  And on the "Security and Technology" section, just

6    if you could, how many -- just looking at this section, how

7    many posts were --

8    A.    2,035 posts.

9    Q.    And how many topics?

10   A.    800 -- or, I'm sorry, 281 topics.

11   Q.    Okay.  And you were talking about, briefly, the "Request"

12   section.  Briefly describe for the jury what that section

13   entailed.

14   A.    Just simply if somebody -- if there was a particular

15   content that someone was looking for that they, you know, had

16   no -- maybe couldn't find on the site or something.  They

17   would make the request in that section and if somebody either

18   knew that it was -- maybe it was posted somewhere on the forum

19   or maybe if they knew another place and if they had the

20   material that they could post.  That's where that information

21   would go.

22   Q.    You said "Request," request for what?

23   A.    Child porn, just different -- different videos or

24   photographs.

25   Q.    Okay.  How many briefly -- how many posted topics were

1  the Request section?

2  A.    Looks like 2,487 and 650 topics.

3           THE COURT:  Let me see counsel at the sidebar.

4           Members of the jury, we'll talk a little bit about

5  scheduling and I will speak to you about that at the

6  appropriate time but for now you all are at ease and we'll be

7  back in just a moment.

8           (Bench conference as follows:)

9           THE COURT:  Just wanted to check with you about

10  where we might stand so I could give the jury as much of a

11  head's up on that as I can.

12           MR. JONES:  Your Honor, we have Mr. Browning, and

13  after Mr. Browning we have a couple forensic examiners, and

14  one other short FBI agent witness after that and that should

15  be the government's case in chief.

16           THE COURT:  Okay.  Well, now assuming we have

17  available for court approximately five hours tomorrow, as I

18  may have already indicated to you we will adjourn about 2:00.

19  Then we would have Friday.  We talked to the jury about the

20  possibility of finishing this week but that it might go into

21  next week.  Tell me a little more of what you think about it.

22           MR. JONES:  The government's case, the two

23  examiners --

24           MS. RANDALL:  They won't be long.  I think there's a

25  fairly good chance we can close by 2:00 tomorrow, kind of

1  depends on the extent of cross-examination of our cooperator.

2  Which I know he has to hear what he's going to say first, he

3  has no idea.  But I think we'll be close, if not all the way

4  there by 2:00 p.m. tomorrow.

5        MR. ADOLF:  That leaves the jury charge.  I don't

6  know when Your Honor wants to deal with that.

7        THE COURT:  Well, we can give you, in the morning, a

8  set of our proposed instructions.  And I don't think it will

9  be a surprising sort of thing, the usual stuff.

10        MR. ADOLF:  Maybe some legal back and forth about

11  the instructions because it's kind of a complicated statute,

12  actually.

13        MS. RANDALL:  Not a lot of case law on the

14  enterprise.

15        MR. ADOLF:  The case law we may need time to play

16  those issues out in front of the Court, how it's charged, in

17  terms of other counts that are sort of predicated for.  It may

18  take a little longer than we expect, more than a simple read

19  through.

20        THE COURT:  Right.

21        MR. ADOLF:  I'm thinking it sounds like we can get

22  the testimony done tomorrow for sure.

23        THE COURT:  Right.  Well, we'll certainly try to do

24  that.

25        MR. ADOLF:  I don't know about the jury charge.  I

1    would guess, based on what I'm hearing, sum up Friday,

2    probably early, and maybe --

3              THE COURT:  Be nice to get the arguments and charge

4    in maybe Friday morning.

5              MR. JONES:  Before lunch.

6              THE COURT:  Then we have to do the forfeiture,

7    but --

8              MR. JONES:  That doesn't take long.  I only did one.

9              THE COURT:  It doesn't take long.

10             MS. RANDALL:  I think our forfeiture, we're not

11   planning on presenting evidence, just resting on the evidence

12   in the trial.

13             MR. ADOLF:  Might be able to get it done Friday.

14             THE COURT:  I'll basically tell the jury what I told

15   them before, still a viable chance to finish on Friday but may

16   go into Monday so...

17             MS. RANDALL:  Okay.

18             THE COURT:  Now, we ought to for the sake of jury

19   morale, and so forth.  I'm sure they would all prefer if we do

20   it this week.

21             MR. ADOLF:  Absolutely.  Not just the jury's morale

22   either.

23             THE COURT:  Okay.  Now, as far as today, how much

24   longer do you have with this witness?

25             MR. JONES:  We've got quite a bit more with

1    Mr. Browning.  I'm sure Peter has a little bit of cross on

2    him.

3              MR. ADOLF:  A little bit.

4              MR. JONES:  Like I said, after Browning, the two

5    examiners, and another brief, short witness.  So hopefully we

6    can close before 2:00 tomorrow.

7              THE COURT:  I think we'll let everybody go now and

8    be back at it in the morning.  Thanks a lot.

9              (The bench conference was concluded.)

10             THE COURT:  Members of the jury, I've told you just

11   before that break that we would talk about scheduling.  It

12   appears that we're still on our schedule, we think, and have

13   our best guess that we will be able to wrap up testimony

14   likely tomorrow.  And as I told you about tomorrow, we'll

15   start the usual time and then we'll adjourn about 2:00 because

16   of a conflict in requirements.  And then we'll be here all day

17   Friday -- or have it available, but we'll see about that.  It

18   looks like the case may go to the jury on Friday.  And I

19   assume that would suit everybody, all things being equal.  But

20   there's still that chance that it might go to Monday if the

21   case simply works out.  But that's the best advice I can give

22   you about our schedule.

23             Thank you very much for your attention to these

24   matters.  We will let you go for today and ask you to be with

25   us at 9:30.

1            (The jury was escorted from the courtroom at 5:06.)

2            THE COURT:  I believe the government needs to

3    provide a certain format for the forfeiture instruction.  I

4    think you've given it in PDF and it needs to be in Word.

5            MS. RANDALL:  Yes.  We'll take care of that this

6    evening.

7            THE COURT:  Please don't overlook that, as soon as

8    possible, because we're trying to get these things done

9    tonight.

10           MS. RANDALL:  I'll take care of that.  Can I just --

11           THE COURT:  That brief interruption there, the juror

12   came to look for her car keys and she evidently didn't find

13   them but now she's gone back out.

14           I would make sure now, you'll probably get a copy of

15   our proposed jury instructions tonight by email within an hour

16   or two, and we'll look for that Word document.

17           MS. RANDALL:  I'll take care of it, Your Honor.

18           THE COURT:  Let me ask you a question.  Cygnus

19   report.  How do you spell Cygnus?

20           MS. RANDALL:  C-y-g-n-u-s, Your Honor.

21           THE COURT:  C-y-g-n-u-s.

22           All right.  Point of curiosity.

23           MS. RANDALL:  Probably not one we've heard before

24   this case.

25           If I could bring up one quick matter, Your Honor.

1    It's probably not an issue, I just want to make sure it's not

2    an issue.

3            Mr. Browning is currently testifying.  We turned

4    over a copy of his NCIC to Mr. Adolf.  All that is reflected

5    on his NCIC is a failure to appear on a driving while

6    suspended, a dismissed count of child molesting, a protective

7    order, and then the current charges that he's pled guilty to.

8    Other than the current charge he's pled guilty to, we don't

9    think any of those matters would be an appropriate line of

10   inquiry on cross-examination because there are no convictions

11   or anything reflected.

12           MR. ADOLF:  I'm going to follow the rules of

13   impeachment, Your Honor.

14           THE COURT:  Very well.  That's a pretty clear rule.

15           MR. ADOLF:  Thank you, Your Honor.  I assume I'll

16   also get a copy of the proposed forfeiture instructions.

17           MS. RANDALL:  They were filed --

18           MR. ADOLF:  I'm sorry.  I remember that.  Is that

19   going to be the same as what it currently is?

20           MS. RANDALL:  Yes, it's going to be a Word copy.

21           MR. ADOLF:  I assume we'll deal with any problems

22   with that in the charge conference along with the regular

23   instructions?

24           THE COURT:  Yes.

25           MR. ADOLF:  Thank you, Your Honor.

1                THE COURT:  All right.  Thank you all.

2                (The Court was in recess for the day at 5:15.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25