UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | DOCKET NO. 5:15-cr-15-1 |
| | ) | |
| vs. | ) | VOLUME III of IV |
| | ) | |
| STEVEN W. CHASE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
SEPTEMBER 15, 2016

APPEARANCES:

On Behalf of the Government:

    REGINALD E. JONES, ESQ.,
    United States Department of Justice
    1400 New York Avenue, NW
    Washington, DC 20005

    CORTNEY S. RANDALL, ESQ.,
    Assistant United States Attorney
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    PETER ADOLF, ESQ.,
    Federal Defenders of Western North Carolina
    129 West Trade Street, Suite 300
    Charlotte, North Carolina 28202

LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

1         <u>I N D E X</u>
      SEPTEMBER 15, 2016; VOLUME III of IV

2  <u>GOVERNMENT WITNESSES:</u>        <u>PAGE</u>

3  DAVID LYNN BROWNING
   Continuted Direct Examination By Mr. Jones  327
4   Cross-Examination By Mr. Adolf     343
    Redirect Examination By Mr. Jones    358
5   Recross-Examination By Mr. Adolf    358

6  JOHN SHUMWAY
   Direct Examination By Ms. Randall    359
7   Cross-Examination By Mr. Adolf     368

8  RAY HSU
   Direct Examination By Ms. Randall    374
9   Cross-Examination By Mr. Adolf     397

10  CHRISTOPHER BUTCH
   Direct Examination By Ms. Randall    399
11   Cross-Examination By Mr. Adolf     401
        * * * * * *
12       E X H I B I T S

13  <u>GOVERNMENT EXHIBITS:</u>
   <u>NUMBER</u>          <u>ADMITTED</u>
14
   69 ..............................................368
15  75 ..............................................391
   76 ..............................................384
16  77 ..............................................382
   78 ..............................................389
17  79 ..............................................390
   80 ..............................................394
18  82 ..............................................397

19       E X H I B I T S

20  <u>DEFENDANT'S EXHIBITS:</u>
   <u>NUMBER</u>          <u>ADMITTED</u>
21  1-8 ........................................407

22       * * * * * *

23  Government Rests ..............................402
   Defendant Motion ..............................402
24  Charge Conference ............................405

25

1                    P R O C E E D I N G S

2    THURSDAY, SEPTEMBER 15, 2016:

3              THE COURT:  May we have the jury, please.

4              (The jury was returned to the courtroom.)

5              THE COURT:  Good morning, members of the jury.

6              THE JURY:  Good morning.

7              THE COURT:  I believe the Government was inquiring

8    of the witness.

9              MR. JONES:  Thank you, Your Honor.

10          DAVID LYNN BROWNING, GOVERNMENT WITNESS, SWORN

11                  CONTINUED DIRECT EXAMINATION

12   BY MR. JONES:

13   Q.   Good morning, Mr. Browning.

14   A.   Good morning.

15   Q.   When we left off on yesterday afternoon we were just

16   walking through some of the sections within the PlayPen child

17   pornography website.  You were just describing some of the

18   sections for the jury.  We wanted to pick up where you left

19   off.

20   A.   Okay.

21   Q.   And just, especially, I know you kind of forgot your

22   glasses this morning.  And so if you have trouble reading

23   something just let me know.  We can help you out.

24   A.   I think if you enlarge it I will be fine.

25   Q.   Okay.  Let's start off with where we left off yesterday

1    with the "General" category section.  Just kind of continue

2    walking the jury, kind of, through -- just scroll down.

3        All right.  The "PlayPen Chan," describe that section for

4    the jury.

5    A.   First of all, there's nothing on my screen.

6    Q.   That would help.

7    A.   There we go.  The "Chan" section was -- most of the

8    material that was posted in all of the other sections was

9    posted in files so -- meaning, that you basically put the

10   contents, say, in a briefcase, you know, and put everything in

11   there and then there's a way to download that and access that.

12   The "Chan" section --

13   Q.   When you say the "contents," what do you mean by

14   contents?

15   A.   Just the videos and photographs of the material that was

16   posted there.

17   Q.   Of the -- what type of material?

18   A.   Of the child pornography.

19   Q.   Okay.

20   A.   The "Chan" section was just a -- an area where individual

21   pictures could be posted without having to put them in a file

22   or compress them into a file.  So that was just like single

23   pictures that you could post under one -- you could go in and

24   post, like, one post and you could post maybe six or eight

25   pictures in that particular thing.

1    Q.    Okay.  Just moving down a little further, "Jailbait

2    Videos, Preteen Videos and Photos" as well.

3    A.    I'm sorry.

4    Q.    Just kind of describe some of these sections as well.

5    A.    Yeah, the "Jailbait Videos," again, that was kids that

6    were typically, you know, early to mid teens.  "Jailbait

7    Photos," same thing, just photographs, separating the videos

8    and photographs.

9    Q.    Okay.

10   A.    "Preteen Videos," the one section for "Hard Core," one

11   section for "Soft Core" or "Non-Nude."  Same thing with the

12   boys, "Boys Hard Core, Boys Soft Core" or "Non-Nude."

13   "Preteen Photos," that was separated in the exact same way

14   between "Hard Core" and "Soft Core, Non-Nude," boys and girls

15   separated that way also.

16        "Web Cam" section separated between boys and girls.

17        "Potpourri," obviously, you know, just a mishmash of

18   different things.

19        Also had an "Incest" section, the "Toddler" section, and

20   an "Artwork" section.

21   Q.    Mr. Browning, just -- who created these sections?  The

22   sections that you're talking about, who created these

23   sections?

24   A.    I guess the administrator of the site.  I don't know if

25   there was any -- if it was the three administrators as a team.

1    Q.   Okay.

2    A.   Or if it was just the one individual.  I'm not -- I'm not

3    certain.

4    Q.   But the administrator's job on the board lets you create

5    the section?

6    A.   That's correct.

7    Q.   What was your duty on the section?  What was your job?

8    A.   Just to kind of watch if I was in a certain section, for

9    instance, if I was in the "Web Cam Girls" section and somebody

10   posted a video of boys, then I just move that to the "Boys"

11   section, just that sort of.

12   Q.   Who delegated those duties to you?  Who gave those duties

13   to you?

14   A.   The administrators.

15   Q.   Okay.  "Kinky Fetish."

16   A.   Yeah, "Kinky Fetish" and "Bondage, Chubby."  I cannot

17   read the one under that one.

18   Q.   That's okay.

19   A.   Okay.  "Panties, Nylons and Spandex; Peeing, Scat and

20   Spanking; Vintage; Voyeur and Zoo," looks like.  Then

21   obviously there's a separate section for "Languages,"

22   different languages.  I think those were -- I think those were

23   just discussion, maybe discussions forums.

24   Q.   Okay.

25   A.   I'm not positive.

1   Q.   Okay.

2   A.   And then the "Story" section, section for "Fiction," and

3   looks like -- okay.  "PlayPen Members Tor Chat Information

4   Exchange."  There's another program called "Tor Chat" that is

5   just a private message program where you can communicate

6   individually with other individuals.  But you have to have,

7   like, a Tor Chat ID.  So that was a place where you could go

8   and post your ID and then tell -- maybe tell people what you

9   were into and then they would contact you through that

10  program.

11  Q.   Now, the sections you just described, Mr. Browning, were

12  the materials -- just say the "Toddlers" and "Jailbait," were

13  the materials contained inside those sections accurate as to,

14  you know, the name of the section?  So there were toddler

15  materials?

16  A.   Yes.

17  Q.   And whose job was it to make sure that material was

18  accurate in the section?

19  A.   Basically everyone, the administrators and the

20  moderators.

21  Q.   Okay.  I want to show you an exhibit that's already been

22  admitted.  I want you to walk the jury through, you know, how

23  you would go about making the posts on the PlayPen website.

24  Let's look at U.S. exhibit -- give me one second -- U.S.

25  Exhibit 8.  We're going to blow it up for you, one second.

1    Would you just -- just kind of walk the jury through, you

2  know, how you would make a post beginning where the post was

3  made.

4  A.   You would go into the particular sub-forum that you were

5  interested in making a post in.  There was an option that

6  allowed you to create a new post.  You could go into a post

7  that was already there and reply to that thread if you wanted.

8    But if you wanted to make a new post, you just click new

9  post and basically just enter whatever information or --

10  whatever you wanted to add and then enter that and it popped

11  up as a new post.

12  Q.   Okay.  Could you just walk the jury through just this

13  posting right here and how it was made and --

14  A.   The -- most of the material that was -- that was posted

15  there, as I said, was posted in files.  And trying to describe

16  that without getting too technical, the way it works is you

17  take whatever material you're wanting to post.  So let's say

18  you have a -- let me see what this one was.  It doesn't really

19  say if it was photographs or videos but either way.  There's a

20  separate program -- there's a couple separate programs that

21  allow you to put those -- that material in a file.

22    So let's say, for instance, you've got a video that you

23  put in that briefcase.  There are separate websites like this

24  one was "upload BAZ.com" which was just for hosting files.

25  Now didn't necessarily have to be child pornography.  It can

1    be any file at all.  But what you would do is, once you got

2    that file set up from your end, you would go to a site like

3    this.  You would upload that file to that website.  It would

4    then give you a website address such as you see here where

5    people could go then and download that file.

6         "Backup Preview," there were several websites where they

7    would just host photographs.  So rather than posting a

8    picture, a preview picture of what the material was here, you

9    had to post it on a separate website.  So you could click that

10   website and it would pop up the preview.

11        "The Password," that was just the password for -- there

12   were actually two different -- there were two different

13   passwords -- there could be -- the file always had a password.

14   But depending on which host website you used, some of those

15   host websites required a password to download the material

16   so --

17   Q.   Mr. Browning, were you able, once that material was

18   downloaded, is this depiction of what was able to be seen by

19   all members of the site?

20   A.   Yes.

21   Q.   Okay.  Just kind of walk through the "Read and Title" and

22   who created all of this.

23   A.   Looks like the author's name was "SIDS."  The topic was

24   "All Tied Up."  I mean, you know, the user obviously was a new

25   poster, had 18 posts.

1  Q.   What does the "Read" mean?

2  A.   I'm sorry.

3  Q.   The "Read."

4  A.   The read?

5  Q.   Five thousand --

6  A.   Oh, I'm sorry.  Yeah, that was the number of times that

7  particular thread had been read by other members of the site,

8  so 5,826.

9  Q.   And once someone posted child pornography to the site,

10  could -- was it available for all members to access?

11  A.   Yes, it was.

12  Q.   Now, Mr. Browning, were there any sections on the board

13  where all members couldn't access, only certain members?

14  A.   There was briefly a section that was a producer's

15  section.  As I understand it, there was a gentleman who was

16  supposedly producing his own child pornography.  He had went

17  to -- I'm not positive, but I think he had set it up with the

18  administrator Isabella to try to create a section for other

19  producers to post just their -- their specific material or

20  material they had produced.

21  Q.   When you talk about "produced," walk the jury through --

22  what do you mean by produced?

23  A.   Either, you know, their own videos or photographs of

24  children that they were abusing.  That section was, it

25  really -- I don't think it really got off the ground.  There

1   wasn't many people that was interested in it.  So -- but as

2   far as those who were able to access it, it was, I think, only

3   available to members who had maybe a certain post number or

4   something.  Maybe you had to have 100 posts or maybe it was

5   just an invite thing where the administrators allowed you

6   access to it.

7   Q.   Was there also a section on the board just for admin,

8   "Administrators and Moderators"?

9   A.   There was.

10  Q.   Okay.  Just briefly explain that section for the jury.

11  A.   Basically kind of the manager's meeting type area.  It

12  was where just all of the workings of the board or -- were

13  discussed among the administrators and moderators of the

14  board.

15  Q.   When you say, "workings of the board," just be a little

16  more specific on what was talked about in those sections.

17  What was discussed.  What was done.

18  A.   Probably a lot of it dealt with, you know, discussion of

19  the different materials that were there.  Particular users who

20  may be causing, you know, some significant problems on the

21  board.  Could have been, you know, suggestion type posts where

22  maybe one of the moderators said, Hey, I think it's a good

23  idea that we do this.  So they tossed that idea out there.

24  Just those type of discussions were --

25  Q.   Okay.  Were there things to -- when it comes to

1   disapproving or approving -- making the board better, anything

2   like those type of things?

3   A.   There were.  There were, yeah.

4   Q.   Did the PlayPen user account participate in those

5   discussions?

6   A.   On occasion, on occasion, yeah.

7   Q.   And so that board was only for "Admins and Moderators."

8   A.   Correct.

9   Q.   Okay.  Now, did you know the username -- or how did you

10  know the username PlayPen on the board?

11  A.   Just as the administrator, the person who had actually

12  set up the site.

13  Q.   How did you know this?

14  A.   Just from -- I mean, I remember when the forum first

15  opened or thereabouts.  Initially he was the only

16  administrator there and maybe just -- he was the only

17  administrator.  There may have been only two or three

18  moderators at the time so...

19  Q.   Did you have much activity with PlayPen throughout the

20  board?

21  A.   Very little.  I had very little interaction, like, direct

22  interaction with him.  Usually, you know, my communication was

23  primarily with the other two administrators, Isabella and

24  Vitellius.

25  Q.   Okay.  Now, Mr. Browning, you were a global moderator on

1  the board, correct?

2  A.   Yes, I was.

3  Q.   Who chose you to be a global moderator?

4  A.   I was asked by a couple different people, actually.

5  Q.   Okay.

6  A.   Initially I think it was Isabella who was an

7  administrator, and there was another moderator named

8  "Tactile."  They had approached me, I think in -- sometime in

9  November and had asked me to be a moderator.  And I really

10 didn't have a lot of interest in it.  Then several weeks

11 later, I think Isabella had mentioned it again, and then

12 Vitellius had also asked me.  And I decided maybe a week or so

13 after that that I would go ahead and take that position.

14 Q.   Okay.  Now, you mentioned earlier that you were also a

15 member of other child pornography sites besides PlayPen?

16 A.   Yes.

17 Q.   Now, did you have any interaction with any of the board

18 members on those other sites?  Did they have the same

19 username?

20 A.   Yes.

21 Q.   Could you just explain to the jury, I guess in your own

22 words, you know, if there were, like, things that could -- you

23 felt that could differentiate a member on the board.  Like,

24 could you tell by like who -- a post?  Like, who was making

25 this post, or any language or any -- that they would use?

1  A.    Within posts on the forum it was -- it was a little

2  harder to differentiate between individuals.  When you got

3  into the chat rooms when you were actually communicating with

4  people, interacting with people, you could pick up little

5  nuances, you know, certain ways that they typed, certain

6  terminology that they used on occasion; just the particular

7  nuances of folks, like any normal conversation.

8        Within posts on the forum, though, it was a little bit

9  more difficult.  Because you didn't have that direct

10 interaction.  So you could tend to pick up on things.

11 Q.    Mr. Browning, I'm showing you your profile page on the

12 board.  I want to zoom in.  I know you don't have your

13 glasses --

14 A.    Well, I lost it.  There we go.

15 Q.    Hold on one second.

16 A.    I got it.

17 Q.    I want to zoom in on the -- on the post the "Thanks" --

18 on the "Thanked."

19 A.    Um-hmm.

20 Q.    Mr. Browning, isn't it correct you were on the PlayPen

21 site a lot?

22 A.    I was.

23 Q.    You were on the board more than some

24 administrators/moderators on the board.

25 A.    Okay.

1  Q.   Is that correct?

2  A.   Probably.

3  Q.   In your time on the board, would you consider PlayPen --

4  how big would you consider PlayPen, as far as the child

5  pornography website?

6  A.   It -- after -- it had a pretty short lifespan.  I mean, I

7  guess it was -- it come up in October maybe, and it was down

8  in February so, you know, five to six months.

9       When it first popped up there was a couple of other

10 sites.  But in December the two other primary sites had went

11 down.  And so from the latter part of December through

12 February it was basically the -- one of the only sites that

13 this material was available.  I think there was a couple --

14 couple smaller sites but nothing -- this was kind of the --

15 this was -- for a while I guess you could say it was the only

16 game in town so it was pretty large.

17 Q.   809 times, I mean, that's considered a lot of posts.  You

18 made a lot of posts in child pornography?

19 A.   Not the material.

20 Q.   Okay.

21 A.   Most of -- I mean, I did post a couple videos.  There

22 were some photo series that I posted like the -- as I had said

23 earlier with my profile picture, a lot of those non-nude type

24 pictures.  But a lot of this was just in discussions.

25 Q.   Discussion about what?

1  A.   Just the material that was being posted or -- basically

2  that.

3  Q.   Mr. Browning, in your own words, for the jury, what was

4  the purpose of the PlayPen website?

5  A.   Just for folks to -- well, you know, I guess it could

6  have served a couple purposes.  You know, it's primary

7  focus -- or primary purpose was to provide folks with child

8  pornography.  But then, you know, I mean, within my own self

9  it was kind of -- being a pedophile you can't exactly go to

10  your best friend or your spouse or -- you know, I mean, I

11  didn't even feel comfortable going to a counselor, you know,

12  talking with someone about it.

13      So it became that one area of my life that -- that I was

14  free to talk -- to just open the closets, so to speak.  So it

15  was kind of -- it was almost therapeutic in a way in that

16  sense, just that I could have conversations with folks who,

17  you know, who had the same mindsets.

18      You know, like I said yesterday, not everyone has the

19  same tastes.  You know, there's different likes and dislikes.

20  There's, you know, there's a lot of things on the forum that I

21  didn't particularly approve of.  There was a lot of people

22  that felt the same way.

23      So it certainly served that purpose.  But it's primary

24  purpose was to provide child pornography.

25  Q.   And I want to show you before I end -- I only have a

1    couple more questions left.  I want to show you the posts you

2    made on the board.  I want you to walk the jury through the

3    requested and what you provided.

4          Starting with -- I know it may be hard to read I'm going

5    to try to blow it up a little more for you.

6    A.    Yeah, this was a post that was done in the "Request"

7    section.  The person that requested this particular video,

8    "Project 777."  He obviously had a, looks from this

9    description, was a photograph, like a screen cap of a

10   particular video that he was looking for.  And he had the --

11   excuse me, the name of the video which I guess was "Two Cool

12   Girls" and then the link to the photograph.  So that was his

13   request.

14   Q.    Okay.

15   A.    And this was my reply.  I remembered that there was -- in

16   this particular thread on the forum, I knew where the girl --

17   or where the video was.  So I posted the link to the actual

18   spot on the PlayPen forum where he could find the video.

19   Q.    That was your job as a global moderator?

20   A.    Probably.  That didn't -- I mean, anyone on the forum

21   could have done that --

22   Q.    Okay.

23   A.    -- if they knew.

24   Q.    Go ahead.  I'm sorry.

25   A.    If they knew where the material was, anybody could have

1  replied to that so...

2  Q.   And once you posted that, that was available for anyone

3  on the board to access.

4  A.   Correct.

5  Q.   Okay.  Mr. Browning, just a few more questions.

6       Did you know the defendant Steven Chase?  Did you know he

7  was PlayPen?

8  A.   I did not, no.

9  Q.   Did you know any users by name on the board?

10 A.   No, I did not.

11 Q.   What was purpose of the board being on the Tor network?

12 A.   Just complete anonymity.  You did not want your --

13 yourself to be known.  And there was a lot of things that

14 people did that even -- even outside of being on the Tor

15 network which, you know, covered your IP address and so forth.

16 People would be encouraged to be, you know, very careful about

17 just things that they said.

18      For instance, if someone said, "I have two weeks of

19 vacation coming up next month."  Well, that says that you're

20 probably an American because Europeans take holidays.  You

21 know, just little things like that.  Maybe you would say -- if

22 you were in a chat room, "It's 2:00 in the morning.  I've got

23 to be up for work in four hours so I got to go to bed."  You

24 know, will that just narrows your time -- you know, your time

25 zone down.  So people were very cautious about that.

1    Q.   Okay.

2             MR. JONES:  No further questions.  Thank you,

3    Mr. Browning.

4             MR. ADOLF:  Thank you, Your Honor.

5                      CROSS-EXAMINATION

6    BY MR. ADOLF:

7    Q.   Mr. Browning, good morning.

8    A.   Good morning.

9    Q.   I'm Peter Adolf.  I'm here representing Steven Chase.

10   A.   Yes, sir.

11   Q.   I have some questions I need to ask you.  If I ask you

12   anything that's confusing or doesn't make sense, let me know

13   and I'll try to clarify; all right?

14   A.   Okay.

15   Q.   Now you're here testifying today on behalf of the

16   government?

17   A.   Yes, sir.

18   Q.   And that's something you agreed to do in a plea

19   agreement?

20   A.   That's correct.

21   Q.   The plea agreement that the government showed you

22   yesterday?

23   A.   Yes, sir.

24   Q.   And that's an agreement that you went over carefully with

25   your lawyer?

1    A.    Yes, I did.

2    Q.    And spent a lot of time thinking about it and considering

3    what that meant to you --

4    A.    Yes.

5    Q.    -- before you signed it?

6    A.    Um-hmm, I did.

7    Q.    And then you went into court and entered a guilty plea in

8    front of a magistrate judge --

9    A.    I did.

10   Q.    -- down in Charlotte.

11   A.    Yes.

12   Q.    And then they read, actually, most of that plea agreement

13   out loud in court at that hearing to make sure you understood

14   all of it.

15   A.    Correct.

16   Q.    And all the consequences of it?

17   A.    Um-hmm.

18   Q.    Now when you were first arrested, you first learned at

19   that point what you had been charged with.

20   A.    Um-hmm.  That's correct.

21   Q.    And what the potential consequences of this behavior that

22   you had been doing on line were.

23   A.    After a while I learned about the -- I wasn't aware of

24   the specific penalty until I got to Charlotte.  But -- so it

25   was about a month.  So not initially, but certainly within a

1    certain timeframe.

2    Q.    Fair to say, that came as a shock to you to find that

3    out?

4    A.    It did.   It did.

5    Q.    Because you found out that there were a number of charges

6    against you.

7    A.    Correct.

8    Q.    The ones listed in the Bill of Indictment.

9    A.    Correct.

10   Q.    And that there were very severe penalties attached to all

11   those charges.

12   A.    Um-hmm.

13   Q.    Mandatory minimum sentences in federal prison that you

14   were facing.

15   A.    Yes.

16   Q.    And the charge you ultimately pled guilty to is the child

17   exploitation enterprise charge.

18   A.    Yes, sir.

19   Q.    And you were aware when you pled guilty to that that

20   being found guilty of that, or in your case pleading guilty to

21   it, meant that you were subject to a mandatory minimum of 20

22   years in federal prison.

23   A.    Correct.

24   Q.    And as you sit here today, that is still the amount that

25   you face.

1    A.    Correct.

2    Q.    You also learned in discussions before you pled guilty,

3    and it was gone over with you when you pled guilty, that there

4    was going to be a recommendation made, calculated by the

5    probation department, as to what sentence you should actually

6    get.

7    A.    Yes.

8    Q.    And that recommendation, not binding on the Judge, but a

9    recommendation that the Judge would consider was actually

10   going to be even more than the 20 year mandatory minimum?

11   A.    I wasn't aware of that, no.

12   Q.    Well, you're aware of that now.

13   A.    Only from you telling me this now.

14   Q.    Well, there's a presentence report in your case, is there

15   not?

16   A.    I got an initial presentence report.  I got the first

17   one.  I never did see a final.  So if it was -- if it was

18   listed in a final, then I never -- I never saw it.

19   Q.    Right.  So what you received and went over with your

20   lawyer was a report from the probation department which

21   included what they believe the recommendation was that the

22   Federal Sentencing Guidelines call for, for your case?

23   A.    The only thing that I recall specifically was the 20-year

24   to life.  Now when you say that there was a recommendation of

25   a sentence higher, I never saw that.  So, then, that's what

1    I'm trying to say, is that, that was not in the initial

2    report.  You know, to my understanding there's an initial

3    report, then you make any changes or, you know, any changes to

4    that, and then you're supposed to get a final PSI within 30

5    days is my understanding.  But I never did receive a final

6    PSI.  So if that recommendation for a higher sentence was on

7    that, I haven't seen it.

8    Q.   Are you telling us that your lawyer has not reviewed the

9    draft presentence report with you in your case?

10   A.   When you say the draft -- I mean, I'll just -- I got

11   the --

12   Q.   I'm sorry, let me clarify.  Have you received an initial

13   presentence report?

14   A.   I received in February the very first PSI.  My attorney

15   came to see me.  Then about two weeks later we set down with

16   someone from the court to go over any changes or anything like

17   that that needed to be made.  That was literarily the last

18   time I had seen my attorney since this past Friday.  So -- so

19   if you're talking about another document, then I haven't seen

20   it.

21           MR. ADOLF:  Your Honor, if I could just -- if I

22   could have a moment to speak to the clerk briefly?

23           THE COURT:  You may.

24           (Pause.)

25           MR. ADOLF:  Your Honor, I'm going to ask for a

1   sidebar.

2           THE COURT:  Yes, sir.

3           MR. ADOLF:  Regarding the questions I have.

4           THE COURT:  Excuse us please, members of the jury,

5   you all may be at ease.

6           (Bench conference as follows:)

7           MR. JONES:  It looks like the draft came out on

8   February 5th and the final on February 26th.

9           MR. ADOLF:  So, Your Honor, I obviously don't have

10  his presentence report.  I was cross-examining him about what

11  he believes the potential sentences are, and the consequences

12  of testifying which go to bias, and his consent to testify for

13  the government.

14          He just told us he has not seen his final

15  presentence report and that was issued months ago.  I find

16  that very hard to believe that Steve Meier, who represents

17  him, has not given his client his presentence report seven

18  months after it was issued.  Whether he's just waiting for a

19  sentencing date and there would have to be objections that

20  would have been filed to the initial and he's apparently not

21  seen any of them.  I don't believe that's possible and I would

22  like to cross-examine him about what's in that document.

23  Maybe he's not remembering six months ago.

24          THE COURT:  You seem to have forgotten my

25  instruction in the beginning of trial, you were to only go so

 1  far as to talk about these are very serious charges with very

 2  serious penalties to that effect.  Do you remember that

 3  comment that I made to you?

 4          MR. ADOLF:  I do, Your Honor, but I assume --

 5          THE COURT:  Then you go right to the mandatory

 6  minimum and have that put in the record.

 7          MR. ADOLF:  I'm sorry, Judge.

 8          THE COURT:  There was no objection.  So being no

 9  objection that came in without objection.  So there you are.

10  You've already got him with ten -- with 20 to life.  He said

11  that.  That's all you need.  You can talk about this man is

12  facing serious penalties and you're bound by his answers.

13  We're certainly not going to put in evidence the presentence

14  report.

15          MR. ADOLF:  And I was not trying to get the

16  presentence report into evidence, Your Honor.  But I think to

17  say "very serious" is -- what's important here is his own

18  belief about what he's facing and the consequences of it.  And

19  I think saying that it's "very serious" does not really do

20  justice to the pressure that he's under.

21          THE COURT:  Well, you have a right to cross-examine

22  him about what he knows and doesn't know and what his attorney

23  may have told him or not, subject to objections by the

24  government that might or might not be made.

25          MR. ADOLF:  I understand, Your Honor.  And I

1  apologize for not understanding the Court's ruling.  I assumed

2  the Court was talking about -- because we hadn't talked about,

3  at that point, Mr. Browning testifying.  I obviously was not

4  going to talk to penalties in general in the case.  Once you

5  have somebody who is facing those penalties testifying in an

6  effort to get a reduction below that 20 year mandatory

7  minimum, I think that goes very critically and directly to the

8  motivation of testifying.  And talking about the seriousness

9  in general, I don't think the jurors -- of course the jurors

10  can't know what that means to him.  That's why I assumed it

11  was different once we have a co-defendant facing specific

12  charges.

13        THE COURT:  It's very common, of course, for

14  cooperating witnesses to be cross-examined at length or

15  effectively in various ways, but not to go to the kind of

16  specifics like, What is your guideline?  Things like that.

17        MR. ADOLF:  I understand, Judge.

18        THE COURT:  He evidently doesn't know his guideline.

19        MR. ADOLF:  Right.

20        THE COURT:  At least that's what he said.

21        MR. ADOLF:  And that, frankly, Judge, I find

22  impossible to think Mr. Meier hasn't shown that to him.

23        THE COURT:  Well, you can argue he probably knows

24  more.

25        MR. ADOLF:  I understand, Judge.  I understand.  But

1   I guess my other concern is if that's Your Honor's ruling, I

2   won't talk anymore about the specific numbers or what the

3   mandatory minimum is.

4           THE COURT:  That was the exact tenor of my

5   instruction.

6           MR. ADOLF:  I do think it's important, conceptually,

7   the fact that a mandatory minimum exists right now for the

8   Court -- and can only be waived, not by the Court but by the

9   government in exchange for this testimony, I think is

10  important.

11          THE COURT:  That's fair game.

12          MR. ADOLF:  Okay.  I'll restrict it to that.  And I

13  apologize for not understanding that.

14          THE COURT:  It's okay.  All right.  Anything

15  further?

16          MS. RANDALL:  No, Your Honor.  I think you summed it

17  up for us.

18          THE COURT:  All right.

19          (The bench conference was concluded.)

20  Q.   Mr. Browning, you were talking earlier about the fact

21  that you had learned that you faced -- for this -- for the

22  charge you have pled guilty to and are awaiting sentencing for

23  that there is a mandatory minimum federal prison sentence

24  attached to that.

25  A.   That's correct.

1  Q.   Do you recall that discussion?

2  A.   Yes.

3  Q.   Now when we talk about the word "mandatory," "mandatory"

4  usually means that there's no way around it.  You are going to

5  spend at least that much time, that mandatory time in federal

6  prison.  Do you understand that?

7  A.   I do, yes.

8  Q.   But you have learned, and including from the plea

9  agreement that we just saw which talks about it, that there is

10  one way for you to end up with a sentence that is below that

11  mandatory minimum sentence, right?

12  A.   Yes.  Yes, sir.

13  Q.   Because as you sit here today, right now, if His Honor

14  were to sentence you today with nothing else happening for

15  that sentencing, the Court would be bound by that mandatory

16  minimum sentence; and that's what you would serve.

17  A.   Yes.  Yes.

18  Q.   But that one way out is that the government, which is

19  these lawyers who are sitting here over to my right -- the

20  ones who brought you to court -- have the power to waive that

21  mandatory minimum?

22  A.   Correct.

23  Q.   And the way they do that is by filing papers with the

24  court explaining that you have helped them prosecute somebody

25  else.

1    A.    Correct.

2    Q.    And just the act of them filing that on your behalf, if

3    they end up doing such a thing, would mean that now that

4    mandatory minimum sentence would not be mandatory any more,

5    and the Judge would, for the first time, have the option to

6    give you less time.

7    A.    Right.

8    Q.    A lot less time.

9    A.    Okay.

10   Q.    But all of that depends on these lawyers filing a piece

11   of paper saying that you have helped them out in court.

12   A.    Okay.

13   Q.    Well, that's what your plea agreement says.

14   A.    Yes.

15   Q.    And that's what you're here for --

16   A.    Yes.

17   Q.    -- testifying in court today.

18   A.    Yes, sir.

19   Q.    Now, you told us about how you first found the PlayPen

20   website.

21   A.    Um-hmm.

22   Q.    You said that it was in another online forum or community

23   that you called the "Pedo Support Community."

24   A.    Correct.

25   Q.    And what happened was some other user let you know that

1    that person had found another totally separate website which

2    was PlayPen?

3    A.    Yes.

4    Q.    And that it was accessible only through Tor.

5    A.    Yes.

6    Q.    Through the Dark Web.

7    A.    Um-hmm.

8    Q.    This other user who told you about that, you have no idea

9    who that was.

10   A.    I do not.

11   Q.    You don't know whether that was somebody associated with

12   the PlayPen website.

13   A.    I don't know.  Yeah, I'm not sure.

14         There could have honestly been a couple other -- at least

15   one other way to find it.  There was a directory also that was

16   available.  It's called "Hidden Wiki" and then within "Hidden

17   Wiki" there's a section called "Hard Candy."  And "Hard Candy"

18   would take you or give you links to various, either active or

19   defunct websites pertaining to child pornography.  So it could

20   have been that that was the way I found it.  I'm really not

21   for certain but I think it was most likely through someone

22   telling me about the site.

23   Q.    And this "Hard Candy," that's something totally separate

24   from the PlayPen website?

25   A.    Yes, it's entirely separate.

1   Q.   And what that is, is folks who have found other websites

2   that contain child pornography, letting other people know

3   about it?

4   A.   That's correct.

5   Q.   But that need not be anybody connected with those

6   particular websites.

7   A.   No.  No.

8   Q.   It's very often just somebody who's found it and wants to

9   help somebody else out.

10  A.   Yes.

11  Q.   Because sites are very difficult to find.

12  A.   Yes.

13  Q.   Because they're hidden.

14  A.   Correct.

15  Q.   And you told us that you -- I'm sorry, I think you said

16  previously that there were times when you were spending four

17  or five hours a day on the PlayPen website.

18  A.   That's -- that's correct.

19  Q.   You logged in, fair to say, hundreds of times.

20  A.   Yes.

21  Q.   And when you did that, you always did that through the

22  Tor network.

23  A.   Yes.  It's the only way it was accessible.

24  Q.   And the reason it was set up like that, and the reason

25  the other sites that you visited were often set up the same

1   way, is because you knew that if you logged into it correctly

2   the site would not record any information about where you were

3   or who you were, right?

4   A.    Correct.

5   Q.    And by the same token, you could not see any information

6   about where the site was housed or the identities of any of

7   the other people on.

8   A.    That's correct.

9   Q.    Now, you did at some point receive a message from another

10  user that the site had been hacked.

11  A.    Yes.

12  Q.    And that in fact -- and that user actually described to

13  you in detail the techniques that the user, he or she, whoever

14  was used to hack the site, and actually was telling folks that

15  to warn them that there were problems with the site.

16  A.    Was that the one that occurred, I think in early

17  February, maybe?  Someone had hacked into the site and posted

18  a message in the administrator section saying that the

19  security of the site was suspect?

20  Q.    And that it was possible to identify the actual names of

21  certain people on the site.  Does that sound familiar?

22  A.    It -- I'll -- I'll believe that.  I mean --

23  Q.    Well, you were the one that explained that to the

24  government when they interviewed you, right?

25  A.    I don't think that I explained that there were any

1  reference to identifying specific IP addresses.

2  Q.  But you remember that -- well, you told the government

3  that somebody -- that somebody had said that it was possible

4  to hack on to the site and found out, not just IP addresses,

5  but figure out who people might be.

6  A.  I honestly don't recall that.

7  Q.  If I could just have a moment, Your Honor.

8      Mr. Browning, were you interviewed a year ago by the FBI?

9  A.  Yes, I was.

10  Q.  By Agent Alfin, who is sitting at the table over there?

11  A.  Yes.

12  Q.  And do you recall that you told him that you remembered

13  that a user on PlayPen that posted a name and address for an

14  individual in Texas, and claimed that was the true identity of

15  the individual running the PlayPen site?

16  A.  That's correct.

17  Q.  And you told us about how you had been spending four to

18  five hours a day on site for months.

19  A.  Um-hmm.

20  Q.  And every time you logged in, you logged in the same way.

21  A.  There was another nickname I used, "Mr. Speed."

22  Q.  But every time you did that you used the same

23  technique --

24  A.  Yes.

25  Q.  Going through Tor.

1    A.    Yes.

2    Q.    And as you told us, the purpose and effect of that was

3    that the website would not record any information about where

4    you were or who you were, and you conversely would not see

5    anything about that website.

6    A.    Correct.

7    Q.    And as far as you are aware, that was successful.

8    A.    As far as I was aware.  But, again, it was the only way

9    you could access the site, too, so...

10             MR. ADOLF:  Nothing further, Your Honor.  Thank you.

11                        REDIRECT EXAMINATION

12   BY MR. JONES:

13   Q.    Mr. Browning, just a few questions.

14         Has the government made you any promises today?  Have any

15   promises been made to you?

16   A.    No, not at all.

17   Q.    Have you testified truthfully here today?

18   A.    I have, yes.

19   Q.    Who ultimately will determine your sentence?

20   A.    Judge Voorhees.

21             MR. JONES:  No further questions.

22             MR. ADOLF:  Just one, redirect [sic], Your Honor.

23             THE COURT:  Yes.

24                        RECROSS-EXAMINATION

25   BY MR. ADOLF:

1    Q.    You just said that ultimately it is Judge Voorhees who

2    determines your sentence.

3    A.    Correct.

4    Q.    However, whether he has the option to sentence you below

5    that mandatory minimum sentence, that's up to the government,

6    right?

7    A.    Right.

8              MR. ADOLF:  Nothing further, Your Honor.  Thank you.

9              THE COURT:  You may step down.

10             MS. RANDALL:  Your Honor, the Government is going to

11   next call Jon Shumway.

12             JOHN SHUMWAY, GOVERNMENT WITNESS, SWORN

13                     DIRECT EXAMINATION

14   BY MS. RANDALL:

15   Q.    Good morning, sir.

16   A.    Good morning.

17   Q.    Would you please state your name for the record and spell

18   it.

19   A.    My name is Jon, J-o-n.  Shumway, S-h-u-m-w-a-y.

20   Q.    And where are you employed?

21   A.    I am employed by the FBI at the Digital Analysis Research

22   Center in Linthicum, Maryland.

23   Q.    And how long have you worked at the FBI?

24   A.    I've been there for eight years now.

25   Q.    Have you always worked in the Digital Analysis Section?

1    A.    No, I have not.  Prior to that I was a police officer for

2    the City of Niagara Falls, New York, for 24 and a half years.

3    The last seven and a half of those I was on assignment to the

4    FBI at the Western New York Regional Computer Forensics lab.

5    Q.    And what type of work do you do for the FBI?

6    A.    I do computer forensics.

7    Q.    Can you just give a brief summary of what you mean by

8    computer forensics?

9    A.    Computer forensics in general is the seizure, imaging,

10   analysis, and presentation of digital evidence for a court of

11   law.

12   Q.    And can you -- we're going to talk a little bit about

13   your background.  Can you tell us a little bit about your

14   education?

15   A.    I have a Bachelor's degree in computer science.  I have

16   multiple computer certifications.  I am trained and certified

17   as a forensic examiner by the FBI.  I'm also trained and

18   certified as a CFCE or Certified Forensic Computer Examiner

19   through IACIS, I-A-C-I-S.  Which is the International

20   Association of Computer Investigative Specialists.

21   Q.    Approximately how many cases have you worked as a

22   computer forensic examiner over the years?

23   A.    Countless cases, I've examined over 1,000 pieces of media

24   on computers.

25   Q.    And were any of those cases related to child pornography?

1    A.   Almost all of those cases have been, yes.

2    Q.   What type of evidence have you -- when you talk about

3    digital media, what kind of evidence have you actually

4    examined?

5    A.   Computers and their internal hard drives, external

6    storage media such as USB thumb drives, wireless hard drives,

7    USB thumb drives, cell phones, basically anything that digital

8    storage is contained in.

9         MS. RANDALL:  Your Honor, at this point we would

10   tender Mr. Shumway as an expert in computer and digital media

11   forensics.

12        MR. ADOLF:  No objection, Your Honor.

13        THE COURT:  He will be so declared.

14        And the same instructions will apply, members of the

15   jury, that I gave you earlier about the other person who was

16   declared as an expert witness.

17   Q.   Sir, what is the role of a forensic examiner at the FBI?

18   A.   Again, you assist in on-scene searches, you image

19   computers that are seized, computers with digital media that

20   are seized.  You then analyze it per the search warrant, and

21   the service requested of the case agents, and present your

22   findings in a report, both written and in digital form.

23   Q.   And in that capacity were you asked to assist with a

24   search warrant on February 2015, at 3570 15th Avenue,

25   Southwest, Naples, Florida?

1    A.    Yes, I was.

2    Q.    And did that search occur late at night?

3    A.    Yes, it did.

4    Q.    Why were you asked to accompany the agents in Florida on

5    the search warrant if you're based out of Maryland?

6    A.    I have a lot of experience in on-scene searches, live

7    capture situations dealing with encryption.  And this was

8    expected to be one of those situations.

9    Q.    What do you mean by "live capture"?

10   A.    Generally with forensics you do what is called "Dead

11   Power Forensics."  There is no power to them.  You extract the

12   hard drive.  You image it and you examine it.  With live

13   capture in dealing with encryption status, you can't just do

14   that.  If you turn the system off, everything is encrypted

15   again.  If you unplug an encrypted device it becomes

16   encrypted.  So you have to do your work based on the live

17   available evidence that is there.

18   Q.    What is the concern with something becoming encrypted?

19   A.    If you don't know the password you'll never get into it

20   again.

21   Q.    Can you describe for the jury what you saw when you

22   entered the home during this particular search?

23   A.    There was a laptop to the left of the front door that had

24   a USB thumb drive inserted in the side of it.  The laptop was

25   logged on and running at the time.

1  Q.   And did you or anyone else take any special steps to make

2  sure that the computer did not become locked?

3  A.   Yes.  One of the members of the SWAT team was actually

4  sitting at the computer using the mouse pad to keep it awake.

5  Essentially, he was the "mouse jigglier."

6  Q.   Did you take over for him once you entered the house?

7  A.   I did take over mouse-jigglier duties.

8  Q.   When you first looked at the computer, what did you see?

9  A.   I saw that there was a document, I believe the name of

10  such document was "PP underscore two" was open and viewable.

11  Q.   And what did you do when you saw that there was live data

12  on the computer?

13  A.   I noted that there was an entry for user ID that said

14  "PlayPen" and password which I do not recall showing in that

15  document.  At that point I contacted Special Agent Dan Alfin

16  for him to observe what was there.

17  Q.   And then what happened next?

18  A.   Special Agent Alfin communicated with some other people

19  on the phone, looked through that document extracting some

20  data.  I just stood by until he was done.  When he was done it

21  was my job to try to make an image of whatever was going on.

22  Q.   Was there any other device attached to the laptop that

23  day?

24  A.   Just a USB thumb drive, black and red in color.

25  Q.   I show you what's marked as Government's Exhibit 68.  Do

1  you recognize that item?

2  A.    That would be the thumb drive that was inserted into the

3  laptop.

4  Q.    Did you have reasons to have concerns if you didn't

5  capture the data right then that you wouldn't be able to

6  access it later?

7  A.    Yes.  When I reviewed the running operating system and

8  specifically that drive, I noted that there was a program

9  called "Bit Locker" enabled on that drive.

10 Q.    What is Bit Locker?

11 A.    Bit Locker is a default encryption scheme by Microsoft

12 for the Windows Operating System.

13 Q.    Is it normally found on a thumb drive that you just

14 purchased at the store?

15 A.    It only comes with an operating system and can be placed

16 on external devices by the user logged into a Windows

17 Operating System.

18 Q.    So someone using the computer has to put it on the thumb

19 drive.

20 A.    That's correct.

21 Q.    So if the thumb drive had just been pulled out of the

22 computer, what would happen?

23 A.    It would automatically encrypt itself the next time it

24 was inserted into a computer.  You would have had a pop up

25 window asking for the password.

1    Q.   What type of password would have been required?

2    A.   It's hard to say.  I did not go any further with that

3    portion of it.  But most people use somewhat complex passwords

4    when dealing with encryption.

5    Q.   So once you realized that the thumb drive did actually

6    have this encryption software, what did you do?

7    A.   I attempted to make an image of the mounted volume, which

8    what that is, is when you normally stick a hard drive in there

9    it's a drive letter and you can see the whole thing.  When

10   it's encrypted you enter the password and you get a volume as

11   opposed to the whole drive.  I tried to image that volume.

12   Q.   What did you use to try to image the volume?

13   A.   The standard tool that we use is "FTK Imager."

14   Q.   And is that a tool that's been vetted and approved by the

15   FBI?

16   A.   Yes, it has.

17   Q.   Is it a tool that is recognized by the computer forensic

18   community?

19   A.   Yes, it is.

20   Q.   And what happened when you attempted to use that tool on

21   the defendant's computer?

22   A.   The defendant's computer had Norton Security System

23   software on there which detected my imaging program as a virus

24   or mal-ware and it deleted it from my thumb drive.

25   Q.   Can you explain what Norton Security System software is?

1    A.    It is a security system software for computers to protect
2    you against viruses and mal-ware when you are using a
3    computer, either on the internet or introducing other files to
4    the computer.
5    Q.    Does it come already installed on a computer or is it
6    something a user has to purchase?
7    A.    That is something a user has to purchase.
8    Q.    And so when you inserted your tool, your FBI tool, this
9    software immediately detected your program and tried to
10   delete -- or did delete it?
11   A.    It did delete it as soon as I tried to run the program.
12   It didn't detect it immediately, but when I clicked the
13   executable it deleted it.
14   Q.    At the time you were running this program or when you
15   entered the house, did you see whether or not the computer
16   logged into a website called "PlayPen" at the time?
17   A.    I personally did not notice.  I saw that the document
18   that I mentioned earlier was up and knowing that that was
19   pertinent to this investigation I contacted the case agent.
20   Q.    So would it be safe to say at the time you guys entered
21   the house and took over the computer it was actively running
22   anti mal-ware virus program?
23   A.    Yes.
24   Q.    So after it deleted your FTF -- your FBI tool, what did
25   you have to do?

1    A.   After panic set in, I settled down a bit and grabbed the

2    hard drive that I knew was preprepared with Imager on it.  I

3    then went to the bottom right of the task bar and disabled the

4    antivirus so that it wouldn't do that again.

5    Q.   And what were you able to do with his hard drive that

6    you -- your backup hard drive?

7    A.   I made what's called a "logical copy" of all the files

8    that were on the thumb drive.

9    Q.   And what exactly is a "logical copy"?

10   A.   Well, there's two kinds of copies that you can do.  There

11   is a "forensic image" or physical copy in which you get the

12   entire file including things in it that you can't see or the

13   entire drive.

14        A "logical copy" would be something similar to if you're

15   a receptionist in an office and someone brings you a piece of

16   paper, you stamp it received, you make a copy of it, deliver

17   it to another office, they stamp it received.  The logical

18   file, the actual data is unchanged, like date time stamps have

19   changed.  You still have the logical data there in its

20   original form.

21   Q.   So in this case it would be fair to say the information

22   that you copied over from the thumb drive is the -- are the

23   files that would have been visible to a user of the thumb

24   drive?

25   A.   That's correct.

1    Q.   Are there sometimes files that are not visible to a user?

2    A.   There are plenty of hidden system files or possibly even

3    other encrypted files that are not viewable, yes.

4    Q.   So everything that you copied over was something that was

5    visible, though?

6    A.   That's correct.

7    Q.   And you said it can change maybe dates and times.  But

8    did the action you take in copying alter the contents of the

9    files from the thumb drive?

10   A.   No, the content is not changed.

11   Q.   I'm going to show you what I marked as Government's

12   Exhibit 69.  Do you recognize that item?

13   A.   Yes, I do.

14   Q.   And what is it?

15   A.   This is the drive that I extracted the logical files from

16   the thumb drive to.

17          MS. RANDALL:  Your Honor, the Government moves to

18   introduce Government's Exhibit 69 into evidence.

19          THE COURT:  Let it be admitted.

20          (Government's Exhibit No. 69 was received into

21   evidence and published.)

22          MS. RANDALL:  No further questions, Your Honor.

23                    CROSS-EXAMINATION

24   BY MR. ADOLF:

25   Q.   Mr. Shumway, I'm sorry.  It's special agent?

1    A.    No, just Mr. Shumway.  I'm a civilian.

2    Q.    Okay.  Mr. Shumway then.  Excuse me.  Is it still

3    morning?  Good morning.

4    A.    Good morning.

5    Q.    I'm Peter Adolf.  I'm here representing Mr. Chase, just

6    have a few questions for you.  If I ask you anything confusing

7    or it's not making sense to you, let me know I'll try to

8    straighten that out, all right?

9    A.    I will do so, sir.

10   Q.    Thank you.  You were telling us earlier about a problem

11   you had when you tried to insert the -- when you had the --

12   let me back up.

13        You came in, one of the tools you had at your disposal

14   when you came into the house that we were talking about during

15   the search, you had a thumb drive containing FTK.

16   A.    FTK Imager.

17   Q.    FTK Imager.  That's on a thumb drive that you brought.

18   A.    It's on a thumb drive that I had brought with me, yes.

19   Q.    FTK stands for Forensic Tool Kit.

20   A.    That is correct.

21   Q.    That's a standard tool that forensic examiners use in the

22   process of trying to examine electronic devices they're trying

23   to extract data from.

24   A.    It's one of many forensics tools that can do that, yes.

25   Q.    And basically that was rejected by the Norton Antivirus

1   software that was on the machine?

2   A.   The FTK Imager executable program was deleted by the

3   mal-ware antivirus software, yes.

4   Q.   Now, you are a computer forensic examiner.

5   A.   Yes, I am.

6   Q.   You have received, as you talked about, extensive

7   training?

8   A.   That's correct.

9   Q.   And you are actually qualified as an expert in this area

10  to try to explain these things to the jury.

11  A.   Yes.

12  Q.   You have to go back for periodic training as technology

13  changes to learn new techniques and how to deal with these

14  changes, right?

15  A.   That is correct.

16  Q.   And forensic computer examiners always have associations

17  that you belong to?

18  A.   Yes.

19  Q.   And certifications that you do from time to time.

20  A.   Yes.

21  Q.   And there are standard practices that are known in your

22  field that forensic examiners are supposed to follow in every

23  case, right?

24  A.   There are standard procedures but there are also a lot of

25  fluid situations that can cause variances to that.

1    Q.    But your goal at the end of the day when you are

2    examining a device that contains data is to try to preserve

3    the integrity of that data.

4    A.    That is correct.

5    Q.    Did you use a write blocker when you inserted the thumb

6    drive into any media or forensic tool kit imager into that

7    machine?

8    A.    I did not.

9    Q.    Isn't that part of a standard practice of a forensic

10   examination, if you're going to introduce something like that,

11   you use a write blocker so you don't corrupt the data that

12   you're trying to examine.

13   A.    Right blockers are more used for the dead box forensics

14   that I referred to where I would put a thumb drive into a

15   physical write block and attach it to my forensic computer to

16   examine.  It was not the case in this.  Again, it's a live

17   capture situation, rules are different.  And that's across the

18   board in the forensics field.

19   Q.    So in your view there was no need or no advantage to

20   using a write blocker to try to protect the integrity of the

21   data on the machine you were going to examine.

22   A.    You can't write block data that's running.  The only

23   thing I could have write blocked, I could have write blocked

24   my only personal thumb drive.  But my intention was to make

25   the image of that drive to my thumb drive.  So the write

1  blocker would have negated that also.

2  Q.   At the risk, though, of the fact that what you're doing

3  is introducing new data into the machine.

4  A.   It is limited data.  Entries will be made in the Windows

5  Registry that you inserted a thumb drive on there.  The fact

6  that you run a program will be documented.  But the actual

7  data that you're looking at is not altered.

8  Q.   Now you talked a little bit about the difference between

9  live box and dead box analysis.

10  A.   Yes.

11  Q.   You've done both.

12  A.   Yes.

13  Q.   In terms of the kinds of devices, storage media and so

14  forth that you are called upon to examine in the cases that

15  you work on, those include items familiar to all of us that we

16  see in court, such as personal computers, laptops, thumb

17  drives, personal storage media.

18  A.   That's correct.

19  Q.   You also are called upon to examine larger devices or

20  devices that are for more commercial uses such as larger

21  servers.

22  A.   I have been, yes.

23  Q.   And larger hard drives that are not typically used in the

24  home, for instance.

25  A.   I've had plenty of opportunities and experience in doing

1    the larger storage devices also, yes.

2    Q.   And as part of your training dealing with larger -- well,

3    let me back up.  Very often when you're talking about larger

4    storage devices or servers, we're talking about web servers?

5    A.   There are many different kinds of servers, web servers,

6    data servers, data storage warehouses, yes.

7    Q.   And some of what you worked on include the kind of

8    servers that house websites.

9    A.   I have been, yes.

10   Q.   You're aware that those websites are very often set up to

11   collect data about the users who are using the websites and to

12   store that data in the server.

13   A.   Yes.

14   Q.   And that would include, for instance, if someone is

15   logging on to the website, how often they log in, what areas

16   of the website are being accessed, and so forth.

17   A.   If the website is set up to log all that information,

18   yes.

19   Q.   And that's very common among websites; is that fair to

20   say?

21   A.   I would have to assume that it is very common, yes.

22   Q.   And that is a common function that websites have, that

23   servers can accommodate easily, and that there are plenty of

24   programs and plenty of websites all over the world where that

25   kind of data is collected and stored on the server.

1    A.    Again, that's not specifically, dealing with web servers,

2    my area of expertise but I believe you are correct.

3    Q.    Was there indication in this case that you're aware of

4    that the website that was being investigated had any way of

5    altering that data as it came in?

6    A.    I am not familiar, again, with the website or where it

7    was stored and how it was set up.

8              MR. ADOLF:   That's fine.   No further questions, Your

9    Honor.

10             MS. RANDALL:   No redirect, Your Honor.

11             THE COURT:   All right.   You may step down.

12             THE WITNESS:   Thank you.

13             MS. RANDALL:   The Government calls Ray Hsu.

14                   RAY HSU, GOVERNMENT WITNESS, SWORN

15                         DIRECT EXAMINATION

16   BY MS. RANDALL:

17   Q.    Good morning, sir.   Can you please state your name for

18   the record and spell it.

19   A.    Good morning.   My name is Ray Hsu.   R-a-y, H-s-u.

20   Q.    And how are you employed?

21   A.    By the FBI.

22   Q.    And how long have you worked at the FBI?

23   A.    Eleven years.

24   Q.    And what type of work do you do for the FBI?

25   A.    I'm a computer forensic examiner.

1   Q.   And have you done computer forensics your entire 11 years

2   with the FBI?

3   A.   Yes.

4   Q.   Can you give us a brief background of your education in

5   the area of computer forensics?  Well, I guess starting with

6   college.

7   A.   Okay.  I received a Bachelor of Science degree from

8   Perdue University in the area of computer information systems.

9   And later I went on and received a Master's of Science degree

10  in management computer systems from University of Illinois

11  Springfield campus.  And last month I just completed another

12  Master Science degree in the area of network engineering from

13  Johns Hopkins University.  I'm just waiting for the diploma.

14  Q.   As part of your job you received training on computer

15  forensics?

16  A.   Yes.

17  Q.   And how often do you go to training in this area?

18  A.   We are encouraged to be trained at least twice a year.

19  So the past 11 years I've taken quite a bit of training

20  courses in both theory and hands-on practice.

21  Q.   And you hold any certifications in the area of computer

22  forensics?

23  A.   Yes.  I hold a total of four certifications.  The first

24  one I obtained was the FBI Computer Forensics Education.  And

25  I also have certification by the organization called IACIS,

1   which stands for International Association of Computer

2   Investigative Specialists.  And I also have two industry

3   certifications, first one is EnCase EnCE Certified Examiner,

4   and ACE Access Certified Examiner.  And both forensic software

5   are widely used in the industry.

6   Q.   Since you began working at the FBI, approximately how

7   many cases have you worked in the area of computer forensics,

8   roughly?

9   A.   Over 100 cases.

10  Q.   And were any of those related to child pornography or

11  child exploitation?

12  A.   Most of them are related to child exploitation, child

13  pornography cases.

14  Q.   And can you give us a rough estimate of how many pieces

15  of actual evidence have you examined?

16  A.   I would say over 1,000.

17  Q.   And what type of devices have you examined?

18  A.   They range from computer systems in Windows Operating

19  System, Linux, Mac Operating System, to loose media items such

20  as CD, DVD, thumb drives, even gaming consoles and cell phone

21  devices.

22  Q.   Have you previously testified as an expert in federal

23  court?

24  A.   Yes.

25          MS. RANDALL:  Your Honor, at this point we would

1  offer Mr. Hsu as an expert in computer and digital media

2  forensics.

3        MR. ADOLF:  No objection, Your Honor.

4        THE COURT:  He will be declared an expert in that

5  area, members of the jury.

6  Q.   Mr. Hsu, we just spoke with a different forensic examiner

7  who was talking about the difference between "live capture

8  forensics" and then what he called "dead box forensics."  Were

9  you involved in any type of live capture in this case?

10 A.   No.

11 Q.   What type of work were you doing?

12 A.   I received evidence from this website and I process the

13 evidence in my lab.

14 Q.   Can you explain, starting first with computers and hard

15 drives what is the process for conducting forensic examination

16 on devices such as that?

17 A.   Well, the first step is to create a forensic image of the

18 original evidence.

19 Q.   And how do you do that?

20 A.   I do that using my forensic imaging tools.

21 Q.   What steps do you do to make the copy?

22 A.   Well, the first step is to calculate the MD5 hash value

23 which serves as the -- as the identifier for the device being

24 imaged.  And during the image process I would calculate the

25 MD5 value again, and if the MD5 value match, I know I have an

1  exact duplication of the original evidence item.

2  Q.   Can you give us a, kind of, a brief definition of what a

3  MD5 hash value is?

4  A.   Sure, MD5 stands for message digest 5.  This is a

5  mathematical algorithm that is used to show data integrity.

6  So a string of data which can be a text file, a picture, or

7  even entire length of a hard drive.  And when the MD5

8  algorithm is applied to this specific string of data, at the

9  end of calculation it will generate a unique number which

10 represent that string of data.

11 Q.   Would it be fair to say that data is sort of like a

12 fingerprint for that item?

13 A.   Yes.  Fingerprinting would be a good analogy for MD5.

14 Q.   If any change is made to the item you're examining, even

15 if you just add a period or move one thing from the original

16 device, does it change the MD5 value?

17 A.   Yes, you're right.  You have a complete different set of

18 MD5 value.

19 Q.   So you testified you will take your forensic image,

20 compare the hash value of it to the original piece of

21 evidence?

22 A.   Yes.

23 Q.   And if those match, does that mean your forensic image is

24 an exact copy of the original piece of evidence?

25 A.   Yes.

1    Q.   Why do you go through the step of making a copy?

2    A.   Well, we work on a copy so that once I know that the copy

3    is the exact duplicate of the original, I can lock up the

4    original evidence away in a controlled area where nobody can

5    touch the original evidence so we would reduce the possibility

6    of damaging the original evidence.

7    Q.   So would that preserve the integrity of the original data

8    on the original piece of evidence?

9    A.   Correct.

10   Q.   So when you do your actual examination which piece of

11   evidence -- media, do you do your examination on?  I didn't

12   phrase that very well.  I'm sorry.

13        When you're doing your examination are you using the

14   forensic image?

15   A.   Yes.

16   Q.   And after you finish conducting your image, do you take

17   any steps to try and verify the integrity of your forensic

18   image again?

19   A.   Yeah, after my analysis and forensic process, I would do

20   the MD5 calculation again.  And if the MD5 also matched the

21   first time and the second time the MD5 was taken, then I can

22   ensure that during my process I didn't change the content of

23   the forensic image.

24   Q.   And for the examinations you're going to be testifying

25   about today, did you follow that procedure in terms of

1    creating forensic images and verifying hash values?

2    A.    Yes.

3    Q.    Now let's turn to the actual examination process.

4          After you created this forensic image and are doing your

5    examination, how do you do an examination?

6    A.    I first look at the request that the case agent asked us

7    to do.  And then I follow the case agent's request.

8    Q.    So you're told to look for specific things.

9    A.    Yes.

10   Q.    Do you just go in there and start poking around or do you

11   have some tools that you use?

12   A.    I have some tools I can use.

13   Q.    What are a couple of the tools that you use to do your

14   forensic examination?

15   A.    EnCase and FTK, which I am both certified to use.

16   Q.    And is there another tool called "IEF Finder"?

17   A.    Yes.

18   Q.    What is IEF?

19   A.    IEF is -- it stands for Internet Evidence Finder.  And

20   it's basically extracts internet activities from the forensic

21   image.

22   Q.    Now, the tools that you just mentioned, EnCase FTK and

23   IEF Finder, are those all tools that are recognized within the

24   computer forensic community?

25   A.    Yes.

1   Q.   And have they all been vetted by the FBI to work

2   properly?

3   A.   Yes.

4   Q.   I want to talk to you first about a laptop that you were

5   asked to examine.  I want to show you what has previously been

6   marked as Government Exhibit 66.  Do you recognize that item?

7   A.   Yes.

8   Q.   And how do you recognize this item?

9   A.   The serial number.  I recognize the serial number.

10  Q.   And is that the laptop you were asked to evaluate in this

11  case or examine?

12  A.   Yes.

13  Q.   And did you run the IEF tool that you mentioned on the

14  forensic image of that computer?

15  A.   Yes.

16  Q.   And did you review the results of the report from IEF?

17  A.   Yes.

18  Q.   And did you find any information related to a website

19  called PlayPen?

20  A.   Yes.

21  Q.   At that time?

22          MS. RANDALL:  Madam Clerk, I don't think I have

23  access.  Thank you.

24  Q.   I'm going to show you what I have marked as Government's

25  Exhibit 77.  Do you recognize Government's Exhibit 77?  Scroll

1  down.  This is a multipage exhibit.  I'm sorry.  It's not.

2  The next one is.

3      Do you recognize Government's Exhibit 77?

4  A.   Yes, I recognize it.

5  Q.   Can you tell us what it is?

6  A.   This screen shows the browser activity.  There are four

7  records showing the user activity of visiting PlayPen website.

8  Q.   Does this show user activity that was found on

9  Government's Exhibit 66, the laptop?

10 A.   Yes.

11     MS. RANDALL:  Your Honor, the Government would move

12 to introduce Exhibit 77 into evidence.

13     THE COURT:  Let it be admitted.

14     (Government's Exhibit No. 77 was received into

15 evidence and published.)

16 Q.   And, Mr. Hsu, can you start by explaining what the URL

17 column is?  And if you need a minute, just let me know.

18 A.   All right.  This URL column basically shows the link

19 where the user had clicked on.  And now we see four records of

20 the user visiting a PlayPen website and accessing the "Read"

21 portion of certain foreign board.  For example, let's look at

22 the first record, record 363, board equal 39.  That correlates

23 to the form titled "Administration."

24 Q.   Let's kind of simplify that.  This shows that someone

25 used that computer to access the "Administration" forum of the

1    PlayPen website.

2    A.    Yes, specifically the unread portion of that.

3    Q.    The unread portion.   Okay.   Looking at the next line,

4    what does that browser activity show?

5    A.    It's similar to the first record except this is showing

6    that the user access board number 6, which represents "Preteen

7    Video Girls HC," and it's accessing the unread portion of that

8    forum.

9    Q.    And what about the third line of this exhibit?

10   A.    The third one is board number 41, which correlates to

11   "Preteen Girl Chan" forum.   Again, the user is trying to

12   access the unread portion of that forum.

13   Q.    Then the fourth line.

14   A.    Board number 7 which is "Preteen Videos Boys HC," again,

15   is unread portion of the forum.

16   Q.    And to clarify, the IEF tool would have pulled out this

17   URL source information, correct?

18   A.    Yes.

19   Q.    And then did you have to consult with someone to figure

20   out the board -- what board like 7.0 corresponded to on the

21   actual website?

22   A.    Yes.

23   Q.    Who did you consult with to figure that out?

24   A.    Special Agent Dan Alfin.

25   Q.    Now I want to show you what has been marked as

1    Government's Exhibit 76.  It's a multipage document.  I'm

2    going to scroll through all the pages so you can see it all.

3    Do you recognize Government's Exhibit 76?

4    A.    Yes.

5    Q.    What does it contain?

6    A.    This contains Firefox bookmarks.  Firefox is a popular

7    web browser.

8    Q.    Are these results from the IEF tool report that you

9    ran -- from the report that the IEF tool collected?

10   A.    Yes.

11   Q.    Does it contain information about other parts of the

12   computer, as well?

13   A.    Yes.

14          MS. RANDALL:  Your Honor, the Government would move

15   to introduce Exhibit 76 into evidence.

16          THE COURT:  Let it be admitted.

17          (Government's Exhibit No. 76 was received into

18   evidence and published.)

19   Q.    What is a Firefox bookmark?

20   A.    Well, Firefox is a popular web browser.  So bookmark is

21   something that a user had previously visited the website and

22   he or she clicked -- creates a bookmark so the next --

23   basically it serves as a shortcut to the internet website.

24   Q.    So a bookmark is a shortcut that's created by the user on

25   the computer?

1    A.    Yes.

2    Q.    It's not something that's automatically generated by a

3    website or a program?

4    A.    No.

5    Q.    And in this case, this doesn't show every bookmark on the

6    computer, correct?

7    A.    Not every bookmark.

8    Q.    But did you find some bookmarks that were relevant to the

9    investigation in this case?

10   A.    Yes.

11   Q.    Looking at page 1 of Government's Exhibit 76, can you

12   describe what this bookmark is?

13   A.    This bookmark is PlayPen website.  The title of the

14   website is called "PlayPen Image Hosting."

15   Q.    And the title section, is that what the bookmark would

16   have been named on the computer that we're examining?

17   A.    Yes.

18   Q.    And then at page 2, can you describe this Firefox

19   bookmark that was created?

20   A.    This is also a PlayPen site, and this link will point to

21   web page was titled "PlayPen File Hosting"?

22   Q.    Looking at page 3, is this a third Firefox bookmark that

23   was located on the computer?

24   A.    Yes.

25   Q.    What did this bookmark indicate?

1    A.    It's a PlayPen website which title is "PlayPen Index."

2    Q.    Does the IEF tool also find evidence of searches that

3    were performed on the website Google on the computer?

4    A.    Yes.

5    Q.    Did you review the results of that, as well?

6    A.    Yes, I did.

7    Q.    And did you find any entries that were relevant to this

8    investigation?

9    A.    Yes.

10   Q.    We're looking at the next page, it's titled "Google

11   Searches."  Is this containing the information we were just

12   kind of talking about here?

13   A.    Right.

14   Q.    What search term does it indicate was entered into the

15   computer?

16   A.    So in the second column is where it says "Search Term"

17   and the user had searched the onion site slash PlayPen.

18   Q.    Is that a URL?

19   A.    That is the URL.

20   Q.    Is this a second Google search that was recovered from

21   the defendant's computer?

22   A.    Yes.

23   Q.    And what does it tell us?

24   A.    It tells the user has searched the term "Siberian Mouse."

25   Q.    Does the term "Siberian Mouse" mean anything to you?

1   A.    Yes.

2   Q.    What is "Siberian Mouse"?

3   A.    Siberian Mouse is a Eastern European child pornography

4   production studio.

5   Q.    Go to the next page.  Does this show some additional

6   Google searches that were located on the defendant's computer?

7   A.    Yes.

8   Q.    What are the records found on the defendant's computer?

9   What are the types of searches?

10  A.    The first one is "Tor."  The other one is "Child Porn on

11  Netflix."

12  Q.    Go to the next page.  What is "Firefox web history"?

13  A.    It shows the users web browsing history.

14  Q.    Is it kind of a subsection of the browser history?

15  A.    Yes.

16  Q.    So these are websites that were visited using the browser

17  Firefox, particularly?

18  A.    Correct.

19  Q.    Did you find any records relevant to the investigation in

20  this case?

21  A.    Yes.

22  Q.    And is that what's shown on the screen here?

23  A.    Right.

24  Q.    What does this indicate?

25  A.    It indicates the user had visited the PlayPen website.

1   Q.   As part of your examination did you also locate some

2   relevant information in the recycle bin of the computer?

3   A.   Yes.

4   Q.   What is a recycle bin?

5   A.   You can see recycle bin in Windows Operating System.

6   It's basically a special folder for user to place deleted

7   files.  On a desktop it has a special icon that looks like a

8   trash can.  The purpose of that is that when the user clicks a

9   file and hits the delete button, to the user it seems that the

10  file is moved to the trash can.  Now if the user feels that he

11  made a mistake, he or she made a mistake, she can also go to

12  the recycle bin and restore it.  Now if the user feels that

13  the file needs to be deleted, and he or she has the option to

14  permanently delete the file.

15  Q.   While it's in the recycle bin the user can still recover

16  it?

17  A.   Yes.

18  Q.   Did you find anything of value in the recycle bin in the

19  case?

20  A.   Yes.

21  Q.   Can you give us an example of some of the things you

22  found?

23  A.   I found several graphic files and also a video file.

24  Q.   I'm going to show you what I've marked as Government's

25  Exhibit 78.  Do you recognize Government's Exhibit 78?

1   A.   Yes.

2   Q.   Was this one of the video files that you found in the

3   recycle bin in the defendant's computer?

4   A.   Yes.

5           MS. RANDALL:  Your Honor, the Government would move

6   to introduce Exhibit 78 into evidence.

7           THE COURT:  Let it be admitted.

8           (Government's Exhibit No. 78 was received into

9   evidence and published.)

10  Q.   So this file is a video.  Let's play it for a few

11  seconds.  If this video were continue to play, what would it

12  depict?

13  A.   This is a 45-minute long video.  Later on in the video

14  you see this young girl strip naked and masturbate using a sex

15  toy.

16  Q.   You say you also found some graphic images.

17  A.   Yes.

18  Q.   I'm going to show you what I've marked as Government's

19  Exhibit 79.  Do you recognize Government's Exhibit 79?

20  A.   Yes.

21  Q.   What is it?

22  A.   It appears to be a young girl, toddler-aged girl, being

23  sexually abused.

24  Q.   Is this an accurate representation of what you found in

25  the defendant's -- in the recycle bin of the defendant's

1   computer?

2   A.   Yes.

3        MS. RANDALL:  Your Honor, we move to introduce

4   Government's Exhibit 79.  Your Honor, may we publish it to the

5   jury -- admit and publish it?

6        Your Honor, we would move to admit Government's

7   Exhibit 79.

8        THE COURT:  Let it be admitted.

9        (Government's Exhibit No. 79 was received into

10  evidence and published.)

11  Q.   Did you also find some files of the PlayPen logo on the

12  defendant's computer?

13  A.   Yes.

14  Q.   And were those just image files of just the logo; is that

15  correct?

16  A.   That's correct.

17  Q.   I want to show you what I've marked as Government's

18  Exhibit 75.  Do you recognize Government's Exhibit 75?

19  A.   Yes.

20  Q.   What is that?

21  A.   This is a picture that I found in the laptop computer

22  which appeared to depict the desktop of the laptop.

23        MS. RANDALL:  Your Honor, the Government move to

24  introduce Government's Exhibit 75 into evidence.

25        THE COURT:  Let it be admitted.

1          (Government's Exhibit No. 75 was received into

2    evidence and published.)

3          THE COURT:  We'll take our morning break at this

4    time, members of the jury.

5          For your information we'll have to adjourn court

6    today at approximately 1:30 because we are losing our court

7    reporter to other court functions.  So just for your

8    information, we will take another break between now and 1:30.

9    But in the meantime we will take an ordinary break and

10   remember the usual instructions.  Thank you.

11         (The jury was escorted from the courtroom.)

12         (Recess at 11:09 until 11:25.)

13         THE COURT:  All right.  May we have the jury,

14   please.

15         All right.  The jury is with us.  And the

16   questioning may continue.

17         MS. RANDALL:  I think I was just moving to admit

18   Government's Exhibit 75 when we broke, which is a screen shot

19   depicted on the screen now.

20         THE COURT:  I believe the exhibit has been admitted.

21         MS. RANDALL:  Thank you.

22   Q.   Mr. Hsu, you're looking at Government's Exhibit 75.  This

23   is an actual image that was found on the defendant's computer,

24   correct?

25   A.   Correct.

1    Q.    And it appears to be a picture of the laptop screen; is

2    that correct?

3    A.    Yes.

4    Q.    So the file that's open here with the PlayPen, what type

5    of -- what is that?

6    A.    This appeared to be the website of the PlayPen index.

7    Q.    And looking at some of the icons to the left of the

8    browser being opened, do you recognize the one titled "Express

9    VPN" that's the fourth one down in the first column?

10   A.    Yes.

11   Q.    What is that?

12   A.    It's a VPN software.

13   Q.    And two above it, "CCleaner."  What is CCleaner?

14   A.    CCleaner is a -- designed to delete files in a way that

15   forensic tools cannot recover.

16   Q.    Are either of those programs on the home screen installed

17   on the computer or are they programs that user adds?

18   A.    I'm sorry.  Can you repeat the question?

19   Q.    Are those programs that are added to a computer by a

20   user?

21   A.    Yes.

22   Q.    I'm going to show you what I marked as Government's

23   Exhibit 67, it's previously been admitted.  Do you recognize

24   that item?

25   A.    Yes, I do.

1   Q.   And what is it?

2   A.   It's a cell phone.

3   Q.   And did you perform an examination of this cell phone?

4   A.   Yes.

5   Q.   How does a forensic examination of a cell phone differ

6   from a forensic examination of a computer?

7   A.   Well, with a cell phone there's really no step of

8   obtaining a forensic image of it.  It's pretty much, you would

9   attach the cell phone to the forensic software and hardware

10  and you process directly and generate a report.

11  Q.   Are you -- you were asked to do so in this case to look

12  for evidence relevant to the PlayPen website?

13  A.   Yes.

14  Q.   And did you find anything?

15  A.   Yes, I found PlayPen related information.

16  Q.   I want to show you what has been marked as Government's

17  Exhibit 80.  Do you recognize Government's Exhibit 80?

18  A.   Yes.

19  Q.   Can you briefly describe what Government Exhibit 80

20  depicts?

21  A.   Yes, it appeared that the user had used the cell phone's

22  web browser feature to perform Google search on several terms.

23  Q.   Does this report accurately reflect what your examination

24  revealed as to the search terms on the cell phone?

25  A.   Yes.

1          MS. RANDALL:  Your Honor, the Government would move

2    to introduce Exhibit 80 into evidence.

3          THE COURT:  Let it be admitted.

4          (Government's Exhibit No. 80 was received into

5    evidence and published.)

6    Q.   Now, this isn't all the search terms that were recovered

7    off the phone, correct?

8    A.   That is not all the search terms.

9    Q.   These are just some examples of ones you found related to

10   the investigation; is that correct?

11   A.   Yes.

12   Q.   Looking at the first line you have, what does that tell

13   us?

14   A.   It shows that the user had used Google search on the term

15   "PlayPen.onion."

16   Q.   And what about the second line?

17   A.   The second line, "PlayPen CP Tor onion link."

18   Q.   How about the third line?

19   A.   The third line is another Google search "PlayPen.onion."

20   Q.   A previous witness testified that he made a logical copy

21   of a thumb drive on scene.  I'm going to show you what's been

22   previously identified as Government's Exhibit 69.  Do you

23   recognize that item?

24   A.   Yes, I do.

25   Q.   And what is it?

1  A.    It's a hard drive.

2  Q.    Were you asked to do an examination on this hard drive?

3  A.    Yes.

4  Q.    Do you -- even though it's just a lone hard drive instead

5  of a whole computer, do you still follow the same procedure of

6  creating a forensic image and verifying it to the hash value?

7  A.    Yes.

8  Q.    And you did that in this case?

9  A.    Yes.

10  Q.    And what did you find related to the investigation on the

11  external hard drive?

12  A.    I found a total of 8,905 child exploitation material or

13  child abusive material.

14  Q.    Can you just give a brief -- what's the difference

15  between child exploitative material or child abusive material?

16  A.    Child exploitation, an example, child erotica, children

17  possessing nude modeling underwear or swimsuit.  Child abusive

18  material would be, you know, picture and videos depicting

19  children performing sexual acts.  In addition, there may be

20  more sadistic nature such as torturing, physical abuse.

21  Q.    So that number you gave us, a little over 8,900, is a

22  combination of both those materials?

23  A.    Yes.

24  Q.    Did you also find some text files on the logical copy of

25  the hard drive?

1   A.   Yes.

2   Q.   I want to show you what I marked as -- or is previously

3   introduced as Government's Exhibit 81.  Do you recognize

4   Government's Exhibit 81?

5   A.   Yes.

6   Q.   Is this a text file that was recovered from the logical

7   copy of the thumb drive?

8   A.   Yes.

9   Q.   Now, the process of making a logical copy from a thumb

10  drive, would that have altered any of the information within

11  his text document at all?

12  A.   No.

13  Q.   Let me show you what I marked as Government's Exhibit 82.

14  Do you recognize Government's Exhibit 82?

15  A.   Yes.

16  Q.   How do you recognize -- what is Government's Exhibit 82?

17  A.   This appears to be a text file that shows the steps of

18  creating a Tor hidden website.  And this one appeared to be

19  tailored to PlayPen.

20  Q.   Was this a text file that you found during your

21  examination of the external hard drive?

22  A.   Yes.

23          MS. RANDALL:  Your Honor, the Government would move

24  to introduce Exhibit 82 into evidence.

25          THE COURT:  Let it be admitted.

1          (Government's Exhibit No. 82 was received into

2     evidence and published.)

3     Q.    So you said this is instructions on how to create the

4     hidden service Tor website for PlayPen?

5     A.    Yes.

6     Q.    Would the process of moving information to making a

7     logical copy of a thumb drive alter the information within

8     this text document at all?

9     A.    No.

10          MS. RANDALL:  No further questions, Your Honor.

11          MR. ADOLF:  Thank you, Your Honor.

12                         CROSS-EXAMINATION

13    BY MR. ADOLF:

14    Q.    Good morning.

15    A.    Good morning.

16    Q.    Is it Special Agent Hsu or Mr. Hsu?

17    A.    Mr. Hsu.

18    Q.    Thank you.  Good morning, Mr. Hsu.

19    A.    Thank you.

20    Q.    I'm Peter Adolf representing Mr. Chase.  I just have a

21    few questions for you.  If I ask you anything that is

22    confusing or garbled, let me know and I'll try to make that

23    more clear.

24    A.    Sure.

25    Q.    Now, what we've been talking about here is the PlayPen

1  website and data from the PlayPen website.

2  A.    Correct.

3  Q.    PlayPen is a bulletin board website, or was a bulletin

4  board website; yes?

5  A.    Um -- I -- as a forensic examiner I never been to the

6  website so I can't testify.

7  Q.    Well, you were -- we were just -- you were just shown

8  screen shots that appeared to be from the website.

9  A.    Yes.

10 Q.    And what those were pictures of were a bulletin board

11 that was running standard bulletin board software.

12 A.    Yes.

13 Q.    And bulletin board software includes a number of

14 different features.

15 A.    Yes.

16 Q.    Did anyone ask you -- by anyone, I mean anyone connected

17 to the investigation, Special Agent Alfin or anyone else.  Did

18 anyone ask you to analyze the bulletin board software for any

19 anomalies in the counter functionality?

20 A.    No.

21         MR. ADOLF:  Nothing further, Your Honor.  Thank you.

22         MS. RANDALL:  No redirect, Your Honor.

23         THE COURT:  You may step down, please.

24         MS. RANDALL:  Your Honor, the Government calls

25 Christopher Butch.

1    CHRISTOPHER BUTCH, GOVERNMENT WITNESS, SWORN

2    DIRECT EXAMINATION

3  BY MS. RANDALL:

4  Q.    Sir, can you please tell us your name.

5  A.    Special Agent Christopher Butch.

6  Q.    And where are you employed?

7  A.    The U.S. Naval Criminal Investigative Service.

8  Q.    How long have you worked there?

9  A.    Since 2007.

10  Q.   And where are you currently assigned?

11  A.   The NCIS field office Hawaii, Pearl Harbor, Hawaii.

12  Q.   How long have you been working at that field office?

13  A.   I've been there on this assignment from July 2014.  I was

14  previously assigned there from a tour from 2009 to 2012.

15  Q.   And do you do criminal investigations for the Navy?

16  A.   Yes, I do.

17  Q.   And in that capacity sometimes, do you do investigations

18  such as child sexual exploitation?

19  A.   Yes, I do.

20  Q.   Have you ever had the opportunity to investigate the

21  actual production of child pornography, as a child pornography

22  series?

23  A.   Yes, I have.

24  Q.   Does the term "NattyDatty" mean anything to you?

25  A.   Yes, it does.

1  Q.   Can you tell us a little bit about what that term means

2  to you?

3  A.   In 2012 during my first tour at the Pearl Harbor office,

4  I was assigned to -- what we refer to as our Family and Sexual

5  Violence unit.  And in that unit we investigate adult sexual

6  assault, domestic violence, child physical and sexual abuse,

7  and also child pornography.

8        So in January 2012 our office was requested by our

9  special agent liaison to the National Center for Missing and

10 Exploited Children to assist in the identification of the

11 victim in the NattyDatty series who was unknown at that time.

12 So --

13 Q.   Were you able to identify the child from that series?

14 A.   Yes, we were.

15 Q.   And you said this was in 2012?

16 A.   That's correct.

17 Q.   I'm going to show you briefly what's been marked as

18 Government's Exhibit 26a.  Do you recognize that?

19 A.   Yes, I do.

20 Q.   And what do you recognize that video to be?

21 A.   That's a short clip from one of the videos that appears

22 in the NattyDatty series.

23 Q.   And the female depicted in that series, is that a person

24 that you actually met?

25 A.   Yes, it is.

1    Q.    When did you meet that person?

2    A.    It was in January of 2012.

3    Q.    And was that after this video had been created?

4    A.    That's correct.

5    Q.    And approximately how old was that person -- that female

6    when you met her?

7    A.    She was eight years old at the time.

8              MS. RANDALL:  No further questions, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. ADOLF:

11   Q.    Special Agent Butch, good morning.

12   A.    Good morning.

13   Q.    The -- when you talk about a series, what you're talking

14   about is that there are a series of images that circulate

15   widely on the Dark Web and among child pornography viewers and

16   so forth, right?

17   A.    Essentially, yes.

18   Q.    And many of those images have been circulating for years

19   or even decades?

20   A.    That's correct.

21   Q.    The girl that you met, interviewed, where was she living

22   at the time those images were created?

23   A.    Her father was active duty United States Navy, and they

24   were living on base housing on Ford Island, Hawaii.

25   Q.    No connection to any person named Steven Chase living in

1   Florida, right?

2   A.    No.

3               MR. ADOLF:  Nothing further, Your Honor.  Thank you.

4               THE COURT:  You may step down.

5               MS. RANDALL:  Your Honor, that will be the

6   government's evidence.

7               THE COURT:  All right.  Thank you.

8               Members of the jury, you have now heard the

9   government's case.  We'll ask you to step out to the jury room

10  and we'll call for you very shortly.  Please keep an open mind

11  about the case and don't discuss it.

12              (The jury was escorted from the courtroom at 11:44.)

13              THE COURT:  All right.  The government has rested.

14  Will there be any motion by the defendant?

15              MR. ADOLF:  Yes, Your Honor.  Motion pursuant to

16  Rule 29 to dismiss each and every count of the indictment for

17  insufficient evidence.  Specifically, but not limited to the

18  argument that the government has failed to connect Mr. Chase

19  sufficiently to enough predicate -- enough predicate crimes to

20  make out the Count One.

21              And also, and specifically, that they have not

22  demonstrated that there are sufficient numbers of counts in

23  the indictment Two through Seven, that were committed as

24  different incidents, that were separate incidents, given the

25  overlaps, and dates, and conduct, to support a finding that

1  there were three felonies committed that were committed as

2  parts of the different incidents.

3  THE COURT: All right. The Court, having considered

4  the evidence and these comments by counsel, will deny the

5  motion finding that there was sufficient evidence. Of course

6  the burden being on the government but taking, at this point,

7  the evidence in the light most favorable to the government.

8  Now, I have a matter I would like to take up with

9  you, Mr. Chase. This has to do with your right to testify. I

10 want to go over this right you have to testify to make sure

11 you understand it.

12 So I would ask you first, do you understand that you

13 do have an absolute right to take the stand and give your own

14 testimony in your own defense?

15 THE DEFENDANT: Yes, Your Honor, I do.

16 THE COURT: And do you also understand that you have

17 an absolute right not to testify in your own defense and, in

18 that event, the jury would be instructed that the jury could

19 not hold it against you that you decided not to testify?

20 THE DEFENDANT: Yes, Your Honor, I do.

21 THE COURT: So you have the option to testify or

22 not. Now your attorney can advise you based on his experience

23 as to the pros and cons of testifying or not, the advantages

24 and disadvantages of testifying. Do you understand that you

25 should consult with your attorney on this question?

1          THE DEFENDANT:  Yes, Your Honor.  We have talked

2    about it.  Yes, sir.

3          THE COURT:  All right.  So you have done that.

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Do you understand that whatever advice

6    your attorney has given you or may give you, ultimately it is

7    your decision whether to testify or not and not your

8    attorney's decision?

9          THE DEFENDANT:  Yes.  Yes, sir.

10          THE COURT:  All right, sir.  Anything further on

11    that subject?

12          MR. ADOLF:  No, Your Honor.  Thank you.

13          THE DEFENDANT:  Very dizzy.

14          MR. ADOLF:  Sit down.

15          THE COURT:  Is it the posture of the defendant that

16    he will be offering evidence?

17          MR. ADOLF:  Your Honor, we will be moving to admit

18    the defense exhibits that have previously been identified and

19    displayed to the jury as Exhibits 1 through 8.  I guess I'll

20    need to do that in front of the jury.  I don't know what Your

21    Honor's preference is on that but that will be it for the

22    defense case.

23          THE COURT:  All right.  I'll admit them into

24    evidence, but do feel free to state that to the jury, and I'll

25    admit them in front of the jury.  And then you will, I guess,

1    indicate you are resting.

2            MR. ADOLF:  Yes, sir.

3            THE COURT:  All right.  Now, have the parties been

4    given a copy of the Court's instructions?

5            MR. JONES:  We have, Your Honor.

6            THE COURT:  What I propose to do is to bring the

7    jury back in and dismiss them for the day and have them come

8    back in the morning.  And we now will have plenty of time to

9    go over the jury instructions so that when 1:30 comes around,

10   if it does, in terms of our scheduling -- the fact that we

11   have to move on to Charlotte about that time -- I would hope

12   we would have the jury instructions all discussed and revised

13   as necessary, also the verdict sheet, and be ready to go along

14   with the arguments.

15           Normally what the Court would do is give the

16   instructions leading up to the substantive instructions first,

17   because they are fairly long.  And that would give a bit of a

18   break and have the arguments and then the Court would give the

19   substantive instructions.  Then the jury would have the case

20   for deliberation in the morning.

21           Now then, how much time do the parties believe they

22   might need or wish to have for argument?  Thirty minutes?

23   I'll just throw that out there.

24           MR. ADOLF:  I'm sorry, Your Honor?

25           THE COURT:  Thirty minutes, maybe.

1          MS. RANDALL:  Your Honor, just given the number of
2     charges and the, kind of, the intricacy, especially the
3     exploitation, would we be able to get 45 minutes?  I think it
4     will take some time to explain the law before we can even get
5     into the evidence with the jury what the elements are.
6          THE COURT:  Does the defendant have a preference?
7          MR. ADOLF:  Judge, I don't expect to go quite that
8     long.  My guess is 30 minutes will be enough for me.  If the
9     Court feels that it's necessary to give the government 45, I'm
10    going to ask for that as well, just as an abundance of caution
11    but I don't expect to go that long.
12         THE COURT:  All right.  So we'll say that each party
13    would have up to 45 minutes.
14         MS. RANDALL:  We'll try to keep it shorter, though.
15         THE COURT:  That's good.  And if you reach the 40
16    minute mark, the Clerk would advise you of that.  Then if you
17    reach the 45 minute mark, the Court would speak to you, and
18    without cutting you off in mid paragraph or mid sentence,
19    anyway, and that would take care of the arguments.
20         MS. RANDALL:  Yes, sir.
21         THE COURT:  All right.  So let's bring the jury back
22    and dismiss them and then we'll begin our examination of the
23    jury instructions as proposed by the Court.  And also we have
24    one submission, I believe, from the government as to
25    instructions.

1          MS. RANDALL:  Your Honor, I left some of my notes on

2     the instructions on my desk.  I didn't actually realize we

3     would get here this quickly.  May I run up and get my computer

4     that has the notes on it?

5          THE COURT:  Let's do that as soon as the jury is

6     dismissed.

7          May we have the jury, please.

8          (The jury was returned to the courtroom.)

9          THE COURT:  I'll be with you in just one second,

10    members of the jury.

11         When we first -- now that you're assembled we'll ask

12    the defendant if you will choose to offer evidence.

13         MR. ADOLF:  Your Honor, the defense would offer into

14    evidence what's been previously marked as Defense 1, 2, 3, 4,

15    5, 6, 7 and 8.

16         THE COURT:  All right, sir, let them be admitted.

17         (Defendant's Exhibit No. 1-8 were received into

18    evidence and published.)

19         MR. ADOLF:  And with that, the defense rests.

20         THE COURT:  All right.  And I take it there's no

21    rebuttal concerning exhibits.

22         MR. JONES:  No, Your Honor.

23         THE COURT:  Members of the jury, you've now heard

24    all the evidence in the case.  And as I told you earlier, our

25    schedule of events would include the presentation of evidence,

1   and then the Court would instruct you as to the law, and the

2   attorneys would argue their cases for you, and then you would

3   have it to deliberate and reach your verdict.  And since we do

4   have the limitations on the afternoon, we'll start fresh in

5   the morning and let you all go ahead about your business

6   today.  Before I do that and release the jury, I'll remind you

7   of a few things.

8           First of all, you are not to discuss this case with

9   anyone, whether members of your family, anyone involved in the

10  trial or anyone else, including fellow jurors.  If anyone

11  should approach you and try to discuss the case with you, you

12  should let me know about that immediately.

13          Also, you must not listen or read any news accounts

14  about the trial if there should be any.

15          Finally, remember, you must not talk about anything

16  with any person who is involved in the trial, even if it has

17  nothing to do with the trial.

18          Now I ask you to do no research or investigation

19  about the case on your own.  Do not engage in any electronic

20  media for any purpose relating to this case.  Keep an open

21  mind about the case because now that you've heard the

22  evidence, you still haven't heard the arguments of the

23  attorneys, and you haven't heard the statement of the Court as

24  to the law that applies in this case.  So keep in mind -- keep

25  an open mind until you actually start your deliberations

1    tomorrow morning.

2          So thank you again for your attention to the case.

3    You're all dismissed for the day.  We would ask you to be with

4    us at 9:30 in the morning.

5          (The jury was escorted from the courtroom at 11:55.)

6          THE COURT:  All right.  All jurors have departed.

7          What I thought we might do is get a preliminary

8    discussion from counsel as what you may have seen up to now in

9    terms of these instructions.  And then if you would request

10   it, we would take a break and give you additional time to look

11   at what's here and consider -- present what your positions

12   might be on various aspects of the instructions so that we can

13   have as full and informed a discussion as possible.

14         Now, any comments on these matters, on these

15   instructions?

16         MS. RANDALL:  Your Honor, I can kind of run through

17   what I have.  I haven't marked it out by page.  I just made

18   the notes on instructions.  Or if you want to take a five

19   minute recess I can put them all on one page and go through

20   them more organized, if you would prefer.

21         THE COURT:  All right.  We can do that.

22         MR. ADOLF:  Right.  Before we take a break, Judge,

23   just to sort of lay out the parameters of what we have to do.

24   I have to say, I don't think I've ever had these many issues

25   to raise with an instruction, because we're dealing with a

1  charge that's probably the most difficult I've seen to try to

2  craft instructions for, which is obviously Count One, in a

3  case where there are predicate crimes that are both elements

4  of that offense and also listed separately.

5       So there's a lot I have to try to explain to the

6  Court in terms of my concerns, procedurally, in terms of how

7  the counts are laid out and in what order.  And also dealing

8  with specific counts and how they relate to Count One.

9       So there is quite a bit to go through.  I'm not sure

10 if the Court has a preference on how to do that.

11       What I was going to do was first address the

12 structure of how Count One is laid out and suggest changes to

13 that.  Basically just reordering things to make them a lot

14 more comprehensible to the jury and more clear to everybody.

15 And then specific things I want to talk about, about the

16 separate incidents element of Count One, which is dealing with

17 other aspects of the counts.

18       So I was planning to go through it in that order.

19 Basically addressing structure first and then substantive

20 objections to each count, but it's a fair bit to talk about.

21       THE COURT:  All right.  Well, we'll take a ten

22 minute break and then we will reassemble and we'll hear what

23 comments you have as of now.  We will also be able to come in

24 a bit early tomorrow morning, if the parties see fit, and that

25 would give you an opportunity to make any additional comments

1    about these instructions at that time.

2            And I would ask you that if you are going to request

3    certain specifics, it's always helpful to have actual written

4    proposals as opposed to, "Judge, we would like you to change

5    such and so." But, the Court, you know, as you know, these

6    suggestions have to be converted into actual language. And I

7    would appreciate it if the attorneys would make the effort to

8    do that before simply throwing it out to the Court to do what

9    it can do.

10           MS. RANDALL: Yes, sir.

11           THE COURT: All right. So we will take a ten minute

12   break, please.

13           (Recess at 12:01 until 12:17.)

14           THE COURT: All right. Anything from the government

15   at this point?

16           MS. RANDALL: Your Honor, we just have a few

17   clarifications and one additional requested instruction.

18           With regard to page 54, the "Advertising Child

19   Pornography." What is listed as element Number 4, "The

20   Defendant knew that the person depicted in the visual

21   depiction was a minor."

22           I don't think that's an element because the act of

23   advertising child pornography, that is a crime even if in

24   advertising as child pornography it ends up not being child

25   pornography. It's still a crime offering to seek or receive

1   child pornography.  It doesn't have to be child pornography

2   involved.

3          So, for example, some evidence we gave is that when

4   people were asking for images representing that they wanted

5   child pornography, even if the person responded with something

6   that wasn't correct, it would still be a crime because they

7   were offering or they were seeking to receive child

8   pornography.

9          So I don't think we have to prove that "The

10  Defendant knew that the person of a particular visual

11  depiction was a minor in this case."

12         THE COURT:  All right.  What says the defendant

13  about that?

14         MR. ADOLF:  Your Honor, I think there does have to

15  be, as far as the text or the message of the advertisement, I

16  think.  At least there has to be a reasonable expectation that

17  the advertising is such that it is likely to attract or result

18  in an offer of a visual depiction of a minor.

19         So while obviously one can't know what one is

20  getting until one sees it, I think the jury would have to find

21  that the advertising was -- that a reasonable person making

22  that advertisement would believe that they were going to

23  receive images of a visual depiction of a minor in return for

24  it.

25         MS. RANDALL:  Your Honor, I think that is cleared up

1  by Number 3, "The Notice or Advertisement must have included

2  the visual depiction of use of minors."  If we can't meet

3  Number 3, that the notice or advertisement was regarding

4  something involving the use of a minor engaged in sexually

5  explicit conduct, that kind of covers, I think, what Mr.

6  Adolf's concern is.

7           MR. ADOLF:  Can I respond to that, Your Honor?

8           THE COURT:  No, what page are you on?

9           MS. RANDALL:  Page 54.

10           THE COURT:  Still 54.  Which number?

11           MS. RANDALL:  Our concern is listed as element

12  Number 4.

13           THE COURT:  Still on 4?

14           MS. RANDALL:  Yeah, I was saying, I believe his

15  concern was addressed by the fact that we have to prove

16  element 3.  Since we have to prove the notice or advertisement

17  was in regard to basically what is child pornography there,

18  and that the defendant is the one who made that notice.  That

19  covers the knowledge requirement.

20           MR. ADOLF:  May I respond to that, Your Honor?

21           THE COURT:  Just one moment.

22           MR. ADOLF:  Yes.

23           THE COURT:  Yes.

24           MR. ADOLF:  Yes, Your Honor.  I think that's really

25  a separate issue.  Again, 3(a) talks about the actual image

1  that is ultimately received, "The production of the visual

2  depiction involved the use of a minor engaging in sexually

3  explicit conduct."

4          So that's talking about the actual image that gets

5  received, not necessarily what the advertisement contains.

6  That's why I think that if the government has an objection to

7  four, which I don't have an objection to, at least four needs

8  to convey that the advertisement needs to be such that the

9  defendant believed or a reasonable person would believe that

10  what would be received in response was in fact a visual

11  depiction of a minor.

12          THE COURT:  All right.  We'll give that some more

13  thought.

14          MR. ADOLF:  Judge, I'm sorry.  While we're looking

15  at that particular instruction --

16          THE COURT:  Yes, sir.

17          MR. ADOLF:  I don't think there's any allegation

18  that gives rise to 3(b).  I don't think there's any evidence

19  or the government is going to argue that Mr. Chase

20  participated in any act of sexually explicit conduct.  So I

21  think that's really for a different case.  I think that 3(b)

22  could be removed.

23          THE COURT:  A reason not to do that?

24          MS. RANDALL:  Your Honor, there was some testimony

25  with relation to maybe the conspiracy charge from Mr. Browning

1   about a section called the "Producers."  I don't know if he

2   called it "Producers" section.  The purpose was to produce

3   child pornography to share with other people.  So I think

4   there is some evidence that could support 3(b) in this case.

5         MR. ADOLF:  May I respond?

6         THE COURT:  Yes, sir.

7         MR. ADOLF:  I think that's really where the

8   confusion lies, because 3(b) is saying the defendant

9   participated in any act of sexually explicit conduct, not in

10  advertising any act or in transmitting or anything of that

11  nature.  And I think that's -- that subparagraph is supposed

12  to address actual production or participation and production

13  which is not alleged here.

14        Apparently there was -- apparently there were

15  sections on the website for people doing that, but there is no

16  allegation Mr. Chase was one of those people.  So I think that

17  would confuse the jury and that is not actually supported by

18  the evidence.

19       MS. RANDALL:  I think that could be changed to

20  remove the word the "defendant," maybe say "the participation

21  in the act of," to make it more broad so it's clear we're not

22  alleging the defendant participated in the production but

23  that's part of the conspiracy charge that was encouraged

24  through the website.

25       MR. ADOLF:  Well, Judge, I think the conspiracy

 1  charge is separate.  This is a substantive offense we're

 2  looking at.

 3          MS. RANDALL:  True, conspiracy to advertise, I

 4  guess, is kind of overlapping in my head.  The elements are

 5  the same for both.  We have to prove for both.

 6          THE COURT:  Well, I would say there was some

 7  likelihood that one will come out.  We'll address that.

 8          Any changes the Court proposes between now and

 9  tomorrow morning we will send out to let you have a look at it

10  for purposes of your closing statements and so on.

11          MS. RANDALL:  Your Honor, moving on to the next one

12  we go to page 64 which is the elements for transportation.

13          THE COURT:  Okay.

14          MS. RANDALL:  I was trying to pull some of these up.

15  I'll send them out maybe in an email to the clerk.

16          We think what needs to be added to element 1 is that

17  we also -- not only, "material in and affecting interstate and

18  foreign commerce," but also "means or facility in interstate."

19   So "means or facility" language is missing from that section.

20          THE COURT:  All right.  That's likely to stay in.

21          MS. RANDALL:  Page 66, Your Honor, where we define

22  child pornography.  The indictment actually only alleges

23  Section A of the definition so I think we could remove

24  Sections B and C, not to confuse the jury.

25          THE COURT:  Any objection from the defendant?

1          MR. ADOLF:  No, Your Honor.

2          THE COURT:  All right.  Let B and C be deleted.

3          MS. RANDALL:  Your Honor, on page 69, kind of the

4     same as the transportation.  We just would like to request

5     that in element 4 the language regarding the "means or

6     facility of interstate or foreign commerce" be added so it is

7     also as alleged in the indictment.

8          THE COURT:  Do you see what she's looking at there?

9          MR. JORDAN:  Yes.

10         MS. RANDALL:  On page 60, going back to the

11    definition of "interstate and foreign commerce," but no

12    definition for "means or facility of interstate commerce"

13    which is the language we're seeking to add.  So I don't know

14    if you want to add to that section or just have a separate

15    instruction.  But we cite to some case law in our trial brief,

16    then I've also printed out what I could find.

17         A quick example is an Eleventh Circuit pattern

18    criminal jury instruction for coercion, but uses kind of the

19    same language where their suggested jury instructions say

20    simply, "The internet is a facility of interstate or foreign

21    commerce."  Which is similar to an instruction the government

22    submitted in a child pornography case a few years ago where we

23    submitted "The internet is a facility, means, or

24    instrumentality of interstate or foreign commerce."  That

25    language is based on legal -- the case law, which there are

1    multiple circuits have held that definition is correct.

2         So we ask that definition be added to explain to the

3    jury what the language "facility of interstate commerce"

4    means.

5         THE COURT:  Any objection to that?

6         MR. ADOLF:  I'm not going to object to that.

7         THE COURT:  All right.

8         MS. RANDALL:  Your clerk informed us about the

9    double jeopardy question.  We will be prepared at the

10   appropriate time to respond to that.

11        THE COURT:  Well, this is as good a time as any.

12        MS. RANDALL:  Your Honor, we've read the case and

13   this issue actually came up with some other child enterprise

14   cases that have been prosecuted around the country.

15        In general, since double jeopardy is a sentencing

16   issue, we think the jury should be allowed to deliberate on

17   the charges as is.  If he is convicted on both, this would

18   become an issue at sentencing.  At that point the Judge has

19   the option to dismiss the lesser charge or vacate the sentence

20   on that second charge, which is how it's been handled in some

21   other districts that have encountered the same issue.  So

22   because it doesn't become an issue, just at sentencing, we

23   think that's the appropriate time to resolve it.

24        MR. ADOLF:  Judge, I assume we're talking about the

25   advertising and advertising conspiracy counts?

1    MS. RANDALL:  Enterprise and conspiracy since both

2  involve --

3    MR. ADOLF:  Right.  The problem, Judge, is that, as

4  I understand it the conspiracy, I guess, is going to be used

5  as a predicate for the --

6    MS. RANDALL:  No.

7    MR. ADOLF:  It's not?

8    MS. RANDALL:  Just Count Seven.

9    MR. ADOLF:  One conspiracy count?

10   MS. RANDALL:  Yes.

11   MR. ADOLF:  All the rest are substantive counts?

12   MS. RANDALL:  Correct.

13   MR. ADOLF:  Judge, given the problem I will get more

14 into in a minute when it is my turn about the fact the jury is

15 trying to simultaneously find predicate offenses with elements

16 and uses those offenses of elements as yet another crime.  I

17 think there is prejudice in that it adds yet another level of

18 confusion, in that some of the charges that the jury considers

19 outside of the child exploitation enterprise can be used as

20 predicates and some can't.

21      I think it is an offense that -- there are no

22 elements outside -- what's the *Blockburger* test?  That

23 everything in that count is also encompassed by the higher

24 count.  And the only reason to charge those two, when

25 ultimately Your Honor is not going to be able, I believe,

1    under double jeopardy, to impose consecutive time for those

2    counts.  That would be the only cure, at that point, to run

3    the sentences concurrent.  That there is no point.  And there

4    is prejudice to subjecting Mr. Chase to two different counts

5    for the same violation of law, even if that could be cured

6    later.  The prejudice with having the jury consider not just

7    the same conduct but actually the same elements twice, and

8    then adding additional elements as substantive punishment.  I

9    think it's prejudice with no purpose at the end of the day.

10   Since I don't think the Court is going to be able to sentence

11   on both of them, essentially.

12            THE COURT:  Well, so your take seems to go to the

13   question of sentencing also.

14            MR. ADOLF:  Well, Judge, the -- I guess the analysis

15   is, if there's a double jeopardy violation, there's two

16   aspects to it.  Is that something that should be allowed to go

17   to the jury?  And if it has, but there's a potential double

18   jeopardy issue that could be cured later, as long as the total

19   punishment doesn't exceed any single count.

20            I believe that there is actual prejudice even in

21   allowing the jury to consider and perhaps convict Mr. Chase of

22   what is essentially two crimes that are the same crime where

23   one just has additional elements.

24            THE COURT:  You have a case for this proposition?

25            MR. ADOLF:  Judge, I do not.  I didn't know this was

1      an issue.

2              The *Blockburger* case is the case that of course

3      defines the problem.  And I know that -- as far as the

4      prejudice analysis before the jury I don't have a case off the

5      top of my head, Judge.  I apologize for that.

6              THE COURT:  Well, it might be that if there is some

7      law that might help and it doesn't come under this kind of

8      case exactly, you might find something under the continuing

9      criminal enterprise statute which has -- or maybe even RICO

10     that would have some bearing on this.  In the absence of some

11     law about it, we'll have to likely do what -- pretty much what

12     these instructions do at the time and then deal with any

13     residue at sentencing, if it becomes necessary.

14             MR. ADOLF:  Yes, Your Honor.

15             MS. RANDALL:  And can I just clarify, Your Honor, as

16     we continue to do research, as well, in case Mr. Adolf comes

17     up with cases.  The concern is Counts One and Two, I think

18     both of those can't be submitted to the jury.

19             MR. ADOLF:  Right.

20             MS. RANDALL:  Okay.  I just want to make sure we're

21     talking about the same thing.

22             THE COURT:  All right.  So that concludes what you

23     were going to bring up?

24             MS. RANDALL:  Yes, Your Honor.  Thank you.

25             THE COURT:  All right.  And from the defendant.

1          MR. ADOLF:  Yes, Your Honor, my objections are a

2    little broader.  And I guess that's why I was puzzling over

3    trying to submit instructions of my own, but I think there are

4    several variables, several things the Court has to answer

5    before we attempt that.  I just want to say I really think the

6    Court and the law clerk have done a yeoman's job trying to

7    make sense of this statute and putting it in a form we can

8    use.  I just don't think it's possible, given the structure

9    that we have.

10          What I'm looking at -- if we're talking about a

11    particular instruction, I'm looking at page 34, which is the

12    instruction on three separate predicate offenses comprising a

13    series.  Basically what I will be asking the Court to do is --

14    because I think it's possible to leave this entirely out and

15    actually help the jury do their job much easier and ensure

16    unanimity and everything else.

17          The essential problem is this:  Your Honor recalls

18    in voir dire I put a lot of stress -- and I know the Court

19    also did -- on the fact that the jurors need to consider each

20    count individually and not just convict the defendant because

21    of extraneous matters or allow proof of one count to influence

22    their decision on another count.

23          The problem with that is that we begin here by

24    talking about Count One which then encompasses every other

25    count.  And the confusion sort of comes to a head if you look

1   at the jury verdict form, which again I think the clerk did a

2   remarkable job -- creative job of trying to come up with some

3   way to explain this.  But we're not even sure whether each

4   count is its own count because it's labeled as Issue One in

5   parenthesis Count One.

6           Essentially what we're asking the jury to do is

7   decide the elements of the predicate offenses, then decide the

8   additional elements of the child exploitation enterprise

9   count, and then go back and decide what they've already

10  decided with the substantive counts individually.

11          And I can't even really explain how a person does

12  that.  I'm sure they're not going to understand it because I

13  don't.  I think, though, that there is a simple solution which

14  is:  We're used to considering the counts just in the order

15  that they are in the indictment, the order that the government

16  charged them in.  I don't think there's any rule that requires

17  that.  And I think in this case it makes it very confusing and

18  even misleading.

19          So what I would propose is that because the jury has

20  to -- how ever they do it on paper, as far as finding

21  elements, the jury first has to find the elements of the

22  predicate offenses.  Then it has to add in the extra elements

23  of child victim and separate incidents to arrive at the

24  verdict on Count One.

25          So what I would propose to do is let them do that in

1    order, actually with the verdict form, which is to have them
2    deal with the possible predicate offenses first.  And then,
3    instead of saying to go back and deal -- to deal with them a
4    second time or as a part of Count One, just simply say:  If
5    you have found Mr. Chase guilty of at least three of these
6    offenses then you proceed to consider additional elements and
7    those would be Count One.

8           That allows the jury to consider each count once,
9    and they will have the predicates, and then we would be
10   assured that they actually found unanimously on each predicate
11   offense because that will be laid out in the verdict form
12   before they get to Count One.  We will know whether or not
13   they have found the right predicates unanimously.

14          And then they can consider whether looking at the
15   offenses they have already found, whether additional elements
16   of those offenses being separate incidents and child victim to
17   arrive at Count One, instead of sort of doing it both first
18   and then again.

19          So I think that would solve a lot of the problems of
20   potential unanimity of Count One versus the other counts.

21          And if that were the case then we wouldn't even
22   really need to explain the concept to them of a predicate
23   offense, all we would need to say is:  List the possible
24   predicates.  And then say:  If you, the jury, have found
25   Mr. Chase guilty of three or more offenses, at this point,

1    then continue to Count One.  And if you have not, then stop.

2    And then give the extra elements of Count One.

3         So that's my first objection and it's just in terms

4    of the layout.  I think that if we had that we could use -- we

5    would have to change the jury form to just put them in a

6    different order and then add in the language of:  If you have

7    found three of these offenses guilty then you go on to

8    consider Count One.

9         And I think we could also cut everything about

10   predicate offenses at that point.

11        THE COURT:  What does the government say about that?

12        MS. RANDALL:  Your Honor, we think that would

13   actually be more confusing to the jury.  Because they will

14   have a copy of the indictment in one order, and if your

15   verdict sheet is not in the same order, I think that will

16   cause a lot more confusion for them.  And actually creates a

17   problem that they may put the verdict that they want to do on

18   Count One in the wrong spot, because the indictment is in one

19   order and the verdict sheet is in another.  And the same with

20   instructions.  It would make more sense for them to follow the

21   indictment, because that's kind of the roadmap for the case.

22        Additionally, unless Mr. Adolf has a case, I assume

23   this is like other cases where the jury can have inconsistent

24   verdicts where they convict him on Count One and maybe don't

25   convict him on some of the other counts.

1    So I don't think it's appropriate to have, "You must
2  convict on three of -- Counts Three through Seven before you
3  can consider Count One."  I haven't found any cases that
4  indicate that that's required in any way.  You can have an
5  inconsistent verdict.
6          MR. ADOLF:  Judge, may I respond briefly?
7          THE COURT:  One minute.
8          MR. ADOLF:  Thank you.
9          THE COURT:  Well, go ahead and respond.
10          MR. ADOLF:  Judge, I think it's one thing to deal
11  with the problem of inconsistent verdicts later and see what's
12  permissible, what's not permissible.  But I don't think we
13  should be encouraging that up front.  I think that by dealing
14  with the charges -- first, with the substantive charges.  At
15  that point the jury has found the elements and we know they've
16  done it unanimously.  And then we can see, they can clearly
17  look at and decide whether they have actually found enough
18  predicates.  And it ends the problem of potential inconsistent
19  verdicts.
20          Because if -- let's say we go with what the
21  government wants.  If the Court -- if what we get back from
22  them is a verdict that he's guilty on Count One, but looking
23  at the other predicate counts there aren't enough predicate
24  counts to support that, then we have a real problem because
25  that's not just inconsistent that's an indication of

1   non-unanimity.

2        THE COURT:  What would you say about the possibility

3   of putting a special interrogatory to the jury at the end of

4   Count One asking for the predicate offenses which they may

5   have -- on which they may have found the defendant guilty?

6        MR. ADOLF:  Well, Judge, like with all the

7   instructions, I'm not saying the instructions are technically

8   incorrect.  I'm just saying by laying it out that way I think

9   it adds confusion rather than clarity.

10       And if what I'm hearing from the Court I'm imagining

11  what that special verdict form would be.  It would be the

12  verdict on Count One.  It would have the jury list what are

13  the predicate offenses.  And we would have to instruct the

14  jury that those are the same predicate offenses that you're

15  then going to find because we have to address each count

16  individually.  And so now you're having the jury make two

17  findings as to each count, I think, on the special verdict

18  form.  And then that could give rise to even more inconsistent

19  verdicts where you have an explicit finding that's different

20  as to the same elements on the verdict sheet.  So again --

21       THE COURT:  I think we might be underestimating the

22  jury's powers.  And we also don't want to ignore the power of

23  argument.  In argument, your very first slide, so to speak if

24  you were going to use any graphics, could show the

25  relationship between Count One and the other counts.  That

1   seems to me would be an intelligent way that might resolve

2   these issues you're talking about.

3           MR. ADOLF:  Judge, I'm not going to underestimate

4   the power of jury other than I am going to underestimate the

5   power of me to explain it.  I think that the statute could be

6   taught as a course in law school in trying to figure out how

7   it works.

8           I just -- I don't think there's any real need --

9   what I hear the government saying is that it might be

10  confusing to have an indictment that's in one order and a

11  verdict sheet in another order.  I think that's a much easier

12  problem to address than having the jury go back and forth

13  between the different counts and try to figure out what's an

14  element of which.  And I think that could be cured by just

15  letting the jury know, the verdict sheet's a little different

16  from what the indictment says.  We're going to ask you to

17  consider the other counts before you consider Count One.  And

18  just understand that you're going to be starting on the

19  verdict sheet with Count Two.

20          Frankly, that's a lot easier for me to explain, I

21  just did it in a few seconds, than try to explain what a

22  predicate offense is and what the difference is between

23  considering a substantive offense as a predicate offense to

24  Count One versus as its own independent count.  So that's all

25  I have to say about that.

1          THE COURT:  Well, there are other context involving

2     weapons offenses, for example, whereby the jury finds a --

3     let's say Count Two they find a gun offense and that bears on

4     Count One and they don't seem to have any problem with that.

5          MR. ADOLF:  I haven't dealt with that specifically,

6     Your Honor, in the context of jury instructions.  So I don't

7     have Your Honor's experience with that.  But I was thinking of

8     it as sort of being akin to the Armed Career Criminal Act

9     concept, except all compacted into one hearing where the first

10    question is, "Has the person been convicted of three

11    qualifying offenses?"  And then there are additional elements

12    of whether they were committed on separate occasions.  And I

13    think trying to explain to someone that they would have to

14    make all the findings as to each individual thing as a part of

15    a single one out of order is just going to add confusion to

16    that.  And I think the logical way to deal with it is the way

17    the Court deals with it, normally, is to first see if there

18    are three offenses, see if they are qualifying predicates, and

19    then address the issue of whether they were committed on

20    separate occasions, instead of trying to do it backwards or

21    backwards and forward.

22          So, again, Judge, I can't point to any particular --

23    any particular language in the instruction on three separate

24    predicate offenses comprising a series that is incorrect.  I

25    just think it's going to be very difficult for anybody to

1    figure that out.  I've been looking at these -- at this kind

2    of offense for a while getting ready for this case and I have

3    a hard time explaining it so...

4           THE COURT:  Anything further from the government?

5           MS. RANDALL:  No, Your Honor.  We would just agree

6    with Your Honor.  I think the jury instructions actually lay

7    it out very clearly.  I mean, you put it in a good simple

8    language for the jury to understand and we agree with Your

9    Honor that I don't want to underestimate their ability to

10   follow the instructions.  And then if they have questions they

11   can come back out and ask you about those questions.  It just

12   seems like I'm looking at under RICO or drug conspiracies, you

13   just always follow the way the indictment is written and we

14   would ask that you continue that type of pattern as we've done

15   in our district before.  I have even tried to look at some

16   other jury instructions that we have access to on the child

17   exploitation enterprise and I can't find anything like what

18   Mr. Adolf is suggesting.

19          THE COURT:  All right.  We'll keep your comments in

20   mind, both parties, and -- however, I would say it's not

21   likely we would be changing the structure of the presentation

22   of issues in the instructions.

23          MR. ADOLF:  Judge, I have a couple more objections.

24          THE COURT:  Yes, sir.

25          MR. ADOLF:  If we're prepared to deal with those

1  now.

2         Regarding separate different incidents, I believe

3  that's the language in the statute.  The jury has to find that

4  there are three separate predicate crimes that have been

5  proven beyond a reasonable doubt unanimously and so forth.

6  And then there's the additional element of child victim, which

7  I think is adequately covered by the instructions and then

8  different incidents.

9         And, I mean, I guess incidents is a term we don't

10 see a lot, but it's obviously similar to separate occasions

11 that we deal with in Armed Career Criminal and so forth.

12        In this case what we have is, we have some crimes in

13 the indictment that are charged on specific dates, and some

14 crimes that are charged over a range of dates.  For instance,

15 I think it's Count Seven is the possession child pornography

16 charge.  That covers, I guess the entire life of the site.

17 And Your Honor is aware, of course, that possession is a

18 continuing offense.  So possession of child pornography images

19 over a lengthy period of time is a single offense.

20        I believe that as a matter of law, nothing that

21 happened during the operation of that website that the

22 Government has shown us could be considered a separate

23 incident from the possession of child pornography during that

24 period.

25        Again, it may be a separate act, an act of

1 transmitting the child pornography, or an act of advertising

2 for it, but it's all the same child pornography and it's all

3 over the same period of time.

4 So if the jury -- I don't think there's anything in

5 the indictment that the jury could consider as being a

6 separate incident from the entire lengthy period. So just the

7 way that that is charged, I think that charges the entire

8 operation of the website, or Mr. Chase's possession of child

9 pornography in connection with that as a single incident and,

10 therefore, as a matter of law, that cannot be a predicate.

11 That's a separate incident.

12 And, I guess, for Count Three, which is the

13 advertising count -- foolish to do this without the indictment

14 in front of me.

15 I think we've already heard from the government that

16 they're not trying to use Count Two as a predicate offense for

17 Count One. But I think Count Three has the same problem,

18 which is that it is completely co-extensive. Actually, it's

19 slightly longer but covers all of the time between the

20 creation of the website and when Mr. Chase was arrested,

21 saying that it was -- that that's the charge of advertising

22 child pornography. And it's not specific as to any particular

23 act. It potentially encompasses all the acts of advertising

24 over the period of August 19, 2014 to March 4, 2015. And all

25 the other counts that are named on specific dates, Counts

1    Four, Five and Six all took place during that same period of
2    time as was charged in Count Three.  So I don't think it's
3    possible for those to be different incidents if they're
4    happening at the same time.

5          Because it's not just that it's a different act, the
6    statute requires something more.  It requires not that the
7    acts be different incidents.  So you could have predicate
8    offenses that happened at the same time or over the course of
9    the same incident, that nonetheless one of them could be a
10   predicate but you couldn't use two.

11         I think that's what we have here, as far as Count
12   Three, that if the government's going to use any of Count
13   Four, Five or Six as predicates, they can't use Count Three
14   because that's as a matter of law going to be the same
15   incident, at least in some part.

16         THE COURT:  What says the government?

17         MS. RANDALL:  Your Honor, a couple different things.

18         First of all, there has been plenty of evidence
19   shown that would support the advertising charge separate from
20   the transportation.  So the jury can find a separate act
21   supports the advertising charges.  Kind of like when you
22   charge receipt and possession, they may still possess the
23   charge -- excuse me, the image that they received, but as long
24   as the government has also presented evidence of other images
25   the defendant possessed, you could be convicted and sentenced

1    on both charges separately.

2              I'd also note that it's kind of premature at this

3    point because one act can violate multiple statutes.  Even if

4    we had only charged one act as violating both advertisement

5    and the transportation statute, we don't know which one the

6    jury would convict on.  So the jury may only convict on the

7    advertisement, may only convict on the transportation.  We

8    shouldn't take away the option from them before they have a

9    chance to consider it.

10             So for both of those reasons we think that the jury

11   should be allowed to consider all of the counts as predicate

12   offenses.

13             THE COURT:  All right.

14             MR. ADOLF:  May I, Your Honor?

15             THE COURT:  Yes, sir.

16             MR. ADOLF:  I think what the government is doing is

17   bringing up the problem and actually making the problem worse

18   that we were just dealing with, with double jeopardy, and with

19   the problem of combining all of the predicate offenses, which

20   they're now saying it sounds like to me, is the jury could

21   pick any act of advertising, even one that's not named or

22   charged in the indictment, or any other predicate act that

23   they find happened during that period of time and use that as

24   a predicate.

25             I think the case law is pretty clear that because

 1    each predicate crime is an element of the offense, each

 2    predicate crime has to be found by the Grand Jury and charged

 3    in the indictment.  And we have predicate offenses here, just

 4    not all of them are separate incidents.

 5         So what the government is inviting the jury to do at

 6    this point is to pick some other act of advertising or

 7    distribution that's not in the indictment and find that,

 8    basically, well, he must have committed at least three

 9    somewhere in there, and therefore he's guilty of Count One,

10    regardless of whether he's guilty of any of the predicates

11    that's in the indictment.

12         And what that's inviting is double jeopardy problem.

13    That is inviting the jury to consider charges that are not

14    charged in the indictment that he has a right to be charged by

15    Grand Jury and included in that indictment, violation of due

16    process, and non-unanimity.  Because now what we could have

17    is, if the government is able to argue as long as you find

18    that he convicted -- that he committed three predicate acts,

19    that would be crimes if they were charged in here, then you

20    can find him guilty on Count One.

21         And at that point we have jurors going through

22    trying to find evidence of things that are not charged in the

23    indictment, and there's no reason for them to be unanimous.

24    There's no way to find that.  There's nothing in the verdict

25    sheet that directs them to do that or to name what the acts

1  are. And basically it's allowing the government to add

2  potentially infinite number of charges for every communication

3  on that website, every act of distribution.

4          So I think when they say that the jury shouldn't be

5  limited to the predicates charged in the indictment, I think

6  they are. I think that's the whole problem.

7          So I think the Court needs to make sure that they

8  are not considering charges multiplicitously [sic] and that

9  they're not considering charges that aren't specifically named

10  so we get into basically the jury creating their own elements

11  of the offense outside of the indictment, outside of the

12  verdict sheet.

13          MS. RANDALL: Your Honor, if he thinks that's what I

14  argued, that's not what I intended, they could go outside the

15  indictment. They have to find what's in the indictment, one

16  of those three charges of transportation or that the evidence

17  supports the advertisement charge or that the evidence

18  supports the possession charge. They have to find the three

19  predicate counts from those five counts. I'm just saying we

20  shouldn't take one of them away from them in case they want to

21  convict on one and or think one was violated and not the

22  other.

23          THE COURT: They have to make those findings

24  unanimously as we instruct the jury.

25          I think it may well be that we'll have the special

1    interrogatory under Count One so we know what they are talking

2    for Four, Five and Six as the predicates.

3            I also might mention that we also have experience

4    where you have a matter that either is complex or seems to be

5    complex to the jury, whereby we look at the verdict sheet and

6    then we have a sidebar and we decide what problems if any

7    might exist.  We can have the jury address anything that

8    appears to be out of order or out of line with the

9    instructions so that we make sure we know what their unanimous

10   decisions are in any area of possible misconception by the

11   jury.

12           And, again, I think good arguments by counsel can

13   obviate any of these problems that we've discussed.

14           So anything further for the Court at this point?

15           MR. ADOLF:  Yes, Your Honor, I do.

16           THE COURT:  All right.

17           The floor is open.

18           MR. ADOLF:  Yes.  I'm just trying to find in the

19   elements of the substantive advertising count where it defines

20   advertisement or notice.

21           THE COURT:  Page 54 is where advertising starts.

22           MR. ADOLF:  Right.

23           MS. RANDALL:  Fifty-six, maybe.

24           MR. ADOLF:  If I could just have a moment, Your

25   Honor.

1        THE COURT:  Yes, sir.

2        MR. ADOLF:  Yes, Your Honor.  I have read the *Grovo*

3   case.  That was the Ninth Circuit case that just a couple

4   months ago, where the Ninth Circuit for the first time is

5   defining what the scope of what an advertisement is and that's

6   what this instruction is based on.

7        THE COURT:  What page are you on?

8        MR. ADOLF:  I'm sorry, fifty-six.

9        THE COURT:  All right.

10       MR. ADOLF:  And what I'm talking about,

11   specifically, this is a total of four sentences.  I guess it's

12   the third sentence that I'm looking at which says, "The fact

13   that a published or transmitted matter is distributed or

14   broadcasted to a limited or closed and like-minded segment of

15   the population as opposed to the public at large does not

16   prevent the conclusion that the published or transmitted

17   matter is a notice or advertisement."

18       As I said, I read the *Grovo* case and I was trying to

19   figure out, given that this is a very recent case that is from

20   a different circuit on a matter that our circuit has not

21   passed upon yet, whether the Court should look at this as

22   persuasive authority, and I don't believe it should.  Because

23   the *Grovo* case totally collapses the distinction between

24   public and private.

25       If you look at the *Grovo* case, what the issue was,

1    was trying to figure out whether a small group of people

2    exchanging messages was an advertisement.  In that case there

3    were 40 or 45 people on a website, and whether their messages

4    back and forth to each other should be considered

5    advertisements.  And the Court didn't look at the definition

6    of advertisement as contained anywhere in Title 18 or anywhere

7    else in the United States Code because there isn't.

8         Congress did not offer a definition of notice or

9    advertisement, they just used the words.  They didn't look at

10   legislative history or any of the other usual sources and went

11   straight to the dictionary.  What they found in the dictionary

12   was the word "public" is what's associated with advertising.

13   But the difference between just a message to someone else and

14   an advertisement is that an advertisement is public.

15        And then what the Court did was sort of try to dial

16   it back by saying, Well, public can mean public within the

17   community.  Because there's one dictionary that said that.

18   And they said, In this case a community could be a small

19   community or a small group.  And therefore it's any

20   communication within a small community.  It is not what the

21   dictionary said.  The dictionary said, "the community," which

22   of course means the public at large.

23        And what that means at the end of the day is, Judge,

24   I cannot figure out what the difference is between a message

25   to someone and an advertisement.  I think by this instruction

1    the jury is allowed to speculate that -- and I'm guessing the

2    government is going to argue, probably, that any message to

3    another person or people no matter how small that group is, is

4    advertisement.  And Congress used the word "advertisement."

5    They didn't say, "transmits a message" or "solicits someone

6    else."  It said, "advertisement."  And I think advertisement

7    means what it means, which is something to the public.

8            And I think to the extent that that should be

9    defined at all, it should be -- the Court should instruct them

10   that an advertisement is something that's public.  And

11   something that's private is not an advertisement.

12           I know that in dealing with this issue I read one

13   case in the Second Circuit.  I'll give the cite.  The case

14   doesn't really discuss it in any detail, it just mentions how

15   the District Court dealt with it in that case.  And that's

16   *Pabon-Cruz*.  *United States versus Pabon-Cruz*, I'll give the

17   cite, it's 391 F.3d 86.  And the particular reference is at

18   page 92 where the Court just mentions that in an advertising

19   case -- there in the Second Circuit and apparently without

20   objection the Judge said to the jury, the terms -- or simply

21   said -- told the jury that the terms "notice" and

22   "advertisement" are self-explanatory.

23           Congress didn't feel the need to explain it.  I

24   think those are words that are used every day in common sense.

25   And I think that if the prosecutor or the government believes

1    that somebody saying something to a small group of people is

2    an advertisement.  They can argue that.

3            But the word means what it means and I think this

4    invites the jury to collapse any distinction between the

5    language that Congress used, advertisement, and any

6    communication to anybody.  I mean, that's -- at the end of the

7    day if you ask somebody, Would you like to buy something from

8    me?  Is that an advertisement if you ask two people?  I think

9    what it comes down to, is it intended to be public or is it

10   intended to be private?

11           If I say to somebody, I would like to sell you my

12   car and anyone else you know is interested let them know.

13   Maybe a communication to one person could be an advertisement.

14   On the other hand if I say to a small group of people, Look, I

15   have this car for sale but I only want one of you to have it

16   and I don't want anyone else to know this.  I don't think

17   that's public and I don't think it's an advertisement.  So I

18   think that just cutting out that sentence, which is what's

19   taken from *Grovo*, I think would be sufficient.

20           I would ask to add in that an advertisement -- that

21   the Court could either say that advertisement and notice are

22   words that you use commonly, and that you should use your

23   common understanding of them and I will not attempt to define

24   them further.

25           Or, if the Court wanted to define them, to say, A

```
1   notice or advertisement is one that is intended to be

2   disseminated publicly and if something is not intended -- is

3   intended for a private audience then it's private and it's not

4   a notice or advertisement.

5              THE COURT:  What does the government say about that?

6              MS. RANDALL:  Your Honor, I think the instruction as

7   written is a correct statement of the law that exists out

8   there.  I'm just finding some other case law that similarly

9   says -- I'm looking at U.S. versus Franklin, which is a Tenth

10  Circuit case, 785 F.3d 1365.  It also addresses what the

11  definition of advertisement is.  And they go through how there

12  are some definitions that include the word "public" and some

13  do not.  And I'm -- literally I'm reading this as we're

14  talking.  But he's talking about -- they talk about how

15  individuals who belong to an exclusive wholesale club -- how

16  the public consists of numerous groups and that's an

17  example -- even though the members are limited, communications

18  to the membership may -- would remain public even if they were

19  not indiscriminate or impersonal.

20             They talk about a popular basketball star having

21  hundreds or thousands of friends on his or her Facebook page.

22  Even if the friends are limited, communication to these

23  individuals would be considered public even if not

24  indiscriminate or impersonal.

25             So I think limiting it to only what's out in the
```

1  public -- I mean, the word "public" is defined, I think -- we

2  haven't defined public.  It doesn't need to be public.  I'm

3  sorry.  I'm trying to read the case while I'm talking to you.

4          But since the case law -- there's multiple cases out

5  there that seem to say, even a closed group of people -- as

6  long as they seem to be groups of people -- qualify.  Then

7  that would be a proper statement of law and taking it out

8  would not address the case law that exists today.

9          MR. ADOLF:  Can I just briefly respond to that, Your

10 Honor, if I may?

11         Judge, I think the examples from case law that

12 counsel gave are very telling, talking about a -- somebody

13 tweeting messages to their followers or a wholesale club.

14 Even in those context what we're talking about is somebody

15 communicating messages for sale that are only going to go to a

16 certain group, but there's no limitation on where they end up

17 going and they're not intended to be limited.

18         Just because Sam's Club charges a membership,

19 everybody understands Sam's Club is advertising because

20 they're advertising not just to their members but also for

21 more members.  They want to attract attention.  And that is

22 understood that that is still a public notice, even though

23 only certain people can avail themselves of it, the public can

24 all see that and Sam's Club knows and intends that.

25         Same thing with Twitter; if you post something on

 1    Twitter that is public and it can be searched by anybody, it's
 2    only going to go to certain people on itself but that's not
 3    the intention.  Everyone knows when you post something the
 4    world can see it.

 5            To say that a message that goes to a particular
 6    person or a small group of people that is concealed from
 7    everybody else in the world is an advertisement, well, if
 8    that's true then the word "advertising" doesn't mean any
 9    different from the word "message."

10            And Congress used that word for a reason, I think.
11    And I think it's a word we all understand, and the jury should
12    just be told to use it the way you understand it.

13            MS. RANDALL:  Your Honor, and this is a sentence I
14    was trying to find while I was talking to you in this *Franklin*
15    case.  They're talking about "advertisement" and they say:

16            "Congress surely did not intend to limit the
17    statue's reach to pedophiles who indiscriminately advertise
18    though traditional modes of communication like television or
19    radio.  Congress was trying to capture all advertisements or
20    notices targeting individuals interested in obtaining or
21    distributing child pornography, like Mr. Franklin and his
22    GigaTribe 'friends.'"

23            They refer to the House of Representatives' report
24    "stating that in adopting" this statute "Congress sought to
25    criminalize new technological devices, like 'computer bulletin

1    boards,' that contain offers of child pornography."

2          So apparently in the legislative history of this

3    case, Congress says, "they sought to criminalize people who

4    are using computer bulletin boards."  That's exactly what we

5    have in this case, a computer bulletin board.

6          They also cite to the Senate report that says,

7    "discussing the increasing danger from computer bulletin

8    boards, serving as 'an electronic form' of classified ads for

9    the exchange of communications among pedophiles."

10         Though this particular case was talking about

11   sharing it among GigaTribe "friends," which is a closed

12   network, they do cite also to other cases where people were

13   limited by using complex encryption methods, where they were

14   only advertising to 45 members, or a chat-room posting.  This

15   case there were only 108 members.  In this case we have a

16   bulletin board with over 100,000 members.  So clearly it's

17   much broader than what was contemplated in these cases.  And

18   when you have the legislative history to add to it, clearly,

19   this was -- the statute was intended to apply in this kind of

20   case and the instruction as written is appropriate.

21         THE COURT:  All right.  The Court is likely to leave

22   that one unchanged.

23         Anything else, Mr. Adolf?

24         MR. ADOLF:  I think that's all from the defense on

25   that, Your Honor.

1    THE COURT:  All right, sir.  On that and any other

2  issue?

3    MR. ADOLF:  Well, Judge, actually there's also the

4  forfeiture instructions.

5    THE COURT:  Yes, do you have any questions about

6  that?

7    MR. ADOLF:  I do, Judge.  There is one part of the

8  forfeiture instruction -- I don't have this in the book but --

9  that was added, I think, to the usual forfeiture instruction

10  saying that having a computer in the house where the computer

11  is used can be sufficient to -- for forfeiture of the house,

12  and that that's a sufficient nexus.

13    Now it may be that the jury could find something on

14  that basis but I think that that's -- that the legal support

15  for that is pretty thin and is really taking that away from

16  the province of the jury; that's really directing a factual

17  finding of the jury.

18    What the government cited specifically for that, in

19  terms of published case law in this circuit, was *United States*

20  *versus Ownby*.  That's a District Court case out of the Western

21  District of Virginia.  I have it as 926 F.Supp. 558.  As I

22  read that I'm wondering if it's F.Supp. 2d.  I'm not sure.  I

23  may have left that out.

24    But anyway, it's a 1996 case out of the Western

25  District of Virginia which the government sites for the idea

1    that it is a sufficient nexus that if somebody uses a computer

2    in a home to commit crime on the internet, then that's a

3    sufficient nexus between the act and the house to forfeit the

4    house.  That's not at all what *Ownby* says, at all.  In fact,

5    the *Ownby* court specifically indicated that they were not

6    making that determination.  And that's at page 562, footnote

7    six.

8           What happened in *Ownby* was the defendant pled guilty

9    with a plea agreement.  And the defendant agreed in the plea

10   agreement that his house was subject to forfeiture because

11   there was a sufficient nexus.  So that was taken away from the

12   Court.  The parties agreed to that.

13          The only question in *Ownby* was whether -- because

14   the house so much more valuable than the amount of fine and

15   restitution asked for, was whether that was a constitutional

16   violation of the Eighth Amendment and whether it constituted

17   an excessive fine.

18          The Court explicitly stated that the parties -- the

19   defendant had agreed that there was a sufficient nexus and was

20   not addressing that issue.

21          So I think certainly in that case there was a

22   sufficient nexus found but it was because the defendant agreed

23   to it as part of plea agreement.  Here that's obviously going

24   to be the main issue, if indeed Mr. Chase is convicted of any

25   counts here, is whether it is sufficient for -- if you're

1    sitting in your house on a computer committing a crime, for

2    the government to take away the whole house.  And I think that

3    is certainly debatable.  I don't think the Court should direct

4    that the jury and tell them that that is a sufficient nexus.

5    I think that would be a directed verdict and I'm not sure that

6    it's even true.

7            The other case the government relied on, *United*

8    *States versus Wilk*, which is mentioned in their proposed

9    instruction.  That's affirming a jury verdict and that's

10   simply finding a ground that the jury could have found as

11   whether that is sufficient.

12           It's one thing to say that the jury could find under

13   the circumstance -- specific circumstances of a case that the

14   house is sufficiently connected to the crime to forfeit it.

15   It's something else entirely for the Court to say, for

16   instance, committing this kind of crime in this kind of house

17   is sufficient.

18           So I would ask the Court to cut the part about the

19   house and just say that the jury regard to any particular

20   property is to make the same inquiry, which is, is there a

21   sufficient nexus between that property and the crime committed

22   for it to be subject to forfeiture.

23           THE COURT:  All right.  I'll consider that.

24           What do you have to say about that if anything at

25   this point?

1          MS. RANDALL:  Your Honor, Mr. Bane-Creed is handling

2     the forfeiture for our office.  I would like to consult with

3     him.  Fortunately, he's flying back from DC today so I will

4     try and consult with him or someone else in our forfeiture

5     area, and maybe send an email to your clerk cc'ing Mr. Adolf

6     if he has any response to that, if that's okay.

7          THE COURT:  That will be fine.

8          MS. RANDALL:  Thank you.

9          THE COURT:  I think that takes care of the points to

10    be raised and we will see you all at 9 a.m. to see if there is

11    any further discussion on these matters.

12         MR. ADOLF:  Yes, sir.

13         MS. RANDALL:  Thank you.

14         (The court was in recess for the day at 1:15.)

15

16

17

18

19

20

21

22

23

24

25