UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA,      ) DOCKET NO. 5:15-cr-15-1
                               )
     vs.                       )
                               )
STEVEN W. CHASE,               )
                               )
          Defendant.           )
_____ )


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
MAY 1, 2017


APPEARANCES:

On Behalf of the Government:

     CORTNEY S. RANDALL, ESQ.,
     Assistant United States Attorney
     227 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

     REGINALD E. JONES, ESQ.,
     United States Department of Justice
     1400 New York Avenue, NW
     Washington, DC 20005


On Behalf of the Defendant:

     PETER ADOLF, ESQ.,
     Federal Defenders of Western North Carolina
     129 West Trade Street, Suite 300
     Charlotte, North Carolina 28202


LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

1

I N D E X

DEFENDANT WITNESS:                                      PAGE

2

MATTHEW MENDEL

3       Direct Examination By Mr. Adolf              11
        Cross-Examination By Ms. Randall             37

4       Redirect Examination By Mr. Adolf            73
        Recross-Examination By Ms. Randall           77

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

MONDAY, MAY 1, 2017:

        (Court called to order 2:02:)

        THE COURT:  Good afternoon, ladies and gentlemen.

        MR. ADOLF:  Good afternoon, Your Honor.

        THE COURT:  Are the parties ready to begin?

        MR. ADOLF:  Yes, Your Honor.  We do have -- there are some matters that have come up since last week --

        THE COURT:  All right.

        MR. ADOLF:  -- before we start the sentencing that I would like to bring to the Court's attention.

        The Government filed a new pleading on Friday.  I'm sure Your Honor's seen it.  It is their sentencing memorandum.  And in their sentencing memorandum, one of the factors that they want to argue is the disparity, is the 3553(a) factor of avoiding disparity among similarly situated defendants.  And for that purpose what they've done is they've included about a dozen cases from other jurisdictions that they say got severe sentences and that they say the cases are similar enough to Mr. Chase's that it would be unfair or violate 3553(a) if he were to receive any kind of departure or variance, comparing his cases to those cases of the other defendants.

        Again, this was just filed on Friday.  It was the first I heard that they were going to make such an argument.  And what -- all they did was list the names of the defendants,

1   their sentences, and a couple of facts about them.  And I

2   think this is really problematic for a bunch of reasons.

3           Apparently, what the government has done -- this is

4   not a situation of dealing with guidelines or looking at rates

5   of departure or other publicly available information.  This is

6   saying that these other defendants around the country are

7   similar to Mr. Chase on the facts, and that therefore he

8   should be treated similarly as them.

9           The problem is, they've only told us a few facts

10  when the reality is they have all the facts.  These are cases

11  that were prosecuted by the child exploitation section.

12          THE COURT:  Why wouldn't this simply be a matter of

13  argument appropriate on your part at the time we're arguing

14  about an appropriate sentence?

15          MR. ADOLF:  Well, because, Judge, if what the

16  government is saying there are cases around the country that

17  are similar to Mr. Chase, and therefore the Court should take

18  those cases into account in sentencing him, then we need to

19  know what the facts of those cases are because --

20          THE COURT:  Well, you can read them as well as the

21  Court; is that right?

22          MR. ADOLF:  No, Your Honor, and here's why.  What we

23  don't have is, we don't know if those people, for instance,

24  have criminal histories.  Mr. Chase is a criminal history I.

25  We don't know if those people abused children in real life.

1   We don't know what guidelines were.  We don't know whether

2   there were upward departures or anything else.

3            THE COURT:  I think all of those reservations as

4   stated would apply and could be brought to the Court's

5   attention that the Court should give the cases cited little or

6   no weight because of the very matters you're bringing up.

7            MR. ADOLF:  Well, Judge --

8            THE COURT:  But as far as them being matters of

9   record, the Court can read those cases, you can, and the

10  government can.

11           MR. ADOLF:  Well, Judge, the problem is, they're

12  not -- what they're not doing is, they're not citing published

13  opinions or other information that's generally available.

14           THE COURT:  Well, now let me get you right on that.

15  They cite cases and give the citation so that you can go read

16  that case; is that correct?

17           MR. ADOLF:  They give a case number.  They don't --

18  there's no -- for most of them that I've been able to find

19  there aren't published opinions or anything online.  There was

20  one that I was able to find where there's an unpublished, but

21  at least available online, appellate opinion that talks about

22  the facts.  And that is *United States versus Maweu*.  Which I

23  was only able to find because the defendant has an unusual

24  name.

25           But that's a case that they cite as being similar to

1    Mr. Chase's.  They don't say why other than the sentence.

2            And in the appellate opinion -- at least in that

3    case there was an appellate opinion.  It turns out that that's

4    a defendant who sexually abused, raped a number of children

5    himself and filmed it, and then had a website where he was

6    publishing it.  That was an entirely different case from

7    Mr. Chase.

8            I think for the government to come in and list a

9    name, a case number, and a sentence, and not talk about those

10   distinct differences makes me concerned about all of it.  That

11   what we should be doing, if the government really believes

12   that those cases are similar to Mr. Chase, which is what

13   they're arguing, and they're arguing specifically under the

14   statute that the Court should sentence him the way they were

15   sentenced, then we need to see what those facts are and how

16   they are different from his.  They have the presentence

17   reports in all those cases.

18           THE COURT:  The Court would simply make the

19   observation that -- first of all I will hear from

20   Ms. Randall -- but I think it's abundantly obvious that what

21   the government has done is very common in cases of this sort

22   where the government or the defendant, as the case may be,

23   would cite a case and the first thing the Court knows about it

24   is that it may or may not have anything to do with the current

25   case in terms of its relevance and that's for argument.  I

1   think you're unduly focusing on this at this particular stage.

2   We'll hear from you later on and you can argue exactly what

3   you've already argued that somebody got a 540-month sentence,

4   444, 420.  I'm looking at the same things you are and I'll

5   hear your arguments about that.  But sounds to me like you

6   want to hear -- have the case tried, each one of these

7   separately so that we'll know exactly what the facts were.

8   That's not going to ham.

9          MR. ADOLF:  I understand, Judge.  I also understand,

10   though, that the normal cases is where we're all working from

11   the same set of information and making our arguments, in this

12   case the government has picked those cases out of all the

13   dozens or maybe hundreds that unit has prosecuted.  They have

14   all the presentence reports; I don't.  They have all the facts

15   available; I don't.  I don't have any way of getting them.  I

16   asked them for those.  They refused to turn them over.

17          So I understand the Court's ruling and we'll proceed

18   to argument if that's the Court's ruling.

19          For the record, I'm asking for the presentence

20   reports in the cases that they cite as being somehow similar.

21   And if it comes to it in argument and there's a specific

22   prejudice that I think is happening, I'll bring that to the

23   Court's attention, but other than that I'll stand by the

24   Court's ruling and we can proceed.

25          THE COURT:  All right.  I have no complaint with

1  your ardent advocacy.  But my statement -- I believe it covers

2  the matter up to this point.  We'll hear from Ms. Randall.

3         MS. RANDALL:  Thank you.  I just want to clarify a

4  few things.  Specifically, the last thing he said, the

5  government is refusing to turn over what he requested.

6         Mr. Adolf requested that we turn over the

7  presentence reports of the co-defendants and the other

8  individuals he referenced.  We are legally prohibited from

9  doing that.  The case law has made it clear, as well as the

10 statute that we were not allowed to turn over -- third parties

11 are not allowed to access presentence reports.

12        There's a Fourth Circuit case directly on point that

13 if a defendant wants to see someone else's presentence report

14 they have to make a particularized showing that it's

15 significant and material to the case to a court.  And then the

16 Court can choose whether to do an in-camera review of that

17 document and the whether or not to turn over to defense

18 counsel.

19        He has not made that request in this case, Your

20 Honor, and therefore we are not allowed to turn over the

21 documents he is seeking.

22        Furthermore, I can tell the Court, neither of us

23 were involved in the prosecution of those other cases.  We

24 have not seen those presentence reports.  The information we

25 put in the sentencing memorandum came from publicly available

1  documents.  For example, I have in front of me a press release

2  on one of the cases where they talk about the roles of the

3  defendants and what the defendants were sentenced to.  I have

4  the sentencing memorandum from one of the defendants.  I found

5  this, Your Honor, by simply Googling the defendant's name, and

6  it's online.  It's an unsealed sentencing memorandum where

7  they talk about the foggy defendant, his co-defendants, what

8  they pled guilty to, who cooperated, what their sentence was,

9  what the government recommended their sentence to be.  And all

10  that information is available to Mr. Adolf to use in his

11  argument but he did not go out and find it.

12       With regard to the co-defendants, Your Honor, we do

13  have access to those presentence reports.  However, as I said,

14  we can not legally turn them over.  But Mr. Adolf is welcome

15  to come to their sentencings, which have already occurred, and

16  stand here and listen to the parties debate the 3553(a)

17  factors, including the facts of those cases, their criminal

18  histories, all the factors in the PSRs before this Court,

19  because that was a public hearing, Your Honor, that he could

20  have been at.  So he had the opportunity to be prepared for

21  that argument, Your Honor, but simply chose not to.  So for

22  him to say the government is refusing to give him the

23  information is simply not true.

24       THE COURT:  All right.  So we'll proceed with

25  sentencing.

1          Is your name Steven W. Chase, sir?

2          THE DEFENDANT:  Yes.

3          THE COURT:  All right.  The Court takes note the

4   matter was decided by verdict back on September 16th, of last

5   year, it appears, based on a Second Superseding Indictment and

6   that established the factual basis.

7          So, Mr. Chase, are you fully satisfied with the

8   services of your attorney in this matter to date?

9          THE DEFENDANT:  Yes.  Yes.  Yes, sir.

10         THE COURT:  All right, sir.

11         Do you have a copy of the presentence report there

12  at counsel table?

13         THE DEFENDANT:  Yes.  Yes, sir, I have.

14         THE COURT:  All right.  Have you gone over that

15  carefully with Mr. Adolf and discussed it with him in detail?

16         THE DEFENDANT:  Yes.  Yes.

17         THE COURT:  Do you believe you understand it?

18         THE DEFENDANT:  Yes.

19         THE COURT:  All right.  Are there any outstanding

20  objections, Counselor?

21         MR. ADOLF:  Judge, my objections have been

22  incorporated into the presentence report as potential

23  recommendations for departure or variance; other than that

24  there aren't any.

25         THE COURT:  All right, sir.  Thank you.

1      The Court will adopt the presentence report for all

2 purposes of sentencing, finding it credible and reliable and,

3 moreover, that it accurately scores the Guidelines under 43

4 offense level, and criminal history category I, based on zero

5 criminal history points.

6      So we'll hear you, Mr. Adolf.

7      MR. ADOLF:  Your Honor, as Your Honor's aware, I

8 have witness testimony to present.  The report has been filed.

9 It's the report by Dr. Mendel who is here present in court

10 today.  So I guess I would call him to the stand at this

11 point.

12      THE COURT:  Yes, sir.  You may.

13      MR. ADOLF:  Defense calls Dr. Mendel.

14      MATTHEW MENDEL, DEFENDANT WITNESS, SWORN

15                DIRECT EXAMINATION

16 BY MR. ADOLF:

17 Q.   Dr. Mendel, good afternoon.

18 A.   Afternoon.

19 Q.   I know that the Judge has reviewed the report that you

20 wrote in this matter so I'm just going to ask you a few

21 questions about the report and about your evaluation of

22 Mr. Chase.

23      What is your educational background?

24 A.   I received my AB, Advanced Baccalaureate from Princeton

25 University in 1984 with a major in psychology.  I received

1  both my Master's degree and my Ph.D, both in clinical

2  psychology from the University of Michigan, with a Master's

3  degree -- actually pausing about the year because nothing

4  really changes.  It's not a terminal Master's degree, you get

5  it as in the process of getting the Ph.D., so -- I believe,

6  though, it was 1989 that I got my Master's degree.  Then I got

7  my Ph.D. in clinical psychology in 1992.

8  Q.   And among the various positions that you've held, you've

9  also been in private clinical practice since getting your

10  Ph.D.?

11  A.   That's correct, I did.  For the first few years I was in

12  two different group practices.  But I've been totally solo in

13  solo private practice since 2001.

14  Q.   So over the last 15 years or even before that, what has

15  been your primary focus clinically?

16  A.    I've had a couple of them.  Ever since I was in graduate

17  school I worked a whole lot of adult male survivors of

18  childhood sexual abuse.  That was what my dissertation was on,

19  and then I turned the dissertation into a book a few years

20  after I completed my Ph.D.

21       So one area that I work with a lot are adult men who were

22  sexually abused in childhood.  That's -- with only a few

23  exceptions, those are the only adults that I work with.  Other

24  than that I work primarily with children and teenagers -- not

25  real little kids but basically upper elementary school, middle

1    school and high school.  And I work with a variety of

2    different problem areas or diagnoses.  But the one I work with

3    the most among, among my clientele is high functioning autism,

4    including what until recently was referred to as Asperger's

5    disorder and now is called Autism Spectrum Disorder.

6    Q.   Now what you've been talking about is your clinical

7    practice, that is, actually treating patients?

8    A.   That's correct.

9    Q.   And in the context of treating patients you've dealt with

10   numerous male survivors of childhood sexual abuse, also people

11   with what's now called Autism Spectrum Disorder?

12   A.   That's correct.

13   Q.   And there's some overlap between those two.

14   A.   There is some overlap but -- well, I think research says

15   that people on the autism spectrum actually do have a higher

16   rate of being victims of sexual abuse.  Basically any

17   population that would be considered a vulnerable population.

18   So, you know, people in extreme poverty have higher rates of

19   sexual abuse than people who are better off.  People who are

20   cognitively disabled have higher rates.

21        So there is something of a correlation but for the most

22   part in my practice those are two separate areas.  Partly

23   because clinically the sexual abuse population -- those are

24   adults who are self-referred to me, men who will call me or

25   see my website or contact me through an organization called

1   "The Male Survivor" that lists experts in the area -- and

2   they'll come and contact me for treatment help regarding

3   sexual abuse.  For the most part, those sort of self-referrals

4   are not people on the autism spectrum.

5        So my specialty with autism is really it's a pretty --

6   pretty completely separate population.  It's kids, you know,

7   whose parents bring them for treatment.  Basically kids who

8   don't have friends, are socially awkward, socially inept in

9   different ways, trouble making friends, keeping friends, often

10  very lonely individuals.  And they come, and what I do is I

11  lead a social skills groups for kids.  I don't work with them

12  individually or relatively rarely work with them individually.

13  It's mostly the social skills groups.

14  Q.   Now I think you mentioned in your report that you don't

15  really consider yourself an expert on autism spectrum

16  disorder, per se?

17  A.   Well, actually, I think what I said -- I hope what I said

18  is that I don't consider myself an expert in the diagnosis or

19  the assessment and diagnosis of autism spectrum disorder.  I

20  do consider myself an expert in the treatment of specifically

21  social skills treatment of children, teenagers, young adults

22  on the autism spectrum.

23       But, no, I did go through a whole training on doing

24  autism assessments.  There's a particular instrument called

25  the ADOS, the Autism Diagnostic Observation Schedule.  I went

1  through a two-day training for it and learned it, did a few

2  and then had reached a realization that, you know, there's

3  people out there who do this a bunch who are really good.  I

4  have five or six colleagues in Raleigh who are adept at

5  assessing autism.  And I felt I had plenty of niches so I

6  decided I don't need the assessments to know whether somebody

7  would be appropriate for my social skills group.  If they're

8  having trouble socially.  If they're socially awkward, shy,

9  few or no friends, they're going to be appropriate for my

10  group.  And if I ever really need -- feel like, okay, this

11  person needs to have an assessment to see if they do meet the

12  diagnostic criteria for autism, I have plenty of people to

13  refer to.  So I just decided not to pursue that direction.

14  Q.   Now we've been talking about what your clinical focus has

15  been over the course of your practice.  You also do forensic

16  evaluations?

17  A.   That's correct.

18  Q.   And what -- how many of those have you done over the

19  years and what sort of cases?

20  A.   I believe -- well, I believe when I wrote this report I

21  wrote that I had been involved in 145 forensic evaluations.

22  It's probably closer to 150 now.  And those are -- those are

23  pretty specific.  I mean, it's a pretty circumscribed forensic

24  area that I do and that has to do with the long term impact of

25  sexual abuse.

1    Sometimes I'll get contacted by an attorney or a defense

2    team and I'll be told, We don't think this individual was

3    sexually abused, but he just has a whole lot of trauma in

4    childhood, physical abuse, negligent, whatever.  We would like

5    you to do an evaluation.

6        Because what I do is I go out and I do an evaluation,

7    generally speaking, focusing on impact of sexual abuse.  But I

8    always try to put that in the context and not just say, Oh he

9    was sexually abused, therefore, such and such.  But instead,

10   to look at the entire childhood, the individual's entire life,

11   their strengths, their weaknesses, their resources.  So

12   including sexual abuse, but also including whatever else might

13   have gone on, positive or negative, in their childhood and

14   discuss the impact.  I think as a result I've ended up getting

15   contacted to do evaluations sometimes when there's no sexual

16   abuse involved.

17       But generally speaking there has been either suspicion or

18   knowledge of childhood sexual abuse on the part of the

19   defendant.  The vast, vast, vast majority of the cases I've

20   been involved with have been murder cases, and of those,

21   almost all of them have been capital murder -- have been death

22   penalty cases.

23       So the most -- for the most part I'm doing assessments in

24   cases where the person -- most of them end up -- there ends up

25   being a plea, some end up going to trial.  But generally

1    speaking the decision point facing a judge or jury, if it goes

2    to trial, is death penalty or life without parole.

3    Q.   And you've testified before in a number of different

4    state courts and also in federal court?

5    A.   I think this is either my 19th or 20th time testifying.

6    And, yeah, I've testified in North Carolina state court,

7    Wyoming state court, California state court, Arizona state

8    court, Texas state court, Mississippi state court.  The only

9    federal -- the only time I testified federally was actually

10   U.S. military.  So it was U.S. military jurisdiction.  That

11   was not a murder case.  That was the only time I've testified

12   previously in anything other than a murder case.

13   Q.   And you have been qualified as an expert in forensic

14   psychology the times that you have testified?

15   A.   Yes.  In all of those -- sometimes it will be more

16   specific.  It might be forensic psychology or impact of sexual

17   abuse or something along those lines.

18         MR. ADOLF:  Your Honor, at this point I would

19   proffer Dr. Mendel as an expert in forensic psychology and the

20   effect of childhood abuse on men.

21         THE COURT:  So ordered.

22         MR. ADOLF:  Thank you.

23   Q.   Dr. Mendel, you interviewed Steven Chase for a number of

24   hours and reviewed records and prepared a report on him.

25   A.   That's correct.

1  Q.   And you're aware that that report has been submitted to

2  the Court.

3  A.   Yes.

4  Q.   I just want to hit a couple of points about it.  In the

5  report you say that you don't believe, after reviewing all the

6  records and spending six or seven hours evaluating -- talking

7  to Mr. Chase and evaluating him, that he actually is a

8  pedophile or is sexually attracted to children.

9  A.   That's correct.

10  Q.   Could you explain to the Judge how it is that you arrived

11  at that --

12  A.   Yes, I -- I'm sorry.  I cut you off.

13  Q.   -- and what factors went into that.

14  A.   Well, I -- prior to interviewing Mr. Chase I had read all

15  the records that I was provided.  Basically, the presentencing

16  report, an interview that the paralegal in the case had

17  conducted with Mr. Chase, the discovery provided by the state

18  and the -- I don't remember what it was called, but basically

19  the -- the document -- pardon me -- the expert voucher

20  containing the request for my services, and then the

21  Superseding Bill of Indictment, also some medical -- some

22  medical records.

23       I went in to see him completely expecting -- I guess even

24  assuming -- I -- I try not to assume but I -- I went into the

25  meeting assuming -- at least expecting that Mr. Chase was a

1  pedophile.  And my expectation was that the reason that he was

2  involved with PlayPen was due to sexual attraction to

3  prepubescent or underage children.

4      So in terms of what led me to the conclusion that he is

5  not a pedophile, it was really pretty entirely the interview.

6  I -- I found him to be a very -- a challenging, interesting,

7  fascinating human being.  And one whose story, in my opinion,

8  does not mesh with that of a person who dictates these actions

9  involvement with child pornography network, due to sexual

10 attraction but due to a number of other factors which I found

11 to be very compelling and, of course, I'll be happy to

12 discuss.

13 Q.  Yes, please.  Please, now just as background, you

14 understand that most of the time when people are involved with

15 a child pornography website it's because they're attracted to

16 children and this is their sexual --

17 A.  Absolutely.  And that's why that was certainly my

18 assumption.  And, I mean, and even as I -- one of the things

19 that I had heard before going in, I think from the interview

20 that the paralegal had done previously and then heard directly

21 from Mr. Chase, was about his lack of interest -- his --

22 basically his avoidance of having sex with his wife of 20

23 years and with the one previous relationship he'd been in.

24     And in my notes I write, "So does this mean that his

25 sexual interest is exclusively in children."

1    So even early on in the interview I'm thinking, okay,

2    this is -- so he's not interested and doesn't want to have sex

3    with women -- the adult women with whom he is involved.  Does

4    that mean that he has an exclusive interest in children?

5    Because some pedophiles are exclusively pedophiles.  That is,

6    their only sexual attraction interest is to children, whereas

7    others may also have attraction to others.  At that point --

8    to adults.

9        At that point I was still operating under the assumption

10   or expectation that Mr. Chase was a pedophile.  And I wondered

11   if this was in fact the reason that he was not interested in

12   sex with his wife or with adult women.

13       I discovered, in my opinion, that that was not the case.

14   That that was not the reason.

15   Q.   So what's different about Mr. Chase from a typical

16   pedophile who looks at or is involved with child pornography?

17   A.   I think his motivations for pursuing child pornography

18   and being involved with it were completely, completely

19   different.  The -- and I guess probably the best way to do

20   this is to talk about his childhood, and that I think was the

21   guiding or formative factor in his involvement with PlayPen 50

22   years later, 45 years, whatever it was.

23       So briefly about Mr. Chase's background.  His -- he was

24   born to an intact union, mother and father.  He's the older of

25   two children.  He has a sister about two years younger than he

1    is.

2         When he was about four years of age, his mother, Fern,

3    died very young, tragically, and secondary to a heart

4    condition she had.  So he would have been four at the time,

5    younger sister Carol would have been about two.  And the

6    father was working full time, wasn't able to provide, you

7    know, full time care for the two children and they went to

8    live with relatives.  I believe it was relatives on the

9    mother's side.  But this is all in the same area of New

10   Hampshire.

11        He lived -- he and his sister lived with a maternal aunt

12   and uncle and also with maternal grandmother, I believe that

13   was all in one home, though it may have involved some time in

14   her home, some time in -- I think it was mostly all in one

15   home that the grandmother and aunt and uncle lived, perhaps

16   also a couple of cousins.

17        So they were living there and the father would see them

18   on weekends.  The father, he said, would usually pick up both

19   children, you know, as I guess from the time he was about five

20   until he was about nine.  Again, the sister would be two years

21   younger.

22        He said his father would usually pick up both children

23   for the weekend but sometimes would just pick up Steve.  And

24   during those times when he would -- just Steve was picked

25   up -- this was one of the most striking descriptions that

1  I've -- I've ever heard clinically or forensically.  Because

2  it was a description of significant sexual abuse.  But it was

3  a description of it as sexual contact -- contact occurring in

4  the context of what were the -- what he recalls, at any rate,

5  the best, happiest, most love-filled period of his entire

6  life.

7      He said that he has never been loved, never felt loved

8  like he did for those few years by his father.

9      He talked about being his father's "special little guy"

10  during this time.  He talked about how they would go -- what

11  they would do, the times when it was just the two of them.

12  They would -- they would camp.  They would hike.  Depending on

13  the season, they would ski.  It was very outdoors.  And the

14  sexual contact occurred in the context of these camping trips.

15      So he spoke about being on these trips, feeling so close

16  with his father.  He said at one point that "Most kids

17  wouldn't dream about having this sort of relationship with

18  their father."  And he's not saying, "Most kids wouldn't dream

19  of this horror of the sexual abuse."  It was that, "Most kids

20  wouldn't dream about having this kind of closeness or feeling

21  so loved by their father."

22      There were certain things that stood out to him as

23  tremendously special, and this one that he spoke about

24  numerous times was that his father would have him help him go

25  and get firewood.  This would occur, both on occasions at the

1  father's home, weekends there, and then certainly when out

2  camping.  That they would go out, his father would cut wood,

3  and he would help his father carry the firewood back and start

4  a fire.  And he said, "That was our special thing.  That was

5  our job that we did."  That will come back later as something

6  that was an enormous loss for him when he was no longer

7  allowed to do that.

8      This sort of relationship went on for, you know,

9  somewhere around three, maybe four years, roughly, five to

10 eight, or five to nine, something like that.  During this time

11 there was repeated sexual contact.  It involved his father

12 fondling him, having Steven, little Steven fondle the father,

13 fondle the genital area, and having Steven perform oral sex

14 upon him, upon the father.  He said, he does not recall his

15 father ever performing oral sex on him.  Nor does he recall

16 there ever been anal penetration in either direction.  But

17 this is a question that he has had throughout his life,

18 something he's never sought medical attention for.  But he

19 said that he, to this day, experiences rectal or anal pain

20 that he says is slightly inside the anus maybe, said, a couple

21 inches in.  And he wonders if that could be a long-term

22 consequence of being anally raped.  But he has no recollection

23 of that ever happening.  So what he recalls is the mutual

24 fondling in each direction and him performing oral sex upon

25 his father.

1    He said that this went on throughout the time that --

2    throughout those several years until his father remarried.

3    And this was where he made what I think is a tremendously

4    significant slip of the tongue.  He said -- he said, "Until my

5    father got a new wife."  And I think for him that is precisely

6    what happened; that he was replaced.  And the sexual contact

7    completely stopped, but so did all of the specialness, all of

8    the sense of being Dad's special little guy and having their

9    special little relationship.  And as he told about it, he

10   referred several times to the firewood.  Which to him I think

11   represented this special relationship.

12   Now they were all living together.  Father William,

13   father's name, the stepmother Louise, and then Steve and the

14   younger sister Carol.  No more sexual contact.  And he said

15   that his father wouldn't let him carry firewood anymore.  That

16   was no longer their thing.

17   He said that the sexual abuse stopped and what happened

18   was physical and emotional verbal abuse started.  And he said

19   that this was really, really extreme.  He would talk about his

20   father, basically -- I think this may have been his quote or

21   something close to it, basically beating the heck out of him.

22   That he would punch him with his fists, primarily in the

23   chest.  He said most of this took place in the bathroom.  That

24   the father would take him into the bathroom, have him stand in

25   the bathtub and just whale away on him, punching him in the

1    chest.  He said that this happened very frequently.  I don't

2    recall the exact frequency but that it was a frequent

3    occurrence.  And it was also paired with his father pretty

4    constantly denigrating him, putting him down, saying that he

5    was an idiot, a dummy, that he would never amount to anything

6    that he was going to be a ditch digger, that's what he was

7    destined to be.

8         So he comes through this period, and I think this

9    transition is enormously important where there's this early

10   time that does involve sexual contact but that is a time when

11   he feels special, feels loved, feels this closeness.  That's

12   replaced by a time when there is no sexual contact but there's

13   also no sense of being loved, no sense of feeling close to

14   anyone, no sense of being cared for.

15        He was not close with his stepmother either until

16   literally the -- after the father's funeral a few years before

17   his arrest.  And it was occasioned by physical abuse,

18   emotional abuse.

19        And so he came through this period -- well, I think

20   throughout his adult life he thought about, I suspected over

21   time those early years took on much more of a glamorous,

22   glorified, idealized view that these were the wonder years.

23   These were the glory years that he never has experienced love

24   like that.

25        The closest he ever came was with his wife, Barbara.

1  That he felt like she was a genuine friend.  That he never had

2  a friend before her, a close friend.  I feel like I should

3  probably pause here at some point -- I don't --

4  Q.   I was going to ask you about how it affected his

5  relationships going forward and what effects he talked about

6  and you saw regarding his adult relationships.

7  A.   Okay.  I think there's -- I think there's several and --

8  well, I guess, as I've said, I went in there expecting, okay,

9  I'm going to be talking to someone who's a pedophile and I'm

10  going to understand a connection with that and with childhood

11  events.

12      Instead, I just looked over my notes, my handwritten

13  notes that I take during the interview, and literally on the

14  first page about two-thirds of the page down I wrote, "Is he

15  autistic?"  As a question to myself.

16      Again, I work -- that's not why I was called in.  No one

17  had ever mentioned it.  And that's not anything that -- that

18  was not a referral question here.  But very quickly in

19  spending some time with him that question came to my mind.

20      He has lot of features that are consistent with people

21  with high functioning autism or an autism spectrum disorder.

22  His eye contact is poor.  He described very early on having --

23  having no friends.  That he grew up without friends.  He

24  doesn't have friends.  And he's used to having no friends.  He

25  talked about the computer.

And this is, I think, tremendously important in understanding his eventual involvement with child pornography. He talked about the computer as soon as he came across it being just the most wonderful thing he had ever -- ever seen.

He said that -- and I should say, people on the autism spectrum -- not to suggest that everybody who's into computers and adept at them is autistic -- but, boy, are a lot of people who are on the autism spectrum, really, really into computers. It's a very appealing and very safe way for them to interact with others.

The kids that I work with, generally speaking, would prefer -- that's a bad way to say it. They genuinely long to have face-to-face contact with others, but they feel much more comfortable, much more adept interacting with others on line.

Mr. Chase said that when he first saw a computer -- he had just gotten, I think, AOL -- and he said he actually went to look at pornography on it. He went to look at it and he said he never got there. That he -- on the screen he saw these moving images and he thought, oh, my goodness. That's the coolest thing ever. That's not his exact words but something to that effect. He was fascinated by it and that became his preoccupying -- I would call -- obsessive interest. And I use that phrase intentionally. That's something that in a lot of the literature about autism people will talk about people on the autism spectrum having a preoccupying obsessive

1    interest.  That they just get so focused on something and

2    that's all they can think about, all they can talk about.

3        He talked in enormous length with him about particulars

4    about computers that frankly went totally over my head.  But I

5    could tell how fascinating they were for him.

6        He said that he was looking at these moving images,

7    learns that they're from something called "Flash."  He learns

8    that Flash costs $800 to purchase.  He doesn't have $800.  And

9    he spends all his time learning, teaching himself, Flash.  He

10    mentioned a couple other programs that I don't recall.  But

11    things for being able to do this himself.  He said he learned

12    how to hack it because he couldn't afford to purchase it, and

13    he could actually then -- continue to use Flash after this

14    initial, you know, trial period.

15        And that became his life for a huge part of his life was

16    doing things on computers, creating websites, managing

17    websites for people, something -- I think it may have been the

18    first thing in Mr. Chase's life that he felt he was good at.

19    And he would get good feedback from people where they would

20    say, you know, Hey, good job on this.  And, you know, he'd be

21    able to help people out.  He felt -- he started to feel better

22    about himself.

23        This is a man who I think has suffered from chronically

24    low self-esteem, probably back to the days where he was told

25    that he was an idiot and destined to be a ditch digger.  And

1    here he had some successes.  He was doing these things.  He

2    was fascinated -- separate from the successes he had with

3    dealing with websites, he had these dealings simply dealing

4    with these fascinating moving -- moving images and being able

5    to design and perfect websites.

6        He was working for a trucking company called Patico.  He

7    designed their website.  He managed their website.  He talked

8    about his perfectionism with it.  How he needed and wanted it

9    to be so perfect and to look just right and that he was always

10   updating it and correcting it, revising it, making it how he

11   wanted it to be.

12       Again, here's this person who through his life has been

13   socially avoidant, not had friends.  His job with Patico,

14   though he later took on some other roles, his job was driving

15   a -- he told me the name of a vehicle -- a front loader

16   maybe -- driving a vehicle.  And he said it was a perfect job

17   for him because -- this won't come as any surprise now -- he

18   didn't have to interact with anyone.  He spent his day in the

19   cab of his vehicle driving it around doing his work; didn't

20   have to interact with people.

21       He's been diagnosed with anxiety disorders including

22   social anxiety and has been -- had some treatment, including

23   medication for it.  I don't know diagnostically whether

24   Mr. Chase is -- would most appropriately be diagnosed as

25   having social anxiety, really very extreme, autism spectrum

1    disorder or both.  He certainly has features of autism,

2    whether or not he would meet the full criteria.

3    Q.   Now going forward I just want to focus on a particular

4    issue in this case and cases like this which is, if he were to

5    ever be released in the future, what the risk is of him

6    committing a contact offense against a child in person.

7        So I want to ask you one thing as a prelude to that:  How

8    is the experience of looking at child pornography different

9    for him than it is for most people who are involved in child

10   pornography?

11   A.   I would assume, as you said earlier, that the vast

12   majority of people who look at child pornography or spend

13   extensive time with it.  Do so because of a prurient sexual

14   interest in children.  That there's a sexual attraction,

15   arousal in response to sexualized images of children or sexual

16   activity involving children.  That there would be masturbation

17   in response to or in the context of viewing these images.  I

18   do not believe any of those were the case or are the case for

19   Mr. Chase.

20       I think his motivations in being involved with child

21   pornography and viewing it had to do with each of the factors

22   that I've mentioned already and actually one or two others.

23       In part, it was guided by this fascination with

24   computers, and then the pride he had and involvement he had

25   with websites.  In part -- and the sense of success he had in

1   that involvement.  In part -- I'm sorry -- I'll go to the

2   biggest part.

3        The biggest part is this -- at least in his

4   recollection -- this childhood relationship with his father,

5   which again was sexual in nature, but he experienced as a

6   joyful -- or at least he recalls as a joyful happy period.

7   And he talked with me about searching for that, wanting to

8   understand what it had been like for him, wanting to

9   understand what he had experienced.

10       And he said for that purpose he would look through these

11  photographs, these videos, and was frustrated by the fact that

12  the vast majority, as he described it to me, involved girls.

13  That didn't tell him anything about his experience.  And the

14  ones of males, he said, were predominantly of teenage males.

15  Which also didn't tell him anything about his experience.

16       He was wanting to understand and I think to re-experience

17  what things had been like or what he felt things had been like

18  and to be able to better understand that between he and his

19  father.  So he was looking for images involving boys in the

20  age range that he was in, this five or six to nine period.

21       Looking for sexual imagery that is similar to the sexual

22  abuse one has experienced is not at all uncommon.  For most

23  people, though, it is a very different psychological

24  phenomenon.  It is known, research wise, that people who are

25  sexually abused are at higher risks to perpetrate sexual

1    abuse.  And that there's a connection with the age and type or

2    particulars of childhood sexual abuse and later sexual

3    perpetration.

4         So somebody who is sexually abused in the range -- a male

5    who is sexually abused somewhere in that age range of say

6    between five and nine, most do not go on to perpetrate abuse,

7    but they are at a higher risk, more likely than the general

8    population, to perpetrate abuse.  And if they do, there is a

9    greater likelihood of them seeking out people precisely in the

10   age range when they experienced it.

11        The way we generally understand that has to do with

12   identifications, that is, does one identify with the

13   aggressor, with the perpetrator, or does one identify with the

14   victim?

15        So does someone who gets sexually abused at age six, it's

16   too painful to go through a life feeling like a victim and

17   seeing one's self as a victim.  Some people do that and they

18   repeatedly end up in a victim role.  But for many it's --

19   that's too painful, too psychologically threatening and

20   overwhelming, and instead they identify with the aggressor,

21   with the perpetrator.  And they go on and perpetrate abuse on

22   others or some sort of abuse.

23        I think with Mr. Chase it is a variation of that victim

24   identification that I referred to a moment ago.  I don't think

25   he in any way identifies with the adult males perpetrating

1    sexual abuse, whether that be his father perpetrating sexual

2    abuse on him, or the adults that he would view in the videos

3    and pornographic images, adults perpetrating abuse on

4    children.

5        He identifies with the children and -- but he doesn't do

6    so as, Oh, I'm someone who is going to keep getting

7    victimized.  Because his focus was on this being this happiest

8    period of his life.  The one time when he truly felt loved and

9    liked "Daddy's special little guy."

10       So he sought out images.  And one of the things he talked

11   about is all of the images, all of the kids in these -- in the

12   pornography, all the kids in the videos and photographs, they

13   were happy, smiling, laughing.

14       Now, I doubt very much that that's true, that across the

15   board they all were.  But I do think that that's what he was

16   seeking.  He was, I think, seeking a particular subset.  He

17   wanted to find pre-pubescent boys involved happily, willingly,

18   with older adult males.  He was looking for himself.  He was

19   looking for himself at the ages of five, six, seven, eight,

20   before Dad got a new wife.  Before he stopped being "Dad's

21   special little guy" when he -- before he stopped being able to

22   do the special things.  And that's, I believe, what motivated

23   him.

24       He told me -- and again, I found him to be credible, of

25   course there's no corroborating evidence of this.  He stated

1    that he has never masturbated looking at child pornography.

2    He stated that he never obtained an erection looking at these

3    images.  He described it as "fascinating" to him to see these

4    children and think, that's how I felt.

5         But that he never felt sexual arousal, excitement, never

6    masturbated looking at them.  He has masturbated to

7    pornography but, exclusively by his account which I found to

8    be credible, pornography involving adult males and females

9    interacting.

10   Q.   So, Doctor, based on the history, the -- what you

11   described in terms of research on people who are abused as

12   children in turn become abusers.  Based on your clinical

13   experience and, of course, your interviews, your observations

14   of Mr. Chase, not just what he was saying, but how he was

15   saying it, how he interacts and behaves.  Do you believe he

16   would be any risk of committing a sexual offense against an

17   actual child in person if he were ever released from prison?

18   A.   I don't believe that he ever was, is, or would be at risk

19   of actually doing anything physically with a child.

20        I could not give that same -- state anything like that to

21   anywhere near that level of certainty about -- if you were to

22   ask whether there was any possibility he would ever look at

23   child pornography.  I would not be able to give such a flat,

24   no, no risk.

25        But in terms of actual physical contact with children I

1    don't believe he's ever done that, ever had any interest in

2    doing that, and I don't believe there's any danger in the

3    future of him doing so.

4              MR. ADOLF:  I have nothing further, Your Honor.

5    Thank you.

6              THE WITNESS:  Your Honor, I'm very sorry to do this,

7    would it --

8              THE COURT:  You need a break?

9              THE WITNESS:  Yeah.

10             THE COURT:  We'll do a break.

11             THE WITNESS:  Okay.

12             THE COURT:  Fifteen minutes.

13             THE WITNESS:  Sorry guys.

14             (Recess at 2:58 until 3:15.)

15             MR. ADOLF:  Your Honor, I'm sorry.  There were two

16   questions I neglected to ask him on direct --

17             THE COURT:  All right.  You may.

18             MR. ADOLF:  I would ask if it is possible to do

19   that?  Thank you.

20   BY MR. ADOLF:

21   Q.   Dr. Mendel, you're aware that a version of your report

22   that I submitted to the Court had a couple of redactions in

23   it?

24   A.   Yes, I am.

25   Q.   And what I would just ask you very briefly is, having

1    reviewed those redactions, would your assessment of

2    Mr. Chase's mental condition and future dangerousness change

3    at all in the absence of the specific information about what

4    he did or didn't do regarding the PlayPen website?

5    A.    I have reviewed them just prior to my testimony today.

6    And, no, it would not change any of my conclusions or opinions

7    about Mr. Chase.

8    Q.    And my other question is:  You mentioned to me earlier

9    today, I guess it wasn't in your report, that Mr. Chase has an

10   unusual habit for an adult that you found shows some -- gave

11   us some insight into his behavior and his self-image.  Could

12   you explain what that is to the Court?

13   A.    Yes, but I don't think it's in my report.

14   Q.    Right.

15   A.    Okay.  What happened was we were -- during our meeting

16   Mr. Chase was talking about how he doesn't have any money on

17   his books, you know for commissary, canteen, whatever.  And

18   how he, you know, that's upsetting to him.  And the comment he

19   made was, "I'm the only kid in here without any money on my

20   books."

21        And I was certainly struck by the, "I'm the only kid."

22   And I said, "The only kid?" questioningly.  And he said,

23   "Well, I'm the oldest person in here."  And I said, "But you

24   refer to yourself as a kid?"  And he said -- he said, "Yeah,

25   I -- I've never grew up.  I -- I -- I'm still a baby.  I still

1  suck my thumb."

2       So I certainly took note of it.  When I reviewed my

3  report yesterday and I went through -- I reviewed my report.

4  I've read that a couple times since writing it.  Last night I

5  read the report and then I went back through all my interview

6  notes and saw that part and realized I had just neglected to

7  include it in my report.

8  Q.   Why is that significant?

9  A.   I think it's further -- I think it -- well, it's of

10  course still from his statements.  I think it's more

11  indication, further corroboration that he really did get

12  stuck, psychologically, at a young age.  That he's still, his

13  self image, the way he sees himself and much of how he feels

14  and his identifications are as a young child.

15           MR. ADOLF:  Thank you.  Nothing further, Your Honor.

16           MS. RANDALL:  Thank you.

17                      CROSS-EXAMINATION

18  BY MS. RANDALL:

19  Q.   Good afternoon, Mr. Mendel.

20  A.   Afternoon.

21  Q.   I want to talk a little bit about your background before

22  we get into questions about the report.

23  A.   Sure.

24  Q.   You said you've done approximately, almost -- approaching

25  150 forensic evaluations.

1    A.    Yes.

2    Q.    Were those all criminal -- involving criminal cases?

3    A.    I've been involved in, I believe, four civil cases so the

4    vast majority criminal, but I believe it's four civil cases.

5    Q.    And with regard to the criminal, how many of those were

6    you hired by the defense counsel?

7    A.    All -- all of them.

8    Q.    And I think you said you kind of specialize in doing what

9    the impact of the individual sexual abuse is?

10   A.    Right, that's been the primary area of specialty.  But

11   what I was trying to convey is that over the years sometimes

12   it's been a little more general about impact of childhood

13   trauma, not solely sexual abuse.

14   Q.    And you've done a number of presentations for defense

15   counsel on how to use sexual abuse as mitigation in a criminal

16   case?

17   A.    Yes, I have.

18   Q.    Um --

19   A.    I'm sorry.  Not necessarily for defense counsel, but

20   at -- I've done a number of presentations at different sorts

21   of conferences on that topic, yes.

22   Q.    In the cases that you testified in, you said you haven't

23   testified in Federal District Court before today.

24   A.    No, I have not.

25   Q.    Were any of those involving sex offense?

1  A.   In -- I'm pausing because quite a large -- pretty large

2  number of the 150 or so have involved sex offenses.  I should,

3  just to be clear, it's almost always murder so -- but a chunk

4  of those, I don't know, probably at least 15 or 20 did involve

5  sex offenses as well.  I don't believe I've ever testified in

6  any of those 15 or 20 or whatever it's been.

7  Q.   Of the evaluations you've done, have any of those

8  involved someone charged with child pornography or child

9  exploitation offenses?

10 A.   Yes, I believe this is either the third or fourth

11 evaluation related to child pornography but my first

12 testimony.

13 Q.   Are you a member of the Association for the Treatment of

14 Sex Abusers?

15 A.   No, I'm not.

16 Q.   So do you predominantly work with victims versus abusers?

17 A.   Absolutely that is correct, yes.

18 Q.   What exactly were you asked to do in this case?

19 A.   I could look it up if you want word for word, but

20 basically -- so this would have been in that "expert voucher"

21 that I was asked to conduct a forensic evaluation.  I was told

22 that Mr. Chase had stated he had been sexually and physically

23 abused during childhood by his father.  I was asked to

24 interview Mr. Chase to review records and assess the impact of

25 the alleged abuse upon him and to write a report with my

1  opinions regarding Mr. Chase.

2          THE COURT:  Doctor, if you would stay a little bit

3  farther back from the mike --

4          THE WITNESS:  Oh, sure.  I apologize.

5          THE COURT:  It kind of pops.  Meantime we can hear

6  you fine.

7          THE WITNESS:  Absolutely.

8  Q.  So you were not originally asked to do a risk assessment

9  in this case?

10 A.  No, I was not.

11 Q.  Would you have done other tests or interviews or

12 corroboration of data if you knew you would be asked to offer

13 an opinion regarding his future risks?

14 A.  I think if I were told that they would like me to do an

15 assessment of future risk I would have said that I don't have

16 any training or background in that area.

17 Q.  So you have no training in offering an opinion regarding

18 the risk of -- the future risk of offending?

19 A.  That's correct.

20 Q.  But you just offered an opinion regarding his future

21 risk.

22 A.  I was asked whether I thought there was any danger.  And

23 I do not believe, based on my assessment of him, that there is

24 any danger.

25 Q.  Well, what is that assessment?

1    A.    I'm sorry?

2    Q.    What are you basing it on?  I'm confused.  If you're not

3    trained in risk assessment, what are you using to support your

4    opinion?

5    A.    I would say it would be on 30 years of clinical

6    experience on having read huge amounts about sexual abuse.

7    And probably most fundamentally, and this would relate to my

8    clinical experience, finding Mr. Chase to be credible in his

9    statements.

10   Q.    We'll get to his credibility in a little bit.  But

11   generally, isn't it well recognized in the field that basing

12   an opinion on -- solely on clinical experience is not a valid

13   indicator, unreliable?

14   A.    That it's certainly not enough, no.  This isn't -- this

15   is not optimal.  I would agree with that wholeheartedly.

16   Q.    So let's talk a little bit about what you reviewed for

17   your report.  You talked a little bit about it.  I

18   specifically want to ask you about the medical records you

19   reviewed.  Where did you get those medical records from?

20   A.    Everything I received was provided to me.  I don't know

21   if it was from Mr. Adolf or from Nancy Smith, but that's who

22   sent everything to me.  Nancy Smith is the paralegal who is

23   involved in the case.

24   Q.    So what medical records did you review?  I have, like,

25   titles here, but I'm not sure what they were for.

1    A.    Well, Naples Community Hospital records, Behavioral

2    Medicine Associates records, Physicians Regional Hospital

3    records.

4         I know that one of those -- I want to say it's the

5    Physicians Regional Hospital records didn't have anything

6    particularly relevant.  That it was solely about the surgery

7    to give Mr. Chase a pacemaker and maybe some monitoring of it.

8         I don't have -- I wasn't allowed to bring my computer in

9    so I don't have the documents themselves.  I do have -- I take

10   notes when I -- as I'm reading documents so I would have notes

11   about the medical records so I could give you some sense of

12   what was in each if you would like.

13   Q.    That would be great.  Thanks.

14   A.    You bet.  Okay.  So the first of them -- the first in

15   order of which I reviewed them was the Naples Community

16   Hospital records.  And this does have some psychiatric

17   history, talks about generalized anxiety and panic disorder

18   untreated, aside from a few short trials of Zoloft which he

19   couldn't tolerate.  No suicide attempts.  Talks about

20   substance history, abuse history, talks about social and

21   developmental history.  And then gives a diagnostic

22   impression, and a summary and plan, and this was all in 2011.

23   Q.    2011?

24   A.    Yes.

25   Q.    Do you know -- I'm trying to figure out why no one ever

1   noted this autism-like-tendencies before?  That's what I'm

2   trying to flush out with kind of records --

3   A.   Right.  Yeah -- and, no, that did have psychiatric and it

4   noted panic disorder without agoraphobia, generalized anxiety

5   disorder.  I don't know the answer to it.  I do know that

6   people don't tend to think of autism in adults that they see

7   for the first time.  When they see someone for the first time

8   in adulthood, I mean, it's something that's kind of always

9   with you.  But when it's not diagnosed in childhood it's much

10  less likely to get picked up later on.  I think that's

11  changing somewhat and increasingly people are getting referred

12  for evaluations in adulthood for high functioning autism.

13       But I don't know the answer why it was never considered

14  as -- actually, I don't know if it was never considered, but

15  why it was never noted in any of the records I saw.

16  Q.   Okay.  What were the next records you reviewed?

17  A.   Behavioral -- Behavioral Medicine Associates.  And I

18  believe he was referred from the first place I mentioned to

19  Behavioral Medicine Associates for continued therapy.  And --

20  because that ranges from 2013 -- I'm sorry, 2011 to 2014.

21       So the initial notes have to do with follow-up visits

22  regarding anxiety and panic.  He had been prescribed

23  medication for the anxiety at the first place.  And it looks

24  like an adjustment was made.  He was given both Celexa, and

25  Klonopin/Clonazepam at the first place, Naples.  And then it

1  looks like he was continued on just Klonopin at the Behavioral

2  Medicine Associates.  They talk about panic.

3      Then there's a gap -- I'm sorry, only just a couple month

4  gap.  Yeah, he may have been seen very consistently.  But then

5  there was a note where he came in in January of 2014 where his

6  wife had died two weeks ago.  He said he'd been crying.  They

7  increased the Klonopin.

8      He came in a couple weeks -- no a couple weeks later he

9  no-showed; didn't come to a session.  Came in doing poorly,

10  sleeping 12 to 13 hours a day, doing the bear minimum at work,

11  anhedonia, it's a lack of pleasure, enjoyment, no appetite,

12  weight loss, social isolation, no suicidal ideation.

13      And then there's a later -- the next note after that is,

14  like five months later.  So it goes from February till July

15  and it sounded like he had, in the interim, reported going

16  downhill but now -- oh, getting off his medication, doing

17  worse, getting back on it and gradually doing better.  He's

18  sleeping better, less depressed, less anxious.

19      And then there's one final note in October:  "Anxiety and

20  panic most days, not as much depression."  So basically saying

21  the anxiety has continued but the depression seems to have

22  lessened as months had gone by since his wife's death.  I'm

23  sorry, then -- oh, did you want me go down to the --

24  Q.   Then the final records from the hospital.  You said --

25  A.   Yeah.  Physicians Regional Hospital.  I only have one

1   note about it.  I think this is all about the heart surgery,

2   installation of the pacemaker.  So I didn't make any further

3   notes about it.

4   Q.   Do you have any notes of the year that occurred in?

5   A.   I don't have it on here.

6   Q.   And that's fine, if you don't have it you can just say

7   you don't know.

8   A.   Yeah, I don't know.

9   Q.   And then you said you did an interview with Mr. Chase.

10  A.   That's correct.

11  Q.   In reviewing your report and especially your opinion, you

12  seem to rely heavily on what he told you about his past and

13  why he did what he did?

14  A.   That's correct.

15  Q.   And you would admit that the statement he gave was a

16  self-serving statement.

17  A.   Yeah, I think I even noted that in there.  Yeah, that

18  these are his statements.

19  Q.   And did Mr. Chase know that this could potentially be

20  used for the Court?

21  A.   Yes, I always do forensic advisement in the beginning

22  saying I would be speaking with his attorney about this.  And

23  if he and his attorney felt this would be helpful that they

24  could have me write a report, it could be used in plea

25  negotiations and potentially spoken of in open court.  That's

1    pretty much -- I pretty much just gave you my forensic

2    advisement.  That's what I say so --

3    Q.    Do you know what malingering is?

4    A.    I'm sorry.

5    Q.    Malingering.  Do you know what --

6    A.    Oh, absolutely.

7    Q.    Can you tell us what that is?

8    A.    Sure.  It's the faking or feigning of symptoms of

9    whatever sort.  So it could be physical symptoms people can

10   malinger, or psychiatric symptoms for some sort of secondary

11   gain.  So for some sort of benefit.  So somebody might pretend

12   to have been injured, you know, to hurt their leg badly and

13   can't get about in order to get pay, workman's compensation or

14   money from insurance, that would be a form of malingering

15   somebody could be pretending to have.  Or in some cases having

16   but exaggerating the severity of a psychiatric disorder or

17   psychiatric symptoms in order to -- also for the purposes of

18   disability.  Or in a criminal case to mitigate or reduce

19   potential sentence.  Those would all be examples of

20   malingering.

21   Q.    So is malingering something you need to be cognizant of

22   when doing a forensic evaluation?

23   A.    Would it be something I would be -- oh, yeah, absolutely.

24   Q.    Did you know that Chase had received the diagnosis of

25   malingering in a prior forensic evaluation?

1  A.   Yes, I think it said, malingering and rule out

2  pedophilia, I think it was.

3  Q.   Did you review that report as well?

4  A.   I think I was just told that.  I don't think I had that

5  report.

6  Q.   So you didn't have a chance to review it, as far as you

7  recall.

8  A.   I don't -- I mean, I know I would have listed it if I had

9  and I don't -- I don't recall seeing a report.  I know he'd

10 been -- I think I knew about it from Nancy Smith's interview

11 with him or the notes of those where there's a reference to

12 him being referred, I believe, to Lexington -- Lexington.  I

13 don't know if that's North Carolina or Kentucky.  I assumed

14 Kentucky, but I don't know.  And having an evaluation and then

15 there's that reference to diagnosing him as malingering and

16 rule out pedophilia.

17 Q.   But do you -- if you didn't see the report, do you know

18 why they came up with that diagnosis?

19 A.   I know Mr. Chase's description of that.

20 Q.   What is that?

21 A.   He said that the woman who did the evaluation latched on

22 to this -- this notion at the beginning that he -- and

23 started -- he said, Yelling at him.  Saying, you know, You're

24 a pedophile and you're just saying this so you will get out of

25 this.  He was, like, No, I'm not.  But he said, She wouldn't

1   hear any of it.  She was just convinced that that was the

2   case.  So his sense was that she did not have an open -- open

3   mind about his situation.

4   Q.   But there are tools that an evaluator can use to

5   determine if someone is malingering, correct?

6   A.   Yes.  There's a number of -- I mean, one of which I use,

7   you know, it's called "The Structured Inventory of Reported

8   Symptoms."  There's a Test of Memory Malingering, there's --

9   there's several.

10  Q.   Are you familiar with a Validity Indicator Profile?

11  A.   I am, yeah.

12  Q.   And is that a well-recognized tool in your community to

13  determine if someone is malingering?

14  A.   Yes.  I don't do -- just to be clear, I never

15  administered either the Test of Memory Malingering or the

16  Validity Indicator Profile because that's not really my focus.

17  I'm not doing an overall assessment.

18       I have administered the Structured Interview of Reported

19  Symptoms, which I think those three, the one you mentioned and

20  the two I mentioned may be the most common malingering

21  measures.

22       The reason I've done the Structured Interview --

23  Structured -- sorry, it's called the SIRS, and I can't

24  remember if the I is -- Interview -- not inventory --

25  Structured Interview for Reported Symptoms is when in the

1  context of an assessment or an interview somebody is

2  describing significant psychiatric symptoms.  That's a way of

3  getting a sense of, are these -- are these real?  Are these

4  believable?  Or is this -- I wouldn't have thought it would be

5  particularly appropriate with him because he wasn't exactly

6  describing -- that's particularly involving psychoses, and

7  kind of really crazy stuff.  And he wasn't describing anything

8  like that.

9  Q.   Are you familiar with the MMPI?

10 A.   Oh, yeah.

11 Q.   Does that have a scale built into it to help an evaluator

12 determine if they're getting valid responses?

13 A.   It has a number of validity profiles.  The one with the

14 most relevance for malingering is what's usually commonly

15 referred to as the "faking bad" scale.  So basically an

16 indicator when -- if somebody is trying to make themselves

17 appear much worse off psychiatrically than is actually the

18 case.

19 Q.   So in this case when Mr. Chase told you that it was the

20 evaluator's bias that led to that finding, did you believe

21 him?

22 A.   I believe that was his perception of him.  I didn't see

23 the report.  But I would have expected or assumed that

24 somebody in diagnosing malingering would have based it more --

25 more than on his or her sense of the statements of the

1    respondent.  So I would certainly hope that she would have

2    done something like that.

3    Q.    Well, in this case you say -- you mentioned you didn't

4    perform the one validation tool because it wasn't appropriate,

5    correct?

6    A.    Well, I didn't do it because I didn't do any

7    psychological testing.  SIRS isn't something I would have even

8    considered because he wasn't reporting serve psychiatric

9    symptoms.

10   Q.    What steps did you do to validate the information he gave

11   you?

12   A.    Other than paying a lot of attention to internal

13   consistency, that is, is his story hanging together.  Is it

14   all consistent with his statements to me at various points in

15   the interview and with things he had said otherwise.  I didn't

16   perform any sort of testing or standardized validation

17   measures.

18   Q.    So you didn't take any steps to determine whether what he

19   told you about the website was consistent with what the

20   website actually was?

21   A.    I'm sorry, the website?

22   Q.    Yeah, PlayPen.

23   A.    Oh, I had that -- I don't know what it was, 1,200 page or

24   something, discovery from you all.  So I had a -- I had a --

25   at least a pretty good sense of what it was.  I mean, of those

1    1,200 pages, probably 800 are charts and tables and that I

2    didn't exactly pour over but I knew the basics of what it was.

3         I know that I sent to Mr. Adolf, to his defense attorney,

4    Mr. Chase's comment about the -- him not -- him being

5    frustrated at everything on there being girls or if there were

6    boys it being teenage boys.  I don't think that was really the

7    case.  I think that there were, you know, certainly

8    prepubescent males on the site.  So I think that there were

9    some distortions but I don't know whether that's about him in

10   any way willfully distorting what the website was, as opposed

11   to him talking about what he looked for and what he found.

12   What he looked at on the website.

13   Q.   We will come back to that in a few minutes.  I want to

14   ask you another question about how you evaluated the

15   information.  Did you attempt to corroborate any of his

16   statements by speaking to his family members?

17   A.   As far as I know there are no family members that he's in

18   communication with even.  But, no, I did not.

19   Q.   So you were not aware that he was actually staying with

20   his stepmother just a month before his arrest?

21   A.   I knew he was at the time -- at the time -- I thought at

22   the time of his arrest even.  But I hadn't -- my understanding

23   was that they weren't -- they hadn't spoken in some time.

24   Q.   But if you just wanted to corroborate his childhood, what

25   he told you about his childhood, particularly physical and

1    verbal abuse, his stepmother and his sister both would have

2    been witnesses and could have potentially corroborated that,

3    correct?

4    A.   Yeah, not the sexual abuse because that stopped --

5    Q.   Right.

6    A.   And probably not anyone for the sexual.  But, yeah, he

7    said that his stepmother would certainly have been aware of

8    the physical abuse.  And he thinks that she probably would

9    have had some idea there was something weird beyond that.  I

10   asked him whether he thought she would know about that.

11        But I don't -- I don't pursue others independently.  I

12   don't -- I mean, in the murder cases there's a mitigation

13   specialist who does that.  I believe I did speak with Nancy

14   Smith about whether anybody like the sister -- the two that

15   you mentioned, the sister or the stepmother could provide

16   corroboration.  I think that's when she said that there wasn't

17   communication with them.  He said he hadn't spoken to his

18   sister in -- since, I believe since his father's funeral.

19   Q.   Did you recommend or offer Mr. Chase a polygraph to

20   corroborate what he said?

21   A.   That's totally outside my area.  No, I did not.

22   Q.   Are you familiar with penile plethysmograph?

23   A.   I'm familiar with what it is.  I mean, I don't have a --

24   Q.   Can you explain what it is?

25   A.   I don't have an intimate familiarity with it.

1  Q.   Can you explain what it is?

2  A.   Yeah, it's a -- it's a metal -- basically a metal --

3  Q.   You don't have to go into detail how it works.  But what

4  it is used to measure?

5  A.   So it's something attached to a penis to assess arousal,

6  degree of obtaining an erection in response to various

7  stimuli.  So it might be placed on the penis and then the

8  person would be exposed to an image of an adult female and it

9  gives numbers, I believe, about how much of an erection is

10 attained.  And it would be used for assessing arousal for --

11 to child pornography or to whatever the stimulus might be.

12      I think that would be a great idea, by the way.  I think

13 that would be really good to do.

14 Q.   So it's a tool that could have validated or corroborated

15 his statement that he wasn't aroused by children?

16 A.   Yeah.  No, I love that plan.  I encourage you all to do

17 that.

18 Q.   Knowing that he had this previous diagnosis of

19 malingering, would you have concerns if you knew he presented

20 differently to a different psychologist?

21 A.   Well, I think I would have concerns about difference of

22 presentation regardless of how -- regardless of whether there

23 was that diagnosis.  I would like to see that report.  That

24 would be good, I would agree.

25 Q.   Did you ask Mr. Adolf if you could review it?

1   A.    I don't believe I did.

2   Q.    It wasn't offered to you?

3   A.    I'm sorry?

4   Q.    It wasn't offered to you?

5   A.    No.  No.

6   Q.    Looking at your report, I want to first talk about the

7   characteristics you noted that leads you to believe he may be

8   on the Autism Spectrum Disorder.

9         You testified here today in your report that you are not

10  an expert in the diagnosis or the assessment of that disorder,

11  correct?

12  A.    That's correct.

13  Q.    You did not diagnose him with that?

14  A.    No.  No.  I said, probably if I were doing a formal

15  diagnostic thing I would have listed that as a rule out along

16  with social anxiety and I think it can be both but those are

17  the two I wondered about.

18  Q.    So as we sit here today there is no formal diagnosis of

19  Mr. Chase?

20  A.    I was not asked to make a diagnosis and I didn't do so.

21  Q.    Could you have made a diagnosis if you were asked?

22  A.    Could --

23  Q.    Could you have made the diagnosis if they had asked you

24  to?

25  A.    I guess it depends -- it depends of what I -- I would be

1  really hesitant to diagnose autism.  And it would have had to

2  be, you know, practically beat me over the head with that

3  diagnosis.  It would have to be a very obvious one.

4       I did convey to them -- to Mr. Adolf and Ms. Smith, that

5  I wondered if it would make sense to get an autism assessment

6  expert in to evaluate him.  I wasn't sure.  I am sure that

7  there are features of it.  I just don't know whether he meets

8  the full criteria.

9       As far as diagnosis in general, there are some that I

10 feel comfortable making.  You know, if somebody describes

11 enough, you know, symptoms and especially if it's corroborated

12 by history of anxiety, social anxiety, depression, as is the

13 case here, you know, I'm comfortable making those kind of

14 diagnoses, substance abuse diagnoses by history I'm

15 comfortable with.  Probably PTSD is the one I know best of

16 all.

17 Q.   I think you previously testified that one of the reasons

18 you didn't go into the field of diagnosing is you know a lot

19 of people who are already doing that type of work, diagnosing?

20 A.    Specifically with autism.  I mean, it's such a -- you

21 know, it's a pretty rigorous, time-consuming thing.  And I'm

22 like, wait, what would be the point?  There are people who are

23 really good at it.  I trust them.  And I was not going to take

24 it up.  They'll refer to me for the social skills group.  I'll

25 refer to them to do the assessments.

1   Q.   So you had someone you could have referred Mr. Chase to

2   for that diagnosis -- to determine if he had that diagnosis.

3   A.   That's tricky.  Because I would say of the people that I

4   work with that I know clinically, it's a pretty small

5   percentage that are -- either that do forensic work -- it's a

6   small percentage that do forensic work.  And there's a pretty

7   big chunk that kind of say, if you, you know, mention forensic

8   stuff, say, there's no way I'm not coming -- I'm not coming

9   near that.

10       So having said that I do know -- I know one person in

11  North Carolina, but I'm not sure if he's retired, who does --

12  a huge name in the field of autism and has done forensic

13  assessments for it.  And then I know a few people around the

14  country that do.  So, yeah, if somebody said to me, We would

15  like to do an autism assessment in this forensic context.  I

16  would say, I don't do it but I can get you some names.

17  Q.   With regard to the characteristics you listed in the

18  report, the first one you listed was avoidance or lack of

19  interest in interactions with other people.

20  A.   Yes, ma'am.

21  Q.   Would that be consistent with someone who participates in

22  recreational activities and spends time engaging with other

23  people?

24  A.   Say the end part of the question again.

25  Q.   Is that consistent with an individual -- would that be a

1   descriptor of someone who is actually actively participating

2   in recreational activities and out engaging with other people

3   in a prison setting?

4   A.    No.  I mean, I wouldn't think so.  I don't know that if

5   somebody is having some very limited degree of interaction, I

6   think it could be okay.  Maybe they're -- if they're, you

7   know, taking part in an activity and standing off to the side

8   or on the fringes, yeah, then I would say that would be pretty

9   consistent.  I mean, what he described to me was discomfort,

10  avoidance, not liking to be around people, not liking physical

11  contact of any sort.

12  Q.    So the psychologists at the BOP noted that he was

13  participating in recreational activities and engaging with

14  other individuals in the jail, is not consistent with what he

15  told you?

16  A.    If that was a description from somewhere else, that's

17  something that would not be consistent with being socially

18  avoidant.

19  Q.    And you're basing describing him being socially avoidant

20  based on what he told you and not on anything you observed?

21  A.    Right, I think it's all on his statements.

22  Q.    You also noted his poor eye contact.  Was that, I assume,

23  that was with you?

24  A.    I think it was both with me and something he told me

25  about himself.  I mean, that he said that he had poor eye

1    contact.  I think I had already noted in my notes that I

2    already written down something about he has -- I think I said

3    fairly poor.  I've seen a lot worse.  It wasn't that he had no

4    eye contact but he -- his was somewhat limited.

5    Q.   And is eye contact something you're kind of supposed to

6    look for to make sure they're engaged or is it just autism

7    spectrum disorder characteristic or why was it looked at?

8    A.   Again, I didn't go in here looking for autism.  But from

9    very early on he just seemed that there were a number of

10   things that seemed peculiar about his interaction.  And one of

11   those was, he generally -- he would kind of speak to me like

12   this, you know.  I -- if you were me and you were there, I

13   would -- he would be talking like this, occasionally glancing

14   up to me but generally not looking at me.

15   Q.   Would you be concerned to know that he was reported as

16   having good eye contact in his prior forensic evaluation?

17   A.   Yeah, I mean, that's certainly very interesting and makes

18   me regret more so not having read that report.

19   Q.   How does it affect your opinion knowing that there's some

20   inconsistencies?

21   A.   It raises questions because, yes, one is about

22   inconsistency in the different -- well, it's -- it would

23   clearly be an indication of inconsistency across the two

24   settings.  One possibility would be the one that you're

25   raising about attempting to create a certain image, whether

1   with her, with me, or with both.

2          Another possibility is difference in presentation with a

3   male and with a female.  There's people certainly that can

4   make eye contact with someone of one gender and not feel

5   comfortable with the other agenda.  That's certainly true with

6   a lot of sexual abuse survivors.

7          So I don't know what to make of it but it certainly

8   sounds relevant to me.

9   Q.   Moving on to what Mr. Chase has said.  What did he tell

10  you about PlayPen?

11              MR. ADOLF:  Objection, Your Honor.

12              The Government -- it's outside the scope of the

13  questioning.  The Government is trying to get information to

14  use as admissions in case -- this case was at trial, it's

15  going to be on appeal.  And I believe that his Fourth, Fifth

16  and Eighth Amendment rights to present information at

17  sentencing are impacted.  If the Government is going to try to

18  use this to elicit admissions from him vicariously through the

19  expert.  We already established his specific actions on the

20  website are relevant to what he was guilty of but not relevant

21  to what we're doing today.

22              So for all those reasons I think it's inappropriate.

23  I would object to it.  And I would object to the Government's

24  use of it as an admission in any other context outside of

25  today.

1          MS. RANDALL:  Your Honor, what Mr. Adolf is asking

2    you to do is to allow in the statements that are helpful to

3    Mr. Chase but keep out the statements that he deems are not

4    helpful to him.  He's got in plenty of Mr. Chase's statements

5    through direct examination of this witness.

6          Now this witness has testified as to an opinion as

7    to the defendant's future risks, as well as why he engaged in

8    what he did.  He talks about that he was seeking out images

9    that reminded him of his own sexual abuse.  The Court and I

10   need to know what he is basing his opinion on.  Is he solely

11   basing it on what Mr. Chase told him?  Did he have an accurate

12   description of what the website was?  What the evidence showed

13   Mr. Chase was doing on the website?  And if Mr. Chase was not

14   being truthful with him, Your Honor needs to know that since

15   his opinion is solely based on what Mr. Chase told him.

16          THE COURT:  Overruled.

17          THE WITNESS:  So the question is what he told me

18   about PlayPen?

19   Q.   Yes.

20   A.   I'm going to need to -- is it okay to refer to my notes

21   from our interview?

22   Q.   Yes, please do.

23   A.   And I don't know exactly where -- I think this came up a

24   number of times, certainly was discussed quite a bit.

25          Well, actually, it started out right away.  I brought --

1    I had brought my computer in with me because I was referring

2    to the documents that I had on the computer.  And he was very

3    struck by me having a computer.  And he started talking about

4    it, how computers are a perfect world.  He said, "I don't like

5    people.  I don't like being touched.  I don't like being

6    looked at."  He talked about the charges he's facing, that

7    "it's 20 to life."  He said, "for turning on a computer."  I

8    said, "What are you being charged with?"  He said, "For

9    exploitation of a child."  He said, "I didn't film anyone

10   didn't exploit anyone.  I built a website for a customer.  I

11   built a forum.  I built thousands of websites.  A customer

12   wanted me to build him a website to get him into the Dark

13   Web."

14       He started talking about his computer abilities.  "I'm

15   completely 100 percent self-taught servers, websites."  In

16   building the website, "I got caught up in it more than I

17   should have."

18       Then he talked a bunch about how he learned about

19   computers and teaching himself Flash.  But I don't think

20   that's directly about -- let's see -- talked about a website

21   he built for that trucking company, talked about his wife,

22   talked about the man who had started Patico and helped him out

23   quite a bit.

24       Let's see -- okay.  Yeah.  And actually -- we got to it

25   actually through him talking about -- I assume this is the

1  person who did the previous assessment.

2      He said his attorney had sent him to see a female

3  psychologist and after 15 minutes she had heard -- she heard

4  what she did -- she heard -- I wrote she -- once she heard

5  what she did -- what she heard, a light went on and she kept

6  going on and on about me liking little kids.

7      I said, "Yeah, it did fascinate me.  I knew it was wrong

8  but I didn't know it.  I can honestly say I've never

9  masturbated looking at kids.  Never got into underage porn.

10  Never looked at porn until -- never got into underage porn

11  until after my wife died."  That he got -- learned about this

12  through Tor and Silk Road, the seeking drug stuff.

13      Then through Tor the next thing he found was underage

14  porn.  He said, "Yeah, it did fascinate me."  He said he was

15  fascinated with Tor.

16      And then he talked a whole bunch about users and these

17  ways of generating traffic.  That you get a website that

18  creates fake users.  And then once they get up to a certain

19  number that appeals to, I guess, advertisers, and that leads

20  to real users.

21      He said, "PlayPen was for a customer in Morocco."  He

22  said, "I built PlayPen.  I copied his"-- I guess this customer

23  in Morocco already had a website.  He copied his and then shut

24  his down.  He said, "I hosted dozens of websites, had lots of

25  servers, sold domain names.  I built a website for this guy."

1           THE COURT:  Let's go to another question.

2  Q.   Was he paid by this customer to build a website according

3  to him?

4  A.   I'm sorry.  Can you please repeat that?

5           MR. ADOLF:  Same objection, Your Honor.  This is

6  well beyond the scope.  It's irrelevant, and it's impinging on

7  his Fifth, Sixth and Eighth Amendment rights to present

8  evidence to the sentencer so he can obtain a fair sentence

9  while still maintaining his appellate rights.

10          THE COURT:  Overruled.  Much of that has been

11 reported in the Doctor's report.

12 Q.   What did he tell you about how often he was on the

13 PlayPen website?

14 A.   How often he was on it?

15 Q.   Um-hmm.

16 A.   I'm -- said, "It was fun dealing with these websites."

17 All I can remember about frequency is whether this was -- I

18 don't recall if this was from his statement or from the

19 discovery but that his stepmother had said when people came to

20 question her about Mr. Chase that she replied, "Well it's got

21 to have something to do with the internet because that's all

22 he ever does."  That "He's always on it."

23     I don't recall him saying an estimate of the amount of

24 time.  I mean, I know he said that he was -- I certainly had

25 the impression that he was on it a lot.

1    Okay.  He said that he never -- until after his wife's
2  death he had never surfed the web, never made a Facebook
3  account until just before he got arrested.  He said he did so
4  much helping people.  And that he would talk about helping
5  people with website issues.  I asked about PlayPen.  He said,
6  "At first it wasn't.  It was just to help the Moroccan guy.
7  Then all the time they were having problems with the log-in
8  and they spent the whole time trying to fix those problems.  I
9  set up this beautiful world to run as they wished."
10    That's when he started talking about searching for things
11  related to him and his father.
12    THE COURT:  Go to another question, please.
13 Q.   Sir, you talked about how Mr. Chase was talking about
14  creating the website.  Did he tell you about what sort of
15  things he did once the website was created?  What he was
16  looking at?  How he participated in the actual website?
17    MR. ADOLF:  Judge, may I just have a continuing
18  objection to this line of questioning so I don't continue to
19  interrupt.  I would object to all questions --
20    THE COURT:  Continuing objection granted.
21    MR. ADOLF:  Thank you, Your Honor.
22    THE WITNESS:  His description of it was primarily of
23  troubleshooting and solving problems for others when people
24  would write in -- you know, write in a question about some
25  difficulty they were having.

1    But he also talked about, for example, that a

2  decision was made among the forum members not to include what

3  he referred to as "hurt core," which was a new term to me but

4  he described it as involving pain or torture or rape or

5  bondage of kids.  And he said that a decision had been made

6  among the forum members not to include it.

7    That came up in the context of him talking about

8  how, in all these images he described seeing, the kids seeming

9  happy and smiling and laughing.  And he said, you know, he

10  recognizes that's probably because they didn't include, you

11  know, that the members had decided not to have that.

12    The sense was that he was not an employee of the

13  site.  I never got the sense he considered himself a member.

14  He talked about the members of the forum, the people using the

15  forum made that decision but that he didn't consider himself

16  that.

17  Q.   You were aware he participated by uploading child

18  pornography on the website.

19  A.   I assume he did every aspect of the administration of

20  what -- I don't know, website maintenance, management,

21  administration.

22  Q.   Do you have an unredacted copy of your report with you?

23  A.   I do.

24  Q.   I would like to ask you about those redactions.  I

25  believe the first redactions appear on page 6.

1  A.   I don't have a redacted copy with me -- I don't have a

2  redacted copy.  I have only an unredacted copy so you'll have

3  to refer to me to what's redacted and I can --

4  Q.   On page 6 you write -- about four or five lines down, you

5  said, "that he has watched pornography but has never viewed

6  child pornography prior to" blank, "PlayPen."  What's under

7  the redaction?

8  A.   Creating.

9  Q.   A couple lines down "He said that"...  What does your

10 report go on to say there?

11 A.   "He said that even after creating PlayPen and during the

12 time he managed it he never became excited or aroused, never

13 obtained an erection, viewing children, either in real life or

14 in the photographs or videos contained on PlayPen."

15 Q.   Moving to the next paragraph, what does the first

16 sentence of your report say?

17 A.   "Why then did Steven Chase create and maintain PlayPen, a

18 site dedicated to the viewing and sharing of child

19 pornography?"

20     Is there more redacted?

21 Q.   No.  And then on page 7, the second line of the first

22 full paragraph it reads:  "I believe that Mr. Chase's efforts

23 to find or re-create his image of his early relationship with

24 his father was the central reason for his"...

25 A.   "creation of and continued involvement in PlayPen."

1   Q.   And then a couple lines after that there's a sentence

2   that starts:  "As noted above, he described the process of

3   doing so in minute detail during our interviews."

4        What's the next sentence?

5   A.   "Finally, Steven Chase clearly takes pride in the success

6   he experienced in creating and managing a forum with lots of

7   users.  He appeared to me to" -- does it -- I don't know.  I

8   have no way of knowing when to stop.

9   Q.   It was just that sentence.  Thank you.

10       You mentioned a couple times he said that he was

11  fascinated by looking at the images of the children being

12  happy, smiling, and laughing.

13       Did you believe him that's what the child pornography

14  actually depicted was happy children?

15  A.   I believed that in a -- in a website or forum or

16  whatever, with thousands of pictures and photographs and

17  videos, that some would involve children appearing -- children

18  smiling, children laughing, children appearing happy.  That

19  doesn't surprise me that some would appear that way.

20       And Mr. Chase actually made a comment that was very

21  striking to me in that regard.  He said -- I asked him what he

22  thought about it seeing, you know, these children -- thinking

23  about these children smiling and laughing now.  He said, "It

24  makes me feel sad."  I said -- asked him why.

25       And he said, "To know that at that age, they don't know

1  what's going on and they all are seeming smiling, seeming

2  happy, laughing.  But to know they're going to end up messed

3  up in the end like me."

4  Q.   Were you familiar that there were forums on the website

5  dedicated to bondage, bestiality, Scat and things like that?

6  A.   What did you say after bondage?  What were the --

7  Q.   Bestiality and Scat.

8  A.   I confess, I'm not even sure what Scat is.  Not only

9  didn't I know, wasn't I familiar with it.  I'm still not,

10  but -- I wasn't aware until just before the meeting Mr. Adolf

11  told me that there was a forum -- or there were things on the

12  website involving bondage.  I did not know about the other

13  bestiality and that last one.

14  Q.   And in the report you say: "He said that in every

15  instance the children were happy, smiling and laughing."

16       Every is a pretty strong word --

17  A.   That is what he said, yes.

18  Q.   He also -- reading from your report it says that, "all of

19  the photos and videos on PlayPen were of girls; only images

20  and videos of males were teenagers."  Again, using the word

21  "all" is a strong word.  Is that the word he would have used?

22  A.   Yeah, no.  If I made that a statement of his words, that

23  would be what he said, yes.

24       Now, obviously, he says, "all of them were of girls."

25  And then the next sentence he says, "the only ones of males

1    were of teenage males."  So obviously he's undercutting his

2    own statement about it being "all."

3         But I -- my assumption was that somewhere on there

4    there's going to be ones of prepubescent males as well.

5    Q.   Were you aware that there were entire forums dedicated to

6    preteen boy videos and photos?

7    A.   No, I was not.

8    Q.   You said you assumed he participated.  But did you know

9    he was actually uploading child pornography of prepubescent

10   girls to the website?

11   A.   No, I don't.  I wasn't aware of that.  But let me -- I

12   guess I'm making my computer ignorance really obvious here

13   but -- so he's uploading, meaning he's taking from -- explain

14   to me exactly what you mean by that.

15   Q.   The evidence at trial showed that he put images of

16   prepubescent girls on the website.  He's responsible for them

17   being on the website.

18   A.   Meaning that he took the pictures or --

19   Q.   No.  He put those images and videos on the website for

20   other people.

21   A.   I see.  Okay.  No, I wasn't aware of that but now I am.

22   Q.   And then -- so knowing that there actually were forums

23   dedicated to just young males and that he was convicted of

24   actually participating in the female child pornography part of

25   the website, is that consistent at all with what he told you

1  about seeking out pornography that was consistent with his

2  obsession?

3  A.   I don't think it's exactly inconsistent.  I mean, he

4  would say -- I think I know what he would say, is that, if

5  somebody asked him, all right, you know, we want there to be

6  pictures of this.  That he knows how to find things from other

7  sites, other forums.

8       What would surprise me enormously -- I'm sorry -- I'll

9  finish my sentence.

10      That he would know how to find things on other sites,

11  other forums, other resources, and he were to please this

12  community that he feels this sense of -- this management, this

13  sense of pride and success in helping out, as he viewed it,

14  that he would upload them.

15      What would surprise me enormously, this is why I reacted

16  as I did with the question when I thought you were suggesting

17  that he had actually taken photographs.  Anything involving

18  any actual human interaction with a child or teenager would --

19  would surprise -- would surprise me as much as possible.

20  Q.   You describe him as being "computer adept."  And you

21  said, "It's possible maybe he uploaded these images because he

22  was good at finding things on the computer and adding them."

23  A.   I would think he would be, yeah.

24  Q.   So he could have found child pornography -- the child

25  pornography he wanted to see on his own without creating this

1   website?

2   A.    I -- I -- I'm just not very knowledgeable about the world

3   of child pornography.  The way he described it, people were

4   really grateful to him for providing this forum where they

5   could find everything that they wanted.  Which, to me,

6   suggests that it wasn't quite as easy as that.  I think he is

7   adept at computers and if people can find it, he's going to be

8   someone who is going to be able to find it.

9        I went in with an assumption or -- but it's a stereotype.

10  It's my assumption is that, yeah, everything imageable is out

11  there.  And I sort of assumed that anybody could find anything

12  but I gather that's not quite the case.

13  Q.   You say your opinion about why he would have created this

14  website is kind of the marrying of the relationship he had

15  with his father and his obsession with computers, correct?

16  A.    Yes, I think I list one other source too but, yes.

17  Q.    What was the other source?

18  A.    Okay.  I think the predominant one is the relationship

19  with his father in recreating that or finding that and

20  understanding that, exploring that.

21       Second is this obsessive fascination with computers.

22       And then I also said that there's also this sense of

23  success and pride that he took in doing something well, as he

24  saw it.  He talked about people being very grateful to him for

25  his work on this and giving them this site that was exactly

1    what they wanted.

2        I think as the way I put it here that, you know, here's

3    this person who has been told and believed throughout his life

4    that he's an idiot, would end up as a ditch digger, and here

5    in the world of internet and servers and forums, Steven Chase

6    achieved success, albeit in the context of illegal and morally

7    reprehensible context.  So that's, I think, the other

8    motivating factor.

9    Q.   I guess what I'm trying to figure out is, he was a vice

10   president of a company.  So he had achieved some career

11   success already.

12   A.   Yeah.

13   Q.   And apparently he was very successful.  He said he built

14   thousands of websites and had servers based and was helping

15   other people.  So why did he have to build a child pornography

16   website, if he was already achieving success in these other

17   areas?

18   A.   Yeah, I don't know how much success he ever felt in those

19   other areas.  He said he had done thousands of websites but he

20   also talked about, you know, websites having this many, you

21   know, minute numbers of users.  How many people go to a Patico

22   Trucking Company website?  Whereas, he said, he talked about

23   his excitement when -- I don't remember the exact number, but

24   after a very short time there were 1,000 users, and then there

25   were 2,000 users, or 5,000 users and how much pride he took in

1    that.

2         And, yeah, it sounds -- it sounds -- it sounds strange.

3    It sounds limited, but I don't think that he thinks quite like

4    we do.  I think that his ways of viewing the world are

5    different.  I think he viewed them within the context of this

6    obsessive interest in computers and servers and forums and

7    numbers.  To me it reminds me hugely of -- I had a kid that I

8    worked with who knew the population density of every city in

9    the world; not the population, the population density.  And he

10   would just start talking about, you know, the population

11   density of Statesville is such and such, whereas the

12   population density of Hickory is such and such.  And there's a

13   quality of that with Mr. Chase where he's talking about, you

14   know, this number of fake users, but if you get this number,

15   then that converts to this number of real users and the rates

16   of conversion of it.  And, yes, it went over my head but I

17   think that's what a lot of it is about for him.

18              MS. RANDALL:  If I could have just one second, Your

19   Honor.

20              No further questions, Your Honor.

21              MR. ADOLF:  Just briefly, Your Honor.

22                      REDIRECT EXAMINATION

23   BY MR. ADOLF:

24   Q.   Dr. Mendel, the prosecutor went through a number of

25   statements from Mr. Chase in the course of your interview with

1   him, some of which you believed and took at face value, some

2   of which you were skeptical of.  Do you recall that?

3   A.    Correct.

4   Q.    She also talked about tests that can be given to a person

5   to tease out whether they're malingering or not.

6   A.    Correct.

7   Q.    Now the tests that she's talking about, those are tests

8   for somebody who is faking.  I think you said, psychosis?

9   A.    I was referring to a specific one.  The Structured

10  Interview of Reported Symptoms would really be only if

11  somebody is describing pretty extreme dramatic psychiatric

12  problems.

13  Q.    And the other tests that you described that are used

14  generally in forensic psychology to identify malingering,

15  those are identifying current symptoms for the most part?

16  A.    I believe so.  I'm not sure if there's a way of doing any

17  of those tests retroactively.  I mean, some tests have a way

18  of saying, Okay.  I want you to answer this as you would have

19  at the time of your arrest or one year ago.  I don't -- I

20  simply don't know that regarding the Validity Indicators

21  Profile that she mentioned.  Yeah, the only tests that I know

22  of that specifically allows you to do that is not a

23  malingering test.  It's the Clinician Administered

24  Post-Traumatic Survey has it set up so you can ask about

25  various timeframes in somebody's life.

1  Q.   But whether it's talking about specific symptoms in the

2  present or specific symptoms at a particular time, those tests

3  still focus on psychiatric symptoms, behaviors, thoughts,

4  things of that nature, right?

5  A.   All the ones that I know.  The Test of Memory Malingering

6  is really focused on memory, more of a cognitive thing as

7  opposed to symptoms.

8  Q.   When you say memory malingering, are you talking about

9  somebody who is pretending they don't remember something that

10  they -- could you explain --

11  A.   Right.  It's a way -- my understanding of that test is

12  it's really looking -- it's also a validity scale.  It looks

13  at malingering.  But unlike the Structured Interview of

14  Reported symptoms, or the Validity Indicators Profile, it's

15  less about psychiatric diagnoses and the validity or lack

16  thereof of those diagnoses and more about cognitive

17  functioning and people perhaps acting as if they don't

18  remember, don't recall something or are pretending or alleging

19  that they have some sort of cognitive limitation.

20  Q.   So just to boil it down.  Those tests that she was

21  discussing, could you use those tests and just give them to

22  someone to tell whether they had actually been sexually abused

23  as a child or if they were just saying they had been sexually

24  abused as a child?

25  A.   I don't believe any of them would -- there -- there are

1    tests -- now the closest that I'm aware of would be tests of

2    PTSD.  There are tests of those that have validity measures,

3    but that wouldn't be about, yes or no, were they sexually

4    abused in childhood.  It would be about the veracity of their

5    statements regarding adult or later post-traumatic symptoms

6    that they're reporting as a result of the sexual abuse.

7    There's ways of looking at whether they're minimizing in some

8    cases or exaggerating those symptoms.  But I don't know of any

9    tests that would look at -- I don't know of any tests that

10   would assess the credibility of someone's statements of

11   childhood sexual abuse.

12   Q.   The prosecutor asked you about Mr. Chase's mother-in-law.

13   You were aware from your review of the materials that she's 90

14   years old at this point?

15   A.   I knew she was quite elderly.

16   Q.   She mentioned something about participating in social

17   activities.

18   A.   Right.

19   Q.   Would you agree with me that there's a wide range of what

20   constitutes "participating in social activities"?

21   A.   Yes, I would.

22   Q.   And some of those would be inconsistent with somebody who

23   has social anxiety, and/or is on the autism spectrum, and some

24   that are not?

25   A.   Exactly, and that's why I sort of was bringing up the

1    idea of whether somebody is on the fringes or how much

2    involved, how much initiative they're taking.

3    Q.    And if indeed the assessment that they were given before

4    was dealing with their present competence to stand trial, that

5    is, their ability to comprehend the legal proceedings,

6    understand the role of the judge, the jury, the lawyers, so

7    forth.  Would somebody who had been found to be malingering or

8    exaggerating symptoms they already have or something of that

9    nature, would that necessarily mean that they would be

10   malingering regarding past events?

11   A.    No, not at all.  If the finding of malingering was

12   specifically -- I mean, my understanding of competency

13   evaluations is that they are supposed to be limited to the

14   questions of competency and not used in other context.  That's

15   how it is in the murder cases that I am more familiar with.

16         But that's my understanding of competency evaluations is

17   that that's their purpose, is to assess ability to understand

18   legal proceedings and assist an attorney in one's defense.

19              MR. ADOLF:  Nothing further.  Thank you.

20                      RECROSS-EXAMINATION

21   BY MS. RANDALL:

22   Q.    Just briefly.  In knowing you were going to be giving an

23   opinion to this Court, particularly regarding the defendant's

24   future risk and the ultimate reason why he did what he did --

25   A.    I'm sorry.  Can you repeat it all?  I don't know if it's

1   my getting old and ears and this or if you're talking fast,

2   but I couldn't follow it.

3   Q.   Sorry.  I apologize.  Knowing that you have, in this

4   court, given an opinion as to this particular defendant's

5   future risk, as well as offering opinions as to why he did

6   what he did.

7   A.   Yes.

8   Q.   Would you like to have had access to that other report to

9   know more about why he was diagnosed with malingering or why

10  there were some inconsistent characteristics for what you

11  observed?

12  A.   Yes.

13  Q.   And you previously testified a PPG would have been a good

14  idea.

15  A.   I'm sorry.  That what?

16  Q.   A PPG.  A penile plethysmograph.

17  A.   I hadn't heard the initials for it.  Yes, it sounds great

18  to me.

19  Q.   Would having a penile plethysmograph or a polygraph be

20  beneficial to helping you corroborate a defendant's

21  description of past sexual abuse?

22  A.   Description of past sexual abuse?  I don't think --

23  Q.   Sorry.  A polygraph --

24  A.   I don't think a penile plethysmograph would in any way

25  deal with that at all.  Because somebody could have excitement

 1   related to it or lack of -- no, I don't think that would be

 2   relevant at all.

 3       I think a polygraph could be helpful to the degree that

 4   it's helpful with any question about someone's truthfulness.

 5   I mean, I don't know that they're considered entirely

 6   reliable.  But as far as being helpful or potentially

 7   supportive of evidence saying that he has or potentially

 8   unsupportive or potentially refuting that, yes, I think that

 9   could be helpful.

10           MS. RANDALL:  No further questions, Your Honor.

11           THE COURT:  No further questions?

12           MR. ADOLF:  No further questions.

13           THE COURT:  You may step down.

14           THE WITNESS:  Thank you.

15           THE COURT:  Mr. Adolf.

16           MR. ADOLF:  Your Honor, I think the prosecutor has

17   something to do first.

18           MS. RANDALL:  Your Honor, this is just a

19   housekeeping matter.  In preparing for that restitution motion

20   I was filing, we were evaluating and checking, matching up

21   victims with who was on the website, who was in co-defendant's

22   collections and so forth.  And in doing so, some of the

23   multi-victim series, we verified that while some of the

24   victims were on the website and the victims who submitted the

25   victim impact statements were not among the ones on the

1  website.

2          THE COURT:  I'm sorry.  You went a little fast on

3  that last --

4          MS. RANDALL:  Sorry.  We verified that there were

5  some victims that -- series that have, like, four victims and

6  only one of them would appear on the website.  So we wanted to

7  strike the additional victim impact statements because the

8  victims either did not appear on the website or in one case

9  the image of the child would not meet the federal definition

10  of child pornography.

11          So Ms. Carrigan had filed a supplement, Your Honor,

12  that was Document 125-1 which consisted of all the victim

13  impact statements.  And oddly enough it was pages 65 through

14  121 was paperwork submitted that were for victims that

15  ultimately are not on the website.  So we would move to strike

16  those pages.

17          THE COURT:  All right.  Let that be the case.

18          Further argument from the defendant?

19          MR. ADOLF:  Judge, I guess if we're ready to just

20  argue, generally, about sentencing.

21          THE COURT:  Yes, sir.

22          MR. ADOLF:  I'm ready.

23          Your Honor, you just heard about the unique

24  individual that Steven Chase is.  I was kind of struck by

25  something that the doctor said on cross-examination that

1   Mr. Chase said when he was looking at the child pornography of

2   the children, who to him looked happy.  And he said that it

3   made him sad to think that at that moment they didn't know any

4   better and they were happy and that some day they were going

5   to end up messed up like he was.

6           I think for the government to try to suggest that

7   he's making that up is just absolutely extraordinary.  And we

8   just talked about an experienced clinician who's evaluated 150

9   people, who's seen many more hundreds in his clinical

10  practice, and he understands what child sex abuse survivors go

11  through.  And Mr. Chase's experience is not totally unique,

12  but it really does explain a lot about how he got where he is.

13  That was the happiest time of his life, as he remembers it.

14  That's just how twisted up it is, and what it did to him.

15          At this point whether what he suffers from is

16  intense social anxiety disorder, or whether we label it as on

17  the Asperger's spectrum is not the point.  It's who he is.

18  And it's what he suffered with all these years.  And it's what

19  clearly came in large part out of the severe abuse that he

20  suffered as a child that warped him to this day.  We're

21  talking about a man who went through his whole life who is

22  basically phobic about human contact, even with his own spouse

23  it was difficult for him for all those years.

24          Your Honor heard how he first got involved with

25  child pornography after her death.  And that may be something

1    he wants to talk to the Court about.  But the death of

2    anyone's wife is an incredibly traumatic and life-changing

3    event.  For him even more so because for a year and a half he

4    took care of her hand and foot, had to bath her, and clean

5    her, and this was the only person he ever had any kind of

6    close relationship since he was nine years old, and clearly

7    that's when everything went downhill for him.

8             The government wants you to treat him like the

9    numbers that the guidelines say.  They talk about cases

10   everywhere, and similar cases, and how people are treated.  I

11   don't know that you see a lot of people in his position who

12   have never committed any offense against an actual child.

13   Never touched a child inappropriately.  There's no hint that

14   he's ever done that in his entire life.  In fact, he's phobic

15   about that contact.  And I know that, of course, there's

16   skepticism as to anybody who's looking at child pornography

17   and involved with it.  Why they wouldn't have the attraction?

18   The urge to touch actual children.  And I think that is why I

19   brought Doctor Mendel in to try to explain to the Court how

20   that is possible.  That not everybody looks at child

21   pornography for the same reasons.  And for some people it is

22   relieving the trauma of their childhood.  With Mr. Chase, the

23   trauma of his childhood is all mixed up with the good

24   memories.  That's how warped he was by that experience.

25             You know, Judge, the government is going to talk at

1   great length about the damage done by child pornography to the

2   children whose -- the images of their abuse was circulated

3   around.  Fifty years ago that was Steven Chase, that's who he

4   was.  Merciful for him, it was never filmed.  But he lives

5   those memories every day.  It's affected every bit of his

6   life, and continues to affect him to this day.

7            He said something to me, both today and in the

8   recent past, about how he feels like Doctor Mendel is the

9   first person he's ever met who really understands him.  That

10  he had never had any kind of therapy or any kind of -- anyone

11  giving him insight into his own issues from his childhood that

12  has haunted him.

13           And, ironically, it's through this process that for

14  the first time he started to understand the way it changed him

15  as a person and how it got him where he is today.  And I would

16  just note for the record that he's trying now as he has

17  through most of this hearing and certainly throughout all of

18  Doctor Mendel's direct testimony because it's all taking him

19  back to that earlier abuse and that got him to where he is

20  today.

21           That website obviously caused harm to a lot of

22  children, but at the end of the day what we're looking at here

23  is what is appropriate for Steven Chase.  What does the Court

24  do with someone who stands here convicted, at any rate, by a

25  jury who believed the government's evidence that he created

1    and ran this website, presents no significant history,

2    presents no risk of harming children in the future in person.

3    Certainly he loves computers. But it would be easy enough for

4    the Court to structure a sentence and conditions of release so

5    that some day if he does manage to survive the -- even the

6    minimum sentence this Court can impose, which is by no means

7    certain, he certainly doesn't believe he's going to survive

8    it.

9            Certainly his involvement with computers is

10   something that can be intimately monitored in real time and

11   I'm sure it will be much easier to do in the future, 20 or

12   more years from now.

13           At the end of the day, Judge, what you have is a man

14   who, outside of this website, lived a pretty law-abiding life,

15   lived a pretty productive life, in spite of the handicap of

16   his prior abuse, never came to terms with it, never knew how

17   to deal with it. It impacted his relationships and the way he

18   functioned in daily life his entire life. Despite all that he

19   was a stable worker. He was married for 20 years and took

20   care of his wife even in her decline. Thirty years at the

21   same job that's a pretty amazing thing.

22           So for all that, is this a person who, in the

23   Court's judgment, absolutely needs to die in prison? That's

24   today what the Court's judgment comes down to. Even a

25   mandatory minimum sentence of 20 years will assure that he's

1    in prison into his mid '70s, mid to late '70s.  Given that his

2    father and grandfather died younger than that from dementia,

3    given the heart problems that he already suffers from, the

4    pacemaker that -- because his health has declined so much in

5    jail he's gotten so skinny you can now actually --

6    unfortunately he showed it to me the other day.  It's okay.

7    We don't want to see.  You can actually see the outline of the

8    pacemaker under his skin now.  It looks like a hockey puck and

9    you can see the wires.

10        The question is not what kind of sentence will --

11    will meet the 3553(a) factors.  I think there's no danger from

12    him going forward.  I think his life, until his wife died and

13    he took up involvement with this website shows that he's no

14    danger to anybody in the future and that the Court can

15    certainly monitor him.  He's going to be a registered sex

16    offender for life when he ever gets out.  The question is two

17    things.

18        Number 1:  Is he a person who should ever have any

19    hope of ever emerging from prison alive; and

20        Number 2:  Should that be an option for the Bureau

21    of Prisons.

22        And I want to explain that a little bit further.

23    Because he doesn't believe he's going to live 20 years.  And

24    given the way his health has declined and what we see now.  I

25    mean, Your Honor can see him.  I guess his picture -- his

1    picture is in the record as part of the presentence report.  I

2    would ask the Court to take a look at the two of us at some

3    point.  He's eight years older than I am.  We're close enough

4    in age to be brothers and he looks like he could be my

5    grandfather.  That is no accident.  It would be miraculous if

6    he lived out even a 20-year sentence.

7          The difference is, right now he can at least

8    function, in terms of, he can walk around.  Sometimes he

9    requires use of a walker.  He can do the basic -- his basic

10   daily functioning in prison himself.  That's by no means

11   certain that's always going to be the case.

12         The Bureau of Prisons does have the option to move

13   the Court some day in the future for what's called

14   "compassionate release."  I know Your Honor is familiar with

15   it.  Under their current regulations and policies, it requires

16   that somebody be at the stage of life or illness where they

17   are either terminally ill or whether they are so debilitated

18   that they're unable to function in a prison setting.  But they

19   have to be 65 years old and they have to have served half

20   their sentence.

21         I was curious how those guidelines, those programs

22   apply to someone who is serving a life sentence.  And so I had

23   the opportunity to communicate with the -- Matthew Melody who

24   is the Bureau of Prisons Regional Counsel for this region for,

25   I guess, it's the Eastern -- the southeast region who would be

1    in charge of those kinds of things, and asked if there was any

2    sort of policy.

3              Because what I had heard was, from the defender

4    community, nobody with a life sentence has ever been granted

5    compassionate release, no matter how bad their health was, and

6    no matter how debilitated or close to death they are.

7              And what he told me was that there is no strict rule

8    against it, and he would not confirm or deny that no one has

9    ever gotten it.  What he said was, the fact that someone has

10   gotten a life sentence, in the judgment of the Bureau of

11   Prisons, means that the sentencing judge has made a judgment

12   that this is a person no matter what, who needs to live out

13   their days and die in prison.

14             Whereas somebody who receives a 20-year or even a

15   30-year sentence, the District Court has contemplated that

16   this is a person who may someday return to society.  It's not

17   intended that that person necessarily live out every minute of

18   their life in prison.  And so that given that, it is much less

19   likely that somebody gets a life sentence would ever be given

20   consideration for compassionate release.

21             And that's why what I'm asking the Court to do is

22   not to give him a sentence that he can survive, because I

23   think it's doubtful that he will no matter what.  What I'm

24   asking the Court to do is to give a sentence that leaves open

25   the possibility for the Bureau of Prisons, if they decide in

1  their discretion that he has become so debilitated, so

2  disabled, and/or is so close to death that it would not just

3  be merciful but also would be cost effective and would be a

4  best use of their resources for him to serve out the last of

5  his days in a facility that's not in the Bureau of Prisons and

6  that he would be released for that purpose.

7  I don't believe -- I understand the government's

8  position, but I do not believe that there's anybody in the

9  world who would say that Steven Chase, a person who worked

10 responsibly for years, who was married for 20 years and tended

11 to his wife to her death, who has no significant criminal

12 history and has never improperly touched a child and presents

13 no risk of ever doing that, I don't think anybody would ever

14 say that he got off easy with a 20-year sentence.  That is the

15 mandatory minimum.  I do believe that's appropriate.

16 As I said, I don't say that because I expect it to

17 make a great deal of difference in terms of will he live 20

18 years, 30 years or 40 years.  But what that sentence will do

19 is some day it will allow the Bureau of Prisons to take a look

20 at him and say, it's best for everybody if he serves out his

21 last days on earth outside and not inside.  It will at least

22 give them that option.

23 And most importantly it will give the Court that

24 option.  Because that's something that if the Bureau of

25 Prisons decides that that's appropriate, they'll bring it back

1    to Your Honor.  And Your Honor will have the final say.  My

2    understanding is that if the Bureau of Prisons refuses to do

3    that, the case law is there's no appeal from that.  So this

4    Court will never even know about it, much less expend any

5    judicial resources on it.

6         But, I think, given his record, given his past, even

7    with what he's done, I don't think it's necessary that this

8    Court decide today that he needs to die in prison.  I'd ask

9    the Court to leave that possibility open to the Bureau of

10   Prisons by giving him a sentence that allows them that

11   opportunity.

12        And the Court will know that even if 20 years past

13   and he emerges from prison, I think it's pretty clear from

14   everything we've heard today that he presents no risk to

15   anybody.  His computer use will be managed.  He'll be a

16   registered sex offender.  He will be on supervised release for

17   life, if necessary, if the Court deems that appropriate.

18        So for all those reasons, Your Honor, I'm asking for

19   a 20-year sentence.  If a sentence less than that were

20   available, I would be asking for that because I think that

21   would be appropriate.  But I think under these circumstances

22   that is more than enough time to guarantee that everyone knows

23   how serious this crime was, that he's punished adequately for

24   it, and yet the larger needs of the Bureau of Prisons and

25   society are also met.

1          THE COURT:  Thank you.  Would you like to say

2     anything to the Court, sir?

3          THE DEFENDANT:  I just like to say, I am not a

4     monster.  I've been abused as a little baby.  I have lived my

5     whole life, I've never told anybody.  I've been so scared.  I

6     hid in the shadows.  I hid.  I would tell nobody.  I had no

7     friends.  I didn't go to a school dance.  I never had a

8     girlfriend, dam it.  You know, I finished my last year of high

9     school living in the woods.  I had to get my diploma and I had

10    to prove to my father that I wasn't a bum.  That I wasn't

11    going to grow up to be a ditch digger.

12          Do you know how -- I ran away from home five or six

13    times starting at the age of 13.  I just escaped.  I jumped

14    out of the car on an interstate with snow on the ground and

15    stuck my thumb out at 14 years old and hitchhiked across the

16    country just so I wouldn't get beat up that night when I went

17    home.  Dam it.

18          I hurt nobody.  Never, ever, ever hurt nobody.  I

19    never even knew what child porn was until this mess started.

20    Sure, I was fascinated.  I talked to nobody.  My wife of 20

21    years doesn't know I was sexually abused.  My step mom is 90

22    years old.  I never called her mom until she was probably 75

23    years old.  I never called her mom.  I called her, Louise.  I

24    sat outside the window of her mother's house and watched my

25    Dad knock her on the ground.  Dam it.  I watched it.  I had to

1    go to school the next day.

2           Do you know I didn't know how to tie my shoes until

3    I was in the third grade.  That was my second time through the

4    third grade.  I always knew I was messed up.  I always knew I

5    wasn't like anybody else.

6           I couldn't -- I had no friends.  I always hid.  I

7    hid.  People used to pick on me.  They pick on me in jail.

8    You ought to see it.  It's horrible.  I'm actually in solitary

9    confinement right now so they don't beat me up.  I just don't

10   belong in there.  I get out of my cell three hours a week.

11          I did finish high school.  I got a diploma.  I never

12   went to graduation.  I had no friends.  To this day I have no

13   friends, none.

14          I met my wife in Florida.  She been through two

15   abusive marriages.  She had two kids -- three kids.  She been

16   raped, she'd been kidnapped.  Kidnapped from the courthouse,

17   Barbara Cyr, look it up.  Her and I fit in good.  We lived for

18   20 years with no friends.  We bought an old fixer upper house,

19   paid $100,000.  Who can buy a house for $100,000 in Southwest,

20   Florida.  We put in new cabinets, new tile, new kitchen, new

21   bathrooms, we stuck with the place, replaced all the plumbing.

22   We worked our butts off on that house.

23          We raised three kids.  Travis, her baby boy -- I

24   come home from work one day, Travis is dead.  Travis died from

25   a heroin overdose.  I had to bury Travis.

1    A few years later, Chucky, her oldest boy, Chucky

2    found dead.  Chucky was abused at a deaf school.  Chucky was

3    deaf, went to a school in St. Petersburg.  Chucky died from

4    oxycodone overdose because he ate a whole bottle, suicide.

5    My wife was destroyed.  Her and I stopped talking.

6    We never had sex.  I bet I had sex a dozen times in 20 years

7    of marriage.  We were both so gun shy.

8    The Government over here makes harps on me being a

9    vice president.  Yes, I was the vice president.  Do you know

10   why I was the vice president?  I was the only one in the

11   company who had credit.  We needed to buy a front-end loader.

12   So let's make Steve a vice president, now he can sign for the

13   paperwork to buy the front-end loader.  At that point I think

14   we had 12 employees.  Nice vice president with 12 employees.

15   I was out working on a tractor.  I worked 30 years, 12 hours a

16   day, six days a week.  Spent the rest of my time burying

17   family members.

18   My step mom's still alive.  I'm in here for a crime

19   I committed in her living room with her watching me.  That's

20   what I'm being convicted of.  She watched me do this crime in

21   her living room.  She knew the struggle I went through trying

22   to get a log-in page work for a customer.  She heard me

23   cussing and yelling.  We would talk at breakfast, Did you get

24   the log-in page fixed?  I said, Yeah, I did but now I have

25   another problem.  Be switching back and forth to the website.

1          Your Honor, I don't know what to say.  I can go on

2     all day about my horrible life.

3          How many 14 year olds hitchhike from New Hampshire

4     to California?  How many 14, 15 year olds have had jobs in

5     Texas?  How many people live in the woods to go to college --

6     to go to school, I mean.  I wound up in Southwest Florida.  I

7     hitchhiked to Southwest Florida after I lived in a town, no

8     money, no car, no clothes, no nothing.  I went to work.  Yeah,

9     I had a few small arrests, nothing major, mainly to survive.

10    I fought to survive every day.  I hid every day.

11         Even my wife, I cry -- I'm so embarrassed, Your

12    Honor.  I am so embarrassed to be talking about this stuff.

13    Nobody ever known this stuff.  I never talked to nobody.

14         I met some wonderful lady named Nancy Smith.  I

15    don't even know who the heck Nancy Smith is, somebody Peter

16    brought over here.  Beautiful girl, Oh my God.  She sat down

17    and I talked with her for 6, 8 hours.  Then she came back

18    again and we talked for hours and hours and hours and hours

19    and hours.  I was so ashamed to talk to her.  I cried.  She

20    cried.  And I talked to her.  I told her what happened.  I

21    told her what happened.  She brought in doctor -- the heck's

22    his name -- Doctor Mendel -- Doctor Mendel.

23         Everything he said is exactly right.  How did that

24    son of a gun know it?  I don't know.  He got everything right.

25    That's what I kept telling Peter.  He's got me nailed to the

1   wall, man.

2          You talk about sucking my thumb.  You want to talk

3   about embarrassing?  I still suck my thumb in jail.  My wife

4   has never seen me suck my thumb.  That was half of our

5   marriage problems.  How do you hide in a bed with sucking your

6   thumb with your wife so you can go to sleep at night?  Dam it,

7   that's true.

8          All right.  Your Honor, the only thing I can ask --

9   I don't want to die in prison.  I don't want to die in prison.

10  I don't know what any of this stuff is even about.  I built

11  the website.  All right.  I won't talk about the website.

12          THE COURT:  Thank you.

13          THE DEFENDANT:  Well, Your Honor, please don't let

14  me die in prison, please.  I've got things to do.  My father's

15  on his death bed.  I met a preacher in Maine that helped me.

16  He helped me find peace.  Start to help me forgive my father.

17  Hardest thing I ever did.  I had full intention to spit on his

18  grave.  My stepmom and I became best friends after my Dad

19  started getting sick.  We talked on the phone.  When my wife

20  was sick on her deathbed, we talked on the phone 7, 8 hours a

21  day, seven days a week.  We were buddies.  She don't know

22  anything about me.

23          My father, on his deathbed, had one last saying.  He

24  said to my step mom, he said, "Steve is the only one that

25  doesn't get it."

1    After being in jail now for two years and some odd

2  days, whatever, I can say I get it now.  My father was talking

3  about God.  Yes, Your Honor, I get it now.  I'm so dammed

4  sorry if I hurt anybody.  I never had no intention on hurting

5  nobody.  All I want to do is hide.  All I want to do is

6  survive.  That's all I want to do.  My wife is dead.  My kids

7  are dead.  My dad is dead.  My mom is dead.  Pat Jones, the

8  owner of Patico Trucking, he died while my wife was on her

9  deathbed.  Put me out of business.  I ain't worked in over a

10  year before this happened.  Left me by myself.  Left me by my

11  dam self.  No friends.  I'm sorry.  But thank you for letting

12  me talk.

13    THE COURT:  Yes, sir.

14    MR. JONES:  Thank you.  Reggie Jones on behalf of

15  the United States.  Just briefly, Your Honor.

16    Throughout the defendant's statements, Your Honor,

17  it's me, me, me.  It's all about him.  You know, defendant

18  states, I never hurt anybody.  Your Honor, that's not true.

19  This defendant has hurt countless victims, Your Honor, and he

20  shows no remorse.  He hadn't hurt anybody, Your Honor?  Just

21  listen to one of the victim impact statements which states,

22  you know, "I had to give up modeling and acting because if

23  someone saw my face on TV or on a billboard they might say

24  something and it gets out to the whole world instead of just a

25  few people knowing.  I also have to constantly worry if

1   someone finds out and goes home and looks up the pictures and

2   see them, it would not only be uncomfortable for the both of

3   us, but the person might tell someone who tells another person

4   then soon enough the whole school would know.  All of this I

5   have to worry about to add stress just because of stupid

6   pictures that people look at and make my life harder.  For

7   once, I want to live a normal life with dreams and hopes of

8   reaching them.  I can't because of these pictures."

9            Your Honor, so the defendant's contention of him

10   creating and running a massive child pornography website with

11   over 150,000 members, dedicated to the sexual abuse of

12   children as young as toddlers and infants, Your Honor, and he

13   didn't hurt nobody?  Your Honor, that's simply not true.  He

14   has hurt countless victims, Your Honor, by way of his criminal

15   conduct.

16            Just briefly, Your Honor, in regards to a statement

17   the defendant makes in his sentencing memo.  It states that

18   the sentencing guidelines call for a conviction for the

19   defendant running a website where other people posted and

20   downloaded photos and videos depicting the sexual abuse of

21   children.

22            Your Honor, this defendant still refuses to take

23   responsibility for his actions.  Even after he had been

24   convicted for every single count for which he has been

25   charged.

1          Your Honor, the sentencing guidelines are

2    established to provide federal judges with a fair and

3    consistent ranges at sentencing, Your Honor.  And this

4    defendant's guideline range is off the charts.  It's higher

5    than the 43, Your Honor, and that's rare.  And there's ample

6    justification in this case, Your Honor, for a guideline

7    sentence.

8          I talked a little bit about, and you saw, Your

9    Honor, throughout the course of this week-long trial of just

10   how egregious those images and photos were of those websites,

11   Your Honor, of infants and toddler-aged children, Your Honor.

12         You also heard testimony about how this website

13   operated on the Dark Web, Your Honor.  This wasn't just a site

14   you can get on the regular internet and operate, Your Honor.

15   This website contained the most egregious and vial child

16   pornography activity, because these offenders who operated on

17   what they perceived to be, Your Honor, the safe haven of the

18   Dark Web.

19         So what you have is the worst of the worst

20   offenders, Your Honor, on the site that this defendant

21   created, that this defendant ran.  And that this defendant

22   encouraged users to use encryption in order to avoid law

23   enforcement.

24         Another important point to make, Your Honor, it's

25   just not -- these -- as bad as it is, these individuals just

1  didn't get on the site to trade, view, and distribute child

2  pornography, Your Honor, but they also gave advise.  They gave

3  hands-on advice.  Advice about how to groom kids as we

4  attached some of those exhibits to our sentencing memo, Your

5  Honor.  So they encouraged each other about how to sexually

6  exploit children, Your Honor.

7          Also, Your Honor, the defendant boasted about how

8  big this child pornography website was.  In one post he says,

9  "I just want to thank you guys for helping make PlayPen a good

10  board.  Day is the 16th day since I started PlayPen and

11  already I've had more than 26,000 members."  In another,

12  "77,000 members in one month.  I only wish more would post".

13  Pleased to announce that PlayPen has moved to a more secure

14  server."

15          So not only does this defendant create and run this

16  website depicting the sexual abuse of children, a website

17  where individuals engaged in grooming and hands-on abuse in

18  grooming and giving advice on how to abuse children, but this

19  defendant, on numerous occasions, boasted about this, Your

20  Honor.  Boasting about the size of the site and how he wished

21  more people would post.

22          In talking about the history and characteristics of

23  this defendant, Your Honor, I just briefly want to talk about

24  his characteristics.

25          As reflected in the PSR, this defendant, he states

1  that his expert said that he just liked to design websites,

2  looking for images of boys similar to him when he was a child.

3        Your Honor, as reflected in this PSR, this defendant

4  created over 41 threads, made hundreds of posts, sent hundreds

5  of private messages and received private messages.  Some of

6  the posts of child pornography that this defendant made, Your

7  Honor, were of little girls, Your Honor.  As of one video

8  posted by the defendant featured an adult male holding a

9  toddler with a camera focused on her privates.  Another post

10  of 11 minute video showing three little girls striping down to

11  the camera, Your Honor.  And I won't even go into the

12  egregious of this remaining post, Your Honor, but it's notated

13  in paragraph 15 of the PSR, Your Honor.

14        So this defendant, Your Honor, throughout the course

15  of trial, throughout the course of this sentencing hearing,

16  Your Honor, he has failed to show any remorse and take

17  responsibility for his actions, Your Honor.

18        Deterrence, Your Honor, which is also important in

19  the cases, Your Honor, but it is even more uniquely important

20  in this case, Your Honor.  Because as I said, you know, we

21  were fortunate enough in this case to be able to apprehend the

22  defendant.  Because as you heard during trial, the website was

23  misconfigured so we were able to find out where the site was

24  hosted and then apprehended the defendant and other offenders

25  committing child abuse.

1    But this isn't the norm, Your Honor.  You know,
2  there are other websites out there, Your Honor, like PlayPen,
3  where we can't get to.  We can't shut them down, Your Honor.
4  They're on the Dark Web.  And, you know, that's one of the
5  reasons you have the worst of the worst offenders out there,
6  Your Honor, because they know that they can evade law
7  enforcement by being on the Dark Web, Your Honor.  And for
8  every one of the defenders like this defendant and some of the
9  others caught on the Dark Web, Your Honor, there are thousands
10  more, Your Honor, that go without being caught.  But they'll
11  know your sentence today, Your Honor.  They keep track of all
12  these cases, Your Honor, whether it be search warrants or
13  other court documents, Your Honor.

14    And the United States asks that your sentence today,
15  Your Honor -- and they'll know.  And we ask that you send a
16  message with this sentence, Your Honor.  A message that not
17  only will these offenders be caught, they will also be
18  prosecuted and sentenced to the fullest extent of the law,
19  Your Honor.  And the public will also be protected from the
20  trading of these images.

21    A couple more points, Your Honor, regards to the
22  need to avoid sentencing disparities.

23    Defendant served as a leader of the site, Your
24  Honor.  He created the site.  You know, both of his
25  co-defendants immediately pled guilty, one even testified at

1    trial, Your Honor, and they were sentenced to 20 years in

2    prison.

3            The United States believes that it wouldn't be

4    disparity, Your Honor, if you give this defendant the same

5    sentence as his co-defendants who have pleaded guilty, Your

6    Honor, and accepted responsibility for this egregious conduct

7    which the defendant still to this day, Your Honor, has not

8    done.

9            So the United States requests that a guideline

10   sentence would be consistent in this case, Your Honor, with

11   regards to similar defendants.

12           We also cite in our memo, Your Honor, how defendant

13   similar -- that have committed similar crimes as this

14   defendant have received guideline sentences, Your Honor, 30

15   years sentences and life sentences, Your Honor.  So we ask

16   that you take that into account as well, Your Honor.

17           Finally, we also would like to note that, you know,

18   as probation stated in the PSR, Your Honor, that there's no

19   factors that would warrant a variant sentence from the

20   guidelines range in this case, Your Honor.

21           So United States submits, you know, based on the

22   totality of the circumstances in this case, Your Honor, the

23   guideline sentence is appropriate.

24           And one final point we would like to make, Your

25   Honor, in regards to the defendant's Compassionate Release

1    Program.

2           First of all, Your Honor, the only medical condition

3    that has been corroborated with Mr. Chase, Your Honor, as

4    cited in the PSR of Mr. Chase is that he has a pacemaker, Your

5    Honor.  And these other medical conditions, whether it be

6    Autism Spectrum Disorder or anxiety and depression, Your

7    Honor, these conditions were not so severe as to keep him from

8    creating and running this website dedicated to the sexual

9    abuse of children, Your Honor.

10          It also didn't keep him from participating in extra

11   curricular activities, Your Honor, as in three weeks before he

12   was arrested for this conduct, he was out skiing, Your Honor,

13   skiing the Black Diamond.

14          So when and if Mr. Chase is ever eligible for this

15   program, Your Honor, is totally irrelevant to the 3553(a)

16   factors that Your Honor should take into account today, Your

17   Honor.  Because the defendant's sentencing today should in no

18   way be based on what his medical condition may be in the

19   future, Your Honor.

20          So we ask that this Compassionate Release Program

21   have no bearing on what sentence you impose today.

22          And as I stated before and as I stated when we

23   started, the United States submits that a guideline range

24   sentence is appropriate and fair in this case.

25          Thank you, Your Honor.

1    THE COURT:  All right.  Thank you.  Anything further

2    before the Court states a sentence?

3    MR. ADOLF:  No, Your Honor.

4    MS. RANDALL:  Well, Your Honor, the only other

5    outstanding matter is the restitution.  We did file a motion

6    to hold it open.  I realize it's 5:00 already today, but I

7    would note that Mr. Adolf had objected to our motion to hold

8    open the restitution issue.

9    THE COURT:  I will allow the 90-day period for you

10   all to work out restitution.

11   MR. ADOLF:  Judge, my request, given the Court's

12   ruling and granting the government 90 days, is that I'm not

13   going to agree to any restitution at this point without a

14   hearing.  So if the government does indeed want restitution

15   ordered, once they have all the information within 90 days, I

16   would ask that a hearing be set on that.

17   THE COURT:  Well, I wouldn't make that decision now.

18   I don't think you've seen what the government might do by way

19   of approaching the issue of restitution.  You don't like what

20   the government proposes, you can counteroffer, you can try to

21   work it out.  If that doesn't happen you can give notice you

22   would like to have an appeal.

23   MR. ADOLF:  Yes, Your Honor.

24   THE COURT:  Or, rather, a hearing.

25   MR. ADOLF:  Yes, Your Honor.

1      THE COURT:  Now, I will recite a number of factors

2  that stand out in terms of the defendant's arguments, then

3  I'll do likewise for the government.  The sentence will be

4  very close to a guideline sentence.

5      The defendant has argued that his health concerns

6  should be taken into account under the 3553(a) factors.  That

7  would include the recitals in the presentence report and by

8  Doctor Mendel, the near autism symptoms, the bipolar diagnosis

9  from the past, anxiety disorder and depression disorder.

10 Those go to his overall health which appears to be

11 deteriorated in the sense of his pacemaker and related heart

12 issues.

13     Also the Court notes that he, at age 57, he's an

14 older offender, subject to reduced general risk of recidivism.

15 It is certainly possible that somebody of any age could do

16 what the defendant did, but we're talking about the upper end

17 of the range here and that appears to be an area where age

18 should appropriately be taken into some account.

19     The defendant cites his absence of criminal history,

20 which is to his credit, his 30-year job performance, his

21 20-year marriage, all of these things show a certain amount of

22 stability before the criminal conduct began.

23     The fact that he hasn't had any -- his offense, I'm

24 going to describe the seriousness of the offense which is the

25 driving factor in this sentence.  It did not include contact

1    offense.  And Doctor Mendel doesn't believe contact offense is

2    a likely risk in the future.  He is, according to the doctor,

3    not a threat to children in person.  That he did not,

4    apparently, create images.  He certainly had something to do

5    with posting images, and he was well aware, undoubtedly, that

6    his subordinates were juggling content, moving images around.

7    Even if defendant didn't post any or create any images

8    himself, which I doubt.  He was well aware it was going on and

9    that was what they were doing, was getting those images out

10   where people could view them and that results in the

11   incredible harm to the victims.

12          The compassionate release idea is rather novel for

13   these arguments, but it's undoubted that he would be well

14   advanced in age if he served the entire sentence.

15          Doctor Mendel's report I think is credible and

16   indicates that defendant did not identify as the aggressor,

17   but as the victim of his father's degradations.  Albeit the

18   defendant as a son interpreted them otherwise at the time.

19   The father's subsequent behaviors shows he was no angel and

20   that's another matter.  Those were no doubt insipient events

21   in the defendant's life, both the age five to nine conduct, as

22   the defendant being that age, and the subsequent physical and

23   mental abuse he took from his father and that fed his autistic

24   tendency in terms of his relationship.  However, it didn't

25   prevent his serving that effective 30-year career in

1    productive and gainful employment and, likewise, marriage.

2           The seriousness of the offense can hardly be

3    understated.  It's one where the defendant made possible, an

4    enormous website, with enormous realized capacity to harm

5    victims, as has been well documented in the government's

6    papers and in the presentence report.  The government's

7    exhibits are well taken.  The victims who were quoted, simply

8    as examples, the Court admits all the government exhibits as

9    to victim statements into evidence.

10          Also the customer posts that the government quoted

11   are poignant in terms of the kind of damage and norming --

12   vice norming of behavior that these -- this website encouraged

13   and propagated.

14          So the sentence therefore must recognize the

15   seriousness of the offense, just punishment, respect for the

16   law.  That one is particularly relevant here because the whole

17   idea of the website and the way it was conducted and the

18   genius that went into it to make it what it was, was entirely

19   surrounded by lack of respect for the law.  It was aimed at

20   disrespecting the law.  It was aimed at avoiding the law and

21   making possible criminal conduct by literally thousands of

22   individuals resulting in thousands of victims.

23          The government cites a need for deterrence, which is

24   certainly important in cases of this type, particularly

25   because such offenses are hard to detect, and that's what made

it such an insidious behavior for the defendant to use his
considerable computer skills to help avoid and deflect law
enforcement.

The government also argues unwarranted disparity
which is very appropriate.  You have two other defendants who
richly deserved their 240 month sentences.  They were at the
mandatory minimum.  But nevertheless, this defendant is
certainly more culpable by far.  It's sort of like if a person
gave a wrongdoer a rifle, that would be bad enough if this
defendant gave his -- gave the world a howitzer to spread and
propagate the viscous and insidious activities promoting
images of totally innocent children.  Albeit he wasn't a
producer, he made it possible to encourage production by the
nature of his activity.

The government brought out various limitations on
Doctor Mendel's work, but they did seem to be within the realm
of what he was assigned to do.

He does not -- the defendant does not appear to
recognize the evil of the spread of images such as he
facilitated.

The findings of Doctor Mendel that defendant was not
himself a pedophile or sexually attracted to children are
immaterial, in large part, because the seriousness of the
offense overwhelms concerns about defendant's precise
motivations.

1    Having these facts in mind, paragraph 64 indicates

2  the offense level that pertains, counting up the various

3  enhancements, but they are -- they result in a 45 and the

4  offense level becomes 43 because of the fact that that's the

5  top of the guideline table.

6    But the Court's view is that the concerns about

7  health and age of the defendant would make appropriate a

8  2-level downward variance to 43. And his history as an abused

9  child himself, while not exculpatory, does tend to mitigate

10 down one level which would result in a level 42 and a 360 to

11 life guideline.

12    So Pursuant to the Sentencing Reform Act of 1984,

13 the *Booker* case, and 18 U.S. Code 3553(a), the defendant will

14 be committed to custody for a term of 360 months on Count One,

15 360 months on Count Three, and 240 months on each of Counts

16 Four through Seven, all to be served concurrently.

17    The Court recommends that the Sex Offender Treatment

18 Program if defendant is eligible.

19    The Court recommends the mental health treatment

20 programs that may be available in the BOP and, further, the

21 Substance Abuse Treatment Program, 18, U.S. Code 3621(e)(2).

22    The Court further recommends his participation in

23 any educational and vocational opportunities while

24 incarcerated.

25    If he is released from prison, a life term of

1    supervised release is ordered.  That consists of life on

2    Counts One and Three through Seven all running concurrently.

3            Within 72 hours of release from custody he shall

4    report in person to the probation office in the district to

5    which he is released.  While on supervised release, he shall

6    not commit -- he shall comply with the standard conditions of

7    supervised release, and the standard sex offender conditions

8    of supervised release that have been adopted by this Court and

9    shall comply with the additional condition that he submit to a

10   mental health evaluation and treatment program under the

11   guidance and supervision of the U.S. Probation Office.

12           He shall remain in treatment and maintain any

13   prescribed medications until satisfactorily discharged by the

14   program with the approval of the probation office.

15           Further ordered that he pay the United States a

16   special assessment of $600.  He does not have the ability to

17   pay a fine, interest, and court-appointed attorneys fee.  The

18   Court having considered the factors noted in 18, U.S. Code

19   3572(a) will waive the payment of fine and interest and

20   attorneys fees in this case.

21           He shall forfeit his interest in any properties

22   identified by the United States.

23           Payment of the criminal monetary penalty including

24   any -- including such restitution as may be ordered after the

25   parties have had a chance to look at it, that will be due and

1    payable immediately.

2           The Court has considered the financial and other

3    information contained in the presentence report and finds that

4    the following is feasible:

5           If the defendant is unable to pay any monetary

6    penalty immediately, then during the period of imprisonment,

7    payment shall be made through the Federal Bureau of Prisons

8    Inmate Financial Responsibility Program.

9           Upon release from imprisonment, any remaining

10   balance shall be paid in monthly installments of no less than

11   $50 to commence within 60 days until paid in full.

12          Throughout the period of supervision the probation

13   officer shall monitor his economic circumstances and report to

14   the Court with recommendations as warranted any material

15   changes that affect his ability to pay any court ordered

16   penalties that are not paid through the Inmate Financial

17   Responsibility Program.

18          The Court would mention that in some cases the

19   enhancement for computer is given less weight because of the

20   fact that so many if not all of these cases involve computers.

21   But this case is certainly one where the computer was an

22   essential focus and the fulcrum on which the entire offense

23   operated.  So that was an entirely appropriate enhancement.

24          Would he wish to be placed at a certain location?

25          MR. ADOLF:  Yes, Your Honor.  I would ask for

1  designation as close to Carrabassett Valley, Maine, as

2  possible.  That's his stepmother's residence.  That's the only

3  relative he's in contact who there might conceivably be some

4  sort of visitation.

5          THE COURT:  All right, sir.  I'll make that

6  recommendation.

7          MR. ADOLF:  Thank you.

8          THE COURT:  Order of Forfeiture, Document 131,

9  entitled, "Amended Preliminary Order of Forfeiture" is hereby

10  incorporated into this judgment as a part of it.

11          You're entitled to appeal, to do that you would have

12  to given a written notice of appeal within 14 days after the

13  Court files its sentencing judgment resulting from today's

14  hearing.

15          You may appeal without prepayment of costs since

16  you've been found to be indigent.  Your attorney would file

17  the notice of appeal for you if you asked him to do that, as

18  would the Clerk of Court, and you may also file it yourself.

19          Anything further?

20          MS. RANDALL:  Not from the government, Your Honor.

21          MR. ADOLF:  No, Your Honor.

22          THE COURT:  Thank you.

23          (The matter is concluded at 5:20.)

24

25

1   UNITED STATES DISTRICT COURT
    WESTERN DISTRICT OF NORTH CAROLINA
2   CERTIFICATE OF OFFICIAL REPORTER

3              I, Laura Andersen, Federal Official Court Reporter,

4   in and for the United States District Court for the Western

5   District of North Carolina, do hereby certify that pursuant to

6   Section 753, Title 28, United States Code that the foregoing

7   is a true and correct transcript of the stenographically

8   reported proceedings held in the above-entitled matter and

9   that the transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

11             Dated this the 14th day of August, 2017.

12

13
                        S/Laura Andersen
14                      Laura Andersen, RMR
                        Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25