IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br><br>    vs.<br><br>STEVEN CHASE,<br><br>                Defendant. | DOCKET NO. 5:15 CR 15-1 |

**RESPONSE TO GOVERNMENT'S MOTION FOR RESTITUTION**

Steven Chase, by and through his counsel of record, Assistant Federal Defender

Peter Adolf, respectfully requests that the Court deny the government's "motion for victim

restitution," doc. no. 153, as the government (1) has failed to show the requisite proximate

cause required by *Paroline v. United States,* 572 U.S. __, 134 S. Ct. 1710 (2014), (2) asks for

compensation for amounts not compensable under the governing statute, (3) has failed to

account for the effect of its own actions, and (4) has failed in one case to show any

outstanding uncompensated losses.

# Table of Contents

I.    Without knowledge of the crime, there is no loss ................................................................. 3

II.   Attorneys' fees are not "victim's losses" if the victim doesn't have to pay them.................. 9

III.  Loss to victims caused by the government ........................................................................ 12

IV.   Individual claims............................................................................................................... 15

   a.   "8kids" series .............................................................................................................. 15

      1.   John Doe II .............................................................................................................. 15

      2.   John Doe III ............................................................................................................. 16

      3.   John Doe IV ............................................................................................................. 16

   b.   Violet ("At_School" series) ......................................................................................... 16

   c.   Jane ("Cinderblock Blue" series)................................................................................ 18

   d.   Cindy............................................................................................................................ 20

   e.   Sierra ("Jan_Socks" series)......................................................................................... 21

   f.   Sarah ("Marineland" series)......................................................................................... 22

   g.   Andy ("Sponge Bob" series)........................................................................................ 22

   h.   "Sweet Sugar" series ................................................................................................... 24

   i.   Vicky............................................................................................................................. 25

V.    Conclusion ........................................................................................................................ 27

## I.     Without knowledge of the crime, there is no loss

Under *Paroline v. United States,* 572 U.S. __, 134 S. Ct. 1710 (2014), Mr. Chase can only be held responsible for victims' losses suffered as a proximate cause of his conduct. *See id.* at 1720 ("if the defendant's offense conduct did not cause harm to an individual, that individual is by definition not a 'victim' entitled to restitution under § 2259"); *id.* at 1722 ("[r]estitution is therefore proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses").  One's actions cannot "cause" something that has already happened.  The first requirement of proximate cause is that "the former event caused the latter.  This is known as actual cause or cause in fact.  The concept of actual cause is not a metaphysical one but an ordinary, matter-of-fact inquiry into the existence of a causal relation as lay people would view it.... [T]o say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result." *Paroline,* 134 S. Ct. at 1719 (citation, quotation marks, and ellipses omitted). "Restitution is therefore proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses." *Id.* at 1722.

The government, in its motion, asks this Court to find what the Supreme Court in *Paroline* expressly refused to do: to award restitution even where the victim has suffered no injury from the defendant's actions because the defendant's actions were not a cause in fact of any loss.  "[I]f the defendant's offense conduct did not cause harm to the individual, that individual is by definition not a 'victim' entitled to restitution under § 2259." *Paroline,* 134 S. Ct. at 1720.  "[T]here must be some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 1719 (citations and quotation marks omitted).

"[R]estitution should reflect the consequences of the defendant's own conduct, not the conduct of thousands of geographically and temporally distant offenders acting independently, and with whom the defendant had no contact." *Paroline,* 134 S. Ct. at 1725 (citation omitted). "[A] court applying § 2259 should order restitution in an amount that comports with the defendant's relative role ***in the causal process*** that underlies the victim's general losses." *Id.* at 1727 (emphasis added).

The government claims that a child depicted in a pornographic image or video is harmed whenever the image is viewed or distributed, regardless of whether the child ever finds out about the act of viewing or distribution. This can only be described as believing in voodoo, and would dispense with the cause-in-fact requirement entirely. As the Supreme Court succinctly put it:

> [T]he victim's costs of treatment and lost income resulting from the trauma of knowing that images of her abuse are being viewed over and over are direct and foreseeable results of child-pornography crimes, including possession, *assuming the prerequisite of factual causation is satisfied.*

*Id.* at 1722 (emphasis added).

The problem in the *Paroline* case, and many others like it, was not that there was no causation in fact, but that the defendant was one of many whose possession caused trauma to the victim, "Amy," when she learned each time that another person had been caught viewing images of her. *"From the victim's perspective,* Paroline was just one of thousands of anonymous possessors." *Id.* at 1723 (emphasis added). It is from the victim's perspective that the injury caused by the defendant must be viewed, and where the victim is totally unaware of the defendant's actions, there is accordingly no new injury. That is why the language of the statute itself "indicates Congress' clear intent that victims of child

pornography be compensated by the perpetrators *who contributed to their anguish.*" *Id.* at 1727 (emphasis added).

The *Paroline* decision, while focused on the knotty problem of assessing the restitution amount each defendant should be liable for, nonetheless clearly resolved a prior circuit split by requiring a showing of proximate causation. *See id.* at 1719-22. The prior Court of Appeals cases with which the Supreme Court agreed made a distinction between victims who could show that they were harmed by the defendant's conduct – no matter how slightly – and those who could not.

The question, then, is whether Mr. Chase's actions were an actual cause – a "cause in fact" – of any injury to the victim, and therefore any loss. Where the news of the existence of the crime never reaches the alleged victim, there is no such injury.

It is apparently standard practice for lawyers representing child pornography victims to redirect any notices of new cases involving their images to the lawyers rather than the clients. That is done for the express purpose of shielding the client from the fresh harm that knowledge of each new case brings. *See. e.g.,* doc. no. 132-2 (from website of law firm specializing in representation of child pornography victims: "HOW DOES IT WORK? OUR PART OF THE JOB IS COMPLICATED. YOUR PART IS SIMPLE: HEALING. We Take the Notices. Not You [¶] A very first step in representing the child is that we create a private email account and immediately have the Victim Notification Service redirect all of the VNS Notices to it. Done are the relentless interruptions in moving forward with life and healing. We see them, you don't... Yes, our unique and wonderful approach requires little more of the child than one counseling session with somebody who understands. After that, the fights are all ours, and are invisible to the child"); doc. no. 153-11 at 42 ("[w]hen [Sarah]

became aware that she could retain an attorney to help her manage the deluge of notifications and possibly assist with restitution, she contacted Ms. Hepburn. She says that Ms. Hepburn has been a buffer by having the notifications sent to her rather than being re-traumatized by the reminders"); doc. no. 153-17 at 335 (law firm representing Vicky receives notices on her behalf; Vicky's stepfather notes that notices stopped once representation by a lawyer began).

In *United States v. McDaniel,* 631 F.3d 1204 (11th Cir. 2011), the Eleventh Circuit rejected the defendant's claim that victim Vicky's "father and the distribution of the images caused her harm, and by the time [the defendant] possessed the images, the harm had already been done." The *McDaniel* court explained:

> Dr. Green explained that each NCMEC notification adds to the 'slow acid drip' of trauma and exacerbates Vicky's emotional issues. He testified that each notification is 'extraordinarily distressing and emotionally painful' to Vicky and that Vicky suffers 'each time an individual views an image depicting her abuse.'

*Id.* at 1209. Thus was the requirement of proximate cause satisfied.

By contrast, in *United States v. Aumais,* 656 F.3d 147 (2d Cir. 2011),[1] "Amy," the victim, "had neither contact with Aumais nor knowledge of his existence," *id.* at 151, and the materials submitted as victim impact evidence, including the victim's statement and the report of her psychological evaluation, were all created before the defendant's arrest. *Id.* at 154. The Second Circuit wrote:

---

[1] The government claims that the *Paroline* decision abrogated *Aumais* "to the extent [that the *Aumais* decision] had required 'but for' causation." Doc. no. 153 at 4 n.2. The *Aumais* decision is not mentioned in *Paroline,* and did not even address but-for causation. Rather, the *Aumais* court found that the government had failed to establish proximate cause when it submitted only materials created before the defendant's arrest. *See United States v. Lundquist,* 731 F.3d 124, 132-33 (2d Cir. 2013) *vacated and remanded on other grounds* 134 S. Ct. 1940 (2014).

While Dr. Silberg may describe generally what Amy suffers from knowing that people possess her images, Dr. Silberg cannot speak to the impact on Amy caused by *this defendant....* Here, in the absence of evidence linking Aumais' possession to any loss suffered by Amy, we cannot agree with the magistrate judge's conclusion that Aumais' conduct remains a substantial cause of Amy's harm.

This opinion does not categorically foreclose payment of restitution to victims of child pornography from a defendant who possesses their pornographic images. We have no basis for rejecting Dr. Silberg's findings that Amy has suffered greatly and will require counseling well into the future. But where the Victim Impact Statement and the psychological evaluation were drafted before the defendant was even arrested – or might as well have been – we hold as a matter of law that the victim's loss was not proximately caused by a defendant's possession of the victim's image.

*Id.* at 154-55 (emphasis in original; quotation marks and citation omitted).

This Court should pay special attention to the government's claim that the Supreme Court "in essence adopted the government's aggregate-causation theory, based on tort law, that when multiple causes combine to produce an event and no single cause is either necessary or sufficient, each cause can still be said to be one cause-in-fact of the event." Doc. no. 153 at 4-5. That is true as far as it goes, but the government goes further, writing that any defendant is liable for restitution "even if the victim is unaware of a particular defendant's conduct." For that proposition, the government cites the Supreme Court's observation that the parties had stipulated that "the victim had no knowledge of Paroline." The Supreme Court is of course talking about the victim's knowledge at the time Paroline viewed the images; the victim obviously learned about Paroline once he was charged, since she was not merely a passive victim, but was actually a party to the litigation.

In all of the passages the government quotes, the Supreme Court is discussing how much damage the defendant caused, not whether the defendant caused any damage at all. If the victim never learned anything about a particular defendant or the case – or at least

the bare existence of the case – then the defendant's actions could not affect the victim in any way. That is simple logic. At least nine times in *Paroline* the Supreme Court discusses liability not just in terms of a defendant's conduct, or the conduct of similarly situated defendants, but rather the defendant's "contribution" or "role" in the "causal process" resulting in injury to the victim. *See id.* at 1725 ("contribution to the causal process underlying the victim's losses"); *id.* ("contribution to a causal set"); *id.* at 1727 ("relative role in the causal process"); *id.* ("role of the offender in the causal process underlying the victim's losses"); *id.* at 1728 ("the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses"); *id.* ("individual defendant's role in the causal process behind a child-pornography victim's losses"); *id.* ("the relative causal significance of the defendant's conduct in producing those losses"); *id.* at 1729 ("his role in the overall causal process behind those losses"); *id.* ("his own individual causal relation to the victim's losses").

The government is really asking this Court to do what it dared not ask the Supreme Court to do: to remove any causation requirement whatsoever. It is asking this Court to find that any defendant convicted of a child pornography crime is required to pay restitution to the child depicted even if the child never learned of the defendant's actions, or even of the defendant's very existence. The Supreme Court made clear many times in *Paroline* that even if it may be impossible to parse out what portion of the harm to the victim the defendant actually caused, and even if the victim would have roughly the same losses if the defendant had never committed the crime, the defendant must have actually caused some harm, no matter how slight, before restitution can be ordered.

The government has had more than fair warning of the problems surrounding the restitution claims, and has had ample time to consult with the alleged victims' attorneys to remedy those problems. Over four months ago the defense filed a motion to strike victim impact statements and for discovery, doc. no. 129, asking the Court, *inter alia,* to "require that submissions regarding victim losses (1) postdate the offenses charged in this case, (2) describe the victim's claimed losses, [and (3)] explain how, when, and from whom the victim heard about Mr. Chase's case and what they learned." *Id.* at 5. Nonetheless, the government's 1,388-page submission contains insufficient and even contradictory information regarding whether the victims know of the existence of Mr. Chase's case, much less the effect of his actions on the victims.

## II. Attorneys' fees are not "victim's losses" if the victim doesn't have to pay them

Recovery under the statute is limited to "costs incurred by the victim." § 2259(b)(1). Nonetheless, several of the victims' attorneys include expert and attorneys' fees in their demands without any indication that the victims have been billed for those services or will ever be billed for those services. Indeed, some of the attorneys involved in the representation of child pornography victims make clear in publicly available materials that those costs are *not* billed to the victims, but are instead covered by the attorneys under some sort of contingency fee arrangement. *See, e.g.,* doc. no. 132-2 at 2 ("[w]e will invest considerable money and time in representing the child. *But you will never receive a bill, or be asked to write us a check, even if we never recover a penny for the child.* When we do succeed in securing money for the child through the Federal Criminal Courts or through

suits in the Federal Civil Courts, our expenses are reimbursed from the proceeds, and we simply retain a percentage of the recovery as our attorneys' fees. In other words, *the financial risks are ours, not yours*") (emphasis added).

The attorneys themselves, analogizing to civil rights statutes, claim that § 2259 authorizes the payment of attorneys' fees regardless of whether those fees constitute a loss to the victim or not. *See* doc. no. 153-11 at 14. Nothing could be further from the truth. In addition to specifically limiting losses generally to "costs incurred by the victim," § 2259 reiterates that limitation when it includes "attorneys' fees, as well as other *costs incurred*." § 2259(b)(3)(E) (emphasis added).

Comparison to the relevant civil rights statute is enlightening. 42 U.S.C. § 1988(b) reads in part that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." There is no limitation to "costs incurred" by the prevailing party, and indeed attorneys' fees in such cases are calculated separately from actual damages.

Congress did expressly allow attorneys' fees to be sought by child pornography victims irrespective of the victims' liability for those fees, but under a different statute: 18 U.S.C. § 2252A(f), which creates a civil cause of action for "any person aggrieved by reason of the conduct prohibited under" certain child pornography statutes. That statute separates out "compensatory and punitive damages" from "the costs of the civil action and reasonable fees for attorneys and expert witnesses" and allows the court to award either or both. § 2252A(f)(2)(B & C).

Not so under § 2259.  The statute at issue in Mr. Chase's case provides compensation to victims to repay what they have lost financially, not as a windfall to lawyers and expert witnesses.

The attorney for one alleged victim argues that the existence of civil causes of action created by other federal statute supports similar awards under § 2259 as criminal restitution.  *See* doc. no. 153-13.  The opposite is true.  Congress set forth different legal standards, procedures, and damages provisions for the civil causes of action available to the victims than for the criminal restitution statutes.  We must presume that Congress meant the courts to treat the civil and criminal statutes differently, since Congress wrote them differently.  If the attorneys for the victims see civil remedies as being more advantageous to their clients than simply demanding criminal restitution awards, they are free to file civil claims under the appropriate statutes; the Court is not free, however, to disregard the differences between the civil and criminal statutes and rewrite either of those statutes for the attorneys' convenience.

Child pornography victims who cannot show that a particular defendant proximately caused them injury have still another vehicle by which they can recover money; it is simply not as restitution in a criminal case.  18 U.S.C. § 3014, enacted in 2015, assesses a $5,000 penalty against anyone convicted, *inter alia,* of child pornography crimes.  That money must be used, at least in part, for programs and services for victims, including direct aid to victims to pay for health care and other services.  *See* § 3014(e)(1) (funds shall be used "to award grants or enhance victims' programming under… section 214(b) of the Victims of Child Abuse Act of 1990 (42 U.S.C. 13002(b))"); 42 U.S.C. § 13002(b) (permitting grants to "provide direct services to victims of child pornography").

However, Congress only mandated the assessment for defendants who are not indigent, *see* § 3014(a), undoubtedly recognizing that there is no benefit to any victim to be gained by assessing financial penalties against a defendant with nothing to give.

### III.    Loss to victims caused by the government

As noted in prior filings, government agents committed the exact same acts Mr. Chase has since been convicted of, namely the large-scale distribution of child pornography.  The government seems to deny harming the children depicted.  While the government claims that its actions were justified by the goal of prosecuting viewers of child pornography, it has never admitted causing the same harm the administrators of the Playpen website caused.

If the government indeed harmed the very same victims, it must be held liable as well.  If it claims not to have harmed the same victims, it must explain why, and must provide discovery regarding the relative harm inflicted by its own actions and Mr. Chase's actions.

Following the arrest of Mr. Chase on February 19, 2015, rather than shutting down the Playpen website, the FBI took direct and exclusive control of the site, moving the data from the commercial servers on which it had been operating to FBI-controlled servers. Doc. no. 80 at 2.  From there the FBI distributed child pornography to viewers and downloaders worldwide for nearly two weeks, until at least March 4, 2015, reaching 50,000 unique visitors per week.  *Id.*  During those two weeks, the website's membership grew by over 30%, and approximately 200 videos, 9,000 images, and 13,000 links to child pornography were posted to the site, presumably then to be disseminated across the globe

without any way for law enforcement to stop the further distribution of this material. *Id.* at 13. As one law professor has commented, the "F.B.I. appears to have committed a more serious crime – the distribution of child pornography – to catch people committing less serious crimes: the receipt and possession of child pornography." Carissa Bryne Hessick, "Law Enforcement Alone Shouldn't Decide When to use a Pornography Website to Snare Predators," *New York Times Room for Debate* (Jan. 27, 2016) (available at https://www.nytimes.com/ roomfordebate/2016/01/27/the-ethics-of-a-child-pornography-sting/law-enforcement-alone-shouldnt-decide-when-to-use-a-pornography-website-to-snare-predators). *Id.*

Although the government had been permitted to operate the site for 30 days, it ultimately shut down the operation after less than two weeks. As the government previously explained:

> During the government's operation of [Playpen], regular meetings were held to . . . assess whether the site should continue to operate, based upon a balancing of various factors, to include site users' continued access to child pornography, the risk of imminent harm to a child, the need to identify and apprehend perpetrators of those harms to children, and other factors such as those described above. On March 4, 2015, it was determined that the balance of those factors weighed in favor of shutting down the website.

Doc. no. 80 at 5; doc. no. 80-2 at 7.

In the end, roughly 1% of Playpen users have been prosecuted, doc. no. 80 at 7-8, meaning that 99% of the users to whom the government distributed child pornography were able to download, keep, and redistribute the images freely and without consequences.

Worse, the government had the opportunity to seek permission from the child victims to use their images in its operation and chose not to do so. The government located the physical servers hosting Playpen and duplicated the website's data three weeks before

arresting Mr. Chase and seizing control of the website. *See* doc. no. 80-1 at 22 [¶ 28];

*United States v. Carlson,* 2017 WL 1535995, *2 (D. Minn. March 23, 2017) (search warrant

for commercial server housing Playpen website executed January 29, 2015; FBI took over

Playpen website on February 20, 2015) *recommendation rejected in part on other grounds*

2017 WL 3382309 (D. Minn. Aug. 7, 2017). The government was able to monitor activity

on the site during that time, including the images that were being posted and downloaded.

*See* doc. no 80-1 at 19-20 [¶¶ 23-26]. Agents could have checked for known images,

identified known victims, contacted the attorneys for those victims – who are in constant

communication with the Department of Justice regarding restitution in these cases – and,

once the government took over the website, taken down the images of any victims who did

not want their images to be disseminated any further. Instead, the government chose to

allow those images to be shared worldwide with no notice to those victims, much less their

permission.

      Neither the government nor the victims' attorneys has revealed, in pleadings or

otherwise, which victims' images the government distributed while it controlled the

Playpen website, nor whether the victims have even now been made aware of the

government's actions. If the government has indeed harmed child pornography victims the

same way Mr. Chase allegedly did, using the very same website Mr. Chase allegedly used,

and did so as part of a carefully executed plan without any provision for preventing further

harm to the victims, then the government must be held jointly and severally liable for any

damages ascribed to Mr. Chase. At the very least, the government and the victims must

provide discovery of which victims' images were distributed through Playpen when the

government was running it; whether the victims were informed of the government's plans

in advance, or of its actions after the fact; and accordingly what portion of the harm to the victims was caused by the government rather than Mr. Chase.

The government has asserted repeatedly that its actions were justified by the need to prosecute child pornography viewers. *See, e.g.* doc. no. 82 at 11-14. It may be that the harm the government inflicted on the same victims now demanding restitution from Mr. Chase was worth it from a law enforcement perspective. Or maybe not. But the government cannot claim that Mr. Chase's conduct caused harm to the children while claiming that its own conduct did no harm whatsoever.

## IV.     Individual claims

Regarding the individual restitution claims, some victims' attorneys have failed to show the proximate cause required by *Paroline;* some seek payment for attorneys' fees never charged to the victim; and at least one victim has been fully compensated for the losses alleged before other federal district courts, while her lawyer now inexplicably alleges far greater losses than previously claimed.

*a.      "8kids" series*

1.      John Doe II

There is no indication in the materials submitted on behalf of John Doe II that he ever received notice of Mr. Chase's case or was ever informed of its existence, much less that it had any effect on his mental state. Indeed, the psychological evaluation attached to the government's motion was written before Mr. Chase's crimes even occurred. *See* doc.

no. 153-1 at 23.  Accordingly, no showing has been made of any causation whatsoever, much less proximate causation.  *See Aumais,* 656 F.3d at 154-55.

2.     John Doe III

As for John Doe II, there is no indication in the materials submitted on behalf of John Doe III that he ever received notice of Mr. Chase's case or was ever informed of its existence, much less that it had any effect on his mental state.  Accordingly, no showing has been made of any causation whatsoever, much less proximate causation.

3.     John Doe IV

According to the psychological report regarding John Doe IV, as of the original interview of October 22, 2013 he had no knowledge that images of his abuse were circulating on the internet.  It was only at the follow-up interview on January 12, 2016 that he related that his adoptive mother had told him about the "pictures on the Internet."  Doc. no. 153-1 at 70 (interview dates), 73.  There is no indication that John Doe IV ever received notice of Mr. Chase's case or was ever informed of its existence, much less that the notice had any effect on his mental state.  Accordingly, no showing has been made of any causation whatsoever, much less proximate causation.

b.     *Violet ("At_School" series)*

"Violet" was sexually abused by her father, and undoubtedly suffered grievous harm. But she has no idea that images of that abuse have been distributed on the internet.  Doc. no. 153 at 11; doc. no. 153-3 at 13, 16.  The estimates of her "loss" are based entirely on

speculation that she will find out someday, that she will be traumatized by that knowledge, and that the additional trauma will cause future losses.

Law enforcement agents the world over, in conjunction with the National Center for Missing and Exploited Children, work tirelessly to try to identify and catalogue the many thousands of images of child pornography circulating on the internet. Most such images nonetheless remain unidentified, and many if not most of the children depicted will never be identified. The corollary, of course, is that those children have no way of knowing that images of them are in circulation, and will likely never know. They will never suffer the renewed trauma that comes with that knowledge.

Violet's legal team has gone to great lengths to make sure she never finds out about the internet traffic in her images. Alone among all of the psychological evaluations supplied by the government in this case, Violet's includes the following admonition:

> The reader will note that all identifying references to specific persons and locations have been sanitized from this report in order to protect the confidentiality of the victim. There exists an original document on file with the attorney that contains the unredacted references, but it is strongly advised that this be kept confidential to reduce the long term risks of additional trauma exposure to "Violet."

Doc. no. 153-3 at 4.

Indeed, the cover letter from the attorney representing Violet boldly demands compensation for "future counseling costs for her as a result of her *anticipated understanding* of the existence of the circulation of images of her sexual abuse." Doc. no. 153-3 at 1 (emphasis supplied).

In other words, Violet has no such understanding, and accordingly has suffered no loss as a result of the circulation of those images. Indeed, the psychologist conducting her

examination admits that any calculation of her future therapeutic needs if she ever finds

out about the images "is, at best, speculative." Doc. no. 153-3 at 21. Nonetheless, the

psychologist goes on to estimate Violet's "speculative" future treatment needs as costing

between $72,400 and $118,025, if indeed they ever happen. *Id.* at 21-22.

It is indeed fortunate that Violet has been spared the additional trauma of knowing

about the internet traffic in her images. But if she been spared any such trauma, she has

also been spared any loss therefrom. The idea that it is somehow inevitable that Violet will

learn about the images of her on the internet is simply untrue.

The only "actual losses" alleged by Violet's attorney are attorneys' fees and costs.

However, there is no indication that Violet has been billed for, or is in any way responsible

for, those costs. Doc. no. 153 at 12. Tellingly, the government asserts that "her attorney

has incurred" expenses, *id.,* not that Violet or her family have incurred expenses, because of

course they have not. If anyone is a victim here, it is Violet, not her attorney.

Accordingly, no showing has been made of any causation whatsoever, much less

proximate causation. *See supra* at 9-12. The only "actual losses" alleged by Violet's

attorney are attorneys' fees and costs, but there is no indication that Violet has been billed

for, or is in any way responsible for, those costs.

c.    *Jane ("Cinderblock Blue" series)*

The submission on behalf of Jane of the "Cinderblock Blue" series illustrates the

problems that arise when attorneys submit boilerplate restitution claims written long

before the instant defendant's crime even happened. The victim impact statement and

psychological evaluation were prepared before Mr. Chase was even arrested, at a time

when Jane had no knowledge of his crime.

The only indication that Jane received actual notice of this case is contained in the letter from her lawyer, stating: "She receives ongoing notices of the possession and distribution of her sex abuse images and videos by newly identified perpetrators and offenders, including this defendant." Doc. no. 153-5 at 12. However, the letter seems to have been prepared for a case involving mere possession of the images. Mr. Chase is not named and there are no specifics of his case discussed. In discussing the *Paroline* factor of "the number of past criminal defendants found to have contributed to the victim's general losses," the lawyer writes: "Factor 1 is not entitled to significant weight in determining restitution. Included in this raw number are defendants who might have distributed, trafficked, or produced Jane's child sex abuse images and who therefore have greater responsibility for her losses…." Doc. no. 153-5 at 20. And later: "The Defendant… could have refused to participate in possessing Jane's child pornography images but did not." *Id.* at 25. The writer was obviously thinking of someone other than Mr. Chase at the time he wrote these words.

If a child pornography victim seeks compensation for actual losses from a particular defendant, *Paroline* teaches that the victim need not show what portion of her losses result from the defendant's conduct as distinct from other similarly situated defendants; but that does not excuse the victim from at least saying what the particular injury was and how it happened. To excuse that failure is to eliminate *Paroline's* proximate cause requirement, and indeed to eliminate any requirement of cause-in-fact entirely. Jane has not sufficiently and credibly alleged any awareness of Mr. Chase's crime whatsoever – pre-written boilerplate language notwithstanding – and therefore has not shown proximate cause for her losses.

d.	*Cindy*

	Cindy has no awareness of Mr. Chase, this case, or anything about it.  She received victim notifications regarding new cases involving her images for just one month sometime between 2006 and 2011, and quickly opted out.  Doc. no. 153-7 at 20 (Cindy received GED in 2006; working to continue her college education from then until writing of report in 2011); *id.* at 26 (Cindy opted out of notifications after one month while in college).  As with the letter from Jane's lawyer, the letter filed on behalf of Cindy is obviously boilerplate written for some other case, as the second page mentions "casual users of child pornography like this Defendant."  Doc. no. 153-7 at 2.  Accordingly, as a matter of basic logic and physics, Mr. Chase's conduct was not the proximate cause of any loss to Cindy.

	It is also notable that the losses claimed by Cindy's attorneys include $111,296.14 in attorneys' fees, expert fees, travel expenses, and out-of-pocket costs "advanced by Attorneys."  Doc. no. 153-7 at 2.  There is no indication that Cindy has been billed for any of these expenses, nor that she is liable for repaying any of those expenditures.  Moreover, even a cursory review of the report detailing the attorneys' fees shows that the law firm is demanding restitution in every case for work done on every other case, including the time spent negotiating restitution settlements with the various defense attorneys involved.  *See* doc. no. 153-7 at 70-90.

	It is hard to decide which is more absurd – Mr. Chase being billed for "restitution" for the time opposing counsel spent negotiating with his lawyer over restitution (which, incidentally, never happened), or Mr. Chase being billed for "restitution" for the time opposing counsel spent negotiating restitution with other lawyers on behalf of other defendants.  "[I]t should be clear that allocation [among all defendants] will not apply when

proximately caused harms are clearly traceable to a particular defendant. An example would be litigation costs in connection with the particular defendant." *United States v. Gamble,* 709 F.3d 541, 554 (6th Cir. 2013).

As noted above, recovery under the statute is limited to "costs incurred by the victim." § 2259(b)(1). The statute 2259 reiterates that limitation when it includes "attorneys' fees, as well as other costs incurred." § 2259(b)(3)(E). Since Cindy has no liability for these expenses, they are neither "victim's losses" nor "costs incurred by the victim."

    e.    *Sierra ("Jan_Socks" series)*

There is no indication in the materials filed by Sierra's attorney that Sierra received notice of, or has any knowledge of, Mr. Chase or his case. Indeed, the attorney's letter suggests that Sierra does not know about her images being circulated at all: "Dr. Cooper projects that for all these children the symptoms of dysfunction will become exacerbated with the realization of the existence and circulation of the images." Doc. no. 153-9 at 4.

As noted above, *Paroline* requires a causal relationship between a defendant's individual conduct and a loss to the victim, which in turn requires, at minimum, a causally-related chain of events beginning with the defendant's crime and ending with some financial loss to the victim, no matter how slight. Where the victim has never had any contact with the defendant, was never told about the defendant or the case, and consequently has no knowledge of the case, the case has caused no loss. The materials filed by the government on behalf of Sierra do not indicate any proximate causation.

*f.*     *Sarah ("Marineland" series)*

The information the government provided about Sarah is contradictory.  Her

attorney writes that she has received actual notice of the instant prosecution.  *See* doc. no.

153-11 at 3.  She is the only alleged victim whose lawyer has made that claim.  However,

the report of her psychological evaluation includes the following:

> When [Sarah] became aware that she could retain an attorney to help her
> manage the deluge of notifications and possibly assist with restitution, she
> contacted Ms. Hepburn. She says that Ms. Hepburn has been a buffer by having
> the notifications sent to her rather than being re-traumatized by the
> reminders.

Doc. no. 153-11 at 42.  Counsel's declaration regarding the work done on the case makes no

mention of notifications.  *See* doc. no. 153-11 at 155-58.  Accordingly, the defense objects to

any award of restitution without definitive proof of proximate cause.

Sarah's alleged losses also include attorneys' fees.  The filed materials give no hint of

the fee arrangement between Sarah and her attorney, and accordingly how any money

received will be split between them if the money obtainable from Mr. Chase is less than the

full amount awarded by the Court.  But regardless, since Sarah is not personally liable for

the attorneys' fees, the defense objects to labelling them as "victim's losses" nor "costs

incurred by the victim" under § 2259, as discussed more fully above.

*g.*     *Andy ("Sponge Bob" series)*

The information the government provided about Andy is contradictory.  On the one

hand, his attorney writes that he has received actual notice of the instant prosecution.  *See*

doc. no. 153-13 at 8.  On the other hand, in the very same document, the attorney writes:

> On the advice of his psychologist, Andy is not briefed on each and every defendant who distributes, transports, receives or possesses his child sex abuse images. Andy does receive ongoing updates about the number of new cases and efforts to obtain restitution on his behalf.

Doc. no. 153-13 at 10 n.6. Accordingly, the defense objects to any award of restitution without definitive proof of proximate cause.

Andy's attorneys, incredibly, assert greater "losses" for themselves than for their client. They demand $25,000 for Andy's alleged losses, while making a separate demand of $33,415 for attorneys' fees and costs, the latter including $29,000 for a psychological examination and accompanying expert report, billing for two experts at a cost of $600 per hour and $200 per hour respectively. Doc. no. 153-13 at 20-22. Since Andy is not personally liable for the attorneys' and expert fees, the defense objects to labelling them as "victim's losses" nor "costs incurred by the victim" under § 2259, as discussed more fully above.

Moreover, the $29,000 expert report was written before Mr. Chase committed any crime. His actions cannot be the proximate cause of something that had already occurred.

> The total amount of a victim's losses caused by the continuing traffic in the victim's image is determined by looking to costs incurred from the time of the offense conduct *and excluding those costs incurred prior to that date.*

*United States v. Wencewicz,* 63 F. Supp. 3d 1238, 1242 (D. Mont. 2014) (emphasis added);[2] *see United States v. Rogers,* 758 F.3d 37, 38 (1st Cir. 2014) ("[t]he district court's decision comports with these instructions [from *Paroline*].... The district court *excluded past costs* and based its award on an estimate of [the victim's] *future therapy costs*, occasioned by

---

[2] The *Wencewicz* opinion was vacated and remanded on other grounds as to a different defendant in *United States v. Grovo,* 826 F.3d 1207, 1220-22 (9th Cir. 2016). That remand did not impact the portion cited here.

defendant's conduct") (emphasis added); *In re Amy,* 714 F.3d 1165, 1166 (9th Cir. 2013) ("the district court determined the relevant 'pool' of each victim's provable losses by excluding any losses incurred prior to the offense date"); *United States v. Reynolds,* 2014 WL 4187936, *5 (E.D. Mich. Aug. 22, 2014) ("Reynolds should not be ordered to pay restitution for medical care that [the victim] received several years before Reynolds ever possessed her images because Reynolds only proximately caused losses caused by the continuing traffic in her images"); *United States v. Austin,* 2015 WL 5224917, *2 (D. Nev. Sept. 8, 2015) (same, citing *Reynolds*).

   h.   *"Sweet Sugar" series*

   The attorney representing the victims in the Sweet Sugar series asks for $5,000 in restitution on behalf of each of the three victims.  Doc. no. 153-15.  There is also a claim of $10,252.83 in attorneys' costs as part of the restitution claim.  Doc. no. 153-15 at 41.  In response to an inquiry by the defense, the government asserted that it is requesting a total award of $15,000 to these victims.  It is not clear what portion of such an award would go toward attorneys' fees.

   Although the attorney lists expenses in connection with litigating the restitution claims, the chart included with the government's motion lists thirty-three other cases in which the attorney has secured restitution awards.  *See* doc. no. 153-16.  Every one of those cases was apparently also pending when the work listed in the declaration was done. While it may be that under the *Paroline* standards Mr. Chase's actions contributed to the harm to the victims and therefore "caused" loss to them, the same is not true for costs of litigation.  As noted above, "[i]t should be clear that allocation [among all defendants] will not apply when proximately caused harms are clearly traceable to a particular defendant.

An example would be litigation costs in connection with the particular defendant." *United States v. Gamble,* 709 F.3d 541, 554 (6th Cir. 2013). Mr. Chase cannot be held jointly and severally liable for the cost of litigating against other defendants.

There is also no indication of the fee arrangement between counsel and the children or their mother, and no hint that the family is in any way liable for those fees in the absence of recovery from criminal defendants. There is therefore no indication that the attorneys' fees or costs constitute "loss to the victim" under § 2259.

     i.     *Vicky*

According to her lawyer, Vicky has already received over $1.1 million in restitution payments from 755 defendants. *See* doc. no. 153-17 at 2 ($1,122,832.01 received as of July 27, 2017); *id.* at 11 (755 out of 945 defendants with restitution orders have made payments). Even according to the materials included in the government's submission, the amount of money already collected "supports a decrease in Vicky's recovery from" the defendant. *United States v. McIntosh,* 2014 WL 5422215, *6 (E.D. Va. Oct. 22, 2014) (slip op. included as a government exhibit in doc. no. 153-17 at 372).

Less than three years ago, Vicky's lawyer submitted materials in another federal case claiming that Vicky's "full economic losses" – including "future counseling expenses," "educational and vocational counseling needs and lost part-time income during schooling," "lost earnings," and "expenses paid in out-of-pocket costs incurred relative to restitution documentation," but not including attorneys' fees – totaled $1,082,180.51. *United States v. McIntosh,* 2014 WL 5422215, *6 (E.D. Va. Oct. 22, 2014). Thus, by the lawyer's own admission, Vicky has already received $40,651.50 more than she claimed as losses.

In Mr. Chase's case, the same losses are now claimed to be $4,462,040.96, or over four times as much as they were at the time of the *McIntosh* case in 2014. *See* doc. no. 153-17. Moreover, these are claimed to be "disaggregated losses," meaning that the claim omits expenses incurred before Mr. Chase's crime. *See id.*

The law does not allow recovery by the victim of more than her losses, *see United States v. Burgess,* 684 F.3d 445, 458 (4th Cir. 2012), and Vicky's lawyer has previously represented to the Fourth Circuit that "she did not seek more than the full amount of her loss, regardless of the ultimate number of defendants convicted of causing her harm." *Id.* at 458 n.10.

The actual sexual abuse and filming of Vicky took place over fifteen years ago. The restitution request and calculation in *McIntosh* was submitted three years ago. It cannot be that in the past three years Vicky's attorney's good-faith estimates of her losses has quadrupled, or that Mr. Chase personally caused over $3.3 million in "disaggregated losses" that Vicky had not suffered before.

At the very least, the Court must order that Vicky's lawyer disclose to the defense the materials submitted to the court in the Eastern District of Virginia in the *McIntosh* case, since those materials apparently contradict or undercut the current loss claim, as well as any other materials submitted in prior cases that contradict the submission here. Evidence that might mitigate potential punishment must be disclosed to the defense as a matter of due process, *Brady v. Maryland,* 373 U.S. 83, 87 (1963), and restitution in the child pornography context "is imposed by the Government…and requires conviction of an underlying crime,…implicates the prosecutorial powers of government…[and] is remedial or compensatory, but it also serves punitive purposes," and is therefore considered

punishment for constitutional purposes. *Paroline,* 134 S. Ct. at 1726 (restitution potentially subject to the Excessive Fines clause) (citations and quotation marks omitted).

Further, as with the other alleged victims, the government's submission lacks evidence sufficient to find causation in fact, since it is not clear that Vicky has ever heard of Mr. Chase or this case. In her declaration of May 10, 2014, Vicky's lawyer writes that in October 2008 she "notified VNS [the Victim Notification System] to redirect the notices to our office rather than to the family. [¶] Since November 2008 we have received directly the VNS notices for the Vicky series of cases." Doc. no. 153-17 at 335. That is undoubtedly because as of the writing of the declaration, the office had been receiving approximately thirty notices per day on Vicky's behalf for the previous four years. *Id.* Vicky's stepfather, in his victim impact statement, writes: "We don't receive the notices anymore, the pain and gut wrenching reminder of receiving enough notices to over flow a 55 gallon drum is more than my family can take…. The letters and emails brought that pain up again and again and I couldn't deal with that…." Doc. no. 153-17 at 32.

As noted above, if Vicky has no personal knowledge of Mr. Chase's case, and was never told about it, Mr. Chase's actions could not be the cause of any psychological injury to her, much less the proximate cause of any financial loss.

## V.    Conclusion

The government's submission on behalf of alleged child pornography victims contains insufficient and self-contradictory evidence of causation in fact; includes claims for attorneys' fees and other costs of litigation for which the victims are not liable, and therefore are not compensable under the restitution statute; fails to account for the

government's own role in causing harm to the children depicted in the images it distributed when it administered the Playpen website; and in one case asks for double recovery for losses already compensated. This Court should therefore deny the government's request.

In the alternative, without waiving the greater relief, the defense demands that this Court conduct a hearing in the presence of Mr. Chase to determine what restitution claims are supported by competent evidence; and prior to any such hearing, that this Court issue an order compelling the government and/or any attorneys submitting restitution claims in this matter to produce any evidence contradicting those claims, as well as any evidence they intend to use to show that Mr. Chase's actions were a cause-in-fact of any losses to the alleged victims.

Respectfully submitted:

  s/ Peter Adolf
Peter Adolf
Assistant Federal Public Defender
North Carolina Bar No. 37157
Attorney for Steven Chase
Federal Public Defender, Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720 (phone)
(704) 374-0722 (fax)
Peter_Adolf@fd.org

DATE: August 15, 2017

## CERTIFICATE OF SERVICE

I, Peter Adolf, Assistant Federal Public Defender, hereby certify that I have served a

copy of the attached Response to the Government's Motion for Restitution upon the

following via electronic filing:

**Cortney Randall**
U.S. Attorney's Office
227 W. Trade Street
Suite 1700
Charlotte, NC 28202
704-338-3116
704-227-0254 (fax)
cortney.randall@usdoj.gov

**Keith A. Becker**
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section
1400 New York Ave., NW, Sixth Floor
Washington, DC 20530
202-305-4104
Fax: 202-514-1793
Email: Keith.Becker@usdoj.gov

**Michael Wayne Grant**
United States Department of Justice
1400 New York Ave, N.W.
Sixth Floor
Washington, DC 20005
202-307-1982
Fax: 202-514-1793
Email: michael.grant@usdoj.gov

**Reginald E. Jones**
United States Department of Justice
1400 New York Avenue NW
Washington, DC 20005
202-286-1059
Fax: 202-514-1793
Email: reginald.jones4@usdoj.gov

Respectfully submitted:

  s/ Peter Adolf
Peter Adolf
Assistant Federal Public Defender
North Carolina Bar No. 37157
Attorney for Steven Chase
Federal Public Defender, Western District of North Carolina
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720 (phone)
(704) 374-0722 (fax)
Peter_Adolf@fd.org

DATE: August 15, 2017