UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA    )   DOCKET NO. 5:15-CR-15
                        )
      vs.            )
                        )
STEVEN W. CHASE,        )
                        )
        Defendant.    )
_____)

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
FEBRUARY 5, 2018

<u>APPEARANCES</u>:

On Behalf of the Government:

    CORTNEY S. RANDALL, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    PETER ADOLF, ESQ.
    Federal Public Defender's Office
    129 West Trade Street, Suite 300
    Charlotte, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

P R O C E E D I N G S

MONDAY AFTERNOON, FEBRUARY 5, 2018

THE COURT:  Good morning -- good afternoon.

MS. RANDALL:  Good afternoon, Your Honor.

MR. ADOLF:  Good afternoon.

THE COURT:  Old habits die hard.

This matter is before the Court on the government's motion for restitution for a number of victims in the case. The parties have extensively briefed the matter with exhibits pertaining to various victims and considerable specifics in reference to the materials that have already been presented.

The record indicates that on October 26th of last year, 2017, Mr. Adolf notified the Court that Mr. Chase wished to waive his appearance at this hearing.  I take it that remains the case.

MR. ADOLF:  It does, Your Honor.

THE COURT:  All right.  Thank you.

So the Court having noted the thoroughness of the papers already presented, I'd invite you to nevertheless present such matters as you think might be helpful to the Court in addition to what you've already presented.  The law essentially comes down to the *Paroline* case as the focal point of restitution, that being the Supreme Court's most thorough engagement with the issues before the Court in this matter.

The government having made the motion, we'll ask you

1  first if you'd like to proceed with any further commentary.

2          MS. RANDALL:  Your Honor, I think -- I intend to be

3  fairly brief given the extensiveness of the briefing in this

4  case.

5          But as Your Honor noted, *Paroline* is the leading

6  case in this context.  And in that decision, the Supreme Court

7  noted that this is a very unique context in the sense that the

8  victims have numerous contributors to their harm and that the

9  loss is ongoing.  And because of that, they fashioned this

10  standard as laid out in the briefings where if it can be shown

11  that a defendant possessed a victim's image and, second, that

12  the victim has outstanding losses caused by the continuing

13  trafficking in those images, but where it's impossible to

14  trace a particular amount of those losses to the individual

15  defendant by recourse of the more traditional causal inquiry,

16  the Court should order restitution in an amount that comports

17  with the defendant's relative role in the causal process

18  underlying the victim's general losses.

19          And what the government sought to do in its

20  briefings was to not only lay out the extensive losses each of

21  these victims are suffering from, but also detail some

22  information about Mr. Chase's role in that loss since that is

23  an important part.  And Your Honor actually sat through the

24  trial so you have a very good understanding of what this

25  website was and the fact that the defendant as the creator of

1  this website had a very unique role in that he created a place
2  that gave access to more than a hundred thousand different
3  members, access to these images of these victims.  That's
4  obviously much more of an aggravated role than the typical,
5  say, peer-to-peer distribution case.  He or either of his
6  co-defendants could have at any time removed any of those
7  images and he personally could have shut down the website at
8  any time thereby preventing the distribution of these images,
9  but he never did.
10         And even though he had this type of aggravated role,
11 the government is still only seeking a modest amount of
12 restitution from the defendant and his co-defendants in this
13 case varying between two an ten thousand dollars per victim as
14 laid out in our briefing.
15         I'd be happy to answer any questions, Your Honor,
16 but at this point I would just intend to maybe respond to Mr.
17 Adolf's last filing which direct -- which dealt mostly with
18 the victim Vicky and to clarify a few points in response to
19 that.  As we went through the briefings, it came out that
20 Vicky's request has increased in the past few years due to an
21 additional exhibit that's now being filed which is a medical
22 report filed from Dr. Cooper in her opinion.
23         I think it's, first of all, important to note that
24 we are not holding the defendant responsible for all of it.
25 The defendant's briefing says that Vicky is seeking to hold

1  him 100 percent liable for those losses, and that's not true.
2  We are seeking only $10,000 from the defendant for this
3  particular victim.
4          The evidence that we put in support of our request,
5  Your Honor, is a report provided by Dr. Sharon Cooper.  And I
6  want to spend a minute talking about Dr. Cooper.
7          Dr. Cooper is a world-known expert in the area of
8  child exploitation.  She's been teaching and presenting and
9  working in this area for over a decade.  I think it's probably
10 closer to two decades if I remember correctly.  And her resume
11 or CV was attached as an exhibit which shows the number of
12 presentations and reports that she's written.  It's Exhibit
13 Number 153-17, Your Honor.  It explains that she's been a
14 physician who's worked 20 years with victims, families, law
15 enforcement, and support agencies in the area of sexual
16 exploitation of children.  She was also the lead editor and
17 contributor to the most comprehensive peer-reviewed textbook
18 on this subject.  She's reviewed the medical records of this
19 victim as well as conducted an extensive interview with her
20 and that's what formed the basis of her opinion.
21         Your Honor actually had a chance to meet Dr. Cooper
22 some years ago when she actually testified on behalf of a
23 defendant in this courtroom, that defendant being Joshua
24 Shields.
25         But Your Honor, her opinion basically came down to

1  this.  This -- Vicky suffers from a number of medical
2  conditions.  Stress and particularly the -- I don't want to
3  misstate her -- the hormone created by stress can aggravate or
4  sometimes cause autoimmune deficiencies as well as aggravate
5  other conditions.  And because of that we are seeking aid for
6  Vicky to seek -- to treat her medical conditions.

7        The defendant attacks that request, Your Honor.  But
8  to be honest, I don't think it's a particularly large jump for
9  anyone to realize that stress can aggravate a medical
10 condition, and that's basically what Dr. Cooper's opinion
11 comes down to.

12       Vicky is one of the most prolifically traded series
13 out there.  As the evidence shows, she's been stalked.  She's
14 been harassed.  She understands -- there's an exhibit in there
15 that shows people talking about her; how they put out her
16 home, her family, her husband's picture, where she lives,
17 where she goes to school, and the type of life she has to lead
18 now because of the fact her images are so prevalently traded.

19       2259 specifically provides loss -- that the victim
20 should be made whole for any kind of medical costs, and that's
21 what we're seeking here in Vicky's case.

22       After the defendant's filing I did a quick -- I did
23 a Westlaw search, Your Honor, to see if I could find any cases
24 that dealt with the most recent filing of Vicky and the only
25 one I could find, Your Honor, came from the Ninth Circuit, the

1  Eastern District of California, *United States versus Bailey*,

2  which is 2017 Westlaw 4124058.  And this is an opinion that

3  specifically came out after the *Gallon* [phonetic] case that

4  the defendant references in his filing.  And there they

5  explored Vicky's restitution request and ordered $15,000 in

6  restitution for these exact medical losses that the government

7  is now seeking restitution for.  And they relied, I believe,

8  on the same evidence because they provide the same quote from

9  the Dr. Cooper letter that the government uses in its filing.

10        So, Your Honor, when you look at the standard that

11 the government must meet, that being that the government must

12 show by a preponderance of the evidence the loss, I think

13 we've clearly gone way above and beyond that in not only

14 Vicky's case, but all of the cases here.

15        The defendant was a large part of the phenomenon

16 that led to these losses for each of these victims and the

17 government has provided a lot of evidence in terms of expert

18 reports, victim impact statements, and so forth.

19        One of the cases the government cites in its

20 briefing is the *Johnson* case which is an unpublished fourth

21 circuit case.  And it's a production case, but in that case in

22 examining 2259, the court upheld the district court's reliance

23 on an unsworn letter from a guardian who basically just said,

24 I talked to some therapists.  These therapists, who have not

25 examined the victim, all opined that she'll probably need

1   about this much therapy and it's probably going to cost this

2   much.  They found that was sufficient to meet the minimum

3   indicia of reliability that's required when the government is

4   seeking restitution as long as the defendant is given an

5   opportunity to refute the evidence.  And they noted that

6   having hearings or the briefing is the type of process that

7   the defendant is given the opportunity to refute it.

8         So given that the government has gone above and

9   beyond that in the sense that we provided numerous experts,

10   people whose job it is to work with these victims and given

11   their opinions, we would ask that you find the government has

12   met its burden here, especially given the fact that we are

13   seeking such modest amounts of restitution for each of these

14   victims, and hold the defendant jointly and severally

15   responsible with his co-defendants.

16         THE COURT:  All right.  Thank you very much.

17         Mr. Adolf.

18         MR. ADOLF:  Thank you, Your Honor.

19         Again, I invite the Court's question if the Court

20   has any specific things that it wants teased out of the 1500

21   pages of filings on the issue in this case.

22         But I think it all sort of breaks down to basically

23   three issues that are my real problem with the restitution

24   request.  Three issues that sort of cover all the requests and

25   then the special problems of the Vicky amended or newer

1 increased request and how that's increased over the last three

2 or four years in each case that her lawyer is filing things

3 in.

4 And the first problem is going back to *Paroline*, the

5 causation problem, and that I think is the real crux of what

6 the issue is here.

7 *Paroline* didn't really change the basic law of

8 causation on these cases very much.  The majority of circuits

9 had already held that proximate cause was required.  And

10 *Paroline* really just confirmed that and solved the circuit

11 split.  And then things got a little more murky when the court

12 sort of tried to lay out for the district courts how to figure

13 out the amounts, and that's where they essentially punted and

14 said that will be basically left to future case law to

15 develop.

16 But what they didn't change was the basic concept of

17 proximate causation.  And proximate causation is narrower than

18 more general but-for causation.  And it's something we're

19 familiar with from a civil context.  I haven't really dealt

20 with it in many years in my practice.  But what it boils down

21 to is the basics of causation are this:  Somebody does

22 something.  That causes something else.  That causes something

23 else.  That causes an injury.  And the concept of proximate

24 causation is to try to limit that and say at some point it's

25 distant enough that it no longer makes a difference.  It may

1  have contributed in some small way to the injury; but as a
2  legal matter, proximate cause as a legal concept, there's a
3  point past which we won't go in trying to assign liability.
4          But all that assumes still there's but-for
5  causation.  Person A did B which caused C which caused D which
6  caused an injury to person E.  And that's assumed in all of
7  these cases and assumed in the -- and *Paroline* made it pretty
8  clear, as did the lower court cases before that, is that at
9  the end of the day, there still actually has to be something
10  that the defendant did that caused some actual injury even if
11  it's just a psychological injury, even if it's a pretty mild
12  psychological injury.  And even if it's just piling on and
13  that person is the thousandth defendant who's caused a similar
14  injury, the point is that that is still real causation,
15  but-for causation and that has to be proved.
16          Because without that, it's just voodoo.  It's just
17  saying that every time somebody looks at a picture somewhere
18  around the world, that causes some sort of injury in the ether
19  or somehow impacts that person, and that's -- the Supreme
20  Court rejected that when they said that in fact cause is
21  required.  This is not a strict liability statute.  This is
22  not just an automatic penalty for anyone who does something.
23  It's not like a -- they're paying to use an image like a
24  copyright case.  It is that they did something which caused
25  actions which ended up actually harming somebody.

1    And the cases I cited in my first response at page 6

2 and 7 laid out what that standard meant in terms of actual

3 causation. And *Paroline* did not affect those as it was really

4 dealing with a different issue, and in fact affirmed the idea

5 of proximate causation.

6    And the two cases I'm talking about in particular

7 are the Eleventh Circuit case, *United States versus McDaniel*,

8 2011 case. And in that case the defendant claimed, like I

9 guess all of them were until *Paroline*, that this particular

10 victim was so harmed by the original abuse and by the original

11 person who put the abuse out on the internet that whatever

12 damage they did later was so small as to be irrelevant. And

13 because under the traditional way we look at causation, if

14 that defendant had never looked at those images, the victim

15 would be just as bad off and therefore they didn't add

16 anything to it. That's the traditional proximate cause

17 analysis that the Supreme Court made clear wasn't true in

18 *Paroline*.

19    But specifically addressing what that causal chain

20 was that caused that injury, in response to the argument that

21 just having or looking at these pictures on the internet

22 doesn't cause any injury, what the Eleventh Circuit said,

23 they -- that an expert testified and talked about the effect

24 of when these victims get a notice, even if they've gotten a

25 thousand notices -- I mean, we know at one point Vicky was

1  getting something like 30 notices a day from all over the
2  world.  And what the Eleventh Circuit said was it may be that
3  each individual notice doesn't do much, but each does
4  something.  There's a real injury there.  And they quoted the
5  expert in that case.  It was a Dr. Green.  And the Court
6  wrote, "Dr. Green explained that each NCMEC notification adds
7  to the 'slow acid drip' of trauma and exacerbates Vicky's
8  emotional issues.  He testified that each notification is
9  'extraordinarily distressing and emotionally painful' to Vicky
10 and that Vicky suffers 'each time an individual views an image
11 depicting her abuse.'"

12         So what -- the causation is somebody is looking at
13 these images or doing whatever they're doing with them.  They
14 get caught.  They get charged.  Notice goes to the victim.
15 These notices cause -- even if it's one of a thousand or one
16 in ten thousand, each individual notice, the victim's
17 knowledge of it causes some distress and that that's enough to
18 generate restitution obligations.

19         And then we contrast that to a case the same year
20 out of the Second Circuit where the circuit actually remanded
21 and said that there was insufficient information to give rise
22 to restitution where all the materials submitted in that case
23 had been written or generated before the crime ever happened.
24 And in that case the Second Circuit was talking about a
25 different doctor, Dr. Silberg, who had done the reports and

1  they said, "While Dr. Silberg may describe generally what Amy
2  suffers from knowing that people possess her images, Dr.
3  Silberg cannot speak to the impact on Amy caused by this
4  defendant.  In the absence of evidence linking the defendant's
5  possession to any loss suffered by Amy, we cannot agree with
6  the magistrate judge's conclusion that the defendant's conduct
7  remains a substantial cause of Amy's harm."

8          Apparently it didn't change any of that.  It is
9  still required that there be an actual injury.  Not just, you
10  know, every time a bell rings an angel gets its wings.  Not
11  some kind of voodoo.  But the fact that this person became
12  aware of the case, the abuse, in some fashion no matter how
13  slight -- however slight the information they had and that
14  caused them some distress even if that distress was just icing
15  on the cake after all they'd been through already, but that's
16  enough.  There has to be some actual injury.

17          Now, in this case -- and I have to give credit, and
18  I think we all should, to the lawyers who handled this in some
19  regard for the victims, which is they make clear -- and I
20  submitted materials from, I guess, these sort of plaintiffs'
21  attorneys' websites promising the parents of victims when we
22  take the case, the first thing we're going to do is tell the
23  government to redirect all the notices to us.  And they say
24  flat out, we do not want your child retraumatized so we want
25  to make sure that we do our initial intake.  We get the

reports, get the materials together, get a package together, and then you don't ever have to hear about this again.  We will protect your child from further harm.  By getting the notices ourselves, all you're going to do is collect a check when it's all over.  You'll never have to hear about it again.

And that's certainly admirable and I agree with that.  I think that's what ought to be done.  These children ought to be protected from future harm as best as possible. But if you protect them from future harm, then they're protected from future harm.  If they never find out about a particular case or particular defendant, then that defendant's conduct has not had any actual tangible injury to them. Doesn't have to be a physical injury.  A psychological injury is enough.  But if they don't know about it, if it never happened -- as far as they know, it never happened, then it didn't do them any harm.

I've been trying to come up with some sort of analogy because we are in sort of a strange area of the law in terms of causation.  It doesn't really work the way we're used to in civil cases.  And so I was trying to conceive of it this way.  If you have a bunch of people throwing rocks at somebody and the rocks all miss, they still arguably caused an injury. If a person was afraid, they saw rocks coming at them, they saw these people throwing rocks at them, that causes psychological injury.

1    And *Paroline* was really about the case where
2  somebody was saying, look, a thousand people already threw a
3  rock at this person.  They all missed.  I threw a rock after
4  all them, it still missed; it didn't make any difference.
5  Whatever trauma they suffered, mine is just minuscule compared
6  to what they had already been through.  And *Paroline* said no,
7  everybody who does that and causes some injury no matter how
8  slight is liable for something.

9    So the question then is what about the case where
10 somebody later on, the thousand and first person throws a rock
11 and it misses and the victim never sees it, never hears about
12 it, has no knowledge of it.  That person still committed a
13 crime.  They can still be punished for it.  They've still
14 attempted to injure somebody with a rock, but they haven't
15 caused any injury to the victim.  The rock missed.  The victim
16 never suffered any additional trauma.  They went on just as if
17 that had never happened.

18    And that's what we're talking about here.  There has
19 to be a connection.  The Supreme Court talks over and over
20 again not just about what the offender did, which is what
21 the -- the government wants to focus on the fact that all
22 people in these cases all did something illegal that was
23 similar to what somebody else did and they should all be
24 lumped together.  But every time the Supreme Court talks about
25 that in *Paroline* they don't just say what the person did.

1  They say their role in the causal process underlying the
2  victim's losses.  And if the victim never heard of you, heard
3  of your case, was never traumatized by it, it didn't add to
4  that acid drip of trauma, then it did not cause a loss.
5           I know the government has framed this in the past as
6  saying that we should not force the victims to suffer
7  additional trauma in order to collect -- to collect
8  restitution.  I think that really has it backwards.  That
9  there are all kinds of people who caused real injury to this
10 person.  Those people should pay.  But somebody who has been
11 effectively protected from these future kinds of harms isn't a
12 victim of that person under the statute.  They're a victim of
13 a whole bunch of other people, the original abuser, the people
14 who filmed it, the people who first put it out on the
15 internet, but not somebody down the road that they've never
16 heard of.
17          And I think it really -- it becomes clearest to me
18 looking at the particulars of the submissions by the
19 victims -- I'm not going to go through all of them.  It's all
20 in the paperwork.  I know Your Honor is aware of that.  But
21 there's some victims -- I'm talking about the victim known as
22 Violet.  She doesn't even know there are pictures of her on
23 the internet.  Like she's never even heard of that.  She
24 suffered sexual abuse.  She doesn't even know that it was
25 filmed and put out there on the internet.  And the losses that

1  are being asked for -- and we understand that when you're
2  talking about a lifetime of trauma -- or you're talking about
3  traumatic events that are going to cause a lifetime of
4  particular losses, we have to account for all of that.  But
5  there is a point at which it's just pure speculation, purely
6  made up.
7          And what the -- what her lawyer is saying in this
8  case is that they expect that at some point in the future she
9  will find out and they expect that at some point in the future
10  that will cause her trauma.  And they expect that at some
11  point in the future finding out will cause trauma which will
12  then cause injury.
13          The reality of this is if to this point even after
14  years of those images being distributed, we know the lengths
15  that people go through to stop their kids from finding out
16  what's happened to them or to stop these new notices from
17  coming to them and that's what their lawyers do for them.  The
18  idea that we can assign losses for an injury that has not
19  happened based on the idea that some day in the future this
20  child might figure out that there are images of her
21  circulating on the internet is just total speculation.  The
22  idea that we can try to -- that we can somehow compensate her
23  for the treatment she'll need in the future that right now she
24  doesn't need at all because she doesn't even know about it, it
25  just makes no sense.  It's becoming more akin to voodoo injury

1    like I said before.

2         So you've got other listed victims where there is no

3    evidence that they ever got any notices of this case.  There's

4    several where the attorney apparently filed sort of

5    boilerplate things that were apparently intended for

6    possession cases and where there's contradictory information,

7    where in one place the victim or a family member says we don't

8    get these notices anymore because we don't want them, whereas

9    somewhere else it says they do get the notices.  Contradictory

10   information that comes from the victim's attorney itself is

11   not the proof of anything.

12        So the causation element is really the problem.  At

13   the end of the day, if there was no injury caused, and for

14   some of these kids they don't even know that these things are

15   happening, then they are not a victim in this case under the

16   statute.  So that's problem one is the basic -- the most basic

17   causation element.

18        Number two is something that the post-*Paroline* cases

19   have talked about which is disaggregation of losses.  And I

20   cited the cases in there, and I'm talking specifically about

21   the cases in my first reply on pages 23 and 24 where we're

22   talking mostly about district court cases, although there was

23   a Court of Appeals case as well that said that when the

24   Supreme Court talked about the sort of type of injury or the

25   type of behavior that the defendant was involved in and the

role in the causal process of that defendant's conduct, the
*Paroline* court also made clear that restitution has to be for
the defendant's injuries, not for the injuries other people
caused.  And what that means is that the -- when looking at
the whole universe of losses, there's some caused by the
original abuse, there's some caused by the filming of the
abuse, some caused by the distributing around the internet of
the abuse and those have to be separated out.  And however
experts choose to do it or try to figure it out, some of that
loss is because of the original abuse.  Probably a lot of it.
And you can't just pick an arbitrary number.  That's what the
cases said, saying that the original abuse was 10 percent, I
think, in some cases.  There was no scientific basis for it.
No -- there's no ascertainable basis in reality and so you
can't attribute the whole loss to somebody down the road if
you're not subtracting out the earlier abuse.

          And I understand in this case that the -- that the
government is not asking for the full amount when it comes to
the actual amount of damages for all these people, but it has
to begin with what are the limits of liability.  And I list in
there the -- and that's part one of disaggregation is taking
out the losses that were caused before by other people who are
probably more culpable, the original abuser, the original
person who filmed.

          The other thing that needs to be disaggregated is

1  from the others, from any losses that happened before
2  Mr. Chase committed his crimes.  Because the other thing, I
3  think it was the Ninth Circuit cited on those same pages and
4  the district courts that I cited.  Yeah, it was *In Re: Amy*,
5  Ninth Circuit case from 2013.  That you have to look at the
6  losses that happened, the financial losses, the psychic losses
7  resulting in financial losses.  Anything that happened before
8  the crime has to be disaggregated, has to be taken out because
9  you can't cause losses before your crime happened.  That's
10  just simple logic.
11         Out of all of the victim submissions in this case,
12  Vicky's attorney is the only one who even uses the word
13  disaggregation.  So nobody else has done that.  And all she
14  did was say these are the disaggregated losses, but then
15  doesn't say anything beyond just using the word once.  Doesn't
16  try to separate out losses for other earlier people, the
17  original abuse, what that caused or anything else.  So
18  using -- calling it disaggregated doesn't make it
19  disaggregated.  Those losses have to be separated out.
20         And you know, in this case it is unique, Judge, but
21  Your Honor heard the testimony at trial.  This is a case
22  where, you know, frankly, the same harm was continued by the
23  government after Mr. Chase was arrested when they continued to
24  run the website and distributed images, hundreds of thousands,
25  perhaps millions of times.  And so the question is what was

1    the government's role in causing harm to these victims and

2    that has to be disaggregated out as well, I believe.  That if

3    that website was causing particular harms, then it continued

4    to cause particular harms when the government was running it

5    and that also has to be factored in -- or factored out,

6    actually, in Mr. Chase's case.

7            So, Judge, that was causation and disaggregation.  I

8    think there's one more general issue that applies to all the

9    victims and that is the whole attorney's fees problem because

10   the -- a lot of the losses that are included are for

11   attorney's fees.  And attorney's fees are not losses if you

12   don't have to pay them.  The statute is pretty clear and

13   *Paroline* is pretty clear that this is about proximate cause.

14   This is not about a windfall to victims or to lawyers or

15   experts or anybody else.  This is if the victims have been

16   harmed in a way that harms them financially, that costs them

17   money, then restitution is appropriate.

18           And what we learned from the websites operated by

19   these lawyers is that they -- at least some of them tend to

20   work on a contingency.  And there's nothing wrong with that.

21   We see that in civil cases all the time.  But in an ordinary

22   civil case, if you have a fee arrangement with your lawyer,

23   you don't get to add a contingency fee on to your civil claim

24   in general.  That's part of the process is you hire someone.

25   They're doing the work.  Any recovery you get they're going to

1  get a portion of.  But that does not get added to your claim,
2  your civil claim in court.
3         There are cases where those are done separately.
4  And the lawyers try to analogize to the civil rights cases,
5  and specifically to 482 U.S.C. 1988 which is a special section
6  dealing with civil rights cases.  And there Congress
7  specifically said that the court can allow the prevailing
8  party a reasonable attorney's fee as part of the costs.  And
9  that is an exception to the general rule that what -- in any
10  kind of civil context where you're hiring someone to try to
11  get a recovery, the fee arrangement is between you and them.
12         And they try to analogize to that and say these
13  cases are like that, but it's actually exactly the opposite.
14  Congress knows how to award attorneys' fees irrespective of
15  loss.  In this case they lumped in attorneys' fees as a
16  category of the kinds of expenses that a victim may have had
17  to pay that they deserve to be compensated for to get back,
18  but that's only if they're liable for them in the first place.
19  A contingency fee doesn't mean you're liable and these lawyers
20  advertise that you will not have to pay a penny unless we
21  recover for you.  And if that's the case, that's not a loss.
22  That's just a normal contingency-type arrangement.  And if
23  Congress wanted there to be attorneys' fees on top of the
24  actual losses to the victim, basically this sort of windfall
25  for the lawyers, they knew how to do that because in civil

1   rights cases Congress decided that there was a public good to
2   be had by having private lawyers prosecute civil rights cases.
3   Even if the actual award is very small, that it's worth it for
4   all of us for those lawyers to be paid by the Court
5   irrespective of loss to the victim.

6          So there is no separate attorney's fees allowed in
7   these cases.  It is simply like everything else, like every
8   other loss that could be a proximate cause of the defendant's
9   actions.  If the victim is out of pocket, then they can and
10  should be compensated.  But if they're not out of pocket,
11  they're not.

12         And that brings me to the final point that I
13  think -- that covers everything about the victims generally.
14  Vicky presents a special and interesting case because the
15  losses to Vicky have been litigated and awarded in, I guess,
16  around a thousand cases already and she's apparently -- her
17  lawyer has collected on her behalf from 750, probably close to
18  800 victims by now and has apparently collected over
19  $1.1 million.  As of three years ago, that was all the losses
20  she'd ever claimed.

21         And I understand that losses mount up over time and
22  that things can change over time.  But these were represented
23  in the past as being her projected lifetime losses.  Not just
24  losses up to that point, but what it was going to cost to make
25  her whole for the psychological treatment she was going to

1   have to get, for the lost wages because of the impact on her

2   career opportunities, and all of that. And they had experts

3   on lifetime earnings and they had experts on psychological

4   trauma and everything else. Hundreds of pages of

5   documentation.

6         And what we find is that apparently each time they

7   actually collect what they're asking for or start to get

8   close, all of a sudden the request or the demands go up, in

9   this case dramatically. Because what we have from I guess it

10   was about three or four years ago, Your Honor, one of the --

11   the claim that was submitted to one of Your Honor's brethren

12   in the Eastern District of West Virginia had her projected

13   lifetime losses at $1.1 million. Later that went up in

14   another case to $1.3 million. But now all of a sudden it

15   quadrupled.

16         What they claim in this case is that Vicky has --

17   her projected lifetime losses are now $4.5 million. And that

18   somehow in the last three years -- and she's in her twenties

19   already. So the question is what's changed over the last

20   three years that could not have been anticipated before that

21   such that all of a sudden her -- now that the losses she had

22   originally asked for have all been fully paid -- and, you

23   know, I think it's worthy to remember in every case when Your

24   Honor orders restitution, part of the restitution order says

25   the restitution obligation is discharged when the victim or

1  victims have been fully compensated.  And in this case,

2  according to what Vicky's lawyers have been claiming for

3  years, she was fully compensated as of last year at

4  $1.1 million.  Now all of a sudden it's 4.5.

5         So the question is where did that come from?  The

6  answer is now they hired another expert and the new expert

7  says that it's not psychological treatment but medical

8  treatment that is needed.

9         First of all, that's just false for a lot of it.

10  Dialectical behavior therapy is psychological treatment.  It's

11  not medical.  But, you know, when counsel for the government

12  says that it's not a big stretch to say that stress

13  increases -- can increase or cause other medical conditions,

14  well, it needs some evidence.  It needs some kind of

15  scientific basis.

16         The -- what this doctor is claiming, Judge, is that

17  Vicky has a whole host of medical conditions.  I'm just trying

18  to find the long list of it at this point.  Asthma;

19  endometriosis; migraine headaches; seizure disorder; Raynaud's

20  syndrome, which is spasm of the arteries that causes you to

21  get reduced blood flow to your hands and feet; bilateral

22  entrapment neuropathies, which is carpal tunnel syndrome;

23  degenerative spinal disc and scoliosis with chronic back pain;

24  hypothyroidism; and intermittent insomnia.

25         And what this doctor says is that all of those

1  conditions are either caused or exacerbated by stress.  I
2  guess stress can make everything worse, but at some point
3  there has to be some sort of connection that's not just guess
4  work and so-called common sense.  I can't imagine how a
5  degenerative spinal disc disease is made worse by knowing that
6  there are pictures of you on the internet.  It just doesn't
7  make any sense.  Certainly endometriosis, I can't even imagine
8  what that connection is.  And, you know, the doctor herself
9  felt the need to cite to psychological/psychiatric journals to
10 say that there is somehow proof of the connection between
11 knowing the pictures of you are out there on the internet and
12 endometriosis and scoliosis or asthma.
13         And so I actually looked up the articles.  None of
14 them say anything remotely like that.  None of them even
15 mention child pornography.  They're all -- all those articles
16 are talking about the fact that children who are sexually
17 abused in the future are at higher risk for various
18 conditions.  And these children were sexually abused by
19 somebody else.  And Vicky, in particular, by somebody else and
20 those were distributed.
21         Nobody has ever done research, or at least this
22 doctor couldn't come up with any, saying that beyond being a
23 physically sexually abused child, that knowing that your image
24 is on the internet can cause or significantly worsen spinal
25 disc disease or asthma or endometriosis.  That's just --

1   there's no basis for that in fact, common sense or anything
2   else.  That is straying into the realm of voodoo injury that I
3   was talking about before.

4           And I think the clearest basis for that, Judge, is
5   when the -- is the claim that one of the medical conditions
6   that they're asking for additional compensation for -- she's
7   already been -- received hundreds of thousands of dollars to
8   pay for the rest of her life of psychological therapy.  One of
9   the medical conditions they cite that said wasn't covered by
10  that is intermittent -- intermittent insomnia, which you -- in
11  other words, sometimes she can't sleep.  I don't know how you
12  call that a medical condition versus -- and say that it's not
13  a psychological condition.

14          But one way to figure it out is what's the
15  treatment.  And the treatment they're asking for, again,
16  beyond all the psychological treatment that she's already been
17  paid for in advance up until the age of 85, is saying that
18  she's going to need dialectical behavioral therapy for
19  intermittent insomnia.  Dialectical behavioral therapy is
20  psychological therapy.  She was already reimbursed hundreds of
21  thousands of dollars for a future lifetime of psychological
22  therapy.

23          In this case, just for the psychological therapy
24  that they claim is different, they claim it's medical, which
25  it isn't, and just for the fact that she has difficulty

1  sleeping sometimes, that claim is $900,000 out of the
2  3.3 million that was added on after all the previous cases
3  where all the psychological needs were listed.
4      So I think it's pretty clear what's going on here,
5  Judge, which is that -- I understand that you can't put a
6  price on the suffering that these people have suffered because
7  of being sexual abuse victims and then having their images
8  circulated on the internet, but the legal system does put a
9  price on that.  And it was actually their counsel that put a
10 price on it many times in previous cases and it was
11 $1.1 million or thereabouts.  And it can't be that every time
12 they start to get close to that, all of a sudden it gets
13 higher and higher and higher.  This is not -- this is supposed
14 to be compensating victims for what it has cost them in
15 dollars, this kind of trauma and what they have to do about it
16 in the future, not as a windfall for their lawyers and their
17 experts.
18      So I think it's pretty clear that the $1.1 million
19 that Vicky has received represents what her actual losses are.
20 That the additional amounts are speculative or just made up.
21 And once she's been paid, she's been paid.
22      So, Judge, at the end of the day, the problem is
23 that the government has not shown actual causation as to the
24 losses to any of these victims, most of whom have either never
25 gotten notice of this case or there's no evidence in the

1    record that they have.

2              The -- there's been no effort to separate out how

3    much of the losses that the victims have suffered was because

4    of the earlier abuse, the earlier distribution versus later on

5    Mr. Chase's conduct.  There's no effort to separate it out

6    from other defendants from before his case arose.  And we

7    still have all these claims for attorneys' fees that the

8    statute simply does not allow.

9              So for all those reasons, Your Honor, we continue to

10   object to the restitution order.

11             THE COURT:  All right, sir.  Thank you very much.

12             Anything from the government in reply?

13             MS. RANDALL:  Just briefly, Your Honor, because I'll

14   address just the points he made and nothing further.

15             With regard to the causation, I think it's

16   important, Your Honor, to say -- if you read the *Paroline*

17   decision, you could replace the word *Paroline* with Chase and

18   it fits exactly.  *Paroline*, it reads, The cause of the

19   victim's general losses is the trade in her images, and

20   Paroline is a part of that cause for he is one of those who

21   viewed her images.  In this case Chase is one of the people

22   who not only viewed, he helped distribute her images.

23             "While it is not possible to identify a discrete,

24   readily definable incremental loss he caused, it is

25   indisputable that he was a part of the overall phenomenon that

1  caused her general losses.  Just as it undermines the purposes

2  of tort law to turn away plaintiffs harmed by several

3  wrongdoings, it would undermine the remedial and penological

4  purposes of 2259 to turn away victims like this."

5        It goes on to say that, The unlawful conduct of

6  everyone who reproduces, distributes or possesses images of

7  the victim's abuse plays a role in sustaining and aggravating

8  this tragedy.

9        The government is not required to prove which part

10  of the loss he caused.  Now, I do agree we have to separate

11  the hands-on offenses, anything that occurred before his date

12  of offense, and that is what we did in the documents.  If you

13  look, the reports talk about these are the losses caused by

14  the trafficking in the images.  And Dr. Cooper's report

15  specifically talks about the disaggregation, this is from the

16  distribution and the receipt.  And all of her reports talk

17  about the psychological harm caused by the trafficking of the

18  images.  They don't talk about the hands-on abuse because they

19  were not evaluating that.  They were solely evaluating the

20  losses caused by the trafficking of the abuse, Your Honor.

21        The rocks theory that he gave where it talks about

22  if you're throwing rocks at somebody and you miss them, if you

23  want to make that analogy work here, you have to take into

24  account the fact that that victim knows that those rocks are

25  going to be thrown at them every single day for the rest of

1  their life and there's nothing they can do to stop it.  So
2  when you say that victim has the knowledge that no matter what
3  they do, rocks are going to be thrown at them every single day
4  no matter what kind of protective gear they put on, no matter
5  if they close their eyes, if they turn their back, no matter
6  what rocks will be thrown at them every single day, they are
7  still harmed even if they don't see those rocks being thrown
8  at them.

9          And that's the difference in this case, Your Honor.
10  And that's what *Paroline* tried to point out.  *Paroline* twice
11  talks about how the victim in that case had no knowledge what
12  Paroline did and they still ordered that restitution was
13  appropriate in this case.

14          And the idea that Violet, the young victim who had
15  no idea her images had been distributed, is not entitled to
16  restitution is horrible, Your Honor, in addition to
17  ridiculous.  To say that a victim who is too young to know
18  that she is being harmed can't take restitution, Your Honor,
19  is just wrong.

20          The government ciites to the *Osmand* case in its
21  brief.  And in that case the victim was an infant, was
22  approximately 7 to, I think, 14 months old when she was
23  sexually abused and images were produced of her.  And in that
24  case the government just provided a licensed counselor who had
25  been practicing for ten years to say she spoke to that

victim's mother one time and this was her projection of what her loss would be, and the Eleventh Circuit upheld restitution in that case.

So Violet may not know yet, but she will definitely know one day that her images are out there and she will too suffer from knowing that there are rocks being thrown at her every single day for the rest of her life and that is why she is entitled to restitution.

I don't even -- I'm not going to spend time going into the attorneys' fees, Your Honor. I just want to point out when he talks about what these websites say both with regard to the contingency fees or the notice, he is citing to a website of an attorney who is not representing any of the victims in this case. I just want to make that notice known, Your Honor.

If there's anything else -- and then finally, just with regard to Vicky, Your Honor, and these medical records. Fifteen years ago child pornography distribution, it was not imagined it would be on the level it is today. Back then it was done mostly by mail, in secret, recordings in brown mailings that went out. So as technology increases, the harm is going to increase. And as knowledge and studies happen, this is going to increase, Your Honor. So Dr. Cooper has always been on the cutting edge of child exploitation and it's no surprise that she's the one offering this opinion who is

1  using what studies are out there to figure out what the
2  restitution -- or what the harm has done in this case, Your
3  Honor.

4          It's just like when the defense presents a
5  psychologist up here to say this person is not a danger based
6  on these studies and that person is relying on the studies
7  about hands-on offenders, that they're trying to say it's the
8  same thing for child pornography.  It's -- they are doing the
9  best with what they do have, Your Honor.  But in this case you
10 have Dr. Cooper who has been studying this for years and years
11 and years offering up her opinion, Your Honor.  And she
12 specifically offers her opinion, Your Honor, based on the
13 medical literature and the dynamics as known to her, her
14 experience and her evaluation of many survivors of this form
15 of abuse and that, Your Honor, meets the standard the
16 government has to prove here by a preponderance of the
17 evidence.

18         THE COURT:  Thank you very much.  I appreciate your
19 presentations, your thoughtfulness and thoroughness.  The
20 Court will take the matter under advisement and issue an order
21 as soon as possible.  We will therefore be adjourned.

22         (End of proceedings at 2:21 p.m.)

23                        *****

24

25

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10 the foregoing is a true and correct transcript of the

11 stenographically reported proceedings held in the

12 above-entitled matter and that the transcript page format is

13 in conformance with the regulations of the Judicial Conference

14 of the United States.

15

16          Dated this 7th day of May 2018.

17

18

19                         s/Cheryl A. Nuccio

20                         _____
                           Cheryl A. Nuccio, RMR-CRR
21                         Official Court Reporter

22

23

24

25